DAVID BIDERMAN (SBN 101577)
  *dbiderman@perkinscoie.com*
ELLIOTT J. JOH (SBN 264927)
  *ejoh@perkinscoie.com*
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: (415) 344-7000
Facsimile:  (415) 344-7050

HERBERT S. WASHER (*pro hac vice application forthcoming*)
  *hwasher@cahill.com*
TAMMY L. ROY (*pro hac vice application forthcoming*)
  *troy@cahill.com*
NICHOLAS N. MATUSCHAK (*pro hac vice application forthcoming*)
  *nmatuschak@cahill.com*
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone: (212) 701-3000
Facsimile:  (212) 269-5420

Attorneys for Petitioner Credit Suisse
Virtuoso SICAV-SIF in Respect of the Sub-
Fund Credit Suisse (Lux) Supply Chain
Finance Fund

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re Ex Parte Application of Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund,<br><br>Petitioner. | Case No.: _____<br><br>**EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782 AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

I.   INTRODUCTION ......................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................... 2

   A.  Petitioner ............................................................................................... 2

   B.  The Katerra Receivables Program ......................................................... 3

   C.  Softbank ................................................................................................. 4

   D.  The Katerra Restructuring ..................................................................... 4

   E.  The Katerra Bankruptcy and Softbank Investigation ............................. 6

   F.  Petitioner's Anticipated English Legal Action ....................................... 7

III. ARGUMENT ................................................................................................ 7

   A.  Petitioner's Application Satisfies Section 1782's Statutory Factors ........... 8

      1.  SBIA US Is Found in This District ................................................. 8

      2.  Petitioner's Application Seeks Discovery For Use in a Foreign Proceeding ........... 8

      3.  Petitioner Is an "Interested Person" Under Section 1782 ................ 9

   B.  The *Intel* Factors Weigh in Favor of Granting Petitioner's Application .......... 10

      1.  The Evidence Sought by Petitioner Will Not Be Available in the English Lawsuit or Obtainable by Other Means ................... 10

      2.  English Courts Are Receptive to Section 1782 Discovery .................. 11

      3.  Petitioner's Application Is Not an Attempt to Circumvent English Proof-Gathering Restrictions ........................... 12

      4.  The Subpoena Is Narrowly Tailored and Not Burdensome ................. 12

   CONCLUSION ............................................................................................... 14

*EX PARTE* APPLICATION AND MPA ISO DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Page</u>

*In re Apple Retail UK Ltd.*,
 2020 WL 3833392 (N.D. Cal. July 8, 2020) ..................................................... 9, 12

*In re Eurasian Nat'l Res. Corp., Ltd.*,
 2018 WL 1557167 (N.D. Cal. Mar. 30, 2018) ................................................... 9, 10

*In re Glob. Energy Horizons Corp.*,
 2015 WL 1325758 (N.D. Cal. Mar. 24, 2015) ...................................................8-9, 11

*In re Hattori*,
 2021 WL 4804375 (N.D. Cal. Oct. 14, 2021) ......................................................... 12

*Intel Corp* v. *Advanced Micro Devices*,
 542 U.S. 241 (2004) ........................................... 2, 9, 10, 11, 12, 12n

*IS Prime Ltd.* v. *Glassdoor*,
 2021 WL 5889373 (N.D. Cal. Dec. 13, 2021) ........................................................ 11

*In re JSC Com. Bank Privatbank*,
 2021 WL 4355334 (N.D. Cal. Sept. 24, 2021) ................................................... 10, 11

*Khrapunov* v. *Proskyankin*,
 931 F.3d 922 (9th Cir. 2019) ................................................................................... 9

*In re Letter Rogatory*,
 2019 WL 3065009 (N.D. Cal. July 12, 2019) ........................................................... 8

*In re Medical Corp. H&S*,
 2019 WL 1230440 (N.D. Cal. Mar. 15, 2019) ......................................................... 10

*Mees* v. *Buiter*,
 793 F.3d 291 (2d Cir. 2015) .....................................................................................9n

*In re Nat'l Bank Tr.*,
 2021 WL 118531 (D. Conn. Jan. 13, 2021) ............................................................. 11

*Palantir Techs., Inc.* v. *Abramowitz*,
 415 F. Supp. 3d 907 (N.D. Cal. 2019) .............................................................. 10, 11, 13

*In re PJSC Uralkali*,
 2019 WL 291673 (W.D. Wash. Jan. 23, 2019) .................................................9, 11, 13-14

*In re Republic of Ecuador*,
 2011 WL 4434816 (N.D. Cal. Sept. 23, 2011) .......................................................... 8

*Snowflake Inc.* v. *Yeti Data, Inc.*,
  2021 WL 1056550 (N.D. Cal. Mar. 18, 2021) .......................................................................... 8

*In re Super Vitaminas, S.A.*,
  2017 WL 5571037 (N.D. Cal. Nov. 20, 2017) .......................................................................... 8

*In re Takai*,
  2021 WL 5205583 (N.D. Cal. Nov. 9, 2021) ........................................................................... 11

*In re Tovmasyan*,
  2021 WL 3737184 (D.P.R. Aug. 20, 2021) ............................................................................... 9

*In re Varian Med. Sys. Int'l AG*,
  2016 WL 1161568 (N.D. Cal. Mar. 24, 2016) ....................................................................... 1n

**<u>Statutes</u>**

28 U.S.C. § 1782 ........................................................................................................*passim*

Petitioner Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund ("Petitioner") hereby applies to this Court for an *ex parte* order pursuant to 28 U.S.C. § 1782(a) ("Section 1782") permitting Petitioner to serve SB Investment Advisers (US), Inc. ("SBIA US") with the document subpoena attached hereto as **Exhibit 1** (the "Subpoena").  The documents the Subpoena requests are relevant to an anticipated court proceeding in England (the "English Lawsuit") against, among potentially other parties, SoftBank Group Corp. ("SBG" and, with its subsidiaries and affiliates, "Softbank") and certain of its affiliates including SoftBank Vision Fund LP ("Vision Fund"), SoftBank Vision Fund II-2 LP ("Vision Fund II"), SVF Abode (Cayman) Limited ("SVF Abode"), SVF II Abode (Cayman) Limited ("SVF II Abode"), and SVF Habitat (Cayman) Limited ("SVF Habitat" and, collectively with all of the foregoing entities, the "Softbank Defendants").[1]

## I.     INTRODUCTION

As set forth in Section II, below, the English Lawsuit emerges out of a series of transactions in 2019 and 2020 in which Petitioner invested in approximately $440 million worth of notes (the "Notes") backed by the accounts receivable of a U.S.-based construction company called Katerra Inc. and its affiliates ("Katerra"), in which Softbank was a major investor.  In the spring of 2021, those notes defaulted, leaving Petitioner with hundreds of millions of dollars' worth of losses.  Subsequently, Petitioner came to understand that, well before the Notes defaulted, the Softbank Defendants and potentially other Softbank entities had orchestrated a financial restructuring of Katerra in late 2020 (the "Katerra Restructuring").  As part of the Katerra Restructuring, Softbank, Katerra, and multiple affiliates of Greensill Capital Pty Limited (collectively, "Greensill")—the entities that operated the receivables-purchase program into which Petitioner had invested—agreed, improperly, to cancel the Katerra receivables program and purported to forgive the amounts outstanding under that program that ultimately were due to Petitioner.

---

[1] "[Section] 1782 petitions are regularly reviewed on an *ex parte* basis" because the party receiving the request "may still raise objections and exercise its due process rights by challenging the discovery after it is issued via a motion to quash, which mitigates concerns regarding any unfairness of granting the application *ex parte*."  *In re Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *2 (N.D. Cal. Mar. 24, 2016).

Various Greensill entities declared their insolvency in the spring and summer of 2021.   As such, Petitioner plans to assert a claim against the Softbank Defendants pursuant to Section 423 of the Insolvency Act 1986 ("Section 423"), which allows English courts to order remedial measures to make whole victims of undervalued transactions that put valuable assets—such as the amounts outstanding under the Katerra receivables program—beyond the reach of a person or entity, like Petitioner, who might make a claim against an insolvent entity for those assets.

In this action, Petitioner requests that this Court enter an order pursuant to Section 1782 authorizing Petitioner to serve the Subpoena on SBIA US, a California-based affiliate of the Softbank Defendants, in connection with that anticipated Section 423 claim.   U.S. courts routinely grant Section 1782 applications for discovery to be used in English litigation, and Petitioner respectfully submits this Court should do so here as well.   First, Petitioner's application satisfies Section 1782's three statutory requirements: SBIA US is found in this District, the discovery Petitioner seeks is for use in the English Lawsuit, and Petitioner is an "interested person" in that Lawsuit because it is the entity that plans to file the Lawsuit.   *See* Section III(A), below.   Second, the discretionary factors set forth by the Supreme Court in *Intel Corp.* v. *Advanced Micro Devices*, 542 U.S. 241 (2004) support Petitioner's application: Petitioner has no means other than Section 1782 to obtain the documents it seeks; the court hearing the English Lawsuit will be receptive to such documents; there is no statute, order, or policy in the United Kingdom preventing Petitioner from using Section 1782 to seek such documents; and the requests set forth in the Subpoena are narrowly tailored and will not be intrusive or burdensome to SBIA US.   *See* Section III(B), below.

Accordingly, Petitioner respectfully requests that the Court enter an order granting Petitioner permission to promptly serve the Subpoena upon SBIA US.

## II.      FACTUAL BACKGROUND

### A.      Petitioner

Credit Suisse Virtuoso SICAV-SIF ("Virtuoso") is an "umbrella fund" incorporated under the laws of Luxembourg for the purpose of investing in various securities and other investments through multiple sub-funds with varying investment approaches and objectives.   *See* the accompanying December 23, 2021 Declaration of Neil Anthony Golding (the "Golding Decl.") ¶ 8.

One of Virtuoso's sub-funds, named the Credit Suisse (Lux) Supply Chain Finance Fund (the "SCF Subfund"), was designed to invest primarily in notes connected to so-called supply chain finance programs, including programs organized by a group of companies collectively known as Greensill. *See id.* ¶ 9.

### B.  The Katerra Receivables Program

Although the term "supply chain finance" can be used to refer to various activities, for purposes of the English Lawsuit and this application, the term refers to a program wherein a funder—here, Greensill—extends financing to a seller selling supplies or other goods to a third party to cover the period between the time the seller delivers the goods and the time the third party pays the seller for the goods. *See* Golding Decl. ¶ 10.  In short, Greensill would pay the seller a percentage of the amount that the seller ultimately expected the buyer of the goods to owe, and the seller would simultaneously assign its right to receive payment for the goods to Greensill. *See id.* ¶ 11.  The sellers would receive cash from Greensill as soon as, or in some cases before, they delivered the goods to each buyer, and Greensill would benefit because it would collect a premium and/or other fees each time it purchased accounts receivable. *See id.* ¶ 12.

Beginning in or about 2019, the SCF Subfund purchased the Notes backed by the accounts receivable of Katerra.[2]  *See id.* ¶ 13.  With regard to Katerra specifically, a Greensill company called Greensill Limited ("Greensill Ltd.") would purchase Katerra's accounts receivable pursuant to terms set forth in a Receivables Purchase Agreement between Katerra and Greensill Ltd. dated December 9, 2019 (the "Katerra RPA").  *See id.* ¶ 14.  Through a series of transactions, the rights to receive amounts equal to the receivables purchased by Greensill Ltd. were assigned to a special-purpose vehicle that securitized those rights into the Notes that Petitioner purchased.  *See id.* ¶¶ 15-16.

As such, Petitioner was the ultimate funding source for Greensill to purchase Katerra's accounts receivable.  *See id.* ¶ 16.  By early 2020, Petitioner had purchased a total of approximately

---

[2] Katerra's ultimate parent was a Cayman Islands-incorporated entity called Katerra Inc. and is referred to hereinafter as "Katerra Cayman."  *See* Golding Decl. ¶ 13.  Petitioner is also seeking Section 1782 document discovery from Katerra Cayman pursuant to a separate application filed in the United States District Court for the District of Arizona for substantially the same reasons discussed herein.  *See also* Golding Decl. ¶ 76 n.5.

$440 million worth of Notes backed by rights to those Katerra receivables.  *See id.*  During 2020, Petitioner periodically agreed to roll over the Notes—*i.e.*, to exchange Notes that were about to mature with a new set of Notes for the same value that would come due at some later date.  *See id.* ¶ 17.  By late 2020, most of the Notes had maturity dates of March 15, 2021, with some Notes bearing maturity dates of May 17, 2021.  *See id.*

### C.    Softbank

Softbank is a group of corporate entities owned, controlled, or otherwise affiliated with SBG. *See* Golding Decl. ¶ 18.  SBG is incorporated and headquartered in Japan.  *See id.* ¶ 66(d).  SBG engages in private investments primarily through its "Vision Fund," which is a collection of a number of investment funds, investment vehicles, and similar entities.  *See id.* ¶¶ 20, 66(a).  It appears that the SVF Funds fall under the larger Vision Fund umbrella.  *See id.* ¶¶ 66(b)-(c).

The Vision Fund is managed by SB Investment Advisers (UK) Limited ("SBIA UK"), which is a wholly-owned subsidiary of SBG.  *See id.* ¶ 25.  SBIA US is SBIA UK's U.S. affiliate.  *See id.* ¶¶ 25-26.  SBIA US—which, like SBIA UK, is also a wholly-owned subsidiary of SBG—is incorporated in Delaware and headquartered in San Carlos, California.  *See id.* ¶¶ 26-27.  The SVF Funds appear to share office space with SBIA US.  *See id.* ¶¶ 27, 43.  Masayoshi Son, the Chairman and CEO of SBG, is also, for all intents and purposes, the ultimate decision-maker for the Vision Fund.  *See id.* ¶¶ 21-24, 51 & Ex. 1 thereto at 155:10-17.

Between 2018 and 2020, the Vision Fund acquired large stakes in both Greensill and Katerra. *See id.* ¶¶ 18-20.

### D.    The Katerra Restructuring

Katerra began experiencing financial difficulties and was facing imminent insolvency by late 2020.  *See* Golding Decl. ¶ 18.  To avoid or at least forestall this result, Softbank, Katerra, and other entities (but not Petitioner or any of its affiliates) engaged in the Katerra Restructuring, the ultimate goal of which was to eliminate all of Katerra's then-outstanding debt and provide Katerra additional capital.  *See id.* ¶ 28.

As part of the Katerra Restructuring, Softbank, Greensill, and Katerra agreed that Greensill Ltd. would give up its right to Katerra's accounts receivable and that the Katerra RPA would be

cancelled—despite the fact that Greensill Ltd. had already assigned away the rights to those receivables to the entities that securitized those rights into the Notes.  *See id.* ¶ 29.

Although it appears that Katerra and Softbank discussed the purported cancellation of the Katerra RPA as early as September 2020 (*see id.* ¶ 30), the transactions most central to the English Lawsuit began on December 1, 2020, when Greensill Ltd. and Katerra entered into a letter agreement (the "Security Release Agreement") wherein Greensill Ltd. purported to release various liens on assets Katerra had put up as collateral in connection with the Katerra RPA.  *See id.* ¶ 31. Shortly thereafter, on December 30, 2020, Greensill Ltd. and Katerra entered into a "Contribution and Exchange Agreement" (the "CEA") by which Greensill Ltd. purported to cancel any amounts then owed under the Katerra RPA, assigned back to Katerra all rights to any receivables Katerra had previously sold to Greensill Ltd., and render the Katerra RPA null and void going forward.  *See id.* ¶ 32.  In exchange, Greensill Ltd. received approximately 5% of the recapitalized shares of Katerra Cayman.  *See id.*

No Softbank entity was a formal party to the CEA (*see id.* ¶ 33), but there can be no question that Softbank was aware of it.  Jeffrey Housenbold—then a managing partner of SoftBank Investment Advisers ("SBIA")[3] working out of SBIA US's offices—sat on Katerra Cayman's Board of Directors at this time, and Mr. Housenbold and other individuals believed to be employees of or otherwise affiliated with SBIA US attended Katerra Cayman Board meetings in which the CEA and/or Greensill's role in the Katerra Restructuring was discussed.  *See id.* ¶¶ 33-35.[4]

Moreover, in an agreement also dated December 30, 2020, Greensill Ltd. agreed to immediately transfer the Katerra Cayman equity stake it had received from Katerra to SVF II Abode (the "Share Disposal Agreement").  *See id.* ¶ 36.  The Share Disposal Agreement references "good and valuable consideration" but, notwithstanding this language, it does not appear that Greensill

[3] Mr. Housenbold and other SBIA partners or employees are generally described—or describe themselves—as being affiliated with "SoftBank Investment Advisers" without specifying whether that is a reference to SBIA US, SBIA UK, or both.  *See, e.g.*, Golding Decl. ¶¶ 33, 35, 37, 49.

[4] Testimony at a hearing in Katerra's subsequent bankruptcy proceedings indicates that another Vision Fund partner working out of SBIA US's offices—Tom Cheung—also was involved in the Katerra/Greensill/Softbank discussions occurring at this time.  *See* Golding Decl. ¶¶ 48-49.

Ltd. received anything of value in exchange for the Katerra Cayman equity stake.  *See id.*  Brian Wheeler, then an SBIA managing partner and its general counsel—who operated out of SBIA US's offices—signed the Share Disposal Agreement on behalf of SVF II Abode.  *See id.* ¶ 37.

In other words, SoftBank orchestrated a deal wherein ***Greensill*** purported to give up its rights to the $440 million outstanding under the Katerra RPA (and associated security and guarantees) even though it was ***Petitioner*** who ultimately stood to lose by virtue of that deal.  Nevertheless, no one informed Petitioner that this series of events was occurring.  *See id.* ¶ 38.

By the end of 2020, as a result of the Katerra Restructuring, substantially all of Katerra Cayman's equity was held by SVF Abode, SVF II Abode, and SVF Habitat (collectively, the "SVF Funds").  *See id.* ¶ 39.  In March 2021, certain Greensill entities became insolvent, and Greensill Ltd. declared its own insolvency in July 2021.  *See id.* ¶¶ 40, 52.  When the Notes became due in March 2021 (or, in some cases, in May 2021), they defaulted and, to date, Petitioner has not been paid any portion of the $440 million it invested into those Notes.  *See id.* ¶ 41.

After Greensill's insolvency, Katerra's executives reached out to Softbank—including Mr. Housenbold—to confirm that the $440 million previously owed under the Katerra RPA had been "paid off."  *See id.* ¶ 50 & Ex. 1 thereto at 152:9-19.  Katerra continued to seek clarity from Softbank during the spring of 2021, ultimately culminating with a meeting between Katerra representatives and Mr. Son that took place in "late May."  *See id.* ¶¶ 50-51 & Ex. 1 thereto at 153:1-2; 155:1-17.

### E.      The Katerra Bankruptcy and Softbank Investigation

In early June 2021, despite the Katerra Restructuring, Katerra itself initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas (the "Katerra Bankruptcy").  *See* Golding Decl. ¶ 42.  At or around this time, Katerra Cayman's independent directors began an investigation to determine whether Katerra possessed any cognizable claims against Softbank (the "Katerra Softbank Investigation").  *See id.* ¶ 44 & Ex. 1 thereto at 127:15-25.  One focus of the Katerra Softbank Investigation was an effort to determine "what happened with Greensill, and how had SoftBank paid off Greensill or what deal they had made" such that, via the CEA, Greensill was willing to terminate the RPA and return the rights to all outstanding receivables to Katerra.  *See id.* ¶ 45 & Ex. 1 thereto at 133:20-134:8.

In connection with the Katerra Softbank Investigation, Softbank produced over 2,000 documents.  *See id.* ¶ 46 & Ex. 1 thereto at 129:18-21.  Counsel for Katerra's independent directors interviewed four individuals associated with Softbank, including Mr. Housenbold and Mr. Cheung.  *See id.* ¶¶ 47-48 & Ex. 1 thereto at 131:7-14.

### F.      Petitioner's Anticipated English Legal Action

As discussed above, Petitioner plans to file a claim against the Softbank Defendants under Section 423 of the Insolvency Act 1986.  That provision gives the English court discretionary authority to order payments or other remedial measures where a transaction has been entered into at an undervalue for the purpose of putting assets beyond the reach of a person or entity (like Petitioner) that may make a claim against an insolvent entity (like Greensill Ltd.).  *See* Golding Decl. ¶¶ 67-68 & Ex. 11 thereto.  Petitioner plans to allege that the Security Release Agreement, the CEA, and the Share Disposal Agreement (collectively, the "Improper Transactions") constituted undervalue transactions within the scope of Section 423, and that the Defendants who benefited from those transactions ought to make payments or take other action to restore the parties' positions to what they would have been if the transactions had not been entered into and to protect the interests of the Petitioner as a victim of those transactions.  *See id.*

The preparation of the English Lawsuit is well advanced.  Petitioner has retained U.K. counsel and Petitioner's U.K. counsel has already (i) exchanged detailed correspondence with counsel for the Softbank Defendants concerning Petitioner's claim under Section 423 and other claims Petitioner may assert and (ii) retained English barristers to advise Petitioner and finalize the claim initiating the English Lawsuit.  *See id.* ¶¶ 55-64, 69 & Exs. 2-10 thereto.  Petitioner anticipates formally initiating the English Lawsuit in the coming weeks.  *See id*. ¶ 69.

## III.     ARGUMENT

Petitioner seeks an order from this Court pursuant to Section 1782 authorizing Petitioner to serve SBIA US with the Subpoena for discovery for use in the anticipated English Lawsuit.  Such an order is proper under Section 1782 because (1) this application satisfies the three statutory requirements set forth in Section 1782 and (2) the *Intel* factors weigh in favor of granting Petitioner's application.

1

    **A.**    **Petitioner's Application Satisfies Section 1782's Statutory Factors**

2        The first sentence of Section 1782 states that "[t]he district court of the district in which a

3 person resides or is found may order him to give his testimony or statement or to produce a document

4 or other thing for use in a proceeding in a foreign or international tribunal, including criminal

5 investigations conducted before formal accusation."  28 U.S.C. § 1782(a).  Courts have interpreted

6 this language to require that a Section 1782 applicant establish three things:  that "'(1) the person

7 from whom the discovery is sought resides or is found in the district of the district court where the

8 application is made; (2) the discovery is for use in a proceeding in a foreign or international tribunal;

9 and (3) the application is made by a foreign or international tribunal or any interested person.'"

10 *Snowflake Inc.* v. *Yeti Data, Inc.*, 2021 WL 1056550, at *5 (N.D. Cal. Mar. 18, 2021).  Petitioner's

11 application satisfies all three requirements.

12                1.    <u>SBIA US Is Found in This District</u>

13        SBIA US is "found" in this District.  A business entity is "found" in a given district if its

14 headquarters or other offices are located there. *See, e.g.*, *In re Letter Rogatory*, 2019 WL 3065009,

15 at *2 (N.D. Cal. July 12, 2019) ("Facebook is 'found' in this District within the meaning of Section

16 1782 because its headquarters is located in Menlo Park, California."); *In re Super Vitaminas, S.A.*,

17 2017 WL 5571037, at *2 (N.D. Cal. Nov. 20, 2017) ("Microsoft is also 'found' in this district for

18 purposes of § 1782 because it maintains two offices in this District."); *In re Republic of Ecuador*,

19 2011 WL 4434816, at *2 (N.D. Cal. Sept. 23, 2011) (subpoena target found in district because it

20 "maintains an office in Menlo Park, California, which is in this district").

21        Here, according to filings made with the SEC, SBIA US is headquartered in San Carlos,

22 California, which falls within this District.  *See* Golding Decl. ¶ 27.

23                2.    <u>Petitioner's Application Seeks Discovery For Use in a Foreign Proceeding</u>

24        The documents Petitioner seeks are intended for use in a foreign proceeding; namely, the

25 English Lawsuit, which will be filed with the High Court of Justice of England and Wales.  *See*

26 Golding Decl. ¶¶ 2, 90.  That body is a "foreign tribunal" under Section 1782.  *See, e.g.*, *In re Glob.*

27 *Energy Horizons Corp.*, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015) ("[A] proceeding before

28 the High Court of Justice in England, United Kingdom . . . is undisputedly a 'proceeding before a

foreign or international tribunal[.]'"); *In re Apple Retail UK Ltd.*, 2020 WL 3833392, at *1-*2 (N.D.

Cal. July 8, 2020) (holding that the High Court of Justice of England and Wales, Chancery Division,

Patents Court is a "foreign tribunal"); *In re PJSC Uralkali*, 2019 WL 291673, at *1, *3 (W.D. Wash.

Jan. 23, 2019) (Section 1782's statutory requirements met in case seeking discovery for use in action

pending in the High Court of Justice, Business and Property Courts of England and Wales).

  There is no requirement that a foreign proceeding be pending for Section 1782 discovery to

be permissible. Rather, a foreign proceeding need only be "within reasonable contemplation." *Intel*,

542 U.S. at 259; *see also Khrapunov* v. *Proskyankin*, 931 F.3d 922, 925 (9th Cir. 2019) ("So long

as a future proceeding is 'within reasonable contemplation,' it satisfies the statute's requirement.").

Such is the case here, where Petitioner has taken a number of steps to prepare for the filing of the

English Lawsuit, including arranging a meeting between executives on behalf of Petitioner and the

Softbank representatives, reviewing documents in the possession of Petitioner, retaining U.K.

counsel, engaging in multiple rounds of correspondence with counsel for the Softbank Defendants,

and hiring a U.K. barrister. *See* Golding Decl. ¶¶ 55-64, 69 & Exs. 2-10 thereto; *see also In re*

*Eurasian Nat'l Res. Corp., Ltd.*, 2018 WL 1557167, at *1-*2 (N.D. Cal. Mar. 30, 2018) (granting

Section 1782 discovery for a "reasonably contemplated lawsuit in the United Kingdom" even where

petitioner was not sure which specific entity the lawsuit would be filed against); *In re Tovmasyan*,

2021 WL 3737184, at *4 (D.P.R. Aug. 20, 2021) (granting Section 1782 discovery where petitioner

had not initiated action but had retained barrister and served letter of claim upon anticipated

defendant).[5]

### 3. Petitioner Is an "Interested Person" Under Section 1782

  Finally, Petitioner is an "interested person" as that phrase is used in Section 1782 because

Petitioner will be the Claimant in the English Lawsuit. *See* Golding Decl. ¶¶ 2, 65-69; *see also*

---

[5] Similarly, "discovery sought pursuant to § 1782 need not be necessary for the party to prevail in the foreign proceeding in order to satisfy the statute's 'for use' requirement." *Mees* v. *Buiter*, 793 F.3d 291, 298 (2d Cir. 2015). Rather, the discovery must only be intended to "serve some use in the proceeding." *Id.* Here, Petitioner's U.K. counsel "anticipate[s] the requested discovery will be used in the English Lawsuit" (Golding Decl. ¶ 90) and, as discussed herein and in the Golding Decl., evidence obtained via Section 1782 is routinely used in English litigation.

*Eurasian Nat'l Res. Corp.*, 2018 WL 1557167, at *2 ("[Petitioner] qualifies as an 'interested person' because it will be a party to the anticipated litigation."); *In re Medical Corp. H&S*, 2019 WL 1230440, at *2 (N.D. Cal. Mar. 15, 2019) ("[Petitioner], as the putative plaintiff in the contemplated civil action[,] is an interested person within the meaning of the statute.").

**B.    The *Intel* Factors Weigh in Favor of Granting Petitioner's Application**

In *Intel*, 542 U.S. at 264-65, the Supreme Court identified a set of four additional discretionary factors that courts should consider when determining whether to grant Section 1782 discovery. Subsequent decisions have summarized those factors as "(1) whether the 'person from whom discovery is sought is a participant in the foreign proceeding'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance'; (3) whether the request 'conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'" *Palantir Techs., Inc.* v. *Abramowitz*, 415 F. Supp. 3d 907, 911 (N.D. Cal. 2019). All four of those factors weigh in favor of granting Petitioner's application.

1.    The Evidence Sought by Petitioner Will Not Be Available in the English Lawsuit or Obtainable by Other Means

The Supreme Court has suggested that, "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel,* 542 U.S. at 264. "There is, however, no rule that 1782 applications can only be granted where the party from whom discovery is sought is not a party to the foreign proceeding." *Palantir Techs.*, 415 F. Supp. 3d at 912. Rather, "'the key issue is whether the material is obtainable through the foreign proceeding.'" *In re JSC Com. Bank Privatbank*, 2021 WL 4355334, at *3 (N.D. Cal. Sept. 24, 2021).

Here, Petitioner does not currently anticipate naming SBIA US as a defendant in the English Lawsuit. *See* Golding Decl. ¶ 84. Accordingly, it is not expected that the discovery sought by the

Subpoena will be obtainable in that proceeding. *See id.* ¶¶ 84, 88. As such, the first *Intel* factor weighs in Petitioner's favor because "the foreign tribunal may [not] order the discovery sought here." *See IS Prime Ltd.* v. *Glassdoor*, 2021 WL 5889373, at *3 (N.D. Cal. Dec. 13, 2021) ("Glassdoor is not a party to the English litigation . . . . [t]his factor weighs in favor of the court granting leave to issue the subpoena."); *Palantir Techs.*, 415 F. Supp. 3d at 913 (first *Intel* factor weighed in favor of granting Section 1782 application where petitioner "provided a declaration from a German attorney attesting that under German law, the German court cannot order the discovery sought here"); *Glob. Energy Horizons Corp.*, 2015 WL 1325758, at *2 (first *Intel* factor weighed in favor of granting application where subpoena recipient was "not a company resident in the United Kingdom, and the requested information therefore [did] not appear to be within the immediate reach of the English High Court of Justice").

### 2. English Courts Are Receptive to Section 1782 Discovery

The second *Intel* factor looks to "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. "In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782, courts tend to err on the side of permitting discovery." *In re Takai*, 2021 WL 5205583, at *4 (N.D. Cal. Nov. 9, 2021). This factor weighs in Petitioner's favor because it is well-established that English courts are receptive to discovery obtained via Section 1782. *See, e.g.*, *JSC Com. Bank Privatbank*, 2021 WL 4355334, at *4 ("English courts have been receptive to discovery obtained by means of a § 1782 application."); *Glob. Energy Horizons Corp.*, 2015 WL 1325758, at *2 ("There is no authority suggesting the English government would be hostile to or otherwise reject discovery obtained through a Section 1782 subpoena."); *PJSC Uralkali*, 2019 WL 291673, at *5 ("The court . . . presumes that the English Court would be receptive to relevant evidence [petitioner] may obtain through § 1782."); *In re Nat'l Bank Tr.*, 2021 WL 118531, at *3 (D. Conn. Jan. 13, 2021) (court was not "aware of . . . any authority to suggest that the English court would be unwilling to accept discovery under § 1782"). *See also* Golding Decl. ¶¶ 85-86, 88.

3.     Petitioner's Application Is Not an Attempt to Circumvent English Proof-Gathering Restrictions

The third factor the *Intel* court instructs courts to consider is whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  "Courts have found that this factor weighs in favor of discovery where there is nothing to suggest that the applicant is attempting to circumvent foreign proof-gathering restrictions." *In re Hattori*, 2021 WL 4804375, at \*4 (N.D. Cal. Oct. 14, 2021) (internal brackets and quotation marks omitted).  Here, there are no such restrictions—there is no law, rule, or order preventing Petitioner from seeking Section 1782 discovery from SBIA US.  *See* Golding Decl. ¶¶ 87, 89.[6]  On the contrary, as discussed above, English courts routinely accept Section 1782 discovery.  *See also Apple Retail UK Ltd.*, 2020 WL 3833392, at \*4 (third *Intel* factor weighed in petitioner's favor where it represented "that it is aware of no restrictions or policies of the U.K. court that would limit the gathering of the evidence Apple seeks here").  As such, the third *Intel* factor, too, weighs in Petitioner's favor.

4.     The Subpoena Is Narrowly Tailored and Not Burdensome

Finally, the fourth *Intel* factor looks to whether the requests at issue are "unduly intrusive or burdensome[.]"  *Intel*, 542 U.S. at 265.  Here, the eight proposed requests set forth in Exhibit A to the Subpoena (the "Requests") are narrowly tailored and seek evidence relevant to Petitioner's claims against the SVF Funds in the English Lawsuit.  Although SBIA US is not itself an anticipated defendant in the English Lawsuit, (1) numerous individuals operating out of SBIA US's offices were involved in—and are believed to have communicated about—the Katerra Restructuring and/or the Katerra Softbank Investigation (*see* Golding Decl. ¶¶ 33-35, 37, 48-49); (2) SBIA US is the U.S.

---

[6] The third *Intel* factor does not consider whether the requested discovery would be discoverable if the same requests were made in the foreign jurisdiction itself.  In fact, the *Intel* Court itself cited a ruling by the English House of Lords that "nondiscoverability under English law did not stand in the way of a litigant in English proceedings seeking assistance in the United States under § 1782" as an example supporting the proposition that "[a] foreign tribunal's reluctance to order production of materials present in the United States . . . may signal no resistance to the receipt of evidence gathered pursuant to § 1782(a)."  *Intel*, 542 U.S. at 261-62.  Rather, the question is only whether "the foreign tribunal would readily accept relevant information discovered in the United States."  *Id.* at 262.  For the reasons discussed above, the court in the English Lawsuit will readily accept such evidence.

arm of SBIA UK, the entity that manages the Vision Funds and their numerous sub-funds, including the SVF Funds (*see id.* ¶¶ 20, 25-26, 66(a)-(c)); (3) SBIA US shares office space with the SVF Funds (*see id.* ¶¶ 27, 43) and (4) SBIA US is a wholly-owned subsidiary of SBG, and SBG and its CEO Masayoshi Son are intimately involved in decision-making concerning Vision Fund companies such as Katerra and Greensill, meaning that SBIA US personnel almost certainly communicated with SBG personnel, including Mr. Son, concerning the Katerra Restructuring and concerning Katerra's spring 2021 requests for clarity on the status of Katerra's obligations under the Katerra RPA that culminated in a meeting with Mr. Son in late May. *See id.* ¶¶ 18-26, 34, 51 & Ex. 1 thereto at 152:9-10, 153:1-2; 155:1-17.

None of Petitioner's eight Requests will be intrusive or burdensome on SBIA US. First, the Requests are narrowly tailed to seek only documents likely to be relevant in the English Lawsuit. Petitioner's anticipated allegations against the Softbank Defendants include (i) that the Improper Transactions were at an undervalue—that is, that they were made for no or insufficient consideration; (ii) that the Softbank Defendants were aware of the Improper Transactions and what their effect on Petitioner would be; (iii) that the Softbank Defendants had a motive for orchestrating the Improper Transactions to benefit Softbank and its portfolio company Katerra to the ultimate detriment of Petitioner; and (iv) that the Softbank Defendants benefitted from the Improper Transactions. *See id.* ¶ 68. Each of Petitioner's eight Requests thus seek a targeted set of documents that will provide additional information as to one or more of those four core allegations. *See generally id.* ¶¶ 78-83 (discussing the relevance of each of Petitioner's Requests).

Second, the September 1, 2020 through May 31, 2021 time period from which most of Petitioner's Requests seek documents is as narrowly-tailored as possible given that Softbank began discussing the Katerra Restructuring and the cancellation of the Katerra RPA in September 2020, and discussions concerning that Restructuring and Softbank's role therein continued at least through May 2021. *See id.* ¶¶ 30, 51; *see also Palantir Techs.*, 415 F. Supp. 3d at 917 (granting Section 1782 discovery covering up to ten years in light of the facts at issue in the foreign proceeding); *PJSC*

*Uralkali*, 2019 WL 291673, at *7 (granting Section 1782 application that sought documents "generated or received" over an approximately year-long time period).[7]

Third, Petitioner believes in good faith that SBIA US possesses and/or has custody or control over documents responsive to each Request.  Petitioner's first Request seeks materials from Katerra Cayman Board meetings—materials likely to be in the possession, custody, or control of SBIA US given that Mr. Housenbold was a Katerra Cayman Board member and operated out of SBIA US's offices and that other Softbank personnel who also appear to have worked out of those offices also attended at least some Katerra Cayman Board meetings.  *See* Golding Decl. ¶¶ 33, 35.  Petitioner's second through seventh Requests seek communications and/or other documents concerning the Katerra Restructuring or various specific aspects thereof.  Since at least four individuals who appear to have worked out of SBIA US's offices were involved in that Restructuring to various degrees, SBIA US likely possesses and/or has custody or control over documents responsive to those Requests.  *See id.* ¶¶ 33, 35, 37, 48-49.  Petitioner's eighth Request seeks the documents Softbank produced to Katerra in connection with the Katerra Softbank Investigation.  Given the centrality of Mr. Housenbold and others working out of SBIA US's offices to Softbank's relationship with Katerra, SBIA US likely produced at least some portion of those documents and, as such, is likely to have stored copies thereof in the manner in which they were produced to Katerra.

Because each of Petitioner's requests seeks relevant information, is narrowly tailored, and will not be intrusive or burdensome to SBIA US, the fourth *Intel* factor also weighs in Petitioner's favor.

## III.   CONCLUSION

For the foregoing reasons, as well as those set forth in the accompanying Declaration of Neil Anthony Golding, Petitioner respectfully requests that the Court enter an order authorizing Petitioner to issue the Subpoena upon SBIA US pursuant to 28 U.S.C. § 1782.

---

[7] Petitioner's seventh Request seeks documents from an even narrower time period (March 1, 2021 through May 31, 2021), and Petitioner's eighth Request, while not limited by time, seeks only the discrete set of documents Softbank produced to Katerra in connection with the Katerra Softbank Investigation in mid-2021.

1  DATED:  December 23, 2021                    PERKINS COIE LLP

2

3                                                By:        /s/ David Biderman

4                                                     David Biderman

5                                                     Attorneys for Petitioner Credit Suisse Virtuoso
                                                     SICAV-SIF in Respect of the Sub-Fund Credit
6                                                     Suisse (Lux) Supply Chain Finance Fund

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

to Ex Parte Application for Discovery
Order Pursuant to 28 U.S.C. § 1782

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

<table>
<tr><td>In re Ex Parte Application of Credit Suisse Virtuoso SICAV-SIF<br>in Respect of the Sub-Fund Credit Suisse (Lux)<br>Supply Chain Finance Fund<br><br><i>Plaintiff</i><br>v.<br><br><br><i>Defendant</i></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No.</td></tr>
</table>

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       SB Investment Advisers (US) Inc.
1 Circle Star Way, 2F
San Carlos, California 94070

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A annexed hereto.

| Place: Perkins Coie LLP<br>505 Howard Street, Suite 1000<br>San Francisco, California 94105 | Date and Time:<br><br>01/14/2022 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Credit Suisse Virtuoso
SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund    , who issues or requests this subpoena, are:
David Biderman, Perkins Coie LLP, 505 Howard Street, Suite 1000, San Francisco, CA 94105,
dbiderman@perkinscoie.com, 415-344-7003

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $       0.00       .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A TO THE SUBPOENA TO SB INVESTMENT ADVISERS (US) INC.

### DEFINITIONS

1.     The term "CEA" means the December 30, 2020 Contribution and Exchange Agreement among Greensill Ltd., Katerra Cayman, and Katerra Delaware.

2.     The term "Credit Suisse" means Credit Suisse Group AG and all of its subsidiaries, divisions, affiliates—expressly including, without limitation, Petitioner, Credit Suisse Fund Management, S.A., and Credit Suisse Asset Management (Schweiz) AG—and all present and former officers, directors, employees, representatives, agents, and all other persons acting for and on its behalf.

3.     The term "Documents" means paper documents and/or electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form.

4.     The term "Greensill" means Greensill Ltd., Greensill Capital (UK) Ltd., Greensill Capital Pty Ltd., and all of their subsidiaries, divisions, affiliates, and all present and former trustees, officers, directors, managers, administrators, employees, representatives, agents, and all other persons acting for and on their behalf.

5.     The term "Katerra" means Katerra Cayman, Katerra Delaware, and all of their subsidiaries, divisions, affiliates, and all present and former trustees, officers, directors, managers, administrators, employees, representatives, agents, and all other persons acting for and on their behalf.

6.     The term "Katerra Cayman" means Katerra Inc., a company incorporated in the Cayman Islands.

7.      The term "Katerra Delaware" means Katerra Inc., a company incorporated in the State of Delaware.

8.      The term "Katerra Board Materials" means minutes (whether in final or draft form) of any Katerra Board Meeting, any resolutions (whether proposed or approved) discussed at any Katerra Board Meeting, and any other Documents discussed or presented at any Katerra Board Meeting.

9.      The term "Katerra Board Meeting" means any meeting of the Board of Directors of Katerra Cayman or any committee thereof, including but not limited to the Audit Committee of Katerra Cayman.

10.     The term "Katerra Restructuring" means the out-of-court financial restructuring and recapitalization of Katerra that took place via a series of transactions beginning in November 2020 and concluding on or about December 30, 2020.  For the avoidance of doubt, the Katerra Restructuring expressly includes, without limitation, the transactions reflected in (i) the November 10, 2020 Omnibus Deed among Greensill Capital Pty Ltd., Greensill Capital (UK) Limited, Softbank Group Corp., SVF II Holdings (Singapore) Pte. Ltd., and one or more additional parties; (ii); the Security Release Agreement; (iii) the December 23, 2020 Amendment Deed among Greensill Capital Pty Ltd., Greensill Capital (UK) Limited, Softbank Group Corp., SVF II Holdings (Singapore) Pte. Ltd., and one or more additional parties; (iv) the December 23, 2020 Amendment Deed among Greensill Capital Pty Ltd., SVF II Wyatt Subco (Singapore) Ltd., and SVF Wyatt (Singapore) Pte. Ltd.; (v) the CEA; and (vi) the Share Disposal Agreement.

11.     The term "Katerra RPA" means the December 9, 2019 Receivables Purchase Agreement among Greensill Ltd., Katerra Delaware, and various affiliates or subsidiaries of Katerra Delaware.

12.     The term "Katerra Softbank Investigation" means the investigation conducted at the direction of independent Katerra directors Pamela Corrie and Harvey Tepner in or about the spring and/or summer of 2021 in connection with which SoftBank produced over 2,000 documents to counsel conducting the investigation.

13.     The term "Petitioner" means Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund.

14.     The term "Requests" means the document requests contained herein.

15.     The term "Security Release Agreement" means the December 1, 2020 letter agreement between Greensill Ltd., Katerra Delaware, and the other signatories to the Katerra RPA.

16.     The term "Share Disposal Agreement" means the December 30, 2020 Transfer Agreement between Greensill Ltd. and SVF II Abode (Cayman) Limited.

17.     The term "Softbank" means SoftBank Group Corp. and all of its subsidiaries, divisions, affiliates—including but not limited to You, SB Investment Advisers (UK) Ltd., and any and all funds or other entities that make up Softbank's "Vision Fund"—and all present and former trustees, officers, directors, managers, administrators, employees, representatives, agents, and all other persons acting for and on their behalf.

18.     The terms "You" or "Your" refer to SB Investment Advisers (US) Inc., collectively with its predecessors, successors, divisions, subsidiaries and affiliates; each other person directly or indirectly, wholly or in part, owned or controlled by it; each partnership or joint venture to which it is a party; and all present and former directors, officers, partners, and employees thereof.

## INSTRUCTIONS

1.     In construing the Requests, the plural shall include the singular, the singular shall include the plural, and a masculine, feminine, or neuter term shall include all other genders.  The

words "and" and "or" mean "and/or" and should be read both ways so as to encompass both constructions and call for answers to be provided to both constructions. The word "each" includes the word "every," and the word "every" includes the word "each." The word "any" shall be understood to include and encompass "all," and "all" should be interpreted to include and encompass "any."

2.      The use of a verb in any tense includes the use of that verb in all other tenses.

3.      Each Request shall be construed independently and not with reference to any other Request for the purpose of limitation or exclusion.

4.      Each Request is continuing in nature. If, at any time, You obtain additional or different Documents, please promptly supplement Your response to the Requests. Petitioner specifically reserves the right to seek from You supplementary responses or additional supplementary production.

5.      The Requests call for the production of all Documents within Your possession, custody or control, wherever located, regardless of whether such information is possessed directly by You or Your officers, agents, employees, attorneys, representatives, or other persons acting on Your behalf. If You cannot respond to the Requests in full after exercising due diligence to secure the Documents requested, please so state and respond to the extent possible, specifying the nature of Your inability to respond to the remainder.

6.      For the purpose of construing the scope of the Requests, the terms used shall be given their most expansive and inclusive interpretation.

7.      Each requested Document shall be produced in its entirety, without abbreviation or redaction, including all attachments, appendices, exhibits, lists, schedules, or other matters at any time affixed thereto. If a Document responsive to any Request cannot be produced in full, it shall

be produced to the extent possible with an explanation stating why production of the remainder is not possible.

8.      If there are no Documents responsive to a particular Request in Your possession, custody, or control, please provide a written response so stating.

9.      If You believe that any Request, Definition, or Instruction is ambiguous, in whole or in part, please set forth the matter deemed ambiguous and describe the manner in which You construed the Request, Definition, or Instruction in framing Your response.

10.     If You object to any Request, please state with specificity the grounds for such objection and the Request or Requests to which each objection applies.  Respond to the Request to the extent You do not object to it.

11.     Where a claim of privilege (including the application of the work product doctrine) is asserted in objecting to any Request or sub-part thereof, and any Document is withheld or redacted on the basis of such assertion, (i) please identify the nature of the privilege that is being claimed; and (ii) provide the following information, unless divulgence of such information would cause disclosure of the allegedly privileged information:  (1) the type of Document being withheld or redacted; (2) the author of the Document; (3) any recipient of the Document, including, where not apparent, the relationship of the author and recipient to each other; (4) the general subject matter of the Document; (5) the date of the Document; (6) the identity of any enclosures or attachments; and (7) such other information as is sufficient to identify the Document in a manner that will enable Petitioner and, if necessary, a court to assess the applicability of the privilege claimed in accordance with Federal Rule of Civil Procedure 26 and Local Rule 26.2, including, but not limited to, whether the author or any recipient of the Document is an attorney.

REQUESTED TIME PERIOD

1.      Unless otherwise specified, the Requests seek Documents dating from the period of September 1, 2020 to May 31, 2021 (the "Requested Time Period").

2.      If any responsive Document is dated outside of the Requested Time Period but is necessary for a complete understanding of a responsive Document dated inside the Requested Time Period, such Document dated outside of the Requested Time Period shall be produced.  If any responsive Document is undated and the date of its preparation cannot be determined, the Document shall be produced.

DOCUMENTS REQUESTED

1.      For each Katerra Board Meeting that took place during the Requested Time Period, all Katerra Board Materials that concern or relate in any way to the Katerra Restructuring.

2.      All Documents consisting of or reflecting communications You engaged in concerning the Security Release Agreement, the CEA, or the Share Disposal Agreement.

3.      All Documents consisting of or reflecting communications You engaged in concerning whether or how the Katerra Restructuring—or any specific transaction that was a part of the Katerra Restructuring, including but not limited to the Security Release Agreement, the CEA, or the Share Disposal Agreement—would, could, or did affect Petitioner, Credit Suisse, and/or any investors in Petitioner or any sub-fund thereof.

4.      Documents concerning the consideration, if any, provided to Katerra by Greensill, Softbank, or any other entity in connection with the Security Release Agreement.

5.      Documents concerning the consideration, if any, provided to Katerra by Greensill, Softbank, or any other entity in connection with the CEA.

6.      Documents concerning the consideration, if any, provided to Greensill by Softbank or any other entity in connection with the Share Disposal Agreement.

7.      All Documents consisting of or reflecting communications You engaged in between March 1, 2021 and May 31, 2021 concerning Katerra's requests to confirm that the Katerra RPA had been terminated and that Katerra did not owe any amounts thereunder to Greensill, including but not limited to all Documents consisting of or reflecting communications You engaged in internally or with other Softbank entities or personnel concerning whether and, if so, how, to respond to Katerra's requests for confirmation.

8.      Without limitation as to time period, all Documents that You produced to Katerra in connection with the Katerra Softbank Investigation.