DAVID BIDERMAN (SBN 101577)
  *dbiderman@perkinscoie.com*
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: (415) 344-7000
Facsimile:  (415) 344-7050

HERBERT S. WASHER (*pro hac vice application forthcoming*)
  *hwasher@cahill.com*
TAMMY L. ROY (*pro hac vice application forthcoming*)
  *troy@cahill.com*
NICHOLAS N. MATUSCHAK (*pro hac vice application forthcoming*)
  *nmatuschak@cahill.com*
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone: (212) 701-3000
Facsimile:  (212) 269-5420

Attorneys for Petitioner Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Ex Parte Application of Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund,<br><br>Petitioner. | Case No.:<br><br>**DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF EX PARTE APPLICATION FOR DISCOVERY ORDER PURSUANT TO 28 U.S.C. § 1782** |

I, Neil Anthony Golding, declare as follows:

1. I am a partner at Freshfields Bruckhaus Deringer LLP ("Freshfields"). I have personal knowledge of the facts stated below except for those facts stated on information and belief and as to those facts I am informed and believe those facts are true.

2. I have been retained by Credit Suisse Virtuoso SICAV-SIF in respect of the sub-fund Credit Suisse (Lux) Supply Chain Finance Fund ("Petitioner") in connection with a court proceeding the Petitioner is planning to initiate in the High Court of Justice of England and Wales (the "English Lawsuit"). Specifically, the English Lawsuit is intended to include a claim against a number of entities in the SoftBank group (as set out below), under section 423 of the Insolvency Act 1986 (the "Section 423 Claim"). Further details with respect to the English Lawsuit are given below.

3. I make this declaration in support of an application by the Petitioner for discovery from SB Investment Advisers (US) Inc., ("SBIA (US)") pursuant to 28 U.S.C. § 1782 (the "1782 Application" or the "Application").

4. This declaration comprises the following sections:
   a. professional background;
   b. background facts;
   c. steps taken to date;
   d. the English Lawsuit;
   e. discovery sought; and
   f. conclusion.

5. As a preliminary point, I use the following definitions in this declaration:
   a. SoftBank Group Corp ("SBG");
   b. SoftBank Vision Fund LP ("Vision Fund");
   c. SoftBank Vision Fund II-2 LP ("Vision Fund II");
   d. SVF Abode (Cayman) Limited ("SVF Abode");
   e. SVF II Abode (Cayman) Limited ("SVF II Abode");
   f. SVF Habitat (Cayman) Limited ("SVF Habitat"); and
   g. SB Investment Advisers (UK) Limited ("SBIA (UK)").

2
DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO
OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

**Professional Background**

6. I am a solicitor qualified in England and Wales. I qualified as a solicitor in 1992. I have been a partner at Freshfields since May 1, 2000. Since qualifying as a solicitor, I have practised in the Dispute Resolution department of Freshfields' London office and have extensive experience representing clients in litigation brought in the High Court of Justice in London. I am therefore very familiar with the rules and procedures governing High Court litigation and I believe that, due to my legal experience and practice, I am in a position to make the present declaration.

**Background to the English Lawsuit**

7. This section of my declaration sets forth background facts the Petitioner plans to allege in the English Lawsuit or that are otherwise relevant to this proceeding, all of which I am informed and believe are true after reasonable investigation.

8. Credit Suisse Virtuoso SICAV-SIF ("Virtuoso") is an "umbrella fund" incorporated under the laws of Luxembourg for the purpose of investing in various securities and other investments through multiple sub-funds with varying investment approaches and objectives.

9. One of Virtuoso's sub-funds, named the Credit Suisse (Lux) Supply Chain Finance Fund (the "SCF Subfund"), which Virtuoso acts in respect of, was designed to primarily invest in notes connected to so-called supply chain finance programs, including programs organized by Greensill Capital Pty Limited and its subsidiaries, including Greensill Ltd and Greensill UK (as defined below) (collectively known as "Greensill").

10. In a supply chain finance program, a funder—here, Greensill—extends financing (i) to a purchaser buying supplies or other goods from a third party and/or (ii) to a seller selling supplies or other goods to a third party to cover the period between the time the seller invoices for the goods and the time the third party pays the seller for the goods. In the latter scenario, Greensill would fund the sellers by purchasing the sellers' accounts receivable.

11. In other words, at the time or shortly prior to the time when the seller of the goods delivered them to the ultimate buyer, Greensill would pay the seller—an accounts-receivable seller, or "AR Seller"—a discounted amount calculated by reference to the amount that the AR Seller would be entitled (or expected to be entitled) to be paid. The AR Seller would simultaneously assign

3

its right to receive payment for the goods to Greensill such that, when the ultimate buyer of the goods paid for them, that money would go to Greensill, not the AR Seller.

12. The AR Sellers would benefit from this program because they would receive cash from Greensill as soon as, or in some cases before, the AR Sellers delivered the goods to each buyer, as opposed to having to wait for a period of weeks or months to receive that cash from each buyer. Greensill would benefit from this program because it would collect a premium each time it purchased accounts receivable from an AR Seller, as well as, in at least some cases, additional fees and/or interest payments.

13. Beginning in or about 2019, the SCF Subfund purchased notes (the "Notes") backed by participations in respect of accounts receivable of such AR Sellers, being companies in the Katerra group which is a group of construction companies (the "Katerra Group" or "Katerra"). The Katerra Group comprises companies owned by or affiliated with Katerra Inc., a company incorporated in the Cayman Islands ("Katerra Cayman"), including its subsidiary Katerra Inc., a Delaware corporation which was headquartered in California until sometime in 2021 ("Katerra Delaware").

14. With regard to the Katerra Group specifically, a Greensill entity called Greensill Limited ("Greensill Ltd") would purchase accounts receivable from a Katerra Group company that represented amounts which that company expected (or anticipated that it would be able) to collect from its customers, as set forth in a Receivables Purchase Agreement between Katerra Delaware, Greensill Ltd, and various other Katerra Group entities dated December 9, 2019 (the "Katerra RPA"). In various circumstances, Greensill Ltd could also require the relevant Katerra Group company to repurchase a purchased accounts receivable, including where the receivable was not paid by the Expected Payment Date (as defined in the Katerra RPA).

15. Greensill Ltd then granted participations, which were contractual rights to receive equivalent amounts to the payment obligations under the Katerra RPA to its parent company Greensill Capital (UK) Limited ("Greensill UK"), which in turn assigned its rights to those participations to a special-purpose vehicle called Hoffman S.A.R.L. ("Hoffman") to securitize the rights under its supply chain finance programs into notes. The Notes backed by Katerra Group

receivables were issued through Hoffman's Compartment MZ.

16. The SCF Subfund acquired the economic interest in the Notes. As such, the Petitioner was the ultimate funding source for Greensill to purchase the Katerra Group's accounts receivable (apart from a small quantity of Notes earlier in the programme, which were acquired by another similar fund). By early 2020, Greensill Ltd had purchased outstanding receivables from Katerra Group with a value sufficient to support approximately $440 million in issued Notes, and the Petitioner had purchased a mirroring total of approximately $440 million worth of Notes backed by those Katerra Group receivables. In other words, when the Notes came due, the Petitioner expected to be paid back at least $440 million ultimately funded by the collection of payments tied to accounts receivable of Katerra Group companies.

17. During 2020, Notes which fell due were redeemed and replaced with similar Notes for equivalent value that would come due at some later date. By late 2020, in particular as a result of transactions on or about December 22, 2020 to extend Note maturities, most of the outstanding Notes had maturity dates of March 15, 2021, with some Notes bearing maturity dates of May 17, 2021.

18. The Katerra Group was in the midst of severe financial distress by late 2020, despite having been heavily invested in over the preceding approximately two years by one or more funds affiliated with SBG (and collectively with its subsidiaries and affiliates, "SoftBank"). Specifically, according to public sources, it appears that SoftBank invested over a billion dollars into the Katerra Group through various transactions that occurred in or about 2018 and 2019. *See, e.g.*, Declaration of Matthew R. Niemann in Support of (A) DIP Financing and (B) All First Day Relief, *In re Katerra Inc.*, Case No. 21-31861 (Bankr. E.D. Tex.) (the "Katerra Bankruptcy"), Dkt. No. 39 (hereinafter the "Niemann Decl.") ¶ 19 ("In 2018 and 2019, Katerra initiated four different rounds of financing and raised a total of approximately $2.4 billion. During Katerra's Series D-1 & D-2 financing and Series E financing, SoftBank Vision Fund I ("SVF") contributed approximately $1.4 billion of financing and subsequently became Katerra's largest capital investor (though SVF did not hold a controlling stake in Katerra).").

19. Public sources also indicate that SoftBank was a major investor in Greensill in or

DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

about this same time period. *See, e.g.*, *id.* ¶ 20 ("SVF and/or its affiliates owned approximately 40% of Greensill at the time of the 2020 [Katerra] recapitalization transaction described herein.").

20. According to SBG's 2021 Annual Report and other public sources, these investments were made by Vision Fund and/or Vision Fund II (collectively, the "Vision Funds"), SoftBank's private-investment arm. *See, e.g.*, SoftBank Group 2021 Annual Report, https://group.softbank/system/files/pdf/ir/financials/annual_reports/annual-report_fy2021_01_en.pdf (hereinafter "SoftBank 2021 Annual Report") at 022. Vision Fund and Vision Fund II are Jersey limited partnerships. So far as the Petitioner is aware, they carry out their investments through a range of investment vehicles incorporated in various jurisdictions.

21. The Vision Funds' website lists three individuals as the Vision Funds' "Leadership": Masayoshi Son, the "Representative Director, Corporate Officer, Chairman & CEO" of SBG; Rajeev Misra, the "CEO, SoftBank Investment Advisers" and "Executive Vice President" at SBG; and Ron Fisher, "Director & Chairman" of SBIA US. https://visionfund.com/team.

22. Public sources indicate that Mr. Son is the ultimate decision-maker for the Vision Funds. In the "Message from Our CEO" portion of the SoftBank 2021 Annual Report, Mr. Son describes decision-making for the Vision Funds in the first person, writing that "I have been focusing on [the Vision Funds] the most" and that "[c]ritics commented that my insight was not as good as before or that I had become too greedy" when the Vision Funds' "results fell short of expectations[.]" SoftBank 2021 Annual Report at 005.

23. Press reports also confirm this. For example, in an August 8, 2021 article, the Financial Times reported: "People close to [SoftBank] also say that it is difficult to challenge a decision that Son has already made at the Vision Fund level even if the deals are reviewed by [SBG]. 'If Masa has already said yes, who am I to object?' said one of the people." Kana Inagaki and Leo Lewis, *Softbank deals unleash internal compliance tensions: 'If Masa said yes, who am I to object?'*, Financial Times, Aug. 8 2021, https://www.ft.com/content/107fe840-1874-4fb2-a70b-f2f8f1381215.

24. Similarly, in an October 3, 2021 article, Bloomberg reported that "[s]everal senior people who departed [SoftBank Investment Advisers] grew frustrated with Son's overriding

DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO
OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

influence, which left them with little real authority[.]" Pavel Alpeyev, *SoftBank Is Cutting More Deals With Fewer Staff Than Ever*, Bloomberg, Oct. 3 2021, https://www.bloomberg.com/news/articles/2021-10-03/softbank-is-cutting-more-deals-with-fewer-staff-than-ever-before.

25. Again according to the SoftBank 2021 Annual Report, Vision Fund and Vision Fund II are managed by SBIA (UK), a wholly-owned subsidiary of SBG. *See* SoftBank 2021 Annual Report at 013. On the Vision Funds' website, SBIA (UK), SBIA (US) and SB Investment Advisers (Japan) Corp. are described as the Vision Funds' "advisory affiliates" and collectively referred to as "SoftBank Investment Advisers". https://visionfund.com/legal.

26. SBIA (US) is also a wholly-owned subsidiary of SBG and "provides investment advices" to SBIA (UK). SoftBank 2021 Annual Report at 151.

27. According to filings made with the U.S. Securities and Exchange Commission, SBIA (US) is incorporated in Delaware and has its "Business address" in California—specifically, at 1 Circle Star Way, 2F, San Carlos, California 94070. *See* https://www.sec.gov/edgar/browse/?CIK=1730859, "Company Information" tab.

28. Working with SoftBank and other entities (but not the Petitioner or any of its affiliates), the Katerra Group engaged in a comprehensive financial restructuring in late 2020 (the "Katerra Restructuring"), the ultimate goal of which was to eliminate all of the Katerra Group's then-outstanding debt and to provide it with additional capital.

29. As part of the Katerra Restructuring, it was agreed that Greensill Ltd would extinguish all of the Katerra Group's debts and obligations in relation to the outstanding Notes, and that Greensill Ltd would purport to cancel and render void the Katerra RPA and release the security Katerra Delaware had provided to Greensill in connection therewith—despite the fact that Greensill Ltd had already granted the participation rights described above and security to Greensill UK, which in turn had assigned those rights to Hoffman.

30. It appears that Katerra and SoftBank discussed this purported cancellation of the Katerra RPA as early as September 2020. *See* Niemann Decl. ¶ 23 (in September 2020, Katerra, SoftBank and "a consortium of new investors and existing stakeholders . . . executed a non-binding letter of intent" reflecting, among other things, "the retirement of Katerra's outstanding Greensill

DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

Receivables Facility").

31. The specific transaction contemplated in the September 2020 letter of intent "did not materialize" (*id.*), but, on December 1, 2020, Greensill Ltd and Katerra Delaware (and the other signatories to the Katerra RPA) entered into a letter agreement wherein Greensill Ltd purported to release various liens on assets Katerra Delaware and its affiliates had put up as collateral in connection with the Katerra RPA. This agreement is referred to herein as the "Security Release Agreement."[1]

32. Shortly thereafter, on December 30, 2020, Greensill Ltd, Katerra Delaware and Katerra Cayman entered into a "Contribution and Exchange Agreement" (the "CEA") dated December 30, 2020, by which Greensill Ltd purported to cancel any amounts then owed to it under the Katerra RPA to Greensill Ltd, assigned to Katerra Cayman all rights to any receivables previously sold to Greensill Ltd (Katerra Cayman then assigning such rights on to Katerra Delaware), cancelled the Katerra RPA going forward, and released all of the security granted to it as security for the obligations under the Katerra RPA. In exchange, Greensill Ltd received approximately 5% of the recapitalized shares of Katerra Cayman (which were immediately transferred to a Vision Funds entity, as discussed further below).

33. No SoftBank entity was a formal party to the CEA, but there is evidence that from at least about December 4, 2020, SoftBank was coordinating directly with Greensill the final details of the "termination" of Greensill Ltd's arrangements with the Katerra Group in connection with the Katerra Restructuring. The CEA was discussed and ultimately approved at one or more meetings of Katerra Cayman's Board of Directors—one of whom was Jeffrey Housenbold. Mr. Housenbold's LinkedIn page indicates that, during the relevant time period, Mr. Housenbold was a "Founding Managing Partner" at "SoftBank Investment Advisers" in "Silicon Valley." https://www.linkedin.com/in/jeffreyhousenbold1/. Because there does not appear to be an SBIA

---

[1] For purposes of brevity, I have not attached hereto the Security Release Agreement or the other specific agreements forming the basis of the Petitioner's anticipated Section 423 claim, but such agreements are in the possession of the Petitioner and have been reviewed in detail in connection with preparing the Section 423 claim.

8
DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

office in "Silicon Valley" other than SBIA (US)'s San Carlos, California offices, it appears that Mr. Housenbold operated out of those offices.

34. According to press reports and his LinkedIn page, Mr. Housenbold is currently a "Senior Advisor" to Vision Funds head Rajeev Misra and SBG CEO Masayoshi Son. *See* Ari Levy, *SoftBank Vision Fund Is Losing Jeff Housenbold, Who Led Investments in DoorDash, OpenDoor and Wag*, CNBC, Jan. 15, 2021, https://www.cnbc.com/2021/01/15/softbank-vision-fund-losing-jeff-housenbold-who-led-doordash-deal.html; https://www.linkedin.com/in/jeffreyhousenbold1/.

35. Redacted documents filed in later Katerra bankruptcy proceedings indicate that two other individuals associated with SoftBank—at least one of whom appears to have been employed by or operating on behalf of SBIA (US)—also attended at least two of the meetings of Katerra Cayman's Board of Directors where the CEA and/or Greensill's role in the Katerra Restructuring was discussed. *See* DIP Lender's Witness and Exhibit List for Hearing on July 19, 2021, Katerra Bankruptcy, Dkt. No. 610 at Ex. 4, p. 3 (redacted Katerra Cayman Board minutes identifying Hatim Suklha and Carpus Tin as "others present" representing "SoftBank" at a November 12, 2020 Katerra Cayman Board meeting); *id.* at Ex. 5, p. 2 (redacted Katerra Cayman Board minutes identifying Hatim Suklha and Carpus Tin as "others present" representing "SoftBank" at a December 23, 2020 Katerra Cayman Board meeting); https://www.linkedin.com/in/carpusktin/ (Mr. Tin's LinkedIn page indicates that he was an "Investment Associate" at "SoftBank Investment Advisers" in the "San Francisco, California" area at the time of these meetings).

36. Also on December 30, 2020, Greensill Ltd entered into an agreement with SVF II Abode—a Vision Funds entity incorporated in the Cayman Islands—by which Greensill Ltd transferred to SVF II Abode the 5% equity in Katerra Cayman that Greensill Ltd had acquired through the CEA (the "Share Disposal Agreement"). The Share Disposal Agreement references "good and valuable consideration" paid to Greensill Ltd in return for its transfer of Katerra Cayman equity to SVF II Abode, but none is specified in the Share Disposal Agreement, and the Petitioner is not aware of any.

37. Brian Wheeler signed the Share Disposal Agreement on behalf of SVF II Abode. Mr. Wheeler's LinkedIn page indicates that, during the relevant time period, Mr. Wheeler was a

DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

"Managing Partner & General Counsel" at "SoftBank Investment Advisers" in the "San Francisco Bay Area." https://www.linkedin.com/in/bcwheeler1/. Because there does not appear to be an SBIA office in the "San Francisco Bay Area" other than SBIA (US)'s San Carlos, California offices, it appears that Mr. Wheeler operated out of those offices. *See also* Kiyoshi Ota, *SoftBank's Top Lawyer Steps Down Amid Investment-Side Departures*, Bloomberg Law, Nov. 9, 2020, https://news.bloomberglaw.com/business-and-practice/softbanks-top-lawyer-steps-down-amid-investment-side-departures (press report referring to Mr. Wheeler as "managing partner and general counsel for SoftBank Investment Advisers, a San Carlos, Calif.-based entity that oversees [SoftBank's] Vision Fund").

38. To my knowledge, no one informed the Petitioner or any of its affiliates about this series of agreements until after they had already been executed.

39. According to public sources, at the close of the Katerra Restructuring, substantially all of Katerra Cayman's equity was held by three Vision Funds entities: SVF Abode, SVF II Abode, and SVF Habitat (collectively, the "SVF Funds"). *See, e.g.*, Niemann Decl. ¶ 27.

40. Greensill UK and another Greensill entity, Greensill Capital Management Company (UK) Ltd—but not at that time Greensill Ltd—were put into administration in the United Kingdom on March 8, 2021. The Australian parent company of Greensill, Greensill Capital Pty Ltd, was also insolvent. It entered administration in Australia on March 9, 2021 and went into liquidation on April 22, 2021.

41. Also in or about March 2021, the Notes that had been scheduled to mature in that month defaulted. The remaining Notes defaulted in or about May 2021. As such, to date, the Petitioner has not been paid any portion of the approximately $440 million it invested into the Notes.

42. In early June 2021, despite the Katerra Restructuring, the Katerra Group initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas in the form of the Katerra Bankruptcy.

43. In the petition it filed to initiate its bankruptcy proceeding (under case number 21-31862), Katerra Cayman's "List of Equity Security Holders" identifies only the three SVF Funds. The address for each of the SVF Funds listed in the bankruptcy petition is 1 Circle Star Way, San

10
DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

Carlos, California 94070, United States. *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re Katerra Inc.*, Case No. 21-31862 (Bankr. E.D. Tex.), Dkt. No. 1 at 6.

44. In a hearing that occurred on July 19, 2021 in the Katerra Bankruptcy, one of Katerra Cayman's independent directors, Pamela Corrie, provided testimony concerning an investigation she and Katerra Cayman's other independent director, Harvey Tepner, directed to investigate whether the Katerra Group possessed any cognizable claims against SoftBank such that SoftBank's request for a release in exchange for financing during the pendency of the Katerra Bankruptcy would be improper (the "Katerra SoftBank Investigation"). Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the transcript of that hearing. *See* **Exhibit 1** hereto at 127:15-25.

45. One focus of the Katerra SoftBank Investigation was an effort to determine "what happened with Greensill, and how had SoftBank paid off Greensill or what deal they had made" such that, via the CEA, Greensill was willing to terminate the RPA and return the rights to all outstanding receivables to Katerra. *Id.* at 133:20-134:8.

46. According to Ms. Corrie, as part of the Katerra SoftBank Investigation, "SoftBank" produced "over 2,000 documents" to counsel for Katerra Cayman's independent directors. *Id.* at 129:18-21.[2]

47. During the course of the Katerra SoftBank Investigation, counsel for Katerra Cayman's independent directors interviewed Mr. Housenbold as well as Madhav Dhar, Mr. Housenbold's replacement as the SoftBank representative on Katerra Cayman's Board of Directors. See *id.* at 131:7-9.[3]

48. Also interviewed were "two additional [SoftBank-affiliated] individuals, Tom Cheung and Saleh Romeih . . . both of whose names became apparent as having a substantial nexus to Katerra and the decisions made with respect to Greensill as a result of the document production

---

[2] In her testimony, Ms. Corrie did not specify which specific SoftBank entity or entities produced the documents.

[3] The transcript excerpts attached hereto as Ex. 1 refer to Mr. Dhar as "Mahd Abdar," but this appears to be a transcription error. Other filings in the Katerra Bankruptcy identify Mr. Dhar as Mr. Housenbold's replacement on the Katerra Cayman Board of Directors. According to Ms. Corrie, Mr. Housenbold was replaced by Mr. Dhar in "March of 2021." **Exhibit 1** at 152:20-21.

that was done by SoftBank." *Id.* at 131:9-14.

49. The Vision Funds website refers to Mr. Cheung as "Partner, Americas." https://visionfund.com/in/team/tommy-cheung. Mr. Cheung's LinkedIn page refers to Mr. Cheung as a "Partner" at "SoftBank Investment Advisers" in the "San Francisco Bay Area." https://www.linkedin.com/in/tom-cheung-947110/. Because there does not appear to be an SBIA office in the "San Francisco Bay Area" other than SBIA (US)'s San Carlos, California offices, it appears that Mr. Cheung works out of those offices.

50. During the same hearing, Ms. Corrie testified that, after Greensill became insolvent, the Katerra Group's executives reached out to SoftBank—including Mr. Housenbold—to "ask for help" in "confirm[ing] that [the] $440 million [outstanding under Katerra RPA] had been paid off[.]" **Exhibit 1** at 152:9-19. According to Ms. Corrie, however, SoftBank was "not particularly responsive to the requests of -- of Katerra for clarification." *Id.* at 153:1-2.

51. As such, Katerra Group "management continued to ask SoftBank for a number of things," including "information underlying the Greensill-SoftBank transaction[.]" *Id.* at 155:1-8. According to Ms. Corrie, SoftBank "said that this would have to go to the highest levels at SoftBank, up to Masa Son who makes the final decisions at SoftBank, and there was a -- a time set … at Katerra to speak to Masa Son that … ultimately took place [in] … late May of 2020." *Id.* at 155:10-17.[4]

52. On July 30, 2021, Greensill Ltd was placed into liquidation and partners in Grant Thornton were appointed as joint liquidators.

53. On October 21, 2021, the court in the Katerra Bankruptcy confirmed the Katerra Group's amended Chapter 11 bankruptcy plan (the "Katerra Bankruptcy Plan"). *See* Order (I) Approving the Disclosure Statement and (II) Confirming the Amended Joint Chapter 11 Plan of Katerra Inc. and Its Debtor Subsidiaries, Katerra Bankruptcy, Dkt. No. 1372.

54. The Katerra Bankruptcy Plan became effective on October 29, 2021. *See* Notice of Occurrence of the Effective Date of the Amended Joint Chapter 11 Plan of Katerra Inc. and Its Debtor Subsidiaries, Katerra Bankruptcy, Dkt. No. 1422.

---

[4] Given the context, Ms. Corrie clearly misspoke when she described the year of this meeting as 2020 instead of 2021.

**Steps Taken to Date**

55. On October 7, 2021 my firm wrote a 31-page letter to Mr. Timothy Mackey, whom I believe to be the group compliance officer for SoftBank. Attached hereto as **Exhibit 2** is a true and correct copy of that letter (the "October Letter").

56. The specific SoftBank entities to whom the October Letter was addressed are set out at Schedule 1 to that Letter. *See* **Exhibit 2** at 30.

57. The October Letter makes various points in relation to SoftBank's involvement in the Katerra Restructuring as follows:

    a. in the Executive Summary, it references the knowledge and involvement of Mr. Masayoshi Son (*see id.* ¶¶ 6-10);

    b. the relevant background facts are set out in some detail (*see id.* ¶¶ 14-93);

    c. various potential claims against SoftBank Entities are set out (including a reference to the Section 423 Claim) (*see id.* ¶ 95); and

    d. a number of explanations together with copies of various documents are requested (*see id.* ¶¶ 97-98).

58. In particular, the October Letter seeks an explanation of:

"The material discrepancy between: (i) the account which Mr Masayoshi Son and senior SoftBank staff gave of their knowledge and involvement in the Katerra programme and subsequent extinguishment of the RPA to Thomas Gottstein and other senior Credit Suisse representatives in a meeting held in September 2021; and (ii) contemporaneous evidence. In the September meeting, Mr Masayoshi Son denied all knowledge of the Katerra programme. However, this account is inconsistent with Lex Greensill's email with the subject line '*Katerra – Variation*' of 19 December 2019' to certain Greensill staff regarding SoftBank's approval of a guarantee which formed part of the underlying Katerra programme, which includes: "*Masa was personally sighted on the issue and gave me his personal commitment that the guarantee will be issued... (I have now done so and Masa was explicit about his support.)*" Further, we also understand, that on 10 October 2020, when the restructuring and refinancing of Katerra was being developed, Lex Greensill discussed these issues with Mr Son and gave a presentation to him. In light of these facts, Mr Son's stance in his meeting with Mr Gottstein is surprising and requires explanation. On the fact of it, it is clear that the Katerra programme had support and involvement from the most senior levels of management at the SoftBank Entities."

*See id.* ¶ 97.1.

59. On October 18, 2021, the law firm of Morrison & Foerster (UK) LLP ("MF") wrote

13

an initial letter to my firm noting that they acted for SBG (but not any other members of the SoftBank group). A true and correct copy of that letter is attached hereto as **Exhibit 3**.

60. On November 3, 2021, my firm wrote a letter to MF requesting a full response to the October Letter. A true and correct copy of that letter is attached hereto as **Exhibit 4**. The following day, MF wrote a slightly more substantive response to the October Letter. A true and correct copy of that letter is attached hereto as **Exhibit 5**.

61. There followed a further exchange of correspondence:

   a. on November 12, 2021, my firm wrote again to MF requesting a further explanation and documentation (including an explanation in relation to Mr. Son's role); and

   b. on November 26, 2021 MF replied and once again declined to provide any information or documentation (including failing to provide documentation which MF had referred to in the correspondence with my firm). True and correct copies of these letters are attached hereto as **Exhibits 6 & 7**, respectively.

62. There has been no further correspondence with MF since November 26, 2021.

63. On November 1, 2021, my firm received a letter from the law firm of Quinn Emanuel Urquhart & Sullivan UK LLP ("QE") which confirmed that they acted for all of the SoftBank entities listed at paragraph 5, above, apart from SBG. A true and correct copy of that letter is attached hereto as **Exhibit 8.** Since then, there has been an exchange of correspondence as follows:

   a. my firm responded to QE's November 1, 2021 Letter on November 12, 2021; and

   b. QE replied on November 30, 2021. True and correct copies of these letters are attached hereto as **Exhibits 9 & 10**, respectively.

64. There has been no further correspondence with QE since November 30, 2021.

**The English Lawsuit**

65. As matters currently stand, the Petitioner is planning to issue the Section 423 Claim against the following parties, referred to herein as the "Softbank Defendants":

   a. Vision Fund;

   b. Vision Fund II;

       c.       SVF Abode;

       d.       SVF II Abode;

       e.       SVF Habitat; and

       f.       SBG.

66. As to each of the SoftBank Defendants, the Petitioner plans to allege the following facts, all of which I am informed and believe are true:

       a.       SoftBank is a multinational conglomerate group based in Japan but active in the United States and elsewhere. It raises investments in the funds which it manages, and deploys those investments to invest in new and disruptive technologies. SoftBank invests in particular through Vision Fund, which was launched in 2017, and Vision Fund II, which was launched in 2019. As discussed above, the Vision Funds are Jersey limited partnerships. In the last four years, Vision Fund has made 92 investments and Vision Fund II has made 44 since 2019.

       b.       SVF Abode and SVF Habitat are companies incorporated in the Cayman Islands. It is reasonable to infer from their names and their roles as shareholders in Katerra Cayman following the Katerra Restructuring that they are companies through which the Vision Funds make investments;

       c.       SVF II Abode is also a company incorporated in the Cayman Islands. It is reasonable to infer, from its name and from its participation in the Share Disposal Agreement that it is a company through which the Vision Funds make investments.

       d.       SBG is the parent company of SoftBank group. SBG is a company headquartered and incorporated in Japan. SBG is a limited partner of, and contributes to the equity of, Vision Fund and it is the sole limited partner investing in Vision Fund II.

67. A true and correct copy of Sections 423 to 425 of the Insolvency Act 1986 is attached hereto as **Exhibit 11**.

68. The Petitioner's case in the Section 423 Claim is based on the following propositions:

       a.       that the transactions in December 2020 to which Greensill Ltd was party (namely, the Security Release Agreement, the CEA and the Share Disposal Agreement, together the "Improper Transactions") were at an undervalue;

  b. that the intention of Greensill Ltd was to assist SoftBank by freeing the Katerra companies of all Greensill Ltd's rights, claims and security, and therefore to put those valuable assets (which were Greensill Ltd's only assets apart from possible residual claims) beyond the reach of a person who might make a claim against Greensill Ltd's rights, claims and/or security against the relevant Katerra counterparties;

  c. that the English court therefore has discretionary jurisdiction to make a remedial order under Section 423 of the Insolvency Act 1986;

  d. that the SoftBank Defendants received benefits from the transactions (either directly through receiving the shares given up by Greensill Ltd, or indirectly because of the prospective benefit for their shareholding (or their economic interest in the shareholding) in Katerra Cayman);

  e. that the SCF Subfund is a "victim" of the transactions with standing to make an application (strictly, on behalf of all "victims," although it at present appears that the SCF Subfund would be the only such "victim"); and

  f. that the Court can make an appropriate order to restore the position that would have prevailed had the Improper Transactions not occurred and/or or protect the Petitioner's interests (including, potentially, an order that the SoftBank Defendants pay a sum of money to reverse the benefits they received as a result of the Improper Transactions).

69. The preparation of the English Lawsuit is well advanced. My firm has retained two Queen's Counsel to advise the Petitioner: Glen Davis (a restructuring/bankruptcy specialist) and Sonia Tolaney (a commercial litigator and trial lawyer). They (and a team of junior barristers) are currently working with my firm to finalize the Section 423 Claim and the aim is to be ready to file that Claim in the coming weeks.

70. It is considered that it will be necessary as a formality to join Greensill Ltd to the Section 423 Claim. This would be simply to ensure that Greensill Ltd is bound by any order the court made, and no substantive relief would be sought from Greensill Ltd.

71. Since Greensill Ltd is in liquidation, the leave of the English court is required to commence a claim under Section 423 (see section 424(1)(a) of the Insolvency Act 1986).

72.     Since Greensill Ltd is a U.K.-based entity, there is no issue with respect to service on that entity. Given that the other SoftBank Defendants are entities based outside the United Kingdom, leave of the court will be required to effect service on them.

73.     In addition to the Section 423 Claim, the Petitioner considers that it may have other potential claims against SoftBank. These claims are set out in some detail in the October Letter and the Petitioner is continuing to investigate those claims.

74.     The Petitioner is seeking from various sources further information it needs in order to be able to finalize those claims.

75.     It may be that the Requested Documents (as defined below) are relevant to these additional claims.

**Discovery sought**

76.     In this proceeding, the Petitioner seeks disclosure of documents from SBIA (US).[5]

77.     The Petitioner seeks eight limited categories of documents for use in the English Lawsuit (collectively, the "Requested Documents"). The time period for which the Requested Documents are sought is limited to the period between September 1, 2020 and May 31, 2021 (the "Requested Time Period").

78.     Each of the eight categories relates directly to the Section 423 claim the Petitioner plans to assert in that Lawsuit. In particular, several of the categories of Requested Documents will be relevant to the state of mind and knowledge of the SoftBank Defendants in relation to the Improper Transactions, as well as the degree of their involvement in arranging the Improper Transactions. This will be relevant to the English court's consideration of the form of relief it grants pursuant to the Section 423 Claim, under which it has wide discretionary powers (as set out in *4 Eng Ltd v Harper* [2009] EWHC 2633 (Ch): see in particular [13]-[14]).

79.     **First category**: the Petitioner seeks board minutes or other documents related to the Katerra Restructuring that were discussed by or presented to Katerra Cayman's Board of Directors

---

[5] I have submitted a similar declaration in support of the Petitioner's application for discovery from Katerra Cayman, which I understand has been filed or will shortly be filed in the United States District Court for the District of Arizona, also in connection with the English Lawsuit.

17
DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO
OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

in the Requested Time Period. As set out above, Jeffrey Housenbold of (the Petitioner believes) SBIA (US) was on Katerra Cayman's board at the relevant time. These documents will be relevant to the English Lawsuit because they may pertain to the degree of knowledge held and state of mind of the SoftBank Defendants at the relevant points in time.

80. **Second category**: the Petitioner seeks documents from the Requested Time Period consisting of or reflecting communications regarding one or more of the Improper Transactions. Such documents will be relevant to show the SoftBank Defendants' knowledge of, and involvement in procuring, the Improper Transactions.

81. **Third category**: the Petitioner seeks documents from the Requested Time Period consisting of or reflecting communications concerning whether or how the Katerra Restructuring would, could, or did affect the Petitioner, any investors in the Petitioner, or the Petitioner's various Credit Suisse affiliates. Such documents will be relevant to show the SoftBank Defendants' knowledge that the Improper Transactions would be detrimental to the Petitioner.

82. **Fourth, fifth, and sixth categories**: the Petitioner seeks documents from the Requested Time Period regarding the consideration underlying each of the three Improper Transactions. Such information is critical to the Petitioner's claim in the English Lawsuit because lack of proper consideration is fundamental to the Section 423 Claim.

83. **Seventh and eighth categories**: the Petitioner seeks: (i) documents from March 1, 2021 to May 31, 2021 consisting of or reflecting communications concerning the requests discussed above during this time period wherein the Katerra Group asked SoftBank to confirm that the amounts under the Katerra RPA had been "paid off" and for other "information underlying the Greensill-SoftBank transaction" (**Exhibit 1** at 152:9-19, 155:1-8); (ii) and the "over 2,000 documents" produced by one or more SoftBank entities to Katerra (*id.* at 129:18-21). As discussed above, those requests, and the subsequent Katerra SoftBank Investigation, directly related to SoftBank's role in the Katerra Restructuring, in particular the details of whether and, if so, how SoftBank had "paid off" Greensill for its cancellation of the Katerra RPA via the CEA.

84. The Requested Documents will likely not be obtainable in the English Lawsuit because, as discussed above, SBIA (US) is not currently anticipated to be named as a defendant to

DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782

the Section 423 Claim and as such it will not be obliged to provide any disclosure for that claim.

**Conclusion**

85. In my experience, English courts are familiar with the procedures set forth in the procedures set forth in 28 U.S.C. § 1782 and are receptive to the introduction or attempted introduction into evidence of documents obtained through that process.

86. The English Court will be receptive to evidence obtained through 1782 proceedings in the United States, as demonstrated by the English Court's judgment in *South Carolina Insurance Co v Assurantie Maatschappij 'De Zeven Provincien' NV* [1987] 1 AC 24 (see pages 41-42), in which the House of Lords confirmed that the 1782 procedure could be used to obtain evidence for use in English civil proceedings. *See also Nokia Corporation v Interdigital Technology Corporation* [2004] EWHC 2920.

87. There is no law, rule of evidence, or rule of procedure in the English Courts which prohibits a party from seeking discovery pursuant to a Section 1782 application and then using any evidence obtained through a Section 1782 application in English Court proceedings.

88. In fact, under English law, to obtain disclosure of documents within the control of a non-party who is located outside of the jurisdiction of the English Court, it is necessary to seek the assistance of the courts in that jurisdiction. I therefore believe that the English Court will be receptive to the use of the discovery sought by the Petitioner in this Application.

89. While it is technically permissible, as set out in *South Carolina Insurance*, for an English Court to grant an injunction preventing a party from making or proceeding with a Section 1782 application where the facts of that particular application in the context of the English litigation makes its pursuit unconscionable, I do not consider that the Petitioner's making of the Section 1782 Application in this instance is unconscionable, for the reasons set out in this declaration.

90. Should the 1782 Application be granted, I anticipate the requested discovery will be used in the English Lawsuit and will assist the English Court in fairly adjudicating these proceedings.

[SIGNATURE APPEARS ON FOLLOWING PAGE]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that I have executed same on this 23rd day of December, 2021 at 100 Bishopsgate, London. EC2

_____
NEIL ANTHONY GOLDING

20
DECLARATION OF NEIL ANTHONY GOLDING IN SUPPORT OF PETITIONER'S APPLICATION TO OBTAIN DISCOVERY UNDER 28 U.S.C. §1782