# Exhibit 1

to Declaration of Neil Anthony Golding
in Support of Ex Parte Application
for Discovery Order Pursuant to 28
U.S.C. § 1782

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

```
 IN RE:                      .   Case No. 21-31861
                             .   (Jointly Administered)
KATERRA, INC., et al.,       .   Chapter 11
                             .
                             .   515 Rusk Street
                  Debtors.   .   Houston, Texas  77002
                             .
                             .   Monday, July 19, 2021
. . . . . . . . . . . . . .   .   1:30 p.m.
```

TRANSCRIPT OF EMERGENCY MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE AMENDMENT TO THE DIP AGREEMENT
AND (II) GRANTING RELATED RELIEF FILED BY DEBTOR,
KATERRA, INC. [520]
**BEFORE THE HONORABLE DAVID R. JONES VIA VIDEOCONFERENCE
UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

For the Debtors:            Jackson Walker, LLP
                           By:  JENNIFER W. WERTZ, ESQ.
                           100 Congress Avenue, Suite 1100
                           Austin, Texas 78701
                           (512) 236-2000

                           Jackson Walker, LLP
                           By:  MATTHEW D. CAVENAUGH, ESQ.
                           1401 McKinney Street, Suite 1900
                           Houston, Texas 77010
                           (713) 752-4200

                           Jackson Walker LLP
                           By:  CHRIS R. BANKLER, ESQ.
                           2323 Ross Avenue, Suite 600
                           Dallas, TX 75201
                           (214) 953-6053

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:            Melissa Morgan, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):                           2

For the Debtors:          Kirkland & Ellis LLP
                          By:  GABOR BALASSA, ESQ.
                               CASSANDRA E. FENTON, ESQ.
                               RAVI S. SHANKAR, ESQ.
                          300 North LaSalle
                          Chicago, IL 60654
                          (312) 862-2000

                          Kirkland & Ellis LLP
                          By:  JOSHUA A. SUSSBERG, ESQ.
                               CHRISTINE A. OKIKE, ESQ.
                          601 Lexington Avenue
                          New York, NY 10022
                          (212) 446-4800

For the Unsecured         Fox Rothschild LLP
Creditors' Committee:     By:  GORDON GOUVEIA, ESQ.
                          321 N. Clark Street, Suite 1600
                          Chicago , IL 60654
                          (312) 980-3816

                          Fox Rothschild LLP
                          By:  MICHAEL A. SWEET, ESQ.
                               JACK PRAETZELLIS, ESQ.
                          345 California Street, Suite 2200
                          San Francisco, CA 94104-2670
                          (415) 364-5560

                          Fox Rothschild LLP
                          By:  TREY A. MONSOUR, ESQ.
                          2843 Rusk Street
                          Houston, TX 77003
                          (713) 927-7469

                          Fox Rothschild LLP
                          By:  WILLIAM STASSEN, ESQ.
                          2000 Market Street, 20th Floor
                          Philadelphia, PA 19103-3222
                          (215) 299-2853

                          Fox Rothschild LLP
                          By:  ELIZABETH C. VIELE, ESQ.
                               JOSEPH A. CANECO, ESQ.
                          101 Park Avenue, 17th Floor
                          New York, NY 10178
                          (212) 878-7968
```



```
TELEPHONIC APPEARANCES (Continued):                              3

For International        SMTD Law LLP
Fidelity Insurance      By:  ROBERT BERENS, ESQ.
Company and Harco       2001 East Campbell Avenue, Suite 201
National Insurance      Phoenix, AZ 85016
Company:                (602) 258-6219

The Sherwin-Williams    Vorys, Sater, Seymour & Pease LLP
Company:                By:  MELISSA S. GIBERSON, ESQ.
                        52 East Gay Street
                        Columbus, OH 43215
                        (614) 464-6400

For Liberty Mutual      Manier & Herod, P.C.
Insurance Company:      By:  MICHAEL E. COLLINS, ESQ.
                             ROBERT W. MILLER, ESQ.
                        1201 Demonbreun Street, Suite 900
                        Nashville, TN 37203
                        (615) 742-9350

For SB Investment       Weil Gotshal & Manges LLP
Advisers (UK) Limited   By:  JESSICA LIOU, ESQ.
and SoftBank:                SCOTT BOWLING, ESQ.
                             ROBERT S. BEREZIN, ESQ.
                             GARY T. HOLTZER, ESQ.
                             KEVIN F. MEADE, ESQ.
                             CAMERON MAE BONK, ESQ.
                        767 Fifth Avenue
                        New York, NY  10153-0119
                        (212) 310-8000

                        Weil Gotshal & Manges LLP
                        By:  ALFREDO R. PEREZ, ESQ.
                        700 Louisiana Street, Suite 1700
                        Houston, TX 77002-2784
                        (713) 546-5040

For Capitol Indemnity   Clark Hill Strasburger
Corporation:            By:  DUANE J. BRESCIA, ESQ.
                        720 Brazos Street, Suite 700
                        Austin, TX 78701
                        (512) 499-3647

For Wells Fargo:        McGuire Woods LLP
                        By:  CHARLES HAMPTON, ESQ.
                        600 Travis, Suite 4200
                        Houston, TX 77002
                        (713) 225-7104
```

TELEPHONIC APPEARANCES (Continued):                         4

```
For Wolff Company:        Milbank LLP
                          By:  EVAN FLECK, ESQ.
                               ANDREW LEBLANC, ESQ.
                          55 Hudson Yards
                          New York, NY 10001-2163
                          (212) 530-5567


For Haddad Heating &      Baker Donelson Bearman Caldwell &
Plumbing, Inc., E&N         Berkowitz, P.C.
Construction, Inc., and   By:  SUSAN CREGOR MATHEWS, ESQ.
Shehadi Commercial        1301 McKinney Street, Suite 3700
Flooring:                 Houston, TX 77010
                          (713) 286-7165


For BP Products North     Arnold & Porter Kay Scholer LLP
America, Inc., BP         By:  D. TYLER NURNBERG, ESQ.
Corporation North         70 West Madison Street, Suite 4200
America, Inc., and        Chicago, IL 60602-4231
Certain Affiliates:       (312) 583-2323


For Everest Reinsurance   Chiesa, Shahinian & Giantomasic P.C.
Company:                  By:  THOMAS WALSH, ESQ.
                          One Boland Drive
                          West Orange, NJ 07052
                          (973) 530-2096


                          Husch Blackwell LLP
                          By:  RANDALL RIOS, ESQ.
                          600 Travis Street, Suite 2350
                          Houston, TX 77002
                          (713) 525-6226


For Zurich American       Watt Tieder Hoffar & Fitzgerald LLP
Insurance Company and     By:  MARGUERITE LEE DEVOLL, ESQ.
Fidelity and Deposit      1765 Greensboro Station Place, S-1000
Company of Maryland:      McLean, VA 22102
                          (703) 749-1046


For PlayCore Wisconsin,   Gordon Rees Scully Mansukhani, LLP
Inc. d/b/a GameTime and   By:  MEGAN ADEYEMO, ESQ.
GT Grandstands, Inc.:     2200 Ross Avenue, Suite 3700
                          Dallas, TX 75201
                          (214) 231-4726


For Danisney Mejia:       Wingate Russotti Shapiro & Halperin
                            LLP
                          By:  NOAH KATZ, ESQ.
                          420 Lexington Avenue, Suite 2750
                          New York, NY 10170
                          (347) 767-4470
```



I N D E X
7/19/21

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTORS: | | | | |
| Marc Liebman | 63 | 82 | -- | -- |
| Matthew Niemann | 98 | 113 | 123 | -- |
| Pamela Corrie | 126 | 143 | -- | -- |

| EXHIBITS | ID | ADMITTED |
|---|---|---|
| Debtors' Exhibits 578-4 | -- | 60 |
| Debtors' Exhibits 578-6 | -- | 60 |
| Debtors' Exhibits 578-7 | -- | 60 |
| Committee's Exhibit 21 | -- | 63 |
| Committee's Exhibit 22 | -- | 63 |
| Committee's Exhibit 23 | -- | 63 |
| Committee's Exhibit 24 | -- | 63 |

Corrie – Direct/Bankler                    126

1          MR. MONSOUR:  My partner, Mr. Stassen.

2          THE COURT:  All right.  Thank you.  So I just

3 continue to get this wrong.  I'm always one behind.  All right.

4 Thank you.  All right.

5          Mr. Bankler, whenever you're ready.

6          MR. BANKLER:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8 BY MR. BANKLER:

9 Q    Ms. Corrie, will you please introduce yourself to the

10 Court.

11 A    Hi.  My name is Pamela Corrie, and I'm one of the two

12 independent directors for Katerra.

13 Q    When did you become an independent director of Katerra?

14 A    On September 23rd of 2020.

15 Q    When you say that you're an independent director, what

16 does "independent" mean to you in that context?

17 A    It means at a time when Katerra was struggling and facing

18 significant challenges, I was contacted by the attorneys for

19 Katerra and -- as were a number of other people, I assume.  And

20 there were interviews conducted by the then-current board of

21 Katerra, of the potential candidates to become independent

22 directors -- which means I had no prior connections whatsoever

23 with Katerra.

24 Q    Did you have any prior connections with SoftBank?

25 A    I did not.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Direct/Bankler                          127

1  Q    In the meantime, have you had -- aside from your role as

2  an independent director of Katerra, any connections with

3  SoftBank?

4  A    I have not.

5  Q    I assume you heard Mr. Monsour's opening argument here,

6  where he talked about the releases for the directors of

7  Katerra.  Did you hear him make that argument?

8  A    Yes, I did.

9  Q    Ms. Corrie, is it your understanding that you would be

10 released in connection with this DIP financing here today?

11 A    It is my understanding that I most certainly would not be

12 released, nor would the other independent director; and in fact

13 this is a clarification that we made on the record for

14 Mr. Stassen when I was deposed by him over the weekend.

15 Q    In connection with Katerra's filing, did you become aware

16 that SoftBank was requesting a release?

17 A    I did.

18 Q    What was your first step after you heard that request from

19 SoftBank?

20 A    Well, I immediately met with Harvey Tepner, who's the

21 other independent director, and we determined that it would be

22 important to immediately begin an investigation of any actions

23 by SoftBank that could potentially be a release, to make sure

24 that there was not a significant asset of the estate that was

25 inadvertently being released.

Corrie – Direct/Bankler                                    128

1     And once Harvey and I met and we determined to proceed
2  with an independent investigation, we really immediately
3  reached out to Jackson Walker, who had just been contacted to
4  serve as local counsel for Katerra.  And we spoke with you and
5  certain of your partners to ensure -- and to convince ourselves
6  that you, in fact, were -- had no conflicts of interest and
7  could perform an investigation of SoftBank, both as far as your
8  independence, your lack of conflicts, and also that you had the
9  capacity to do so quickly, because we knew we were going to be
10 very pressed in time to conduct this investigation; and that
11 you were able to do it in a reasonable manner, both time-wise
12 and economically.  Because we knew that the debtor had
13 significant liquidity constraints.
14 Q   After your selection of the independent investigators,
15 what was the first step in the investigations?
16 A   We instructed the attorneys at Jackson Walker to send
17 document requests to SoftBank, and we really spent a
18 substantial amount of time doing a full data dump of our
19 experience with Katerra, since we were involved in the previous
20 September, and also what we had learned during that period of
21 time, to give you all the information we could to jumpstart
22 your putting together a request -- document request for
23 SoftBank.  And we also instructed you to begin your review of
24 the documents that could be produced -- that could be found
25 from Katerra itself, and its officers and directors.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Direct/Bankler                    129

1  Q    What was your understanding of the -- where documents for

2  the investigation should come from?

3  A    Well, the biggest black box for us was SoftBank itself.

4  And so that was why our initial focus was to work on the

5  document requests -- have you guys work on the document

6  requests from SoftBank.

7       But we also wanted to review -- wanted you to review the

8  emails and communications from Katerra -- between Katerra and

9  SoftBank, to see if there was anything further to be found

10 there.

11            UNIDENTIFIED:  (Audio interference) --

12            THE COURT:  I did not hear that statement.

13            All right.  We'll just assume that someone forgot to

14 mute their phone.

15            All right.  Mr. Bankler, go ahead, please.

16            MR. BANKLER:  Thank you, Your Honor.

17 BY MR. BANKLER:

18 Q    Do you have an understanding, Ms. Corrie, of how many

19 documents, approximately, SoftBank produced in connection with

20 the investigation?

21 A    Yes, I do.  I believe they produced over 2,000 documents.

22 Q    Did you personally review any of those documents?

23 A    I did review some of them, yes.  I worked with our

24 counsel, you and your partners, to have you identify the

25 documents you thought that were important for the Committee,

Corrie - Direct/Bankler                                  130

1  the independent -- you know, investigation committee, to

2  review.  And I did identify -- I did review certain of those

3  documents myself.  In addition, of course, I looked through

4  some of my own emails, and also personally read some of the

5  Katerra documents that had been produced.

6  Q    Did you direct the investigators to review and search

7  through the emails produced by SoftBank?

8  A    I did.

9  Q    We heard about witness examinations earlier.  What was

10 your direction to the investigators with regard to interviewing

11 witnesses in connection with this investigation?

12 A    Well, we directed Jackson Walker to investigate, through

13 interviews, the current and former officers and directors of

14 Katerra, as well as certain people from SoftBank, the former

15 officer -- I'm sorry, the former director and the then-current

16 director.

17      And also, as we continued to meet on a regular basis with

18 the attorneys from Jackson Walker, to discuss the documents

19 that were being produced, we worked with the attorneys to

20 identify additional people at SoftBank that would be -- it

21 would be important to interview, based on their role with

22 Greensill or their role with Katerra.

23 Q    Which witnesses from the Katerra management team were

24 interviewed in connection with the investigation?

25 A    The CEO, Paal Kibsgaard, was -- had a witness interview;

Corrie – Direct/Bankler                              131

1  as well as Krishna Shivram, who is the former CFO; Brendan

2  Franich, who is the former general counsel; and Mollie Fadule,

3  who was the operational person with the company, and that

4  remains with the company today.

5  Q    Who were the witnesses from SoftBank who were interviewed

6  in connection with the investigation?

7  A    Jeff Housenbold, who is the former director, who no longer

8  is with SoftBank.  Mahd Abdar (phonetic), who is the current

9  director, who represents SoftBank on the board.  And then two

10 additional individuals, Tom Cheung and Saleh Romeih, who both –

11 – both of whose names became apparent as having a substantial

12 nexus to Katerra and the decisions made with respect to

13 Greensill as a result of the document production that was done

14 by SoftBank.

15 Q    Did independent directors, including yourself, receive

16 detailed reports of these witness interviews?

17 A    We did, yes.  We met with our counsel at Jackson Walker,

18 on a weekly or more than a weekly basis, and we discussed the

19 specifics and the relevant information that came out of the

20 witness interviews that would be most probative with respect to

21 the investigation.

22 Q    Did you personally speak with any of the witnesses in

23 connection with the (audio interference) --

24 A    I did.  Of course the dogs haven't barked all day, so I'm

25 so sorry.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Direct/Bankler                    132

1          THE COURT:  That's quite all right.

2          THE WITNESS:  (Audio interference)

3          Yes, I did.  I spoke both to follow up, after the

4    witness interviews of both Paal Kibsgaard and Mollie Fadule, to

5    clarify some information that had come out, not only in their

6    interviews, but in the interviews of the SoftBank employees.

7    BY MR. BANKLER:

8    Q    So, from a documents and witness interview perspective,

9    were you and the other independent directors closely involved

10   in monitoring and directing this investigation?

11   A    Yes, we were closely involved.  We pushed very hard.  We

12   were definitely slave drivers for the attorneys at Jackson

13   Walker and we demanded regular updates, which, once the

14   documents started coming in -- they came in a rolling basis

15   from Weil Gotshal and SoftBank.  And once they started coming

16   in, we met at least on a weekly basis and more often --

17   typically, more often than that.

18   Q    Moving away from the process of the investigation, let's

19   talk a little bit about some of the claims and issues that have

20   come up, principally raised by the objection of the UCC here.

21   First I'll just ask you, generally, what was the process in

22   terms of the investigation for identifying and evaluating

23   potential claims against SoftBank?

24   A    So, as the facts began to come in, and we built our

25   understanding of what had happened with SoftBank -- and

Corrie – Direct/Bankler                                    133

1  specifically, in the area of the Greensill transaction, we then
2  focused -- Jackson Walker directed that the existence of
3  claims, the type of -- certain legal actions to develop what
4  claims were out there, and how did the facts tie into those
5  claims, so that we could evaluate potential causes of action
6  and the strength of the facts in supporting any cause of
7  action.  And we worked closely with Jackson Walker through that
8  time, discussing the application of the facts to the law.
9  Q    You saw in the objection submitted by the UCC that they
10 believe that there are potential breach of contract and implied
11 covenant of good faith claims against SoftBank.  As part of
12 your investigation, did you consider those types of claims?
13 A    Yes, we certainly did.  And specifically, the claims
14 that arose out of the preferred share purchase agreement,
15 which contained a further assurances clause.  We were --
16 Jackson Walker identified that clause, and we talked about it
17 extensively, because we felt that it did create a requirement
18 that SoftBank produce additional documents as requested by
19 Katerra.
20      And since we had -- a significant black box existed as to
21 what happened with Greensill, and how had SoftBank paid off
22 Greensill or what deal had they made.  And that black box, of
23 course, raised our concerns that something had happened that
24 were weren't aware of, and that perhaps wasn't what we had been
25 told by SoftBank.

Corrie – Direct/Bankler                           134

1    And so we did demand –– repeatedly requested from SoftBank

2   management, and Katerra repeatedly requested of SoftBank, the

3   underlying documentation that existed between SoftBank and

4   Greensill to support the fact that the Greensill facility had

5   been paid off.  And so we were actually very concerned that

6   there was –– and I don't know if concerned is –– but we were

7   very focused on the potential cause of action, given the facts

8   in the case.

9   Q    After completing your investigation, what is your

10  assessment of the viability of a breach of contract type claim?

11  A    Well, unfortunately, what we found is that there were a

12  lot of weaknesses with such a claim.  And I think the

13  weaknesses started off with the fact that –– in the context of

14  the recapitalization at the end of December in 2020, Katerra

15  entered into a contribution and exchange agreement, which

16  clearly set out the cancellation of the Greensill debt.  That

17  it had been terminated, cancelled, and all obligations of

18  Katerra under that facility were discharged.

19        So when Katerra went back to SoftBank and said, well, show

20  us that we were discharged, they said you've got a document

21  that shows you were discharged.  And the fact that we wanted to

22  understand what had happened between Greensill and SoftBank,

23  arguably, might not have –– arguably, we might not have been

24  entitled to that, under the further assurance clause.  So we

25  were concerned about that.

1        But I think of equal importance, if not more so, is when
2   we pressed Jackson Walker to complete a legal review of that
3   type of cause of action -- a cause of action under a further
4   assurances clause, what we found is there really wasn't much
5   case law out there to support bringing this type of claim
6   against SoftBank based on these facts.  And in fact, the only
7   case that we found there that really supported the cause of
8   action under a further assurances clause was on wildly
9   different facts and circumstances than existed here.

10       And our sense was that a further assurances clause is
11  really an administrative provision, where if you need something
12  to allow you to file your UCC statements or whatever, you
13  exercise your rights under the further assurances clause.  But
14  to apply our request for -- to see what had happened between
15  Greensill and SoftBank, they -- you know, provide us with all
16  those underlying documents, because we think we might have been
17  damaged by your failure to do so, really got us into the realm
18  of something that was highly speculative.

19       So what type of damages could we prove from the fact that
20  we didn't get the underlying documents?  And as we spoke,
21  extensively, about the potential cause of action, I think we
22  all came to a similar conclusion, which is that damages --
23  first of all, (audio interference) this type of damages were
24  not considered in any of the case law.  And of equal
25  importance, that -- showing, proving damages to Katerra, that

Corrie – Direct/Bankler                    136

1  Katerra was destroyed by the fact that it didn't receive these

2  documents, and couldn't go to the press, couldn't defend

3  itself, was so speculative, was so attenuated, that we felt

4  that it would be extremely difficult to maintain a cause of

5  action under those legal theories.

6  Q    Ms. Corrie, the UCC also identified potential breach of

7  fiduciary duty claims against SoftBank's representatives on

8  Katerra's board of directors.  As part of your investigation,

9  did you evaluate potential breach of fiduciary duty claims?

10 A    We did, yes.

11 Q    What was your assessment on the viability of those types

12 of claims?

13 A    Again, we found many facts that showed that SoftBank had

14 not been forthcoming with Katerra about its underlying -- about

15 the details of its underlying obligation with Greensill.  And

16 while we might have wished that it had been more transparent,

17 we did not find that any of the facts that we discovered rose

18 to the level of breach of fiduciary duty.  And so we just

19 thought that there were some very serious issues with pursuing

20 a fiduciary duty claim against the directors.

21 Q    Did you evaluate any -- you are a lawyer by training,

22 Ms. Corrie, but I'm not asking you to give your legal opinion

23 here.  But did you --

24 A    Oh, thank goodness for that.  I'm a recovering lawyer.

25 Q    As part of your investigation, did you evaluate any

Corrie – Direct/Bankler                    137

1  potential roadblocks for a breach of fiduciary duty claim in

2  this context?

3  A    We did.  And it's going to be a run-on answer, so stop me

4  at any point.  But I think the first thing we made ourselves

5  comfortable about was that SoftBank had not gone rogue and done

6  anything on the board that was not reviewed fully by the

7  independent legal and financial advisors that the board had

8  retained.

9      So, as a threshold matter, independent legal and financial

10 advisors advising the full board, and often excluding SoftBank

11 from decisions of the board if there was a perceived conflict.

12 And then, based on what appeared in our view to be the exercise

13 of its business judgment relying on the advice of those

14 financial experts and legal advisors, the board voted on the

15 transactions that were put in front of it, and approved those

16 actions.

17     And not only did the board approve the recapitalization,

18 but -- in 2020, but, in fact, the board and the company took

19 the recapitalization to the shareholders, and the shareholders

20 approved those actions.

21     And so what you have is something that's set up from a

22 perspective of corporate governance of everybody exercising

23 their obligations, we found, in a way that was consistent with

24 their fiduciary duties.

25     And then, on top of that, we had the reality that SoftBank

Corrie - Direct/Bankler                              138

1  was released in December of 2020 from all actions leading up to

2  the recapitalization.  And all we were left with was, you know,

3  what came in the first few months of 2021.  And that those

4  releases, you know -- and not only releases, but the

5  exoneration that was -- I'm sorry, the exculpation that was

6  provided in the articles of the association of Katerra,

7  basically made SoftBank -- you know, took them out of the realm

8  of being vulnerable or liable to any claims that could be

9  brought under a fiduciary duty cause of action.

10       And then, finally, the facts didn't support a material

11  impact of SoftBank's actions as a board -- as board members,

12  didn't support any kind of material damage that had occurred to

13  Katerra.  So, putting all of that -- and I warned you it would

14  be a long answer, but putting all of that into perspective, we

15  -- in the exercise of our business judgment, we did not feel

16  that there was a good cause of action to pursue, especially

17  weighing that against not having a DIP.

18  Q    Hopefully this one shouldn't require as long of an answer,

19  Ms. Corrie.  If --

20  A    Okay.

21  Q    Putting aside the potential claims against SoftBank's

22  representatives on Katerra's board, did you evaluate other

23  potential claims directly against SoftBank?

24  A    The last set of claims we evaluated was under our

25  controlling shareholder theory, of whether there was some

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Direct/Bankler                              139

1  potential liability there.  And we found that probably to be

2  the very weakest of all of the areas that we looked into.  You

3  know, it's hard to prove that the stockholders, you know, have

4  these obligations -- or controlling shareholders -- and that

5  their behavior resulted in -- we really didn't see anything

6  that SoftBank did as a controlling shareholder, even if it were

7  deemed to be one post recapitalization -- that resulted in

8  damage to Katerra.

9       And specifically what we saw was a situation where

10 SoftBank had put in excess of $2 billion -- in fact, it started

11 to approach $3 billion, and received no return at any point

12 along the way.  And then, on top of everything else, they got

13 the releases through the recapitalization.  So, you know, we

14 didn't see any set of facts that had -- that related to the

15 SoftBank's behavior post-recap -- nor pre-recap, but not

16 post-recap when there were no release in place, that would

17 support a cause of action for a controlling shareholder.

18      In fact, you know, all SoftBank did was they said we've

19 given and we've given and we've contributed and we've supported

20 this company, and we can no longer do so.  And while that was

21 highly regrettable to the independent members of the board, and

22 certainly highly regrettable for management, it just seemed

23 like that that was within their rights as an investor to do so.

24 Q    You may have heard His Honor's question early in the day,

25 but I think you might have just touched on an answer that I

Corrie - Direct/Bankler                                140

1  think would get close to answering His Honor's question, which

2  was along the lines of SoftBank's liability related to whether

3  its officers or itself -- what us lawyers would call an

4  interested transaction or something that it received benefits

5  from.  I'm not going to ask you to opine on that, Ms. Corrie,

6  but I think I did hear you say that, as part of your

7  investigation, you looked at benefits that SoftBank received

8  over the course of its investment in Katerra, right?

9  A    Yes.

10 Q    From the course of your investigation, did you see that

11 SoftBank had ever received any distributions, dividends,

12 payments of any kind?

13 A    To the contrary.  We were certain that SoftBank had not

14 received any dividends or distributions throughout the period

15 of time that it was an investor in SoftBank [sic].

16 Q    Based on your investigation, is it accurate to say that

17 the only interest or payment of any kind that SoftBank got over

18 the course of its investments was equity ownership?

19 A    Absolutely.  And most recently, through the

20 recapitalization, SoftBank put in $200 million, and received

21 about 75 percent of the equity of Katerra, which, based on the

22 balance sheet at that time, was probably -- probably what they

23 had contributed.  The $200 million was in excess of what the

24 equity was worth.

25 Q    I'm going to move on to two quick, final points,

Corrie – Direct/Bankler                                        141

1 Ms. Corrie.  The first is, putting aside the substance of the

2 claims, did you examine the relative costs and benefits of

3 pursuing litigation against SoftBank?

4 A    We certainly did, and we directed Jackson Walker to fully

5 brief us as to their thoughts about what a litigation would

6 cost, how long it would take.  And so we looked at the cost and

7 benefits, and the likelihood of success, discounting any

8 probable or possible recovery by the likelihood of success on

9 the merits, and we concluded that the litigation would likely

10 be expensive, quite expensive, and last a long time.

11      SoftBank is a huge corporation, and it's multinational.

12 The witnesses that we would need are literally scattered around

13 the globe.  And at the end of the day, embarking on such a

14 litigation, where we thought that there was no valuable claim

15 to pursue, seemed like folly, under any circumstances, and

16 certainly when you weighed the likelihood of what would happen

17 with respect to the DIP dissolving, disappearing, and you know,

18 the liquidity no longer being there for the company to pursue.

19 Q    Ms. Corrie, as a director of Katerra, have you considered

20 some of the DIP financing options that we heard about from

21 Mr. Niemann and Mr. Liebman earlier?

22 A    Yes.  Those came in last night and this morning, and we

23 certainly have reviewed them, fairly -- in a fairly full way --

24 you know, robust way, between last night and this morning.

25 And really, with the same conclusions that were offered by

Corrie - Direct/Bankler                                          142

1  Mr. Niemann in his testimony, that it would be great if we

2  could close on one of those and take out SoftBank, because

3  they're difficult to deal with.  But -- nothing personal

4  (indiscernible) -- but that, in the meantime, there are

5  contingencies and we have to complete those contingencies.  We

6  have to -- a number of things have to be done before the money

7  is going to be funded from an alternative DIP.

8        And here's the deal.  I'm a member of the board of

9  directors.  I'm not a gambler, and I don't think it would be

10 prudent of me to gamble with the estate's money, and I don't

11 think it's -- I don't think -- I would never want to make a

12 Hail Mary pass.  And either putting all of our eggs in the

13 basket, litigating against SoftBank, or saying let's just go

14 bare and have no DIP here and have no liquidity and have the

15 company, which is barely being held together by A&M, as far as

16 keeping the contractors and subcontractors in place, and

17 working on the projects, and having them all find out that

18 we're going bare, here, that is really gambling everything on

19 these releases.  And that would not be something that I, in the

20 exercise of my judgment, as a fiduciary of the company (audio

21 interference) --

22            MR. BANKLER:  Thank you.  I'll pass the witness.

23            THE COURT:  All right.  Thank you.

24            Anyone else who supports the DIP have any questions

25 for Ms. Corrie?

Corrie – Cross/Stassen                          143

1    (No audible response)

2         THE COURT:  All right.  Mr. Stassen.

3         MR. STASSEN:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5  BY MS. STASSEN:

6  Q    Good evening, Ms. Corrie.

7  A    Good evening, Will.

8  Q    Good to see you again on such a short turnaround.

9  A    Yes.

10 Q    So a couple questions related to what you've testified

11 about on direct.  A number of questions referred to -- and I

12 want to make clear, your investigation was not as a result of

13 the objection filed by the Creditors' Committee, correct?

14 A    No, it was not.

15 Q    It started before the objection was filed by the

16 Creditors' Committee, correct?

17 A    (No audible response)

18        THE COURT:  Ms. Corrie, we seem to have lost you.

19 Perhaps did earphones die, maybe?

20        THE WITNESS:  (Audio interference)

21        THE COURT:  Oh, there -- you're back.  You're back.

22        THE WITNESS:  Well, I'm glad you can hear me.  I'm

23 frozen on my own (audio interference) --

24        THE COURT:  So you're also cutting out.  Why don't

25 you do this.  We're not going to go anywhere.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Corrie – Cross/Stassen                    144

1           THE WITNESS:  Yes.

2           THE COURT:  Why don't you disconnect and come back

3  in.

4           THE WITNESS:  Okay.  Will do.  Do it right away.

5  Thank you.

6           THE COURT:  Yes, ma'am.

7           Mr. Stassen, sorry for the interruption, but I'm

8  assuming you would rather have it a planned interruption than

9  right in the middle of your Perry Mason moment.

10           MR. STASSEN:  It's amazing, Your Honor, that these

11  don't happen more often, so --

12           THE COURT:  Do you know it's – really haven't, for 16

13  or 17 months, however long it's been, haven't had half a dozen.

14  So I'm going to kick -- oh, she came in through the web, as

15  opposed to the app.  She timed out, my guess.

16           MR. STASSEN:  I don't know if this is a time to take

17  a short break for people -- well, maybe she can come back in

18  right away.

19           THE COURT:  No, fair enough.  Let me ask -- and I

20  will stay right here.  Does anyone need -- oh, well, there she

21  is already.  All right.  You're in --

22           THE WITNESS:  Can you hear me?

23           THE COURT:  Yes.

24           THE WITNESS:  Okay.

25           THE COURT:  Perfect.

1    THE WITNESS:  Well, I just accomplished the one thing

2  I know I how to do, which is reboot.  So thank you, Your Honor,

3  for the recommendation.

4    THE COURT:  All right.  Mr. Stassen.

5    Let me ask -- Mr. Stassen had posed the question as

6  to whether or not a short break would be appropriate.

7    Ms. Corrie, you have been listening all afternoon,

8  and I'm going to totally defer to you.  Do you need a short

9  break or are you okay?

10    THE WITNESS:  I don't, but you've been sitting

11  without any break, so -- I'm happy to take a break, but I don't

12  need one.

13    THE COURT:  All right.  Mr. Stassen, are you okay?

14    MR. STASSEN:  I will make it through, Your Honor.

15    THE COURT:  No.  If you need a break, I'm happy to

16  take five minutes.  As everyone knows, I will sit here all day

17  long and never move.  And so I get insensitive to those issues.

18  So -- but if you need a break, let's take a break.

19    MR. STASSEN:  (Audio interference) --

20    MR. SUSSBERG:  (Audio interference) Your Honor, once

21  we complete Ms. Corrie, that's going to be the end of the case

22  for the company.  So it might be a good point, at that moment

23  in time, to take a break before the UCC puts its case on.

24    THE COURT:  Fair enough.  Mr. Sussberg, I'm reading

25  between the lines, and Ms. Stassen needs a five-minute break.

Corrie – Cross/Stassen                    146

1          So it's 6:34.  We're going to break for five minutes.

2   We'll get started at 6:40 Central Time.  All right?

3          MR. STASSEN:  Thank you, Your Honor.

4          THE WITNESS:  Thank you.

5          THE COURT:  Thank you.

6      (Recess taken at 6:34 p.m.)

7      (Proceedings resumed at 6:41 p.m.)

8          THE COURT:  All right.  The time is 6:41 Central.  We

9   are back on the record.

10          Mr. Stassen, whenever you're ready.

11          MR. STASSEN:  Yes.  First of all, thank you, Your

12   Honor, for the courtesy break.

13   BY MR. STASSEN:

14   Q    Ms. Corrie, there are several questions asked during your

15   direct regarding potential claims identified by the Committee

16   and its objections -- or its objection and whether or not you'd

17   done an assessment of those claims.  Do you remember that?

18   A    Yes.

19   Q    But if I understand your testimony correctly, you started

20   the investigation not as a result of the objection but as a

21   result of your own independent determination that you should

22   look into whether there is valuable claims being released as a

23   result of this DIP funding.  Is that correct?

24   A    That's correct.

25   Q    And I think you'd probably agree with me that during the

Corrie – Cross/Stassen                                    147

1 course of your investigation, you probably have access to more

2 documents and more witness, perhaps, than the Committee did

3 before it prepared its objections.  Is that correct?

4 A    I don't -- I don't know the answer to that.  It's

5 something I -- I know that we directed Jackson Walker to

6 collaborate very closely with the Committee, and my

7 understanding is that that had happened, but I don't know

8 whether you saw all the documents that Jackson Walker saw or

9 not.

10 Q    Okay.  And the total timeframe for you to conduct the

11 investigation that you testified about on direct was

12 approximately how long?

13 A    Well, I think we started probably the day before the

14 bankruptcy filing, so that was June 9th, I believe, June 8th.

15 Q    So --

16 A    No, I'm sorry --

17 Q    -- so that --

18 A    -- we filed on the 6th, I think, so maybe 5th, so five

19 weeks.

20 Q    Five weeks.  Okay.  Thank you.

21      And as a result of the investigation that you conducted,

22 obviously with the assistance of professionals, you identified

23 several potential claim areas.  Is that correct?

24 A    That is correct.

25 Q    And one of those claims related to a claim against

Corrie – Cross/Stassen                              148

1  SoftBank, correct?

2  A    So the -- maybe I didn't understand.  I mean, I discussed

3  in my direct that there were different claims based on

4  different legal theories and -- and specifically, we had looked

5  at three.  One was the contract breach, one was fiduciary duty,

6  another was controlling shareholder, and those were all against

7  SoftBank.

8  Q    Okay.  Let's deal with the SoftBank piece first, and we'll

9  come back to the fiduciary duty analysis and investigation that

10 you conducted.

11      With regard to SoftBank, there was some -- you've been

12 present for the testimony of the prior witnesses, correct?

13 A    Correct.

14 Q    And you heard one of the witnesses testify about the

15 Greensill failure.  Do you remember that?

16 A    You mean the --

17 Q    Do you remember that?

18 A    -- financial failure of Greensill?

19 Q    Correct.

20 A    Yes.

21 Q    Okay.  And prior to the Greensill failure, what was your

22 view of the -- were you optimistic with regard to Katerra's

23 future?

24 A    Yes, I was.

25 Q    And was that optimism shared by your fellow board members

Corrie – Cross/Stassen                           149

1  and management?

2  A    Yes, it was, as far as I know.

3  Q    And that optimism was based on facts, wasn't it?

4  A    Well, what it was based on was basically two months,

5  two-and-a-half months of performance post-recapitalization,

6  that for the first time in its several-year history since

7  Katerra was formed, Katerra performed -- the company performed

8  and met its projection for several months, and so it was the

9  tiny little green shoot and -- but it was the first time that

10 Katerra had met its projections, so yes, we were optimistic

11 that with a new management team and the new capital structure,

12 that it could continue to perform in months three, four, and so

13 on and meet its projection.  And those projections were that

14 Katerra would continue to lose money in 2021 but hopefully

15 become profitable at some point in 2022.

16 Q    And that all changed with the Greensill Financial failure,

17 didn't it?

18 A    Certainly, things, yes, became much more complicated once

19 the negative press arose after the Greensill failure.

20 Q    Okay.  And do you understand that SoftBank has significant

21 investment or had significant investments in Greensill?

22 A    I do understand that now, and I think we always understood

23 that there was a relationship between Greensill and SoftBank,

24 but I don't think -- I personally did not have any kind of

25 in-depth understanding as to what the details of that

Corrie – Cross/Stassen                          150

1  relationship were.

2  Q    Okay.  And there was some testimony earlier today with

3  regard to news media reports.  I think the *Wall Street Journal*

4  was mentioned specifically by a prior witness that related to

5  the Greensill bankruptcy.  Do you recall that?

6  A    Yes.

7  Q    Okay.  What do you recall with regard to the *Wall Street*

8  *Journal* article relating to Greensill?

9  A    What I recall is that it basically said, or postulated,

10  that Katerra might be on the hook for owing Greensill

11  $440 million, which was the amount that we knew that SoftBank

12  had paid off to -- to Greensill as part of the

13  recapitalization.  And so we were --

14  Q    So --

15  A    -- we were dismayed to see that because we felt that that

16  would be a negative -- create a negative fall in the market.

17  Q    Did it, in fact, create a negative fall in the market?

18  A    It did.

19  Q    What was the impact of that news report on Katerra?

20  A    Well, at the time that the news report came out, Katerra

21  was working on one of the important parts, important work

22  streams that would be critical to its ability to succeed, which

23  was setting up a new funding line with sureties, and the staff

24  at Katerra and the executives at Katerra were negotiating, were

25  in the process of negotiating for that new bonding line, and we

Corrie – Cross/Stassen                                        151

1  did not have a new bonding line in -- in place at that time,

2  but negotiations were moving forward.  And as a result of that

3  press, the sureties with whom we were speaking raised concerns

4  that, in fact, Katerra might have exposure, and that might put

5  their willingness to enter into these bonding lines with

6  Katerra in a different light.  And indeed, those sureties did

7  withdraw from negotiations with Katerra.

8  Q    Mr. Bankler asked you what SoftBank employees or Softbank

9  people you or your professionals interviewed as part of this

10 investigation.  Do you recall that testimony?

11           AUTOMATED VOICE:  Our system will end this conference

12 in five minutes.  To extend this call for one hour, please

13 enter the moderator PIN now.

14 BY MR. STASSEN:

15 Q    So you said you interviewed or caused you to --

16           AUTOMATED VOICE:  Your conference has been extended

17 for 60 minutes.

18 BY MR. STASSEN:

19 Q    Is that correct?

20 A    Mahd Abdar -- Jeff Housenbold was the former SoftBank

21 appointee to the board, longstanding, who then left SoftBank,

22 and Mahd Abdar is a very new appointee by SoftBank.

23           In addition, Tom Cheung and Saleh Romeih were all -- and I

24 don't -- and I'm sorry, but I'm not sure how to say his last

25 name, but they also were -- interviewed by --

Corrie – Cross/Stassen                                   152

1  Q    And did --

2  A    -- Jackson Walker.

3  Q    To your knowledge, did Katerra reach out to SoftBank and

4  say something to the effect of, can you please confirm

5  publically that the $440 million is no longer owed by Katerra

6  to Greensill?

7  A    Yes.  The executives at Katerra did reach out to SoftBank

8  and make that request.

9  Q    Did the two SoftBank board members, appointed board

10 members, to your knowledge, do anything to attempt to confirm

11 that that $440 million had been paid off?

12 A    Well, again, Jeff Housenbold was no longer with SoftBank,

13 but I do know that the executives -- I think Paal or perhaps

14 Krishna, the CEO or the CFO at that time, did reach out with --

15 did reach out to SoftBank and ask for help, and then when they

16 didn't hear anything back right away, they reached out to Jeff

17 and said, can you help us.  And whether or not he did anything,

18 I -- I can't say.  I don't think I know that and if I do, I

19 don't remember.

20      And then Mahd, who was not -- who was appointed to the

21 board, I want to say in March of 2021, did repeatedly go to

22 Softbank and -- and press them to be in contact with Katerra

23 and to talk to us about these requests.

24 Q    And did SoftBank respond with assurances that the Katerra

25 debt to Greensill had been paid?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Cross/Stassen                    153

1  A    They did not.  They were not particularly responsive to
2  the requests of -- of Katerra for clarification.
3  Q    And I think one of the things you mentioned on your direct
4  was you analyzed that there was a contract between Katerra and
5  SoftBank that required it to give assurances in relation to the
6  connection between the two companies and their agreements.  Is
7  that correct?
8  A    Correct.
9  Q    And did SoftBank give those assurances?
10 A    They did not.
11 Q    What resulted to Katerra as a result of the failure to
12 give assurances to the marketplace that the $440 million was no
13 longer owed to Greensill?
14 A    Well, Katerra did respond to the marketplace, to its -- as
15 I understand it, the executives at the time let us know that
16 they were speaking to the sureties and they were speaking to
17 the contractors, subcontractors, owners who were asking them,
18 and they were letting them know that, in fact, as part of the
19 recapitalization, the Greensill obligations were repaid in full
20 and, you know, we have the documents to prove that.  I -- I
21 can't say -- I don't know whether that document was shown to
22 anyone in particular or to everyone.  I just don't know that
23 information, but I do know that the management of Katerra were
24 trying to actively manage the anxiety -- the anxiety in the
25 marketplace and the uncertainty by assuring them that here's

Corrie – Cross/Stassen                                    154

1  the -- the document to show that the -- or we have a document

2  that shows, that proves that, in fact, the Greensill

3  obligations were repaid in full and canceled and discharged and

4  that Katerra no longer had any obligations there.

5      So those communications were ongoing, but they didn't --

6  they didn't succeed in -- in quelling the anxiety of the

7  marketplace in full, and we did have agreements in the pipeline

8  that went away.  Can I say that it was only for that reason?  I

9  can't.  But it -- it did happen during that period of time, and

10  we did have our discussions with sureties basically come to an

11  abrupt ending, as -- as I've mentioned previously.

12  Q    You mentioned on your direct that at some point in time,

13  SoftBank told you, you already have an agreement, why don't you

14  just show that agreement to whoever's asking, or something to

15  that effect.  I'm paraphrasing.  Do you recall that testimony

16  or something to that effect?

17  A    Well, I think -- I think what I meant to say, and I don't

18  recall exactly what I said, so I -- I apologize, but what I --

19  what the facts was that we had an agreement, we've asked for

20  SoftBank for more information, they did not provide it, so we

21  tried to do the best we could.  And when I say "we," it's

22  really management that is talking directly with vendors and

23  owners and -- and what have you.  Management did their very

24  best to -- to settle the anxiety in the marketplace, given the

25  facts that we had at hand.

Corrie - Cross/Stassen                          155

1    In the meantime, management continued to ask SoftBank for

2 a number of things, not just for their assurances, not just the

3 information underlying the Greensill-SoftBank transaction, but

4 also for a bonding line or for cash to put in accounts so that

5 we could provide cash collateral to the -- to the sureties, and

6 also for additional funding to help what was becoming a very

7 bad liquidity situation again at Katerra.  So there were many

8 asks that were made over a month or two period of time.

9  Q    And was SoftBank responsive to those asks?

10 A    They did not respond specifically to the asks.  They spoke

11 with management and they said that this would have to go to the

12 highest levels at SoftBank, up to Masa Son who makes the final

13 decisions at SoftBank, and there was a -- a time set for the

14 (indiscernible) at Katerra to speak to Masa Son that was

15 ultimately postponed and rescheduled for perhaps a week later

16 and ultimately took place -- I believe it was in early June.

17 No, I'm sorry.  Late -- late May of 2020.

18 Q    There was testimony from a prior witness that the

19 Greensill financial failure is what caused the failure of --

20 financial failure of Katerra.  Do you agree with that

21 statement?

22         MR. SUSSBERG:  I'm going to object --

23         THE WITNESS:  Well --

24         MR. SUSSBERG:  -- to that as misstating the evidence

25 but go ahead, Ms. Corrie.  If you can answer the question,

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Corrie – Cross/Stassen                    156

1  please do.

2          THE WITNESS:  I think we all --

3          MR. SUSSBERG:  (Indiscernible) objection, Your Honor.

4          THE COURT:  All right.

5          THE WITNESS:  I'm sorry.

6          THE COURT:  Mr. Stassen.

7          MR. STASSEN:  Yeah, I -- I'll rephrase the question.

8  That's probably the easiest thing to do.

9          THE COURT:  All right.

10  BY MR. STASSEN:

11  Q    Do you recall testimony from an earlier witness, she was

12  talking about the various DIP financing options that related

13  the Greensill financial failure to the Katerra financial

14  failure.  Do you recall that?

15  A    I do recall the testimony.

16  Q    Okay.  Do you agree with that testimony?

17          MR. SUSSBERG:  Mr. Stassen, I'm going to object to

18  that question.  It's confusing and vague.  Can you please ask

19  specifically -- I'm sorry.  I'll just state my objection, Your

20  Honor.  I --

21          THE COURT:  So --

22          MR. STASSEN:  That's fine.  I think -- sorry, Your

23  Honor.  I don't --

24          THE COURT:  No --

25          MR. STASSEN:  -- you started  talking.

ACCESS TRANSCRIPTS, LLC       ⚖       1-855-USE-ACCESS (873-2223)

Corrie – Cross/Stassen                              157

1          THE COURT:  Ms. Corrie, did you -- you are a uniquely

2    qualified witness.  Did you understand the question?

3          THE WITNESS:  I do understand the question.

4          THE COURT:  Then go ahead and --

5          THE WITNESS:  I guess how I'd like to answer it is

6    from my own point of view, do I believe that the Greensill

7    debacle negatively impacted Katerra in its -- in it significant

8    way?  I did feel that way at the time.  Absolutely.  We felt

9    that we were barely coming out of the 2020 recapitalization.

10   We were barely getting on our feet, and we were trying to

11   accomplish this major hurdle, which was putting surety lines in

12   place, and the bad press started coming out, and we couldn't

13   get ahead of it and ultimately, you know, we couldn't recover

14   from that.

15        So I do -- I do agree with that to a large extent, which

16   is why we were very interested in the further assurances cause

17   of action.  We -- we felt that -- that Katerra suffered because

18   of the Greensill debacle.  And we hoped that we would have a

19   significant cause of action as a result but as I testified to

20   in my direct, when we really broke it down and we looked at the

21   -- the legal elements of a cause of action, and we looked at

22   the facts here, and the speculative nature of an assertion that

23   Katerra would have succeeded if this had not happened, we felt

24   that we had really very significant obstacles to overcome to

25   bring that cause of action.  And betting that multi-year,

Corrie – Cross/Stassen                                    158

1  multi-million dollar cause of action against an orderly

2  liquidation of Katerra that could realize at least some

3  proceeds for the constituents was a hale Mary, bet-the-farm

4  kind of situation and reluctantly, we -- we -- the board of

5  directors, the independent members of the board determined that

6  it would be irresponsible and imprudent to bet the farm on that

7  cause of action.

8  BY MR. STASSEN:

9  Q    Ms. Corrie, when the --

10         MR. STASSEN:  I'm sorry, Your Honor.  That completed

11  -- was that -- do you have follow up?  Is there a follow-up

12  question from the Court?

13         THE COURT:  No.  No, no, no.  Go ahead.  I'm --

14         MR. STASSEN:  Okay.  All right.

15  BY MR. STASSEN:

16  Q    Ms. Corrie, when the negative press came out in the Wall

17  Street Journal in relation to this $440 million being owed to

18  Greensill which was, in fact, not owed, you testified that the

19  board -- two of the board members reached out to SoftBank,

20  perhaps management reached out to SoftBank.  Correct?

21  A    Management reached out to SoftBank after consulting with

22  the board.

23  Q    And isn't it true that the board felt it was important

24  that Katerra take its own stand and have its own public

25  relations position with regard to whether or not that the $440

Corrie – Cross/Stassen                                    159

1  million was owed?

2  A     Well, Katerra was taking its own stand and was speaking to

3  the sureties, the owners, the contractors, the subcontractors.

4  Katerra did not want a public relations campaign because I

5  guess we thought that it might not be the most effective way to

6  deal with the misinformation and we really hoped that SoftBank

7  would launch that campaign because certainly SoftBank was in a

8  better position to do so than Katerra was.  We had the document

9  that showed the debt we paid in full, that the obligation had

10 been paid and -- and discharged, and we certainly discussed

11 that with our constituents.

12 Q    Well, it is a case that the board decided that at least

13 initially that it was important to get the information out to

14 the press sufficient to calm various constituents of Katerra,

15 right?  In other words, issue a press release.  That was the

16 initial thought of the board.  Let's issue a press release,

17 correct?

18 A     There was discussion about whether we would issue our own

19 press release, yes.  We certainly wanted to go toe to toe and

20 overcome the negative impression in the press.  I mean that was

21 our --

22 Q    How could --

23 A     -- initial response.

24 Q    Right.  But the board didn't do that, did it?

25 A     No, we didn't.

Corrie – Cross/Stassen                              160

1  Q    And you didn't direct management to create a press

2  release, did you?  The board.  When I say --

3  A    Well, you're --

4  Q    -- you, I mean the board.

5  A    Right.  We worked with management to formulate a strategy

6  where we would go to SoftBank and hopefully build a stronger

7  case based on the actual facts of what happened between

8  SoftBank and Greensill, which Katerra did not know.

9  Q    So there's a Wall Street Journal article that is out there

10 in the world saying you owe $440 million, and the board

11 initially thought we should respond with a press release but

12 didn't, correct?

13 A    Correct.

14 Q    Instead, the decision was made let's go interact with

15 SoftBank and see if they'll do a media relations campaign,

16 correct?

17 A    Well, those are your words, but we certainly asked for

18 SoftBank's help in overcoming this perception in the press.

19 Q    Okay.  But you never -- the board never issued a press

20 release.  Is that correct?

21 A    The board did not issue a press release.  That is correct.

22 Q    Did the board make any members of management available to

23 Wall Street Journal or any -- or Blue Blood or, you know, CNBC

24 to address this issue in the public?

25 A    What the board did is it enlisted the advice of our

Corrie – Cross/Stassen                          161

1  advisor -- of our professional legal advisor, and we sought

2  their guidance, as did management -- sought the guidance of our

3  outside counsel as to how best to proceed.  And we received

4  that advice, and we followed  that advice.

5  Q    Even though the board decided to do a press release?  Did

6  the advisors tell the board not to issue a press release or not

7  respond in the media?

8  A    We followed the advice of the advisors, which was to reach

9  out to SoftBank and -- as an initial matter.

10 Q    Okay.  My question is did your advisors ever advise the

11 board or management not to issue a press release correcting the

12 record?

13         MR. SUSSBERG:  Mr. Stassen, are you asking about an

14 attorney-client communication?

15         THE COURT:  He is.

16 BY MR. STASSEN:

17 Q    Well, take the lawyers off the table for a second.  Are

18 there any advisors other than attorneys that you were asking

19 about with regard to this issue?

20 A    No, it was a attorney.

21 Q    Okay.  Were -- I'll move on.  Was Katerra for the board

22 without the help of SoftBank able to turn around the public

23 perception or let's take away the public perception.  It's too

24 general.  The perception of sureties, Katerra sureties, that

25 the $440 million was not owed.

Corrie – Cross/Stassen                              162

1  A    In a response to efforts of management, stock sureties,

2  and to assure them that, in fact, that Greensill facility had

3  been discharged, the surety said they were not in the business

4  -- effectively said they were not in the business of taking any

5  risks and regardless of whether Katerra had any actual

6  liability or not, if it was going to become embroiled in a big

7  kerfuffle -- that's a legal term -- with Greensill and the

8  Greensill insolvency proceeding in Europe, they really were not

9  willing to take that risk.  That was not what they did, and

10 they would want to cash collateralize any bonding line that

11 they provided to -- to Katerra.

12 Q    As a result sort of and in conclusion, Ms. Corrie, as a --

13 well, first of all, is it your pref -- would it be your

14 preference to have a DIP financing without the releases of

15 SoftBank and its directors and officers -- appointed directors

16 and officers?

17 A    Of course.  Of course.

18 Q    And as I understand your testimony -- or maybe I don't

19 want to reach a conclusion.  You should reach the conclusion.

20     As a result of the analysis that you conducted in the

21 investigation, is the reason why you'd rather have a DIP

22 financing without the releases because you -- there is value to

23 the claims that are being released?

24 A    I --

25 Q    I understand that you were doing a balancing --

Corrie - Cross/Stassen                    163

1 A    Sorry.

2 Q    -- of DIP financing in-hand now versus you were saying,

3 you know, claims maybe coming due or being paid sometime later,

4 but my question is more overarching.  In other words, there's

5 value -- you did recognize that there was some value in those

6 claims that you were investigating.  Is that correct?

7          MR. SUSSBERG:  I'm going to have to object to the

8 multiple compound question there.

9          THE COURT:  It did go through a number of different

10 gyrations.

11          Ms. Corrie, what do you believe you're giving up by

12 going along with the releases?

13          THE WITNESS:  Truthfully, what I feel we're most

14 giving up is our ability to come to a collaborative resolution

15 of this issue.  I -- I truly believe that these claims are not

16 worth pursuing if you're going to be paying for litigation and

17 spending good money after bad.  I do not believe they are worth

18 pursuing.  However, if the Committee had more time to evaluate

19 the claims and to take the depositions they want to take, and

20 to gather the information they want to gather, I believe they

21 would come to the same conclusion that Mr. Hefner and I came

22 to, which is that it's not worth spending millions of dollars

23 on litigation to pursue these claims.

24          And then finally -- since this is a compound

25 question, I'll give you a compound answer -- I know how cases

Corrie – Cross/Stassen                    164

1  work.  The Committee negotiates with a secured lender or the

2  DIP financier, and they extract a benefit even if the claims

3  are not worth very much.  That's how it works.  And if we

4  weren't releasing the claims under such pressure, because the

5  case is under such pressure because this is one of the most

6  dire situations I've seen in my many years of doing

7  restructuring, we're under terrible time pressure, and I feel

8  bad that the Committee has been under the same time pressure

9  that we've been under and that they haven't been able to do the

10 fulsome review that they want to do.  I wish they had more time

11 so they could come to the same conclusion I believe they would

12 that –– that I did.

13         So it's not that I feel that the claims have value.

14 It's that I feel that it's a consensual process with great

15 value, and I would always want a consensual collaborative

16 process rather than having to force a result on one of the

17 major constituents in this case, which is the unsecured

18 creditors committee, so I regret that.

19         THE COURT:  Mr. Stassen.

20         MR. STASSEN:  With that, Your Honor, I appreciate the

21 testimony, and I pass the witness.

22         THE COURT:  All right.  Thank you.  Anyone else that

23 opposes the DIP have any questions?

24    (No audible response)

25         THE COURT:  All right.  Ms. Corrie, you have sat and

1 listened to this now for roughly six hours, give or take.  You

2 have also had the benefit of reading the various objections,

3 position statements filed by the parties.  You've heard the

4 lawyers argue this afternoon from a number of different

5 viewpoints.  Have you heard anything that causes you to

6 reconsider your judgment?

7          THE WITNESS:  I have not, Your Honor.

8          THE COURT:  All right.  Thank you.

9          Any redirect?

10          MR. SUSSBERG:  I think you just did it for me, Your

11 Honor.

12          THE COURT:  Mr. Stassen, any recross on my one

13 question?

14          MR. STASSEN:  No, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Any reason that Ms. Corrie can't go feed her puppies?

17          MR. STASSEN:  No, Your Honor.

18          THE COURT:  All right.  Thank you.

19          Ms. Corrie, I appreciate your time this evening.

20          THE WITNESS:  Thank you so much.

21          THE COURT:  Thank you.

22      (Witness excused)

23          THE COURT:  All right.  And Mr. Sussberg, my

24 recollection is that completes the debtor's case in chief.

25          MR. SUSSBERG:  It does, Your Honor.  We are