**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| |
|---|
| IN RE EX PARTE APPLICATION OF CREDIT SUISSE VIRTUOSO SICAV-SIF IN RESPECT OF THE SUBFUND CREDIT SUISSE (LUX) SUPPLY CHAIN FINANCE FUND |

Case No. 21-mc-80308-JCS

## DECLARATION OF RICHARD CHARLES EAST

I, Richard Charles East, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      I submit this declaration in support of SB Investment Advisers (US) Inc. ("SBIA US" or "Respondent")'s Motion to Vacate the January 4, 2022 Order and Quash the Subpoena ("Motion").  The Respondent's Motion is made in response to the January 4 Order granting the *ex parte* application made by the Petitioner pursuant to 28 U.S.C. § 1782 ("1782 Application").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the accompanying Memorandum of Law.

2.      Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the subpoena; and (c) information supplied to me by the Respondent.

3.      All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.  To the extent any exhibit is redacted, such redactions are in the original.

## I.      BACKGROUND AND QUALIFICATIONS

4.      I am a Solicitor Advocate of the Senior Courts of England and Wales, having first qualified as a Solicitor in 1997. I was the founding partner, and I am now the Senior Partner of the London office of Quinn Emanuel Urquhart & Sullivan UK LLP ("Quinn Emanuel").  My

legal practice, which has spanned 25 years, is focused primarily on acting for both domestic and international clients in the areas of financial and insolvency disputes and litigation.

5.      I have conduct of this matter on behalf of the Respondent.

6.      A copy of my resume is attached hereto as Exhibit 1.

## II.      FACTUAL BACKGROUND

### *The Parties*

7.      SoftBank Vision Fund L.P. ("SVF I") and SoftBank Vision Fund II-2 L.P. ("SVF II") (together, the "Vision Funds") are Jersey limited partnerships that invest in emerging technologies through privately negotiated transactions in operating entities, generally referred to as "portfolio companies" and, in some cases, through direct or indirect investments in public securities. The Vision Funds receive investment advice from SBIA US and SB Investment Advisers (UK) Limited ("SBIA UK").  Each Vision Fund is comprised of a number of distinct entities. SVF II, for example, includes:

a)      SVF II Abode (Cayman) Ltd ("SVF II Abode");

b)      SVF II Wyatt Subco (Singapore) Pte Ltd ("SVF II Wyatt"); and

c)      SVF II Holdings (Singapore) Pte Ltd ("SVF II Holdings").

8.      The Greensill group was founded by Mr. Alexander Greensill ("Lex Greensill") in 2011 to provide supply-chain finance to corporate clients. The Greensill group operated through a number of different entities, including:

a)      its Australian-registered parent company, Greensill Capital Pty Ltd ("GCPL"). GCPL entered administration on 9 March 2021, which converted into a liquidation on 22 April 2021.

b)      a UK subsidiary of GCPL, Greensill Capital (UK) Limited ("GCUK"), which was Greensill's main trading company. GCUK entered administration on 8 March 2021.

2

c)      a UK subsidiary of GCUK, Greensill Limited ("GL"). GL entered

liquidation on 30 July 2021,

("GCPL", "GCUK" and "GL", together with any affiliates and Lex Greensill,

are referred to together herein as "Greensill").

9.      The Katerra group was a US-based startup in the construction industry. It

comprised several entities, including: (a) the primary entity, Katerra, Inc ("Katerra, Inc",

together with its affiliates, "Katerra"); and (b) a parent company incorporated in the Cayman

Islands ("Katerra Cayman").

***The Katerra RPA and Katerra's financial difficulties in 2020***

10.      On 9 December 2019, six Katerra entities entered into a Receivables Purchase

Agreement ("RPA") with GL which provided a framework for the Katerra entities to sell

US$440 million worth of receivables to GL.[1]

11.      On 19 December 2019, GL entered into a Participation Agreement with GCUK,

fully transferring its economic interest in Katerra's receivables to GCUK.[2]

12.      According to the Series Supplement which accompanied the Katerra Notes

(defined below), GL "*[was] a special purpose vehicle, which operate[d] solely for the purpose*

*of purchasing [receivables] from [Katerra] pursuant to the [RPA] and granting [interests] in*

*such [receivables] to [GCUK] pursuant to the [Participation Agreement]*".[3]  The reason given

by the Series Supplement for why GL operated as a conduit between Katerra and GCUK was

that this arrangement by-passed the need for GCUK to be licenced in California, which would

have been the case had GCUK entered into the RPA directly with Katerra instead of GL.[4]  GL's

---

[1]      Exhibit 2.

[2]      Exhibit 3.

[3]      Exhibit 4 – see page 10.

[4]      Exhibit 4 – see page 23.

three directors were Lex Greensill, the founder of Greensill; Jonathan Lane, Greensill's General Counsel; and Alastair Eadie, Greensill's Chief Financial Officer.[5]

13.     GCUK then on-sold its interest in Katerra's receivables to Hoffman S.à r.l ("Hoffman") which issued notes to the Petitioner (the "Katerra Notes") via Citibank N.A, London Branch ("Citi"), acting as Note Trustee.  I understand that GCUK and Citi are currently listed as GL's only creditors in the statement of affairs filed by GL's Joint Liquidators on 22 July 2021, without mention of the Petitioner as a creditor.[6]  GCUK used the proceeds from Hoffman's securitization of Katerra's receivables to fund GL's acquisition of US$440 million in current or future receivables from Katerra under the RPA.  This structure is displayed diagrammatically in Figure 1.[7]

Figure 1



The Vision Funds and their affiliates had no involvement in the securitization of the Katerra receivables by GCUK and, I am instructed, was not privy to the terms of the contracts between GCUK, Hoffman, Citi and the Petitioner (although the Vision Funds were generally aware that the Petitioner held the Katerra Notes).

---

[5]     Exhibit 5 – see https://find-and-update.company-information.service.gov.uk/company/11344883/officers.

[6]     Exhibit 6.

[7]     Figure 1 comes from Exhibit 25.

14.     Katerra relied on the RPA to fund its operations from December 2019 to May 2020, instead of raising funds through equity fundraising.[8]

15.     From June 2020 onwards, Katerra faced worsening liquidity that threatened its operations, and had already fully drawn on the US$440 million purchase facility under the RPA.[9]   Due to Katerra's progressively worsening financial difficulties, Katerra engaged advisors in August and September 2020 to evaluate its restructuring alternatives (including Katerra's obligations under the RPA).[10]

*The Restructuring Transaction*[11]

16.     Katerra's financial difficulties posed a risk to both SVF I and Greensill.  It posed a direct risk to SVF I because it was an investor in Katerra, having contributed approximately US$1.75 billion of financing to Katerra in 2018 and 2019 and thereby becoming its largest capital investor (without holding a controlling interest).[12]  It also posed a direct risk to Greensill because its access to funds to support future receivables financing arrangements could be jeopardized if the source of funds for the RPA (i.e. the Petitioner) suffered anything close to a US$440 million loss.  The direct risk to Greensill was an indirect risk to SVF I because SVF I was also an investor in Greensill, having invested US$526,649,687.36 in May 2019 and a further US$180,349,336.50 in September 2019.[13]  I am instructed that SVF I's investments, and later SVF II's investments (as described below), in Katerra and Greensill were managed on behalf of the Vision Funds by SBIA UK, with sub-advisory services provided by SBIA US.

---

[8]   Exhibit 7 – see paragraph 21.

[9]   Exhibit 8 – see paragraph 8.

[10]   Exhibit 8 – see paragraph 10.

[11]   The Restructuring Transaction refers to the suite of inter-connected transactions described in paragraphs 18 to 22.

[12]   Exhibit 7 – see paragraphs 19 and 22.

[13]   Exhibit 9 – see page 25, which also records SVF II's payment of US$440 million under the CLN.

17.     SoftBank Group Corp. ("SBG") is a strategic holding company headquartered in Japan.  SBG makes targeted investments, both directly and through its subsidiaries, in companies expected to drive the development of breakthrough technologies.  Greensill approached SBG and the Vision Funds in early October 2020 to solicit an injection of capital to insulate the Petitioner from incurring losses, which in turn would facilitate the restructuring of Katerra's debt obligations to GL, following which the parties explored their options in respect of the risk posed by Katerra's worsening financial position in order to facilitate a financial recapitalization and restructuring of Katerra's material obligations (including those arising under the RPA).

18.     Following negotiations between the parties, a deal was reached between the Vision Funds, SBG and Greensill, through a series of inter-connected agreements executed on 10 November 2020 (displayed diagrammatically in Figure 2):

a)     A Convertible Loan Note issued by GCPL to SVF II Wyatt, pursuant to which SVF II Wyatt provided US$440 million in cash to GCPL in exchange for the right to acquire equity ("CLN").[14]  This is the same amount that Greensill owed the Petitioner under the Katerra Notes.[15]

b)     An Omnibus Deed between GCPL, GCUK, SBG, Lex Greensill and SVF II Holdings ("Omnibus Deed").[16]  As part of the consideration for the US$440 million payable by SVF II Wyatt to GCPL, the Omnibus Deed provided, among other things, an acknowledgement that GCPL and GCUK would incur all losses arising from the Katerra Notes (held by the Petitioner) and the RPA (effectively relieving GL of any liability to GCUK or other affiliates) and would themselves remit, and procure

---

[14]   Exhibit 10.

[15]   Exhibit 43 – see paragraph 2(a).

[16]   Exhibit 11.

that GL also remit, any amounts recovered from Katerra under the RPA to SVF II Holdings, which were guaranteed to be at least US$176 million by 31 December 2020 (Clauses 2.4 and 3).  Recital C of the Omnibus Deed in fact expressly cross-referred to GCPL's receipt of US$440 million under the CLN, noting that: "*As part of the consideration provided by Greensill in respect of the [CLN], Greensill will assume any and all losses in respect of the Katerra Notes and the Katerra Programme ...*".  Notably, GCPL and GCUK also warranted that their entry into, and performance of, the Omnibus Deed "*do[es] not and will not conflict with ... any agreement or instrument binding upon [them]*" (Clause 6).



19.    The terms and structure of the CLN and Omnibus Deed reflected the Vision Funds' fundamental understanding that Greensill would use the US$440 million injected by SVF II to repurchase the Katerra Notes and thereby internalize the risk of any default by Katerra.  This also is confirmed by an email which Greensill's lawyers, Allen & Overy, sent on 4 November 2020 to SBG's lawyers which stated: "*SVF is putting Greensill in funds to the amount of $440m and <u>Greensill will be able to use this to fund the buy back of the CS notes</u>. That is why Greensill has the obligation to remit any funds recovered*" (underline emphasis added).[17]

---

[17]    Exhibit 12.

20.     On 10 November 2020, SVF II Wyatt performed its obligation under the CLN to advance US$440 million to GCPL by paying an amount equal to the US$440 million directly into a bank account in GCUK's name.[18]  The GCPL Administrators' report, dated 15 April 2021, further confirms that, as between GCPL and GCUK, GCPL on-lent the full US$440 million to GCUK via the intercompany loan account; the report explaining that: "*As a result of [GCPL] advancing funds from debt and equity raised to GCUK, and <u>GCUK providing a treasury function for the Group</u>, intercompany loan accounts were maintained*" (underline emphasis added).[19]  There are several statements which attest to the importance of GCUK to Greensill's financial position:

a)     The GCUK Joint Administrators' Proposals report dated 28 April 2021 noted that: "*GCUK was the main trading entity for the [Greensill] Group and provided financial support and management for the wider Group*".[20]

b)     The GCPL Joint Liquidators' report, dated 22 July 2021, noted that: "*GCUK acted as the central treasury function for the broader Greensill Group and available funding for the Group was typically held by GCUK*".[21]

c)     One of the Joint Liquidators of GL expressly acknowledged in his testimony to the Bankruptcy Court (defined below) that "*[GL] was reliant on Greensill Capital UK*".[22]

21.     I am instructed that, when it became apparent in late November 2020 that Katerra would be unable to raise US$176 million (the amount which Greensill guaranteed

---

[18]   Exhibit 13.

[19]   Exhibit 9 – see page 30, paragraph 7 (left hand column) and note 7 (right hand column).

[20]   Exhibit 14 – see page 2.

[21]   Exhibit 15 – see page 11.

[22]   Exhibit 27 – see page 32.

under the Omnibus Deed that it would remit to SVF II by 31 December 2020),[23] SVF II, Greensill and Katerra executed the following series of interconnected follow-on transactions (displayed diagrammatically in Figures 3 and 4).  Specifically:

a) On 1 December 2020, GL released by letter agreement liens over Katerra assets offered as security in connection with the RPA;[24]

b) On 23 December 2020, GCPL, GCUK, SBG, Lex Greensill and SVF II Holdings amended the Omnibus Deed to, among other things: (1) remove the obligation on GCPL and GCUK to remit US$176 million to SVF II Holdings by 31 December 2020; and (2) add an obligation to remit any equity received from Katerra to SVF II Holdings (in addition to the existing obligation to remit any cash recoveries) (Clause 3);  (the "Amended Omnibus Deed").[25]  GCPL and GCUK again warranted that "*the[ir] entry into and performance by [them] of, and the transactions contemplated by, this Deed do not and will not conflict with: ... any agreement or instrument binding upon [them] or any of [their] assets ...*" (Clause 5).

c) On 23 December 2020, GCPL, SVF II Wyatt and SVF Wyatt (Singapore) Pte Ltd amended the CLN to increase SVF II's equity holding in GCPL (the "Amended CLN").[26]

d) On 30 December 2020, GL, Katerra Cayman and Katerra, Inc entered into the Contribution and Exchange Agreement under which GL transferred Katerra's debts to Katerra Cayman (which were then forgiven) and forgave Katerra Cayman's

---

[23] Exhibit 8 – see paragraph 11, which notes that a prospective transaction with a consortium of new and existing investors did not materialize.

[24] Exhibit 16.

[25] Exhibit 17.

[26] Exhibit 18.

parent guarantee in consideration for Katerra Cayman transferring 5% of its equity to GL (the "CEA").[27]

    e)     On 30 December 2020, GL and SVF II Abode entered into the Transfer Agreement under which GL transferred the 5% equity it received from Katerra Cayman under the CEA to SVF II Abode (the "Transfer Agreement").[28]



22.    The December follow-on transactions were consistent with the Vision Funds' understanding that the risk of loss associated with the RPA had already been passed on to SVF II as part of the consideration for its payment of US$440 million.

---

[27]  Exhibit 19.

[28]  Exhibit 20.

### *Greensill's use of the US$ 440 million*

23.     Instead of using the US$440 million to buy back the Katerra Notes from the Petitioner and, in turn, manage the risk of a potential Katerra default internally as the Vision Funds had understood that Greensill would do, Greensill transferred some of the US$440 million to another Greensill entity incorporated in Germany, Greensill Bank AG ("GBAG").[29] It also appears to have used some of the US$440 million to "*provide additional funding to the Greensill Group*".[30] It is not currently known when these transfers of the US$440 million occurred, albeit that it must have occurred either on or after 10 November 2020, after the funds were paid by SVF II Wyatt into the GCUK-named bank account.  I am instructed that SBIA US, and in turn, the Vision Funds, only discovered for the first time in January 2021 that Greensill did not use the US$440 million to buy back the Katerra Notes.[31]  I am also instructed that GBAG was under investigation by the German Financial Supervisory Authority, BaFin.

## III.   TEXAS PROCEEDINGS

24.     On 6 June 2021, Katerra, Inc and 32 affiliates commenced Chapter 11 Cases before the US Bankruptcy Court Southern District of Texas Houston Division ("Bankruptcy Court") to market and sell their assets and conduct an orderly wind down of their operations. In the Declaration of Mr. Marc Liebman, Chief Transformation Officer of Katerra Cayman, dated 7 June 2021 filed in the Bankruptcy Court, Mr. Liebman states at paragraph 70 that one of the terms upon which Katerra "*consummated*" an out-of-court reorganisation of Katerra's capital structure in December 2020 was that: "*Greensill extinguished approximately $440 million owed by Katerra under the Greensill Receivables Facility in exchange for approximately 5% of the post-equity closing in Katerra, which equity was immediately*

---

[29]   Exhibit 15 – see page 17.

[30]   Exhibit 15 – see page 17.

[31]   Exhibit 37 – see paragraph 12.

*transferred by Greensill to an affiliate of SVF II in connection with a transaction in which SVF II invested $440 million in the parent company of Greensill".*[32]

25.     On 7 August 2021, the Joint Liquidators of GL (the "<u>Joint Liquidators</u>"), which are funded by Credit Suisse (see paragraph 30 below), filed proofs of claim in the Katerra Chapter 11 Cases giving notice of several potential claims ("<u>Proofs of Claim</u>"), including a claim that the CEA constituted a transaction at an undervalue under s 238 of the Insolvency Act 1986, an Act of the Parliament of the United Kingdom ("<u>Insolvency Act</u>") ("<u>238 Claim</u>").[33] The Proofs of Claim also claimed that the CEA constituted a transaction defrauding creditors under s 423 of the Insolvency Act.[34]  The Joint Liquidators further expanded their 238 Claim in their objection to Katerra's Disclosure Statement filed 23 August 2021.[35]

26.     On 31 August 2021, Katerra filed an objection to disallow and expunge GL's Proofs of Claim against each of the Katerra entities.[36] This filing substantively engaged with GL's 238 Claim and rejected it at paragraph 1 as "*a bold attempt to obtain a duplicative recovery on account of comprehensive, arm's-length, multi-party transactions pursuant to which [GL] and its affiliates (collectively, the "<u>Greensill Entities</u>") have already received full consideration* ".

27.     The Joint Liquidators responded to Katerra's objections in their Response filed 15 October 2021.[37]

---

[32]   Exhibit 8 – see paragraph 70.

[33]   Exhibit 21 – see section B(ii)(b).

[34]   Exhibit 21 – see section B(ii)(c).

[35]   Exhibit 22.

[36]   Exhibit 23.

[37]   Exhibit 24.

28.    On 11 September 2021, the Joint Liquidators filed a motion to lift the automatic stay on Katerra so that they could pursue their 238 Claim in England.[38]  In support, a draft particulars of claim was exhibited which identified SVF II Abode as one of the intended defendants.[39] The Joint Liquidators' motion also noted that they could assert "*potentially other claims*".

29.    I am instructed that, in advance of the hearing of that motion to lift the stay, SVF II Abode instructed its counsel (Weil, Gotshal & Manges LLP) that SVF II Abode did not contest the Bankruptcy Court's jurisdiction for the purposes of having that Court determine GL's 238 Claim, as part of the Katerra Chapter 11 proceedings.  That instruction was reflected in the cross-examination of Mr. Charters by Katerra's counsel in open court.[40]

30.    At a hearing on 4 October 2021, the Bankruptcy Court denied GL's application to lift the stay on Katerra, finding that: "*Based upon the evidence presented, there is -- <u>it's not even a close call</u>, that the movant [GL] has <u>failed to establish any cause for relief</u> from the automatic stay*"[41] (underline emphasis added).  The Court went on to state, referring to the Joint Liquidators' efforts to have GL's 238 Claim heard in England, that: "*Again, I will not be a pawn in a game. … people having invoked the claims adjudication process. They will play the game transparently and without exterior motivations that are hidden from the Court. The motion's denied.*"[42]  This followed earlier suggestions by the Court that GL's counsel had not been entirely honest with the Court in describing GL's motivations.[43]  Separately, at the hearing,

---

[38]   Exhibit 25.

[39]   Exhibit 26.

[40]   Exhibit 27 – see page 47.

[41]   Exhibit 27 – see page 97.

[42]   Exhibit 27 – see page 97.

[43]   Exhibit 27 – see pages 93-97.

GL's Liquidator, Mr. Andrew Charters, acknowledged in open court that "*in essence ... Credit Suisse*" (i.e. the Petitioner) was funding the Joint Liquidators' efforts.[44]

31.     On 19 October 2021, Katerra filed an Amended Joint Chapter 11 Plan (the "Plan") which was confirmed by order of the Bankruptcy Court on 21 October 2021.[45]  Katerra Cayman's shares in Katerra, Inc are defined as "Existing Interests", which according to Article III.B.6.(b) are "*canceled, released, and extinguished*" and Katerra Cayman "*shall [not] be entitled to any recovery or distribution under the Plan on account of such Existing Interests*". Since Katerra Cayman's shares in Katerra, Inc have now been extinguished by the Plan, the 5% equity transferred to SVF II Holdings by GL pursuant to the Transfer Agreement is now equally worthless.

32.     On 15 November 2021, with respect to GL's Proofs of Claim, the Bankruptcy Court accordingly ordered, among other things, that:[46]

a)      GL identify all causes of action it was pursuing by 13 December 2021;

b)      There be monthly status conferences, beginning on 24 January 2022; and

c)      The trial be set for 18 July 2022.

33.     On 13 December 2021, the Joint Liquidators filed a notice indicating that they were only pursuing the 238 Claim in relation to both, inter alia, the CEA and the Transfer Agreement against both Katerra and SVF II Abode.[47]

34.     On 22 January 2022, SBIA US, as representative of SVF II Abode and SVF II Holdings, applied to join Katerra's objection to GL's Proofs of Claim, the justification being that GL's 238 Claim named SVF II Abode as a defendant, and GL contended that SVF II

---

[44]   Exhibit 27 – see page 30.

[45]   Exhibit 28; Exhibit 29.

[46]   Exhibit 30.

[47]   Exhibit 31.

Holding's transfer of US$440 million under the CLN was not connected to the CEA and Transfer Agreement.[48]

35.     Before the 24 January 2022 status conference, the Joint Liquidators filed a Notice of Agenda advising that they were aware of SBIA US's proposed joinder, but still intended to address at the status conference: "*Greensill Limited's withdrawal of all causes of action <u>other than its claims for a transaction at an undervalue</u>*" (underline emphasis added).[49] Despite previously notifying the Court of their intention to still pursue the undervalue 238 Claim, at the status conference hearing itself the Joint Liquidators advised the Bankruptcy Court that they intended to withdraw their Proofs of Claim in their entirety. The parties subsequently negotiated a form of order.

36.     On January 28, 2022, the Bankruptcy Court entered the form of order, confirming that "*[t]he Greensill Claims are hereby withdrawn, with prejudice*".[50]   The "*Greensill Claims*" were defined as the Proofs of Claim filed on 7 August 2021 and included both section 238 and 423 claims.  The order imposed limitations on GL, which prevent it from contending that the debts under the RPA should be restored:

> a)     Paragraph 2: "*… Greensill Limited shall not receive any Plan distributions on account of the Greensill Claims.  … Greensill Limited shall not continue to prosecute any of the Greensill Claims to final judgment on the merits against the Debtors … in this Court or any other jurisdiction, foreign or domestic. …*"

> b)     Paragraph 3: "*Greensill Limited shall not be entitled to file any additional claims in these chapter 11 cases.*"

---

[48]   Exhibit 32.

[49]   Exhibit 33.

[50]   Exhibit 34.

c)       Paragraph 4: "*Greensill Limited shall not be entitled to any recovery from the Debtors … in these chapter 11 cases on account of any claims that were or could have been asserted against the Debtors … prior to the Petition Date.*"

## IV.    INTER-PARTES CORRESPONDENCE

37.     The Petitioner did not correspond directly with SBG or the Vision Funds in respect of its alleged "English Lawsuit" (as defined in the 1782 Application) until after GL's Joint Liquidators, who the Petitioner was funding, were unsuccessful on 4 October 2021 in their application to lift the stay on Katerra in order to bring their 238 Claim in England.

38.     On 7 October 2021, Freshfields Bruckhaus Deringer LLP ("Freshfields"), acting on behalf of the Petitioner, sent a letter to Mr. Timothy Mackey, the Group Compliance Officer at SBG (the "Petitioner's October 7 Letter").[51] The Petitioner's October 7 Letter also addressed the Vision Funds and affiliated entities, despite the fact that the Vision Funds are separate legal entities to SBG and have separate legal representation.

39.     On 19 October 2021, Freshfields forwarded the Petitioner's October 7 Letter to Quinn Emanuel, Morrison & Foerster (UK) LLP having confirmed in response to Freshfields that it only acted for SBG.[52]

40.     The Petitioner's October 7 Letter is notable in the following respects:

a)       It advanced several serious allegations against SBG and the Vision Funds, almost all of which depended on proving fraudulent intent and/or knowledge. Such alleged claims included: (a) tortious claims for inducing breach of contract and/or interfering with contract; (b) a tortious claim for unlawful means conspiracy with Greensill; and (c) a claim under s 423 of the Insolvency Act for transactions defrauding creditors ("423 Claim").  As at the date of this declaration, it is only this

---

[51]   Exhibit 35.

[52]   Exhibit 36.

latter claim, the 423 Claim, which the Petitioner has since made any attempt at articulating, as appears in the 1782 Application and the declaration of Neil Anthony Golding.

b)      It identified that the Petitioner had potential claims against SBIA US, which was included in its list of "SoftBank Entities" (as defined therein).[53] The Petitioner has never given an explanation for why it named SBIA US as a potential defendant to English law claims in its October 7 Letter, yet now, in the material supporting its 1782 Application, states that it "*does not currently anticipate naming SBIA US as a defendant in the English Lawsuit*".

c)      It requested an extensive list of documents and information from the SoftBank Entities, including, but not limited to, various letters of undertaking, letters of intent and financial/transaction materials which were purportedly entered into between the SoftBank Entities and GL.  However, no explanation was given for why the Petitioner considered itself entitled to such documents and information.

41.    On 1 November 2021, Quinn Emanuel replied on behalf of the "Vision Fund Entities" (as defined therein to be the SoftBank Entities minus SBG"[54]) to the Petitioner's October 7 Letter (the "Vision Fund Entities' 1 November Letter"),[55] noting that:

a)      The claims identified in the Petitioner's October 7 Letter all suffer from the same fatal flaw, namely, they all rely on proving that the Vision Fund Entities knew, or ought to have known, that the effect of the Katerra restructuring would be to harm the Petitioner by effectively rendering the Katerra Notes worthless.  However,

---

[53]  Exhibits 35 and 36 – see footnote 2.

[54]  Exhibit 37 – see paragraph 2 where "Vision Fund Entities" is defined as: (a) SVF I; (b) SVF II; (c) SVF Abode (Cayman) Limited; (d) SVF II Abode; (e) SVF Habitat (Cayman) Limited; (f) SBIA UK; (g) SBIA US; (h) SVF II Wyatt; and (i) SVF II Holdings.

[55]  Exhibit 37.

not only had the Petitioner failed to provide any evidence to support such a serious assertion, but it would be unable to do so, because the Vision Fund Entities had no such knowledge and as such, could never have possessed the requisite intent to cause any harm to the Petitioner.

b)      The claims in the Petitioner's October 7 Letter are in fact explicitly contradicted by the Omnibus Deed:

i.      As noted above, Recital C of the Omnibus Deed provides that: "*As part of the consideration provided by Greensill in respect of the SVF II Loan Note, Greensill will assume any and all losses in respect of the Katerra Notes and the Katerra Programme*". In order for "*Greensill*" to "*assume any and all losses in respect of the Katerra Notes*", it would obviously have had to repurchase the Katerra Notes from the Petitioner.

ii.      As noted above, GCPL and GCUK warranted that their entry into, and performance of, the Omnibus Deed "*do[es] not and will not conflict with ... any agreement or instrument binding upon [them]*".  Based on this express warranty, it was reasonable for the Vision Fund Entities to understand that GCUK would repurchase the Katerra Notes from the Petitioner so that GCPL and GCUK could comply with their obligations under Clause 3 of the Omnibus Deed to remit any amounts recovered from Katerra under the RPA to SVF II Holdings.

c)      The Vision Fund Entities did not become aware that Greensill had failed to buy back the Katerra Notes until January 2021.

d)      The Vision Fund Entities were under no obligation to provide any of the information sought, which "*amount[ed] to nothing more than a generalised fishing expedition*".

e)      The Petitioner's October 7 Letter was not sent in compliance with the English Civil Procedure Practice Direction on Pre-Action Conduct and Protocol (the "Pre-Action Protocol").[56]  The Pre-Action Protocol, which is legally enforceable under the English Civil Procedure Rules 2016, broadly requires that parties engage in an early and full exchange of information before commencing a claim, which includes providing sufficient evidence and particulars to support the prospective claim.  It is not in accordance with the Pre-Action Protocol for a party to allege unparticularised and unsupported claims against another party, whilst demanding that documents and information be provided.[57]  The Pre-Action Protocol was not designed to permit "fishing expeditions".[58]

42.    On 12 November 2021, Freshfields responded to the Vision Fund Entities' 1 November Letter.[59]  Instead of responding to any of the highlighted deficiencies in the Petitioner's alleged claims, Freshfield's letter made a number of further extensive requests for documents and information, including that it raised queries regarding the "*separate management structures*" and "*differentiated responsibilities*" between the Vision Fund Entities and SBG, as well as making further requests for documents and communications that the Vision Fund Entities purportedly relied on in forming their views around the potential effect of the

---

[56]  Exhibit 38.

[57]  Exhibit 38. Paragraph 6(a) of the Pre-Action Protocol provides that to comply, the claimant should write to the defendant "… *with concise details of the claim. The letter should include the basis on which the claim is made, a summary of the facts …*", while paragraph 3 of the Pre-Action Protocol provides, among other matters, that the "*the court will expect the parties to have exchanged sufficient information to—(a) understand each other's position; (b) make decisions about how to proceed; (c) try to settle the issues without proceedings …*".

[58]  Exhibit 38. Paragraph 6(c) of the Pre-Action Protocol provides that to comply, the parties should disclose "<u>*key documents relevant to the issues in dispute*</u>" (underline emphasis added). Paragraph 4 also provides that "*A pre-action protocol or this Practice Direction must not be used by the party as a tactical device to secure an unfair advantage over another party.* <u>*Only reasonable and proportionate steps should be taken by the parties to identify, narrow and resolve the legal, factual or expert issues*</u>" (underline emphasis added).

[59]  Exhibit 39.

Katerra restructuring.  The Petitioner once again did not identify any reasonable basis for why it was entitled to such information.

43.     On 30 November 2021, Quinn Emanuel sent a letter to Freshfields repeating the fact that the Petitioner had failed to engage with the fatal flaw in its case as to the Vision Fund Entities' lack of knowledge or intent to cause harm, which was outlined in their 1 November Letter.[60]  Accordingly, it once again concluded that the Petitioner was continuing to "*engage in a baseless fishing expedition, apparently without regard to the points made in [the Vision Fund Entities' 1 November Letter]*".

44.     No response was received to Quinn Emanuel's 30 November 2021 letter.  There was no further correspondence until 5 January 2022, when SBIA US was served with the subpoena issued pursuant to the ex parte 1782 Application, which had been granted on 4 January 2022 without prejudice to the Respondent bringing a motion to quash or modify the subpoena.[61]  At the same time, the Petitioner also filed a nearly identical s 1782 application in the District of Arizona for leave to issue a subpoena against Katerra directed towards the same subject matter.[62]

45.     On 19 January 2022, Quinn Emanuel sent a letter to Freshfields referring to the 1782 Application,[63] which, inter alia:

a)     Re-iterated that the purpose of the CLN was to "*put Greensill in funds so as to enable it to buy-back the Katerra Notes from the CS Fund*", and that this was

---

[60]   Exhibit 40.

[61]   Exhibit 41. As the Declaration of Sir William Blair explains in more detail, the Petitioner would not have been able to obtain pre-action disclosure in England.  Declaration of Sir William Blair, dated 18 February 2022, at paragraph 47.  That the Petitioner sought instead to obtain evidence under s 1782 suggests that the Petitioner's 1782 Application is an attempt to circumvent English legal proof-gathering restrictions.

[62]   Exhibit 42. This document is a redline compare showing the minimal differences between the Petitioner's two 1782 subpoenas, one being the subject of this Motion and the other being the subpoena the Petitioner has sought to issue against Katerra Cayman.

[63]   Exhibit 43.

consistent with the Vision Fund Entities' commercial interest in helping Greensill to avoid defaulting on its obligations to the Petitioner given the Vision Funds' investments in Greensill;

b)      Asserted that the 1782 Application was "*nothing more than a generalised and unjustified fishing expedition*";

c)      Noted that the Petitioner had failed to file its claim before the English High Court, notwithstanding that more than three weeks had passed since it stated in its 1782  Application that it intended to do so "*in the coming weeks*";

d)      Re-iterated that the Petitioner had failed to comply with the Pre-Action Protocol;

e)      Noted that, as regards the threatened 423 Claim, my clients intend to oppose the Petitioner's application to obtain leave of the English court to: (i) serve its claim out of the jurisdiction against all of the "SoftBank Defendants" (as defined in the 1782 Application), which were registered outside of the United Kingdom; and (ii) make an application under s 423 in its capacity as an alleged "victim", and therefore requested that any application by the Petitioner be made on proper notice to my clients;

f)      Requested that the Petitioner particularise its non-s 423 claims;

g)      Requested confirmation that an affiliate of the Petitioner had been funding GL's Joint Liquidators' 238 Claim before the Bankruptcy Court.

46.      As at the date of this declaration, to the best of my knowledge, the Petitioner has not sought or obtained leave to commence a 423 Claim in the English court or otherwise sought to obtain leave from the English court to serve a claim outside of the jurisdiction against any of the SoftBank Defendants.

21

47.     On 10 February 2022, Freshfields sent a letter before action ("LBA") on behalf of the Petitioner to the SoftBank Defendants which purports to have been sent in accordance with the Pre-Action Protocol.[64]  The LBA requested documents and a substantive response to its allegations by 8 April 2022.  The request for documents substantially overlaps with the subpoena.

48.     On 17 February 2022, Quinn Emanuel sent a letter to Freshfields which acknowledged receipt of the LBA and indicated that a substantive response to the LBA would be sent within a reasonable time.[65]  The letter reiterated requests made in Quinn Emanuel's letter of 19 January 2022 to which the Petitioner had failed to respond, namely, confirmation that any application by the Petitioner be made on proper notice to my clients, confirmation that an affiliate of the Petitioner had been funding GL's Joint Liquidators' 238 Claim before the Bankruptcy Court, and communications in the Petitioner's possession or control with GL or the Joint Liquidators in connection with the 423 Claim.

49.     On 18 February 2022, the Respondent served its Responses and Objections to the Petitioner's subpoena.[66]


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on February 18, 2022
in London, England

_Richard East_
_____
Richard Charles East

---

[64]   Exhibit 44.

[65]   Exhibit 45.

[66]   Exhibit 46.