# EXHIBIT 14
# TO DECLARATION OF
# RICHARD CHARLES EAST

In accordance with
Rule 3.35 of the
Insolvency (England &
Wales) Rules 2016 &
Paragraph 49(4) of
Schedule B1 to the
Insolvency Act 1986

# AM03
## Notice of administrator's proposals


Companies House

For further information, please
refer to our guidance at
www.gov.uk/companieshouse

---

**1** **Company details**

| Company number | 0 8 0 3 7 7 6 9 |
| Company name in full | Greensill Capital Management Company (UK) Limited |

→ **Filling in this form**
Please complete in typescript or in
bold black capitals.

---

**2** **Administrator's name**

| Full forename(s) | Chris M |
| Surname | Laverty |

---

**3** **Administrator's address**

| Building name/number | 30 Finsbury Square |
| Street | |
| | |
| Post town | London |
| County/Region | |
| Postcode | E C 2 A   1 A G |
| Country | |

---

**4** **Administrator's name ❶**

| Full forename(s) | Trevor P |
| Surname | O'Sullivan |

**❶ Other administrator**
Use this section to tell us about
another administrator.

---

**5** **Administrator's address ❷**

| Building name/number | 30 Finsbury Square |
| Street | |
| | |
| Post town | London |
| County/Region | |
| Postcode | E C 2 A   1 A G |
| Country | |

**❷ Other administrator**
Use this section to tell us about
another administrator.

# AM03
## Notice of Administrator's Proposals

| **6** | **Statement of proposals** | |
|---|---|---|
| | ☑ I attach a copy of the statement of proposals | |

| **7** | **Sign and date** | |
|---|---|---|
| Administrator's Signature | ✗ Signature ~~(signature)~~ ✗ | |
| Signature date | d 2  d 8    m 0  m 4    y 2  y 0  y 2  y 1 | |

## AM03
## Notice of Administrator's Proposals

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

| | |
|---|---|
| Contact name | Aamirah M Patel |
| Company name | Grant Thornton UK LLP |
| | |
| Address | 4 Hardman Square |
| | Spinningfields |
| | |
| Post town | Manchester |
| County/Region | |
| Postcode | M 3  3 E B |
| Country | |
| DX | |
| Telephone | 0161 953 6900 |

### ✔ Checklist

**We may return forms completed incorrectly or with information missing.**

**Please make sure you have remembered the following:**
- ☐ The company name and number match the information held on the public Register.
- ☐ You have attached the required documents.
- ☐ You have signed and dated the form.

### ❗ Important information

**All information on this form will appear on the public record.**

### ✉ Where to send

**You may return this form to any Companies House address, however for expediency we advise you to return it to the address below:**

The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ.
DX 33050 Cardiff.

### ℹ Further information

For further information please see the guidance notes on the website at www.gov.uk/companieshouse or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.gov.uk/companieshouse

# Continuation page
## Name and address of insolvency practitioner

✓ **What this form is for**
Use this continuation page to tell us about another insolvency practitioner where more than 2 are already jointly appointed. Attach this to the relevant form. ❶ Use extra copies to tell us of additional insolvency practitioners.

✗ **What this form is NOT for**
You can't use this continuation page to tell us about an appointment, resignation, removal or vacation of office.

→ **Filling in this form**
Please complete in typescript or in bold black capitals.

All fields are mandatory unless specified or indicated by *

---

## 1   Appointment type

Tick to show the nature of the appointment:

- ☑ Administrator
- ☐ Administrative receiver
- ☐ Receiver
- ☐ Manager
- ☐ Nominee
- ☐ Supervisor
- ☐ Liquidator
- ☐ Provisional liquidator

❶ You can use this continuation page with the following forms:
- VAM1, VAM2, VAM3, VAM4, VAM6, VAM7
- CVA1, CVA3, CVA4
- AM02, AM03, AM04, AM05, AM06, AM07, AM08, AM09, AM10, AM12, AM13, AM14, AM19, AM20, AM21, AM22, AM23, AM24, AM25
- REC1, REC2, REC3
- LIQ2, LIQ3, LIQ05, LIQ13, LIQ14, WU07, WU15
- COM1, COM2, COM3, COM4
- NDISC

---

## 2   Insolvency practitioner's name

| | |
|---|---|
| Full forename(s) | Will G |
| Surname | Stagg |

---

## 3   Insolvency practitioner's address

| | |
|---|---|
| Building name/number | 30 Finsbury Square |
| Street | London |
| | |
| Post town | EC2A 1AG |
| County/Region | |
| Postcode | |
| Country | |

Commercial in confidence



# Greensill Capital (UK) Limited (GCUK) and Greensill Capital Management Company (UK) Limited (GCMC) – Both In Administration (the Companies)

UK Recovery
Grant Thornton UK LLP
4 Hardman Square
Spinningfields
Manchester
M3 3EB

## Joint Administrators' proposals

Appointed in High Court of Justice Business & Property Courts of England & Wales Insolvency & Companies List
No's 000435 and 000436 of 2021

Prepared by:      Christine Mary Laverty, Joint Administrator

Contact details:   Should you wish to discuss any matters in this report, please do not hesitate to contact us at greensill@uk.gt.com

Commercial in confidence

# Guide to these proposals

## Sections

**Definitions**

1 **Introduction**
This should be read in conjunction with the remainder of the proposals, together with the appendices

2 **Background to the appointment of the Joint Administrators**
Includes a summary of the Companies' trading activities prior to the administrations and factors leading to their financial distress

3 **The Joint Administrators' appointments**
Includes a summary of the Joint Administrators' initial introduction to the Companies, Grant Thornton's prior professional relationship with certain members of the Group and the decision of the directors of the Companies to appoint the Joint Administrators

4 **Proposals for achieving the objectives of the administrations**
Includes an explanation of the objectives of the administrations and the anticipated exit route from the administrations

5 **The assets and liabilities of the Companies**
Includes information relating to the Companies' statement of affairs

6 **Conduct of the administrations**
Includes strategy and progress (trading, sale of business and realisation of assets)

7 **Creditors**
Includes creditor balances and information on dividends

8 **Investigations into the affairs of the Companies**
Includes information on statutory investigations

9 **Joint Administrators' remuneration and disbursements**
Includes details of payments to the Joint Administrators (including details of fees and expenses incurred) and their associates

10 **Future strategy**
Includes summary details of further work to be done, a potential extension to the period of the administration(s), details on any proposed creditor decisions, general information for readers (eg data protection) and timing of the next report

## Appendices

A **Notice about these proposals**
Includes information about the preparation and purpose of the proposals, reliance on them and limitations to, or exclusions of, liability for the Joint Administrators

B **Statutory information**
Includes information required about the Companies (eg names, addresses) and about the administrations (eg proceedings, administrators, contact details)

C **Statements of affairs**

D **Abstracts of the Joint Administrators' receipts and payments accounts**

E **Statement of Insolvency Practice 9 disclosure: Payments to the Joint Administrators' and their associates**
Includes proposed remuneration basis, work done, disbursements and expenses of the Joint Administrators, sub-contracted work and relationships requiring disclosure

F **Decision notices**

G **Grant Thornton UK LLP prior professional relationships**

# Definitions

The following definitions are used within the body of this report and the appendices to it.

| | |
|---|---|
| **BaFin** | The Federal Financial Supervisory Authority better known by its abbreviation, BaFin, which is the financial regulatory authority for Germany |
| **the Companies** | GCUK and GCMC |
| **Citibank** | Citibank Europe Plc |
| **Credit Suisse** | Credit Suisse AG |
| **Court** | High Court of Justice Business and Property Courts of England and Wales |
| **CVL** | A creditors' voluntary liquidation under Chapter IV of the Insolvency Act 1986 |
| **Earnd UK** | Earnd (UK) Limited – In Administration |
| **Earnd Pty** | Earnd Pty Limited (incorporated in Australia) |
| **Finacity** | Finacity Corporation (incorporated in the United States) |
| **Firm / Grant Thornton** | Grant Thornton UK LLP |
| **GB** | Greensill Bank AG (incorporated in Germany) |
| **GCUK** | Greensill Capital (UK) Limited – In Administration |
| **GCMC** | Greensill Capital Management Company (UK) Limited – In Administration |
| **GFG** | The Gupta Family Group Alliance |
| **Greensill Asia** | Greensill Asia Pte. Limited (incorportated in Asia) |
| **Greensill Inc** | Greensill Capital Inc (incorporated in the United States) |
| **Greensill India** | Greensill India Private Finance Limited (incorporated in India) |
| **Greensill Pty** | Greensill Capital Pty Limited (liquidators appointed, incorporated in Australia) |
| **the Group** | Greensill Pty and its subsidiaries including GCUK, GCMC and GB |
| **Hilco** | Hilco Streambank, part of Hilco Appraisal Limited |
| **HMRC** | HM Revenue & Customs |
| **Joint Administrators / we / us / our** | Chris M Laverty, Trevor P O'Sullivan and Will G Stagg in their capacities as joint administrators of the Companies |
| **Omni** | Omni Technologies Limited and its subsidiaries |
| **Period** | The period from 8 March 2021 to 16 April 2021 |
| **PGFT** | Peter Greensill Family Co Pty Limited (as trustee for and on behalf of the Peter Greensill Family Trust |
| **R&P** | Receipts and payments accounts at Appendix D |
| **RPS** | Redundancy Payments Service |
| **Rules** | The Insolvency (England & Wales) Rules 2016 |
| **SIP** | Statement of Insolvency Practice |
| **SPV** | Special purpose vehicle |
| **VAT** | Value added tax |
| **Wagestream** | Wagestream Limited |

# 1   Introduction

- I was appointed joint administrator of the Companies with Trevor Patrick O'Sullivan and William George Edward Stagg by the Court on 8 March 2021. Please note that we are all authorised by the Insolvency Practitioners Association to act as insolvency practitioners. Our appointment provide that any act required or authorised to be done may be done by any one or more of us for the time being holding office.
- Following on from our appointments, we are submitting our proposals pursuant to paragraph 49(1) of Schedule B1 to the Insolvency Act 1986 for achieving the objectives of the administrations. This report contains the information required by rule 3.35 of the Rules. These proposals are deemed delivered on 29 April 2021.
- The objective of the administrations will be to achieve a better result for the Companies' creditors as a whole than would be likely if the Companies were wound up (without first being in administration).
- GCUK arranged supply chain finance and other working capital financing solutions for its customers. GCMC provides certain management services for GCUK and it is the employer of the vast majority of the employees who work in GCUK's business.
- Matt Byrnes, Phil Campbell-Wilson and Michael McCann of Grant Thornton Australia Limited were appointed as voluntary liquidators over the Companies' parent company, Greensill Pty in Australia, which has subsequently converted to liquidation.
- The key work for these administrations will be to recover the assets ($17.7 billion at 8 March 2021) held by both GCUK as principal and for third-party investors, recover other receivables, and realise either the equity value or intercompany debt outstanding from subsidiaries owned by the Companies' which are capable of being sold.
- The quantum of any return to the unsecured creditors is uncertain at this stage.
- The administrations of the Companies are currently due to end on 7 March 2022, although it is likely that an extension the period of the administrations will be sought.
- It is anticipated that the administrations of the Companies will end by conversion to CVL, or if there are no monies available for distribution to the unsecured creditors, by the dissolution of the Companies.
- Decisions of creditors are being sought within this report. Please see section 10 for further detail.

Christine Mary Laverty
Joint Administrator

28 April 2021

The wording in this report explains our asset realisations in various currencies to match the R&P accounts. Amounts in the directors' statements of affairs at Appendix C are shown in US Dollars ($) and amounts shown in our SIP 9 disclosures in Appendix E are in Pounds Sterling (£).

Please be aware that fraudsters have been known to masquerade as the administrators of a company that has entered administration, or as the administrators' staff or agents. Fraudsters may contact creditors asking for a payment to enable release of money payable to the creditor or other purposes. The Joint Administrators, their staff or agents will never make such a request.

# 2  Background to the appointments of the Joint Administrators

## 2.1   The trade of the Companies

GCUK was incorporated in England and Wales on 2 July 2012. GCUK is a wholly owned subsidiary of Greensill Pty, a proprietary limited company incorporated in Queensland, Australia.

GCMC was incorporated in England and Wales on 19 April 2012 and is also a wholly owned subsidiary of Greensill PTY.

A simplified structure chart for the Group as at 8 March 2021 is shown below:



GCUK

GCUK arranged supply chain finance and other working capital financing solutions for its customers. GCUK was the main trading entity for the Group and provided financial support and management for the wider Group. GCUK developed bespoke IT platforms which enabled it to purchase working capital and supply chain receivables, and to sell these receivables (or notes backed by the receivables) to investors (typically large financial institutions) generally within a 24-hour period. GCUK also provided other alternative working capital solutions to suit the needs of clients including accounts receivable financing, instalment payment agreements and supplier irrevocable payment undertaking portfolio purchases.

The receivables (or receivables-backed notes) were sold to financial institutions, specialist funds and GB. In the case of direct assignments, the receivables were sold directly and, in the case of receivables-backed notes issuances, the receivables were transferred to insolvency-remote SPVs which issued notes based on security granted on those receivables. Prior to the administrations, GCUK facilitated c.$140 billion of such transactions per annum.

The business was technology driven and much of the technology used in the business was developed by GCUK, either by itself or in partnership with third parties. The transaction process between GCUK, its customers and investors was automated with minimal human intervention.

Commercial in confidence

In order to assist the readers of this report to understand the parties who could be involved in a transaction and who we refer to later in this report, we set out below a simplified diagram of how the supply chain finance business operated:



1. The customer/obligor is issued an invoice by their supplier in the normal course of business
2. GCUK agrees to pay the customer's invoice to the supplier at a discounted rate to the face value of the receivable
3. Sub investment grade receivables benefit from insurance and are sold (see 4 below) with the benefit of that insurance
4. Assets are sold to the investors, either by the direct assignment of receivables themselves or by the indirect sale of notes backed by the receivables (see above)
5. GCUK makes a payment to the obligor's supplier on receipt of funds from the sale of the receivables or the related notes (ie it is not the investor who pays the customer directly)
6. On the maturity date of the notes (which is linked to the payment date of the underlying invoice), the obligor repays GCUK at face value and GCUK, in turn, repays the investors (with the difference between the discounted amount paid by GCUK and the face value of the invoice repaid by the customer constituting profit to be shared between GCUK and the investor)

GCUK ceased originating new business on 2 March 2021. However, the economic benefit in the amounts repayable under the transactions completed by GCUK ahead of its cessation of new business origination predominantly lies with third-party investors rather than GCUK.

The below table summarises the total assets and the amounts which GCUK is beneficially entitled at 8 March 2021 per currency:

**Assets in millions at 8 March 2021**

| Currency | Total assets under management | | GCUK assets | |
|---|---|---|---|---|
| | Local currency | USD | Local currency | USD |
| AUD | 1,598 | 1,214 | 7 | 5 |
| CAD | 20 | 16 | 1 | 1 |
| CHF | 3 | 3 | - | - |
| EUR | 4,242 | 5,048 | 78 | 93 |
| GBP | 3,041 | 4,166 | 104 | 143 |
| HKD | 207 | 27 | - | - |
| NZD | 108 | 76 | 7 | 5 |
| PLN | 3 | 1 | - | - |
| SEK | 58 | 7 | 4 | - |
| SGD | 14 | 11 | - | - |
| USD | 7,119 | 7,119 | 242 | 242 |
| ZAR | 991 | 50 | 14 | 1 |
| **Total assets at 8 March 2021 ($'m)** | | **17,738** | | **490** |
| **Total amount collected at 16 April 2021 ($'m)** | | **3,738** | | **32** |

The total amount collected as at 16 April 2021 has been converted into US Dollars at GCUK's spot rate of exchange on the day of receipt.

As the main beneficial interest in the majority of the trade assets above lies with third-party investors, we are in active dialogue with those investors to agree the form of support to be provided such that the costs incurred in the administration in assisting with the recovery of those assets is recovered. It is proposed that GCUK will continue to:

- Collect the sums due from the obligors
- Institute asset recovery processes, including enforcement where necessary
- Submit and manage insurance claims in respect of notes protected by insurance policies

GCUK provided a significant range of services to the wider Group. As the main trading entity and recipient of most of the Group's income, GCUK provided funding to most of the other Group entities, which were reliant on the provision of that funding to maintain operations.

GCMC

GCMC is a service provider to GCUK. It provides certain management services for GCUK and it is the employer of the vast majority of the employees who work in GCUK's business. Prior to the administration, GCMC employed c580 employees to GCUK via an intercompany support services agreement, though this number has, during the period of the administrations, been reduced to 135 (see section 6.1 below).

GCMC is dependent upon GCUK for operational funding including for the payment of employee salaries and benefits (GCMC's principal liability). Prior to the administration, GCMC recharged these costs to GCUK under a services agreement.

GCMC is also the principal intermediate holding company within the Group holding the entire issued share capital (or its equivalent) in 12 subsidiaries incorporated in the UK and internationally. Most of these subsidiaries were SPVs set up to originate transactions for GCUK and held few assets and their principal costs were employee or property liabilities. Following the appointment of administrators to Greensill Pty, GCUK and GCMC, most of the subsidiaries are either being sold or wound down through solvent or insolvent processes in each jurisdiction via their directors and officers.

GCMC's subsidiaries include Greensill Inc and Earnd UK:

- Greensill Inc is the parent company of Finacity. Greensill Inc is a Delaware corporation and, on 26 March 2021 commenced a voluntary case under chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. As part of this process, the stock in Finacity, owned by Greensill Inc, is being marketed for sale. It is anticipated that, on completion of that sale, GCUK will make a recovery through application of part of the consideration received by Greensill Inc in discharge of intercompany debt due from Finacity

- Earnd UK provided a service that allowed company employees of corporate or public services customers of Earnd UK to draw accrued salary (advanced by Earnd UK) prior to the regular payroll date. The amount advanced by Earnd UK was then deducted from the relevant employee's salary and repaid from the employer to Earnd UK within a contracted period. Earnd UK was a start-up company incorporated in May 2018 and, at the time the Companies were placed into administration, did not generate revenue as the service was provided at nil cost to the employee and employer. The commercial rationale for providing these services without profit was to create critical mass to enable Earnd UK to sell to corporate entities to generate revenues and to provide cross-selling opportunities to the wider Group. The customers of Earnd UK included certain NHS Trusts. Without the financial support of GCUK (which ceased shortly after GCUK entered administration), Earnd UK was itself placed into administration on 22 March 2021. Russell Simpson, Jon Roden and Andrew Charters of the Firm were appointed administrators of Earnd UK on 22 March 2021 and, following their appointment, they sold to Wagestream the rights to Earnd UK's intellectual property rights and the rights to negotiate new contracts with its NHS organisation customers. The administrators of Earnd UK have reported separately to the creditors of this entity. Alongside this transaction, Wagestream also purchased the 100% share capital in Earnd Pty from the Administrators of Greensill Pty for AUD$1. As part of this transaction intercompany balances due to GCUK and GCMC were settled for 50% of their book value, realising £95,280 and £3,806 respectively.

Commercial in confidence

## 2.2   Factors leading to financial distress of the Companies

Towards the end of 2020, the Group sought to implement a restructuring and refinancing plan in order to avoid a formal insolvency process. However, a restructuring was not possible as a result of, among other things, the events described below. A number of factors, most particularly the withdrawal of insurance coverage from GCUK, resulted in the Companies needing to cease origination of new business and, ultimately, becoming insolvent before the proposed restructuring plan could be implemented.

GCUK

- **Attempts to find a solution:** Since the end of 2020, prior to the administrations, GCUK and Greensill Pty investigated further sources of debt or equity to raise liquidity to reduce the Group's exposure to GFG and meet the insurance collateral requirements (each referred to below). This included:
    - Mandating investment banks in relation to an equity raise
    - Seeking bridge financing from existing shareholders
    - Engaging an investment bank to arrange and co-ordinate a structured finance facility, proposed to be structured through an SPV securitisation vehicle which would issue notes backed by insured receivables originated under the GFG supply chain finance programmes

    Ultimately, none of these proposed solutions could be implemented.

- **Insurance**: Trade credit insurance policies were critical to GCUK's ability to offer working capital financing to its sub-investment grade clients. From 1 March 2021, after negotiations in relation to a potential renewal broke down (partly due to GCUK's inability to meet the insurers' collateral requirements), GCUK lost the benefit of c.$4.6 billion cover (of which $4.1 billion was being used at 8 March 2021) under an insurance policy intended to cover newly originated assets, with a further c.$9 billion of cover set to expire later this year. This meant that GCUK could not continue to acquire and sell receivables that would usually be insured under that policy, leading to key investors indicating that they would no longer be investing in insured receivables and receivable-backed assets originated by GCUK's working capital finance business. The combination of the loss of this policy, the consequent loss of key investors and the press speculation and publicity around this which eroded the confidence of other investors, led to GCUK ceasing to originate new assets from 2 March 2021.

- **BaFin:** During 2020, GB's exposure to GFG had become a matter of increased focus by the Auditing Association of German Banks and BaFin and BaFin opened an investigation into GB. The investigation focused on BaFin's concern relating to the concentration of risk of GB's lending to GFG. BaFin set a number of conditions on GB arising out of this investigation, ultimately requiring the reduction in the exposure to GFG to allow the continuation of GB's trade. Different target dates by which a reduction of the exposure to GFG was to be implemented were agreed with PdB and BaFin, but: (i) GFG was unable to source alternative funding to reduce its exposure to GB; and (ii) as noted above, the wider Group's restructuring efforts (which proposed to facilitate a refinancing of the GFG liabilities) were unsuccessful.

- **Defaults under GCUK's financing facilities:** On 4 March 2021, one of Greensill Pty's financial creditors accelerated a $140 million loan and demanded immediate payment from GCUK, as guarantor. This left GCUK unable to pay its debts as they fall due.

    **Contingency planning:** Whilst the board of GCUK were seeking to implement its restructuring plan, it considered that it would be prudent to consider other options in the event that the restructuring was not possible. The board instructed Grant Thornton to undertake contingency planning to ensure a smooth transition into an insolvency process in the event that the restructuring was not successful (further details below).

GCMC

- As set out above, GCMC is wholly reliant on GCUK for the settlement of its ongoing operational costs such as payroll. As such, and as a result of GCUK's insolvency and the consequent cessation of funding from GCUK, GCMC was also unable to pay its debts as they fall due.

# 3   The Joint Administrators' appointments

## 3.1   Initial introduction to, and engagement with, the Companies

Grant Thornton was introduced to the Companies shortly before 31 December 2020 by the Companies' legal advisers, Allen & Overy LLP to provide financial advisory support in relation to the Group's restructuring proposals and contingency planning.

The Joint Administrators and the Firm had certain dealings with GCUK prior to this introduction and further details of this can be found at Appendix G.

The Firm was engaged on 31 December 2020 by GCUK, GB and Greensill Pty. This engagement was to provide:

- The directors of Greensill Pty assistance with a Better Outcome Review. Such a review involves reporting on a company's proposed restructuring plan and providing a view on whether it is reasonable to expect that it would, if successfully implemented, achieve a better outcome than an insolvency and therefore it is reasonable to pursue. The Better Outcome Review is contemplated by the Australian Government's Safe Harbour insolvency law reform. Where necessary, guidance was sought from Grant Thornton Australia Limited. An addendum to the 31 December 2020 engagement letter was executed on 26 January 2021 to include a Better Outcome Review of GCUK as at that time GCUK was in the process of registering as a foreign entity within Australia and conducted certain operations in Australia

- Assistance in contingency planning for GCUK for potential scenarios should it be considered necessary to appoint insolvency practitioners. Our instruction involved monitoring and advising on steps taken by Greensill Pty, GCUK and GB to alleviate financial pressures on the Companies as described in Section 2.2 and assisting with contingency planning in the event that the directors concluded that it was not possible for the Companies to continue trading as going concerns. The contingency plans explored with the Companies included the option of placing the Companies into administration in the UK in order to preserve assets and maximise value for creditors as a whole

Following the commencement of our engagement it became evident that GB was being investigated by BaFin who had appointed special advisors and, therefore, the scope of our work was restricted due to an inability to obtain detailed wind down planning information from GB. We did not provide any contingency planning or other advice to GB.

Grant Thornton was paid fees of £1,437,784 by GCUK in respect of the 31 December 2020 engagement and subsequent addendum.

The Joint Administrators and the Firm had no dealings with GCMC prior to the administration.

Commercial in confidence

## 3.2    Consideration of trading the Companies in administration

As set out above, GCUK's business was highly automated and involved facilitating up to $200m of transactions daily. Transactions involved multiple contracts between multiple counterparties, including asset buyers (investors) and GCUK and/or intermediated SPVs and trustee frameworks (depending upon the asset distribution channel) on the one hand and between GCUK and the underlying obligors/asset sellers on the other. The transaction documentation is, generally, in a standardised form to facilitate the automated transactions and includes many representations and warranties given by GCUK in favour of counterparties other transaction parties pertaining to the conduct of the transaction and the origination and veracity of the assets amongst other matters.

The Joint Administrators reviewed the transaction documentation with their legal advisors and concluded that it would not be possible, in the context of an administration, for the Joint Administrators to continue to have GCUK provide these representations and warranties and that GCUK would be unable, whilst under the control of the Joint Administrators, to continue to originate new business without substantial changes to these terms being agreed by all the relevant transaction counterparties. As such, it was not considered viable for the contingency planning to consider any further origination from the date of the appointment of Joint Administrators without potential support from such counterparties.

In addition to the above, we also considered the following matters would present issues that an administrator could not resolve:

- the investors agree which assets they are going to purchase each morning and are, generally, under no contractual obligation to do so because the arrangements are on an uncommitted basis. In the event of an insolvency, it was considered highly likely that the investors would no longer wish to purchase assets and be reliant on GCUK to maintain the systems necessary to manage the transaction and return the funds to them on maturity of the relevant notes or receivables

- the administration of GCUK would cause concern amongst its customers. Whilst certain customers may have continued with the service to avoid impacting their immediate working capital requirements, it was considered likely that they would seek an alternative provider in the short term due to the uncertainty in the administration process and the uncommitted nature of most of the arrangements (as explained above)

- given the inability to renew the insurance on the renewal date of 1 March 2021 or later dates (as explained above), there would be no insurance coverage available to sub-investment grade assets to allow GCUK to sell these assets (or issue receivables backed by them) on an insured basis

## 3.3    Consideration to sell the business and certain assets

Concurrently with the steps taken to attempt to reach a solvent solution to the Group's financial difficulties, with the assistance of the Firm, the directors' explored the potential sale of GCUK (or some or all of its assets) on a solvent or insolvent basis.

Prior to the administrations, the directors and the proposed administrators considered that, as it would not be possible for the Companies to originate new business in administration, the value of the intangible assets would be severely impacted if the business ceased to originate new business for a prolonged period. The directors concluded therefore that, in order to preserve value in GCUK's intellectual property, a sale of these assets would be attempted which would provide the following benefits:

- by offering the intellectual property for sale at a time when customers and investors have a level of confidence in the system, it may realise value for creditors that could be foregone if the business ceased to originate new business indefinitely

- it minimises the risk of disruption to obligors who are reliant on GCUK for their working capital management by enabling them to continue trading with a new vehicle.

Commercial in confidence

**Marketing and negotiations prior to the administrations**

The directors determined that only a very limited number of potential purchasers for the business would provide confidence to the market and make an offer for the intellectual property in what would be a restricted timescale due to:

- the complex nature of the transactions
- the level of funding required
- if the customers and investors (where agreements were mainly on an uncommitted basis) were to become aware that the Group was taking restructuring advice, which was more likely with a large sales process with multiple purchasers, they would withdraw support and the business may have needed to accelerate the implementation of a protective procedure without appropriate planning to determine whether a better outcome for creditors was available.

From a larger group of potentially interested parties, three potential buyers identified by the Group were therefore contacted on 28 and 29 January 2021, and 1 February 2021.

All three potential buyers signed non-disclosure agreements and were provided with marketing information regarding the sale, including (i) access to a data room containing diligence materials, and (ii) meetings with senior members of the executive management teams of the Companies. Of the three parties approached only one was interested in undertaking detailed diligence in relation to the transaction within the timeframe required by the directors.

In the weeks leading up to the administrations, the potential purchaser conducted extensive diligence into the Group and its operations and engaged with the Group's advisers and executive management team. On 22 February 2021, an initial offer (which was subject to contract among other things) was received to acquire certain assets of the Group. This original proposal was considered commercially unacceptable and, in the opinion of the proposed administrators, could not be executed in the context of an insolvent sale.

Following receipt of the original proposal, a period of negotiation took place between the Group, the potential purchaser and their respective advisers. On 2 March 2021, GCUK and other members of the Group entered into an exclusivity agreement based on a revised offer from the potential purchaser. The revised offer was also subject to contract, among other things.

In preparation for the transaction, Hilco was instructed to value GCUK's intellectual property. Hilco discussed the intellectual property and the business with the directors and was provided with all relevant information requested in order to value the intellectual property that was proposed to be sold.

GCUK and GCMC considered the likely return to creditors resulting from the transaction compared to the alternative of an immediate cessation of new business origination and a piecemeal collection/sale of assets. Based on the financial analysis performed, the potential return to creditors from a transaction was considered to be the best outcome (in an insolvency context) and in addition to the sale proceeds the following benefits were anticipated for the administration estate:

- significant value would be realised for creditors from assets that are not valued on GCUK's balance sheet (ie the intellectual property assets)
- the GCUK balance sheet assets would be retained for the benefit of its creditors
- employees would be transferred to the purchaser and therefore associated employee preferential and unsecured claims would be mitigated
- assignment of certain contracts to the purchaser would reduce creditor claims ie leases
- continuity of operations (through a purchaser vehicle) would minimise claims from customers whose financing would otherwise have been disrupted.

Extensive negotiations were held, including the negotiation of a sale contract with the interested party both prior to, and in the week following our appointments. The contract negotiations ended on 11 March 2021 due to a substantial reduction in the value of the offer by the proposed purchaser meaning it was not in the interests of creditors to proceed with the transaction.

## 3.4    Appointment of Joint Administrators

During the course of our work prior to the administrations, it became evident that the prospect of raising sufficient new funds was fundamental to enable the successful restructuring of GCUK. Equally, the raising of further funds was wholly reliant on the renewal of insurance.

As detailed above, it would not be possible to originate new business in an insolvency process so the directors considered that the best outcome for creditors (absent a successful restructuring) would be an administration, with the potential for a sale in the key assets of GCUK and GCMC.

The Joint Administrators carefully considered the position (including any prior professional relationships detailed at Appendix G) prior to accepting the appointments, having regard to their licensing bodies' ethical guidelines, and considered that there were no circumstances preventing them being appointed administrators of the Companies.

The director of GCUK, Alexander David Greensill, and the directors of GCMC, Alexander David Greensill and Alastair Kenneth Eadie, applied to Court for the appointment of administrators. The Court, having considered the application, made the direct appointment of administrators on 8 March 2021 in accordance with paragraph 12 of Schedule B1 to the Insolvency Act 1986.

# 4   Proposals for achieving the objectives of the administrations

## 4.1   Objective of the administrations

The Joint Administrators must perform their functions with the statutory objective of:

1. rescuing the company as a going concern;

2. if the foregoing is not reasonably practicable, achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration), or;

3. if neither of the foregoing is reasonably practicable, realising property in order to make a distribution to one or more secured or preferential creditors.

Prior to the administrations, the management of GCUK and Greensill PTY explored the prospects of obtaining further funding to enable the business to continue as a going concern but without success. As it was not possible for management to raise additional equity to allow the business to continue as a going concern, we concluded that it would not be possible to achieve the first objective, being the rescue of either of the Companies as a going concern.

The Joint Administrators will pursue the objective of achieving a better result for the Companies' creditors as a whole than would be likely if the Companies were wound up.

This objective will be achieved by the Joint Administrators conducting an orderly wind down of the business to facilitate the recovery of assets for the benefit of creditors. The operations and systems of the business will continue to be maintained for as long as the Joint Administrators believe it is appropriate in attempting a more advantageous realisation of assets for the benefit of creditors.

In addition to realising its own assets, GCUK has been responsible for managing the recovery of liabilities ultimately owed to the investors (as explained above). This process involves GCUK managing:

- the collection of payments from customers into accounts held on trust for the noteholders and overseeing the distribution of those funds to the noteholders
- the engagement with customers/obligors and potential restructuring activity on behalf of the noteholders in the event of a customer default
- insurance claims in the event that the customer is unable to settle its debt.

The above activities for the benefit of investors do not benefit the insolvent estate of GCUK and, if undertaken without funding contributions, would deplete the assets available for GCUK's creditors. However, we recognise the importance of this to the investors and therefore we are in continued discussions with noteholders to agree a way forward that will ensure that noteholders receive the support they require and contibute to the costs of providing that support such that GCUK's creditors are not prejudiced. Equally, support provided to optimise the outcome for investors will be helpful in minimising claims from such investors against the estate.

## 4.2   Exit route

The Joint Administrators may seek permission of the Court to distribute funds to unsecured creditors. It is likely this will also require an application for the extension of the administration period beyond 12 months due to the expected timeframe involved in realising assets for the benefit of both the Companies' creditors and the third party investors.

Thereafter, it is proposed that the administration will end by the Companies' going into CVL or by the dissolution of the Companies if there are no further matters to be resolved. If the Companies are placed into CVL, it is proposed that the Joint Administrators in office at that date will be appointed liquidators and that any act in the liquidation may be done by any one or more of the liquidators holding office. However, creditors may nominate a different liquidator or liquidators for this purpose if nomination to that effect is received before the approval of these proposals.

# 5   The assets and liabilities of the Companies

## 5.1   Statement of Affairs

On 15 March 2021, the directors of the Companies were issued with a notice requiring them to provide a statement of affairs for each of the Companies to the Joint Administrators. A statement of affairs details the assets and liabilities of the Companies as at the date of appointment of the Joint Administrators.

The directors have prepared statements of affairs which are attached at Appendix C. The statements of affairs do not account for the costs of the administration processes.

Further comments on the assets and liabilities of the Companies can be found in sections 6.2 and 7 of this report.

Commercial in confidence

# 6  Conduct of the administrations

## 6.1  Strategy

As described above, our initial strategy to maximise returns to creditors was to attempt to achieve a sale of certain parts of the business as a going concern, whilst retaining the benefit of GCUK's balance sheet assets. As set out above, the sale process was terminated on 11 March 2021 due to the substantial reduction in the offer from the interested party.

Following the conclusion of the sale negotiations, the strategy for the administrations is to:

- Recover the assets held by GCUK as principal, other receivables and debtors, and realise either the equity value or intercompany debt outstanding from subsidiaries owned by the Companies' which are capable of being sold. Further details are in section 6.2

- Negotiate and implement an arrangement with the relevant note trustee(s) / issuers to continue the cash management process to enable the costs incurred by GCUK and GCMC for the continued provision of employees and systems plus Joint Administrators' oversight to be recouped by the administrations for the provision of infrastructure to enable asset recoveries from obligors without interruption

- Enter into an agreement with certain third-party investors to contribute to costs incurred by GCUK and GCMC for the continued assistance with asset recoveries including operations and back-office support, credit, risk and legal support for defaulting or likely to default obligors and insurance support, to recover the sums due from obligors. This ongoing work will also minimise claims which could arise if such functions were not carried out and payment flows were disrupted. To date, we have achieved retainer fees into the GCUK Administration estate from anchor investors of $5 million to cover costs whilst arrangements are being finalised.

As a result of the termination of the sale process, the Joint Administrators immediately sought to reduce the cost of maintaining the business and this resulted in 435 redundancies in GCMC. The Administrators have retained 135 employees to assist with asset realisations and the wind down of the business.

As mentioned above, distribution of assets covered by certain trade insurance policies was key to GCUK's business model. A successful insurance claim(s) on defaulted assets may be a significant area for recovery for investors. As such, key to the Administration strategy has been for GCUK to continue to engage in and provide the insurance services it previously performed on behalf of and to counterparts. To facilitate this, GCUK has retained the insurance professionals employed by GCUK, contracted with GCUK's broker and engaged insurance lawyers who were already acting for GCUK as regards ongoing claims.

At the date of the administrations, GCUK rented office space in London, Warrington, Frankfurt and Abu Dhabi under 14 separate lease arrangements. Hilco determined there was no value in these leases.

As all employees of the Companies were working from home due to the COVID-19 pandemic, we facilitated the collection of employee personal belongings, and company books and records from all relevant offices. We have vacated all of the offices except for one in Warrington whilst we consider our ongoing strategy.

Commercial in confidence

With regards to any legal action against GCUK that may have already commenced as at the date of appointments or legal action is subsequently brought against the estate, the Joint Administrators will consider GCUK's defence to proceedings brought against GCUK, as far as they believe appropriate and mindful of the need to balance the costs of continuing the defence, as against the potential detriment to creditors of abandoning the defence, if it appears that funds may be available to the creditors.

We have instructed the following legal advisors:

- Allen & Overy LLP to assist with statutory administration matters, arrangements with investors and matters relating to the obligors
- Simmons & Simmons LLP to assist with all matters relating to the Note Trustee
- Herbert Smith Freehills LLP to assist with all trade credit insurance related matters.

## 6.2 Realisation of the Companies' assets

**GCUK**

Trade assets

The trade assets of GCUK (c.$490 million as at the date of administration) are predominantly made up of supply chain finance and accounts receivable assets which will mature over the next 36 months.

Within the trade assets balance on the GCUK balance sheet are amounts owed by GFG company obligors (c.$355 million) and other obligors with a value of c.$135 million. Certain other recoveries in respect of assets on GCUK's balance sheet may be subject to claims from third parties and we are currently taking legal advice in relation to these claims.

In order to facilitate the collection of the assets as they approach maturity, the Joint Administrators have retained the core staff required for the collection process, who will work alongside the Joint Administrators and where appropriate, insurers and legal advisors to maximise the realisations.

Since the appointment to 16 April 2021, we successfully collected the following amounts from obligors:

| Currency | Trade assets not subject to claims | Trade assets subject to claims[1] | Total trade assets ($)[2] |
|---|---|---|---|
| GBP | £23,640 | £3,228,220 | $4,520,085 |
| AUD | A$82,658 | A$360,833 | $341,488 |
| USD (which includes other currencies with smaller amounts) | $1,531,827 | $11,611,039 | $13,142,866 |
| EUR | €2,077,919 | €8,452,269 | $13,648,461 |
| **Total amount collected** | | | **$31,652,900** |

Included within these balances are assets that are subject to claims from both Credit Suisse under its floating charge (see Secured Creditors at section 7) and a potential claim from GB as outlined below.

[1] The GB potential claim arises from an agreement between GCUK and GB dated 14 July 2020 under which GB advanced the sum of €90 million to GCUK. We are taking legal advice as to the validity of this claim.

[2] Receipts on the maturity of trade assets have been converted to USD at the spot rate on each transaction date.

With regards to trade assets, there are a number of obligors who have already settled the outstanding amounts early and there are also a number of obligors who have defaulted on their scheduled payments. We are in continued discussions with those obligors concerning their proposals for repayment of the debt.

15

Accounts receivable

The accounts receivable balance of c$2.3 million principally consists of sales ledger balances due from invoices to third parties or other Group companies. These balances originate from a variety of placement and arrangement fees which the GCUK paid on behalf of investors and which are then recharged.

We continue our work to recover all amounts due. To date, we have recovered the following amounts:

- $104,686, of which $56,634 was recovered prior to 16 April 2021 and is therefore shown in the USD R&P

- €104,469, all of which was realised following 16 April 2021 and is therefore not shown in the EUR R&P

- £3,505, which is shown within book debts in the GBP R&P together with an intercompany debt recovery of £95,280 described below.

Other debtors and accrued income

The other debtors balance is made up of a variety of debtor balances which the directors have assumed to have an estimated realisable value of c.$26 million. The main categories within other debtors include:

**Accrued income**

The accrued income balance included in the Statement of Affairs is predominantly made up of c.$194 million of structuring and advisor fees and c.$24 million of data driven revenue.

- The largest fee is for $175 million and was due in equal instalments on 31 March 2021 and 30 June 2021. The first instalment has not been received and the Joint Administrators are pursuing the obligor regarding this.

- The other significant balance of $15m falls due on 30 June 2021 and the Joint Administrators will pursue this along with the other c.$4 million of fees owed.

- The accrued data driven revenue balance of c.$24 million arose from contracts arranged between obligors and investors, principally in the telecoms sector, and involve the securitisation of contracts that are generally of a longer tenor, up to three years, than typical supply chain finance contracts due to the length of the underlying receivable (eg a telecom handset contract). In these contracts, GCUK retains an interest in the transaction that is recoverable when the principle note holder is repaid. These balances will be collected as they mature in the period to 2023, although we note that recoveries may be lower than the amount which has been accrued for given that the facility is no longer being offered.

**Interest and foreign exchange collateral**

- GCUK had a number of interest and foreign exchange instruments on the balance sheet as at the date of appointment which totalled $3.2 million. The collateral is due to unwind upon the maturity of the underlying assets to which they relate.

- At 16 April 2021, we have received $979,573 in respect of these assets, which is shown as an investment realisation in the USD R&P. There is a balance of $2.1 million outstanding, although this may be subject to set off as contracts are terminated early due to the administration.

**Other debtors**

- GCUK is owed $4 million from a former shareholder following the brokering of the sale of the shares to another party. The Statement of Affairs assumes the full amount is recoverable.

- GCUK is owed c.$414,000 from a former contractor and we are pursuing this amount.

**Equity warrants**

- GCUK holds an equity warrant in relation to a US-based mining business. The warrant is held at book value of $50 million.

Commercial in confidence

Intercompany debtors

GCUK is owed $107.4 million from other entities, predominately international subsidiaries within the Group as follows:

| Debtor | Amount owed ($'m) |
|---|---|
| Greensill Inc | 46.3 |
| Omni | 19.3 |
| Earnd UK | 10.9 |
| Finacity | 9.4 |
| Omni Technologies SAS | 7.4 |
| Greensill Capital Asia PTE | 5.9 |
| Portafolio Omnibnk Spa (Chile) | 4.3 |
| Omni Technologies Limited (Cayman) | 1.0 |
| Omnibnk SPA (Chile) | 0.9 |
| GC South Africa Proprietary Ltd | 0.6 |
| Earnd Ltd Pty | 0.5 |
| Shenzhen Greensill Commercial Factoring Limited | 0.5 |
| Portafolio Omnibnk SPA (Chile) | 0.2 |
| GC Securities Ltd | 0.1 |
| Other intercompany debtors | 0.1 |
| **Total** | **107.4** |

The directors have estimated that $13 million will be recoverable in the Statement of Affairs for intercompany debts.

The majority of the overseas subsidiaries provided origination services to GCUK and do not have any material assets. These companies are in the process of being wound up in the local jurisdictions. Further details of certain subsidiaries are as follows:

- **Greensill Inc and Finacity**: As part of Greensill Inc's insolvency as described above, it is looking to realise its main asset, the 100% shareholding in Finacity, with a sale expected to be completed in shortly. GCUK has c.$9 million of loan notes in Finacity, which would be addressed as part of the sale so we await the outcome of such negotiations.

- **Omni**: Omni Technologies Limited and its subsidiaries are owned by Greensill Pty. GCUK has c.$37 million of loan notes respectively in the Omni entities. Together with the administrators of Greensill Pty, we have entered into a binding term sheet for a sale of these entities and loan notes, with agreements to receive a discount on the loan notes owed. The sale completed on 22 April 2021 with realisations of c.$9 million for GCUK in respect of its intercompany debt. This amount is not shown on the R&P as it was received after the Period.

- **Earnd UK** entered administration on 22 March 2021 and GCUK will be treated as an unsecured creditor in Earnd UK which anticipates a distribution at c.1 pence in the pound.

- **Greensill Asia** served as the Asian hub for the Group and served to employ local staff which provided employees for GCUK. Greensill Asia did not have any assets, with all costs met by GCUK, and has now entered a local liquidation process. Greensill India was in the process of being set up to provide the Group's coverage in the Indian market. Greensill India's primary asset is c.$1 million cash at bank and it is in the process of entering a local winding up process, with the expectation that surplus cash will be returned to its immediate parent, Greensill Asia. As an unsecured creditor of Greensill Asia, GCUK may receive a distribution, however, the winding up of Greensill India will take more than one year and there are other creditors of Greensill Asia so we do not have a view of any quantum or timing of any recoveries at this stage

- **Greensill Capital (South Africa) Proprietary Limited** employed six local employees and was in the process of starting to originate new business on behalf of the Group. In addition to local customer relationships, the primary asset was c.$300,000 cash at bank. This entity has appointed a local business rescue professional who is exploring a sale of the business. The sale is underway, although we do not anticipate a recovery.

- **Earnd Pty** is a subsidiary of Greensill Pty and represented the Australian operations of the Earnd business. As part of the sale of a material part of the Earnd business, effected by the voluntary administrators of Greensill Pty and the joint administrators of Earnd UK on 22 March 2021, GCUK's intercompany indebtedness was settled for 50% of its value realising £95,280 for the estate.

Depending on the outcome of the Finacity transaction mentioned above, it is likely that we will surpass the directors' realisation expectations from this asset class.

Employee advances

As per GCUK's statement of affairs prepared by the directors, three employees were provided advances totalling c.$494,000 which the directors expect to be fully recoverable.

Prepayments

The directors of GCUK have assumed that prepayments relating to mainly IT and property costs (book value of c.$3.8 million) may not be recoverable in the administration but we will investigate the recoverability and a further update will be provided in our next report.

Taxes

The balance sheet as at the date of appointment contained tax assets relating to withholding tax and a deferred tax asset relating to trading losses. The directors have estimated tax realisations of c.$1.3 million against a book value of c.$4.5 million. We are currently investigating the position and a further update will be provided in our next report.

Tangible assets

We have instructed Hilco to assist with the valuation and disposal of the tangible assets.

GCUK owned an artwork collection with a book value of $559,990 which was located at an art dealer's and the GCUK office in London. The directors have estimated that the artwork may realise c.$500,000 in their Statement of Affairs. We have uplifted all artwork for secure storage and it will be sold in due course.

GCUK used three vehicles with a combined book value of c.$130,000. Two of the vehicles were leased and have now been returned to the finance companies. The other car is owned by GCUK and will be sold in due course. The directors have estimated this vehicle to realise c$100,000 in their Statement of Affairs.

The largest tangible asset on GCUK's balance sheet with a book value of c.$12 million is a "right of use lease asset" which is the accounting treatment for property leases as per International Financial Reporting Standards. There are also c.$20 million in building improvements, fixtures and fittings, and office equipment. The directors have not attributed any value to these assets in their Statement of Affairs.

We considered the cost of the rent of properties against the potential market value of the furniture therein and determined that an accelerated disposal of furniture was appropriate. With the exception of one office in Warrington, we successfully sold furniture and certain equipment for £69,874 prior to the vacation of the offices. The furniture at the remaining office will be sold in due course.


Intangible assets

GCUK has intangible assets relating to project costs and computer licenses with a book value of c.$10.5 million. These costs relate to the capitalisation of development costs, in particular developer salaries, of a new operating system for GCUK which was partially completed on our appointment. As this is bespoke software and only partially complete, the directors have assumed that these costs will not be recoverable in the Administration but we will investigate this further.


Investments in subsidiaries

The book value of GCUK's investments at the date of appointment was c$8.5 million which related primarily to subsidiaries in China and Germany and an investment in GAM Investments. The directors have estimated total recoveries of c.$5.5 million relating to these assets on their Statement of Affairs.

Shenzhen Greensill Commercial Factoring Limited was set up during 2020 to originate business in China and employs eight people but had not commenced trading activities. This subsidiary's main assets are c.$6 million cash at bank and a local banking licence, of which we understand only three of this kind have been issued. We are currently exploring the option of selling this subsidiary with a number of potential buyers. If a sale is unsuccessful, we will look to wind up the business with the aim of returning the cash to GCUK as the sole shareholder. We anticipate that a repatriation of funds could take some time.

The German subsidiary, Greensill GmbH, had seven employees and provided services to GCUK. Four of these employees are being retained to assist with the administration of GCUK but this entity does not have any realisable assets.

GCUK held an investment in GAM Investments. We anticipate recovering the full amounts owed of c.$1.3m equivalent in aggregate but, to date, we have recovered £354,839, A$115,757, $79,023 and €70,992 (although this amount was transferred to the Administration estate following the end of the Period so is not showing in the R&P).


Investments in Group undertakings

The book value of GCUK's investments in Group undertakings at the date of appointment was c.$14.4 million. The directors have estimated that a full recovery will be made on these amounts.


Cash

At the date of the administration, GCUK had 36 bank accounts in 18 currencies with a total of c.$59 million (based on the exchange rates on 8 March 2021) in addition to an amount of c.$50 million in a segregated account relating to Credit Suisse's security.

We are in the process of transferring funds and closing pre-administration accounts. However, some fee income and settlement pre-appointment accounts remain active under our control.

During the Period, we have recovered the following from the opening cash at bank at the date of the Administration:

| Currency | Opening balance Local currency | Opening balance USD equivalent |
|---|---|---|
| GBP | £2,946,692 | $4,095,903 |
| AUD | A$19,675,359 | $15,346,197 |
| USD | $2,648,770 | $2,648,770 |
| EUR | €17,703,153 | $21,227,614 |
| Other currencies | | $15,856,972 |
| **Total** | | **$59,175,455** |

A number of payments made to suppliers in the ordinary course of business prior to the Administration had been rejected due to incorrect beneficiary bank account details. These payments had subsequently been swept and held in currency specific disbursement client accounts whilst the correct beneficiary account details were sought by the GCUK team. At the date of the Administration, c.$2 million was held in these disbursement accounts. We have sought legal advice which determined that GCUK is not entitled to retain these funds so we are working to return the payments to the correct beneficiaries.

Long term cash deposits totalling c.$6 million are cash collateral backing for letters of credit provided to insurers. Whilst these policies are in run off, there may be claims and offsets for outstanding premiums which may reduce recoveries.

There is also c.$1.8 million which is being held in escrow, and this amount will continue to fund the run-off for specific notes. These funds are in respect to Citibank Reserve Accounts held for Trustee and Issuer fees with respect to the notes structure so do not form part of the GCUK estate.

## GCMC

### Cash

The directors' Statement of Affairs shows $3,195 of cash at bank and £1,393 of petty cash, however at the date of the administration, there were no funds in any GCMC bank account.

### Other debtors

The directors' Statement of Affairs lists other debtors of c.$3.1 million of which c.$3 million was assumed to be recoverable. This related to funds from Saudi Arabia invested in connection with a joint venture arrangement.

On 26 April 2021, we recovered the full amount which, when converted to US Dollars on the date of receipt was $2,918,428. This does not show on the R&P due to the timing of receipt.

### VAT asset

The directors' Statement of Affairs shows a VAT asset of $433,776 with $89,885 as realisable in the Administration. We will investigate the position and provide further information in the next progress report.

Intercompany debtors and loan

GCMC is owed $28.4 million in aggregate from the following entities within the Group:

- Greensill Pty owes GCMC c.$13,369. This amount will be dealt with as an unsecured creditor claim in the administration of Greensill PTY

- GCMC is owed c.$13.6 million from GCUK, which the directors estimate will recover c.$2.7 million. This amount will rank as an unsecured creditor claim in the administration of GCUK

- Greensill Asia owes GCMC $54,799. As described above for GCUK, GCMC is also an unsecured creditor in Greensill Asia but we do not yet have any information on whether a recovery will be likely and within what timeframe

- GCMC is owed c$14.5 million from Earnd UK which will rank as an unsecured creditor claim in the Earnd UK administration and we anticipate a recovery in due course. The records of Earnd UK showed GCMC as being owed c£4 million so we will need to investigate the difference. Earnd UK in administration anticipates paying a dividend to unsecured creditors of c.1 pence in the pound

- Greensill (Netherlands) B.V. owes GCMC c$7,014, did not have any assets and employed one local employee. This entity is in the process of entering a local liquidation process so we do not anticipate a recovery for this debt

- Greensill Limited (UAE) owes GCMC $118,829 and was in the process of being set up to originate business in the Middle East, with its primary asset being c.$400,000 cash at bank. This entity has entered a local winding up process, with the aim that any surplus will be returned to GCMC as its 100% shareholder. This winding up process will take at least 12 months

- Omni Technologies SAS (Columbia) owes GCMC $42,439. GCMC also has c$13.5 million of loan notes respectively into the Omni entities. Together with the voluntary administrators of Omni's parent company, Greensill Pty, we have agreed to settle the loan notes for c.$500,000 which we received on 22 April 2021

- Although not listed in GCMC's Statement of Affairs, we have recovered £3,806 from the sale of Earnd Pty by the voluntary administrators of Greensill Pty. We do not anticipate any further realisations from Earnd Pty.

Employee loan

One loan of $1.1 million has been made to an employee which the directors have assumed is fully recoverable in their Statement of Affairs.

# 6.3   Additional assets

### GCUK

Flooding insurance claim

GCUK suffered a flood in one of the London leased properties on 19 January 2021 causing damage to the premises and certain electronic equipment. GCUK's insurers acknowledged the claim on 27 January 2021 and we are now working to quantify the loss to GCUK with a view to making a full recovery.

Bank interest and general refunds

During the Period, we have recovered the following:

- Bank interest of A$794
- refunds of rates (£210), business refunds (£2,362), client monies in legal accounts (A$5).

Foreign exchange hedging account

GCUK held a foreign exchange hedging account at Citibank which it utilised to hedge foreign currency transactions. In addition to protecting its own transactions, GCUK also facilitated the hedging of foreign exchange positions of GB through this account. As a condition of providing the account, Citibank required that GCUK provide a cash deposit of c.€70 million to cover any losses that might arise on the account.

Following our appointment, Citibank unilaterally closed the account because GCUK was unable to make further margin calls and offset the cost of the closure against the collateral deposit. Following the offset of the collateral, the deposit balance is c.€40 million.

The balance in this account is subject to a potential claim from GB on the basis that the funds for the collateral deposit originated from GB. We are taking legal advice as to the validity of this potential claim and whether GB is entitled to these funds.

**GCMC**

Prior to the Administration, an employee was overpaid salary by £18,402 and we have been able to recover this during the Period.

## 6.4 Receipts and payments accounts

Our R&Ps covering the Period are attached at Appendix D. Please note that 16 April 2021 is the last practicable date for preparations of the R&P accounts prior to the preparation of this report.

There are multiple R&Ps for the various currencies of the Administration estate and each are prepared on a cash basis for the Period so any transactions outside of the Period are not reflected.

# 7   Creditors

## 7.1   Secured creditors

GCUK

GCUK has granted the following security:

- **Citibank:** A fixed charge over a designated bank account and all monies to the credit of that designated account in favour of Citibank, pursuant to a corporate deposit deed dated 24 June 2016. The security secures amounts due from GCUK in connection with standby letters of credit issued by Citibank. At the date of administration, there was no amount outstanding to Citibank.

- **Credit Suisse:** A floating charge over a specified account and any monies standing to the credit of, or otherwise held in, such account and all "Receivables" beneficially owned by GCUK together with any "Related Rights", pursuant to a security agreement dated 22 October 2020.  The security secures amounts due from GCUK under a loan of $140 million to Greensill Pty made on 22 October 2020 (of which GCUK is a guarantor). At the date of administration, the balance due secured by this charge was $140 million. Credit Suisse appointed Geoffrey Paul Rowley and Anthony John Wright of FRP Advisory Trading Limited (the **Receivers**) as receivers of the joint account, Receivables and Related Rights on 5 March 2021. The Receivers instructed Citibank (as account bank of the secured account) to pay Credit Suisse c.$50 million from the secured bank account which was duly paid leaving an outstanding loan balance of c.$90 million. Credit Suisse is also claiming the balance of c.$90 million secured against the receivables held by GCUK.

- **PGFT**: A floating charge over "Receivables" beneficially owned by GCUK together with any "Related Rights" PGFT, pursuant to a security agreement dated 22 October 2020. The security secures amounts due from GCUK under a loan of $60 million to Greensill Pty made on 22 October 2020 (of which GCUK is a guarantor) and is subordinate to the Credit Suisse security. At the date of administration, the balance due secured by this charge was $60 million. No distribution has been paid to PGFT under its security to date.

We are obtaining legal advice on the validity of the security described above.

None of these secured creditors were considered qualifying floating charge holders for the purposes of the Insolvency Act 1986.

GCMC

No secured creditors have been identified.

## 7.2    Preferential creditors

Preferential claims consist of the following:

- Ordinary preferential creditors: employee claims for wages and salary up to £800 per person and accrued holiday pay, and employee contributions to occupational pension schemes deducted in the four months before the insolvency. A significant element of these claims will be subrogated to the Secretary of State, following payment of employment-related claims by the Redundancy Payments Service.
- Secondary preferential creditors: HMRC claims for arrears of VAT and for sums deducted in respect of PAYE, employees' national insurance contributions and student loan repayments, and construction industry scheme deductions.

GCUK

There were no employees at the date of administration, therefore, no ordinary preferential claims are anticipated.

GCMC

There were 569 employees at the date of appointment, of which 435 have now been made redundant.

The estimated preferential claim in the directors' Statement of Affairs is c.$2.1 million ordinary preferential creditors and c.$8 million secondary preferential creditors.

At the date of this report, the timing and quantum of the distribution to the preferential creditors is uncertain.

## 7.3    Prescribed part – unsecured creditors

In accordance with section 176A of the Insolvency Act 1986, a prescribed part is to be set aside from floating charge assets and made available to the unsecured creditors of a company. The prescribed part calculation is applied to the net property available and is calculated at 50% of the first £10,000 of net realisations and 20% of all further amounts, up to a maximum prescribed part of £600,000, or, if the floating charge was created on or after 6 April 2020, £800,000.

We expect the prescribed part of GCUK to be the maximum of £800,000 in this case. The directors' statement of affairs assumes the same but has been shown in US Dollars.

As there is no floating charge holder of GCMC, the prescribed part provisions will not apply.

## 7.4    Non-preferential unsecured creditors

The quantum and timing of distributions to unsecured creditors of the Companies is uncertain at this stage.

The Statement of Affairs of GCUK details 210 unsecured creditors totalling $1.46 billion.

The Statement of Affairs of GCMC states that unsecured creditors' claims total $14.5 million.

# 8   Investigations into the affairs of the Companies

## 8.1   Statutory investigations

Within three months of our appointment as Joint Administrators, as required by the Company Directors Disqualification Act 1986, we will report to the Secretary of State the required facts about the Companies' business and the conduct of their directors (including those acting within the past three years).

We would be pleased to receive from any creditor any useful information concerning the Companies, their dealings or conduct which may assist us.

# 9  Joint Administrators' remuneration and disbursements

## 9.1  Overview

Our remuneration basis has not yet been fixed as our focus has been to consider and implement the most appropriate strategy to achieve the objective of the administrations.

Details about remuneration and expenses are provided in Appendix E to this report.

### GCUK

As described earlier in this report, we are working with investors to recover costs incurred in the administration where GCUK recovers assets for the benefit of investors.

If we are unable to agree to a suitable arrangement with investors in respect of asset recoveries of GCUK, the estimates set out below and in Appendix E could be materially different as certain streams of work would be reduced.

We have incurred time costs and expenses during the Period (8 March 2021 to 16 April 2021) amounting to c.£2.9 million and £366 respectively. No time costs or expenses have been paid to date.

In due course we will seek approval for our remuneration from the appropriate creditors, which we anticipate would be a creditors' committee if established for GCUK. It is anticipated that the Joint Administrators will propose remuneration be fixed on a time costs basis with a fees estimate totalling c.£15 million for the period to 7 March 2022. Our discussions with third-party investors are ongoing but we will request an amount to be transferred to the administration estate to contribute to costs associated to oversight and management of the asset recoveries.

### GCMC

We have incurred time costs in the Period amounting to c.£394,000, of which no time costs have been paid to date. No expenses have been incurred or paid in GCMC.

We propose our remuneration be fixed on a time costs basis with a fees estimate totalling c.£851,000 to 7 March 2022.

# 10 Future strategy

## 10.1  Future conduct of the administrations

We will continue to manage the affairs, business and property of the Companies in order to achieve the purpose of the administrations. In summary, this will include but will not be limited to:

- continuing business as usual for trading operations (but, for the avoidance of doubt, not the origination of new business), obligor receipts and payments to investors including GCUK as principal or third-party investors where appropriate arrangements are put in place
- agreeing and finalising the form of support with investors to recover costs incurred in the administration of GCUK where continuing to assist with recovery of assets
- dealing with any defaulting obligors to take steps to protect the position of GCUK or investors (including, where the Joint Administrators consider it appropriate, enforcing security interests)
- dealing with all trade insurance regulated matters including submitting regular reports as required by the policies and preparation and submissions of claims if obligors default
- processing of insurance claims for defaulting obligors
- retaining employees predominantly for the purposes of asset recoveries
- maintaining complex IT infrastructure to facilitate the realisation of GCUK assets and third-party assets where appropriate
- continuing assistance with subsidiaries to wind up or facilitate a sales process (as applicable) and realise value where possible
- continuing liaison with agents regarding the disposal of remaining furniture, the vehicle and artwork
- paying administration expenses, including our remuneration
- agreeing the claims of the unsecured and preferential creditors and payment of a dividend, if future realisations make this feasible
- paying distributions to the secured creditors of GCUK
- finalising of the Companies' tax affairs, including completion of corporation tax and VAT returns and settlement of any post administration liabilities, and
- complying with statutory and regulatory obligations, including investigations into the Companies' affairs

## 10.2  Extension of the administrations

The duration of an administration is restricted to 12 months from the date of commencement, unless it is extended with the consent of the creditors, or by order of the Court.

If it is identified that an extension is required, the Joint Administrators will apply to Court or seek a resolution from the creditors in our next progress report requesting an extension of up to 12 months.

## 10.3  Resolutions proposed

GCUK

A decision of the creditors of GCUK is required to consider the following resolutions:

- The Joint Administrators' proposals be approved
- Whether a creditors' committee be formed

GCMC

A decision of the creditors of GCMC is required to consider the following resolutions:

- That the Joint Administrators' proposals be approved
- The Joint Administrators' pre-administration costs of £115,214, charged or incurred with a view to the company entering administration, be approved as an expense of the administration
- The basis of the Joint Administrators' remuneration be fixed according to the time properly spent by the Joint Administrators and their staff on the administration, with a fees estimate of £850,716
- The Joint Administrators be permitted to draw category 2 disbursements for mileage at 45p per mile
- Whether a creditors' committee be formed

Creditors are directed to Appendix F in respect of the process for responding to the proposed resolutions and submitting a proof of debt to the Joint Administrators.

## 10.4   Data protection

Any personal information held by the Companies will continue to be processed for the purposes of the administrations of the Companies and in accordance with the requirements of data protection law. Our privacy notice on our website (www.grantthornton.co.uk/en/privacy) contains further details as to how we may use, process and store personal data.

## 10.5   Future reporting

Our first progress report will cover the six months from our appointment to 7 September 2021, to be delivered to creditors within one month after that date.

# A   Notice about these proposals

These proposals (this report) have been prepared by the Joint Administrators solely to comply with the Joint Administrators' statutory duty to report to creditors of the Companies under Paragraph 49 of Schedule B1 to the Insolvency Act 1986 on their proposals for achieving the purpose of the administration, and for no other purpose. It is not suitable to be relied upon by any other person, or for any other purposes, or in any other context.

This report has not been prepared in contemplation of it being used, and is not suitable to be used, to inform any investment decision in relation to the debt of or any financial interest in the Companies or any other member of the Group.

Any estimated outcomes for creditors included in this report are illustrative only and cannot be relied upon as guidance as to the actual outcomes for creditors.

Any persons choosing to rely on this report for any purpose or in any context other than under Paragraph 49 of Schedule B1 to the Insolvency Act 1986do so at their own risk. To the fullest extent permitted by law, the Joint Administrators do not assume any liability and will not accept any liability in respect of this report.

Chris M Laverty, Trevor P O'Sullivan and Will Stagg are authorised in the UK to act as Insolvency Practitioners by the Insolvency Practitioners Association.

The Joint Administrators are bound by the Insolvency Code of Ethics.

The Joint Administrators act as agents for the Companies and contract without personal liability. The appointments of the Joint Administrators are personal to them and to the fullest extent permitted by law, Grant Thornton UK LLP does not assume any responsibility and will not accept any liability to any person in respect of this report or the conduct of the administration.

Unless stated otherwise, all amounts in this statement of proposals and appendices are stated net of VAT. For definitions of abbreviations please refer to the 'Definitions' table at the start of this report.

# B   Statutory information

**Company information**

| | |
|---|---|
| Company name | Greensill Capital (UK) Limited |
| Date of incorporation | 2 July 2012 |
| Company registration number | 08126173 |
| Former trading address | One Southampton Street<br>Covent Garden<br>London<br>WC2R 0LR |
| Present registered office | 4 Hardman Square<br>Spinningfields<br>Manchester<br>M3 3EB |
| Authorised share capital | $13,480 |
| Issued share capital | $13,480 (Greensill Pty) |
| Directors and officers shareholding | Alexander David Greensill (no shareholding) |

**Administration information**

| | |
|---|---|
| Administration appointment | The administration appointment granted in the High Court of Justice Business & Property Courts of England & Wales Insolvency & Companies List, 000435 of 2021 |
| Appointor | Order of the Court on the application of Alexander David Greensill, the sole director of GCUK |
| Date of appointment | 8 March 2021 |
| Joint Administrators' names | Chris M Laverty, Trevor P O'Sullivan and Will G Stagg |
| Joint Administrators' addresses | 30 Finsbury Square, London, EC2A 1AG |
| Purpose of the administration | Achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration) |
| Estimated values of the net property and prescribed part | GCUK's net property and therefore also the prescribed part is unknown at this stage |
| Prescribed part distribution | The Joint Administrators do not intend to apply to Court to obtain an order that the prescribed part provisions do not apply |
| Functions | In accordance with paragraph 100(2) of Schedule B1 to the Insolvency Act 1986, the functions of the administrators are to be exercised by any or all of them. |
| Current administration expiry date | 7 March 2022 |
| EU Regulation as it has effect in the law of the UK | These insolvency proceedings "COMI proceedings" (as that term is defined by rule 1.2(2) of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024)) |

Commercial in confidence

**Company information**

| | |
|---|---|
| Company name | Greensill Capital Management Company (UK) Limited |
| Date of incorporation | 19 April 2012 |
| Company registration number | 08037769 |
| Former trading address | One Southampton Street<br>Covent Garden<br>London<br>WC2R 0LR |
| Present registered office | 4 Hardman Square<br>Spinningfields<br>Manchester<br>M3 3EB |
| Directors and officers' shareholding | |
| | Alexander David Greensill — No shareholding |
| | Jonathan Edward Myott Lane — No shareholding |
| | Alastair Kenneth Eadie — No shareholding |

**Administration information**

| | |
|---|---|
| Administration appointment | The administration appointment granted in the High Court of Justice Business & Property Courts of England & Wales Insolvency & Companies List, 000436 of 2021 |
| Appointor | Order of the Court on the application of Alexander David Greensill and Alastair Kenneth Eadie, directors of GCUK |
| Date of appointment | 8 March 2021 |
| Joint Administrators' names | Chris M Laverty<br>Trevor P O'Sullivan<br>Will G Stagg |
| Joint Administrators' addresses | 30 Finsbury Square, London, EC2A 1AG |
| Purpose of the administration | Achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration) |
| Estimated values of the net property | GCMC's net property is unknown at this stage |
| Prescribed part distribution | The prescribed part provisions will not apply as there is no floating chargeholder |
| Functions | In accordance with paragraph 100(2) of Schedule B1 to the Insolvency Act 1986, the functions of the administrators are to be exercised by any or all of them. |
| Current administration expiry date | 7 March 2022 |
| EU Regulation as it has effect in the law of the UK | These insolvency proceedings "COMI proceedings" (as that term is defined by rule 1.2(2) of the Insolvency (England and Wales) Rules 2016 (SI 2016/1024)) |

Appendix C

# Statement of Affairs

## Statement as to affairs of Greensill Capital (UK) Limited

**Company number 08126173**

**On the 8 March 2021**

Statement of Truth

I believe that the facts stated in this statement of the affairs are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name          Alexander David Greensill

Signed          _____

Dated          28 April 2021

Commercial in confidence

## A – Summary of Assets

Assets

| | Book Value $ | Estimated to Realise $ |
|---|---:|---:|
| **Assets subject to fixed charge:** | | |
| GB Trust assets | 109,286,318 | 109,286,318 |
| Trade assets | (109,286,318) | (109,286,318) |
| **Assets subject to floating charge:** | | |
| Cash | 117,030,238 | 115,400,000 |
| Accrued income[1] | 231,265,416 | 12,000,000 |
| Employee advances | 493,962 | 493,962 |
| Prepayments | 3,818,192 | - |
| Trade assets[1] | 889,447,477 | 304,814,682 |
| Other debtors | 62,198,803 | 7,881,523 |
| Intercompany receivables | 107,436,646 | 13,000,000 |
| **Uncharged assets** | | |
| Tangible assets | 22,578,211 | 630,000 |
| Intangible assets | 10,485,452 | - |
| Investment in subsidiaries | 8,478,656 | 5,500,000 |
| Taxes | 4,506,246 | 1,317,545 |
| Investments in Group undertakings | 14,408,888 | 14,408,888 |
| | **1,472,148,187** | **475,446,600** |

Estimated total assets available for preferential creditors

1.   Whilst the directors have attributed a low recoverable value to certain Trade Assets and Accrued Income balances in the Statement of Affairs, a significant portion of these benefit from security guarantees from a third party.  In the event the security is invoked this could yield additional recoveries of c.$250m of Trade Assets and c.$175m of Accrued Income.

Signature _____        Date: 28 April 2021

**A1 – Summary of Liabilities**

| | | Estimated to Realise |
|---|---|---|
| | | $ |
| **Estimated total assets available for preferential creditors (carried from page A)** | $ | 475,446,600 |
| **Liabilities** | | |
| Ordinary preferential creditors – | - | - |
| **Estimated deficiency/surplus as regards ordinary preferential creditors** | 1,472,148,187 | 475,446,600 |
| Secondary preferential creditors | - | - |
| **Estimated deficiency/surplus as regards secondary preferential creditors** | 1,472,148,187 | 475,446,600 |
| Estimated prescribed part of net property where applicable (to carry forward) | (1,112,000) | (1,112,000) |
| **Estimated total assets available for floating charge holders** | 1,471,036,187 | 474,334,600 |
| Debts secured by floating charges | (200,000,000) | (200,000,000) |
| **Estimated deficiency/surplus of assets after floating charges** | 1,271,036,187 | 274,334,600 |
| Estimated prescribed part of net property where applicable (brought down) | 1,112,000 | 1,112,000 |
| **Total assets available to unsecured creditors** | 1,272,148,187 | 275,446,600 |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | (1,654,699,147) | (1,456,984,613) |
| **Estimated deficiency/surplus as regards non-preferential creditors (excluding any shortfall to floating charge holders)** | (382,550,960) | (1,181,538,013) |
| Shortfall to floating charge holders (brought down) | - | - |
| **Estimated deficiency/surplus as regards creditors** | (382,550,960) | (1,181,538,013) |
| Issued and called up capital | (13,480) | (13,480) |
| **Estimated total deficiency/surplus as regards members** | | (1,181,551,493) |

Signature _____     Date: 28 April 2021

Commercial in confidence

**COMPANY CREDITORS**

**Note:**  You must include all creditors and identify any creditors under hire-purchase, chattel leasing or conditional sale agreements *and* creditors claiming retention of title over property in the company's possession.

| Name of creditor | Address (with postcode) | Amount of debt $ | Details of any security held by creditor | Date security given | Value of security $ |
|---|---|---|---|---|---|
| See excel attached. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Signature _____Date: 28 April 2021

| Name of creditor | Address (with postcode) | Amount of debt |
|---|---|---|
| | | $ |
| **Unsecured non-preferential claims** | | |
| Jones Lang/Colliers | The Walbrook Building 25, Walbrook, London EC4N 8AF | 7,174,489 |
| Expansion Property Limited | Contrarian Group, The Colchester Centre, Hawkins Road, Colchester, Essex, England, CO2 8JX | 2,577,190 |
| Blackenhall & Co | 9 Bonhill Street, London, England, EC2A 4DJ | 650,200 |
| Daresbury Park Developments Limited/ Marsden Group | Marshall House Huddersfield Road, Elland, West Yorkshire, United Kingdom, HX5 9BW | 1,702,458 |
| Threadneedle Pensions Limited | Cannon Place, 78 Cannon Street, London, EC4N 6AG | 5,440,074 |
| NORTH WEST PORTFOLIO (NO.2) LIMITED | Emerson House, Heyes Lane, Alderley Edge, SK9 7LF | 539,082 |
| Coastview Estates Limited | 30 City Road, London, EC1Y 2AB | 647,512 |
| ABM Fire & Security | 6B Masters House, Vesty Road, Liverpool,L30 1NY | 29 |
| BOC Ltd | Worsley Manchester M28 2UT | 43 |
| Daniel Bernal | | 50 |
| M-Line Telecoms Ltd | Mount Manor House, 16 The Mount, Guildford, Surrey, GU2 4HN | 72 |
| Inspired Integrated Systems | 20a Church RoadWelwyn Garden City, Hertfordshire AL8 6PS | 91 |
| Ecotricity | Lion House, Rowcroft, Stroud, England, GL5 3BY | 110 |
| HireRight Limited | 15 Westferry Circus, Canary Wharf, London, England, E14 4HD | 126 |
| DA Utility Services Ltd | 47 Sheridan Avenue, Ewloe, Deeside, Clwyd, CH5 3UN | 235 |
| Addison Lee | The Point, 37 North Wharf Road, London, England, W2 1AF | 303 |
| Euroffice Ltd | Dome House, 48 Artillery Lane, London E1 7LS | 315 |
| Ellis Of Richmond Ltd | Richmond House 1, The Links, Popham Close, Hanworth, TW13 6JE | 381 |
| DTCC Derivatives Repository Ltd | Broadgate Quarter, 7th Floor, One Snowden Street, London, EC2A 2DQ | 495 |
| Powwownow (VIA-VOX) | Vectra House, 36 Paradise Road, Richmond, TW9 1SE | 508 |
| Lassen Global | Showers Farm, Kingsland, Leominster, Herefordshire, United Kingdom, HR6 9SE | 559 |
| de Winter Marketing Limited | 1 Kings Building, King Street, Chester, England, CH1 2AJ | 592 |
| Guernsey Risk Company | Beauregard, Route des Camps, St Martins, Guernsey GY4 6AA | 630 |
| Colt Technology Services | Colt House, 20 Great Eastern Street, London, EC2A 3EH | 740 |
| Zip Water (UK) Limited | Fourth Floor, Abbots House, Abbey Street, Reading, RG1 3BD | 766 |
| BT | 81 Newgate Street, London, EC1A 7AJ | 777 |
| Direct 365 | Parkside Place,Oasis Business Park, Skelmersdale WN8 9RD | 865 |
| AON | The Leadenhall Building 122 Leadenhall Street  London EC3V 4AN | 888 |
| Regular Cleaning | Aldworth House, 1 Aldworth Grove, London, SE13 6HJ | 1,007 |
| Lex Greensill - Walls Avenue | | 1,028 |
| PairCoach Enterprises, Inc. | 151 West Hastings St, Vancouver, Canada BC V6B 1H4 | 1,092 |
| Ulton | Po Box 1000, Bundaberg  QLD 4670 | 1,192 |
| Smythson | 24-25 NEW BOND STREET LONDON W1S 2RR | 1,294 |
| Marshall ACM Ltd | Co Ukmal Unit 7 3-5 Little Somerset Street, London, England, E1 8AH | 1,315 |
| Amazon Payments UK Limited | 1 Principal Place, Worship Street, London, EC2A 2FA | 1,476 |
| Deutsche Bank AG London | Winchester House, 1 Great Winchester Street, London, EC2N 2DB | 1,509 |
| Anexsys LTD | 58 Farringdon Road, London, EC1R 3BP | 1,644 |
| Saville & Co | One Carey Lane London EC2V 8AE | 1,654 |
| Nviron Ltd | Chester Road, Preston Brook, Runcorn, Cheshire, WA7 3FR | 1,680 |
| Bob Rehill Limited | Konward House, High Street, Hartley Wintney, Hampshire RG27 8NY | 2,006 |
| Grays Office Supplies | 15-17 Lodge Lane, Grays, Essex. RM17 5RY | 2,045 |
| SmartNumbers | 25-27 Shaftesbury Avenue, London W1D 7EQ | 2,459 |

| | | |
|---|---|---|
| MAK Integrated Services Limited | Manor House Manor Street, Audenshaw, Manchester, M34 5JG | 2,776 |
| MongoDB Limited | 3rd Floor, Franciscan Court, 16 Hatfields, London, England, SE1 8DJ | 2,883 |
| TMF | Tobin S.a.r.l 46A Avenue J.F.Kennedy L-1855 Luxembourg | 3,199 |
| DHL | Southern Hub, Unit 1, Horton Road, Colnbrook, Berkshire SL3 0BB | 3,284 |
| The London School of Economics & Political Science | Lse, Houghton Street, London, WC2A 2AE | 3,305 |
| Pole Star Space Applications Ltd | C/O Rayner Essex Llp Tavistock House South, Tavistock Square, London, WC1H 9LG | 3,600 |
| Linda Beauchamp | | 4,110 |
| First Hosted Limited | 6th Floor, 25 Farringdon Street, London. United Kingdom, EC4A 4AB | 4,180 |
| Axonmoore | 1st Floor, Canada House, 3 Chepstow Street, Manchester,M1 5FW | 4,180 |
| Bradgate Facility Management Limited | Bradgate House, 9 Hannaford Walk, London, E3 3SU | 4,201 |
| Sandler Consulting | 19 Greenbank, London, N12 8AS | 4,570 |
| Bell Gully | Level 2148 Shortland St,Auckland CBD, Auckland 1010, | 4,646 |
| Leo Law Office, APLC | 110 W A St Ste 1100, San Diego 92101 | 5,000 |
| Australia-Israel Chamber of Commerce | PO Box 179 Double Bay NSW 1360 | 5,067 |
| Herbert Smith Freehills | 101 Collins Street Melbourne VIC 3000 | 5,076 |
| Stephen Greene | | 5,806 |
| StreamlineID Pty Ltd | PO BOX 276, ROSEVILLE, NSW, 2069 | 5,988 |
| LogicMonitor | 6th Floor One London Wall, London, United Kingdom, EC2Y 5EB | 6,013 |
| CDW (Kelway) | 10 Fleet Place, London EC4M 7RB | 6,659 |
| Walkers Global | 190 Elgin Avenue, George Town, Grand Cayman, KY1-9001 | 6,749 |
| As One Solutions (Bradden) LLP | Valhalla House, 30 Ashby Road, Towcester, Northamptonshire, NN12 6PG | 6,967 |
| Michael Page International Recruitment Limited | The Swotch, 1-7 The Grove, Slough, Berkshire SL1 1QP | 7,050 |
| Chapman Tripp | PO Box 2206, Auckland 1140, New Zealand | 7,144 |
| IT Sun Solutions Limited | 3 Carlton Court, Hale, Altrincham, England, WA15 8RP | 7,398 |
| HGF Limited | Headingley Branch, 63 Otley Road, Leeds, LS6 3PS | 8,060 |
| Paul Hastings LLP | 200 Park Avenue, New York, NY 10166-3205 | 8,222 |
| Cato & Clive Partners Pty Ltd | 2 Roedean Heights, Brighton, East Sussex, BN2 5SA | 8,725 |
| Creswood Media | 7 Brackenwood, Liverpool, L12 0NG | 8,778 |
| Workspace interior solutions | The Media Centre 7 Northumberland Street Huddersfield HD1 1RL | 9,018 |
| Allen & Overy | One Bishops Square London E1 6AD | 9,499 |
| TEKsystems (Allegis) | Maxis 2 Western Road, Bracknell, England RG12 1RT | 9,864 |
| UpReach | Ground Floor, Studio 18, Blue Lion Place, 237 Long Lane, London, SE1 4PU | 9,864 |
| Geoweb LLC | P.O. Box 68, Mount Nebo, West Virginia 26679 US | 10,000 |
| Salford Royal NHSFT | Revolution Property Management Limited Suite One, 3 Exchange Quay, Salford, England, M5 3ED | 10,032 |
| Greenberg Traurig | 333 S.E. 2nd Avenue,Suite 4400,Miami Florida 33131 | 10,343 |
| Simmons & Simmons Gaikokuho | 23rd Floor Roppongi Hills Mori Tower, 6-10-1 Roppongi, Minato-ku, Tokyo  106-6123 | 10,417 |
| Green Properties (Cheshire) Limited | 720 Mandarin Court, Centre Park, Warrington, Cheshire, WA1 1GG | 10,746 |
| Toro Risk Solutions –Global Limited | 50, Morris Crocker, North Street, Havant, United Kingdom, PO9 1QU | 11,426 |
| BNY Mellon Australia Pty Ltd | Level 2, 1 Bligh Street, Sydney, NSW 2000 | 11,559 |
| The Bank of New York Mellon | 240 Greenwich Street, New York, New York 10286, United States | 12,000 |
| Worksmans Attorneys | The Central 96 Rivonia Road, Sandton 2196 | 12,053 |
| Fulcrum Chambers | The Shard, 32 London Bridge Street, London, United Kingdom, SE1 9SG | 12,126 |
| Simmons & Simmons JWS Pte | 168 Robinson Road,#11-01, Capital Tower, Singapore 068912 | 12,344 |
| Dilectus Contract Solutions | 7 Portal Business Park, Eaton Lane, TARPORLEY, Cheshire, CW6 9DL | 13,462 |
| Experient Ltd | 2 Millbrook 2 Millbrook, Salisbury, Wilts, United Kingdom, SP1 1NH | 13,794 |
| Creative Developments Freelance Limited | 20 Duke Road, Ilford, England, IG6 1NQ | 14,797 |
| RAAZI LIMITED | 6 Pentlow Street, London, United Kingdom, SW15 1LX | 14,797 |
| Technical Documentation Ltd | Plaza 9 Kd Tower, Cottorells, Hemel Hempstead, United Kingdom, HP1 1FW | 14,797 |
| Thomas Grey Consultancy Ltd | 1st Floor, 110 Station Road, North Chingford, London, E4 6AB | 14,797 |
| PmlpSoftIT Ltd | 10 Woodbine Place, Wanstead, London, England, E11 2RH | 14,838 |

| | | |
|---|---|---|
| Saattvik Ltd | Telecom House, 125-135 Preston Road, Brighton, England, BN1 6AF | 15,048 |
| Y2P PVT LTD | 19, Delaney Way, Salford, Greater Manchester  M7 1BL | 15,048 |
| Maex Ament | Calle Dario Aparicio 16B, Madrid #28023 | 15,149 |
| Swamiksar Consultancy Limited | 47 Landseer Court, Corby, Northamptonshire, United Kingdom, NN18 0RU | 15,619 |
| BAHR | 72 Sceptre Street, Elswick, Newcastle Upon Tyne, Tyne And Wear, NE4 6PR | 15,883 |
| Systechex Consultancy Ltd | 42 Pursey Drive, Bradley Stoke, Bristol, England, BS32 8DJ | 16,441 |
| Yubhas Technologies Ltd | 75 Briony Avenue, Hale, Altrincham, WA15 9PZ | 16,441 |
| Business Data Partners | Regus Sunderland, 4 Admiral Way, Doxford International Business, Park, Sunderland, SR3 3XW | 16,553 |
| Quantum IT Service Ltd | 20 Cavendish Avenue, Eastbourne, England, BN22 8EN | 16,720 |
| Traversus Consulting Limited | 840 Ibis Court Centre Park, Warrington, England, WA1 1RL | 16,720 |
| GD Dev Ltd | Ground Floor Unit B Lostock Office Park Lynstock Way, Lostock, Bolton, England, BL6 4SG | 17,263 |
| BITWISE TECHNOLOGY LIMITED | 17 Candinal Way, Newton-Le-Willows, Merseyside | 17,280 |
| Crumb Umbrella | First Floor Packwood House, Guild Street, Stratford Upon Avon, Warwickshire, England, CV37 | 17,932 |
| Ecodesystem Ltd | Plaza 9, Kd Tower, Cotterells, Hemel Hempstead, United Kingdom, HP1 1FW | 18,085 |
| Data Analytica ltd | Northover House 132a Bournemouth Road Chandlers Ford, Eastleigh, Hants, England, SO53 3AL | 18,742 |
| Donoss Ltd | The Livery Yard Hunshelf Bank, Stocksbridge, Sheffield, England, S36 2BS | 18,949 |
| Try Catch Limited | 61 Savannah Place, Great Sankey, Warrington WA5 8GN | 19,395 |
| Hays Specialist Recruitment Limited | 4th floor, 20 Triton Street, London NW1 3BF | 19,813 |
| Halton Borough Council | Halton B C, PO Box 223, Widnes WA8 2DA | 20,337 |
| Livestock Asset Management Services Pty Ltd | Queens Park, NSW 2022, Australia | 20,379 |
| Neil Hobday | | 20,551 |
| The DPO Centre Ltd | The Suffolk Enterprise Centre, 44 Felaw Street, Ipswich, Suffolk IP2 8SJ | 21,459 |
| King & wood Mallesons | 11th Floor, 20, Fenchurch Street, London, England, EC3M 3BY | 21,734 |
| Haven Power Limited | Drax Power Station, Selby, North Yorkshire,YO8 8PH | 21,868 |
| Talwar Thakore & Associates | 67 Stroud Road, Gloucester, Gloucestershire, GL1 5AQ | 23,000 |
| BLOOMBERG FINANCE L.P | 731 Lexington Avenue, New York NY 10022 | 27,518 |
| Zeinal Bava | | 27,867 |
| Valuable Insights Ltd | 27 Old Gloucester Street, London, England, WC1N 3AX | 28,524 |
| Spacecraft International | Ground Floor, 64-66 Old Street, London EC1V 9AN | 29,296 |
| CloudRock Partners | 869 High Road, London, United Kingdom, N12 8QA | 32,646 |
| Indie TV Ltd | CC YOUNG & CO, 48 Poland Street, London, W1F 7ND | 34,368 |
| AZB & Partners | Azb House, Peninsula Corporate Park, ganpatrao Kadam Marg,L Parel,Mumbai 400013 | 34,471 |
| Cube Logic Ltd | 3rd Floor News Building, 3 London Bridge Street, London, SE1 9SG | 36,115 |
| Intelligent Business Solutions (Khaled Albasias) | 11 Hilly Field, Harlow, Essex, CM18 7HU | 36,666 |
| Taulia GmbH | 6th Floor, Speditionstraße 21, Dusseldorf, 40221 | 37,261 |
| WM Reply | 38 Grosvenor Gardens, London, United Kingdom, SW1W 0EB | 37,328 |
| Diligent Boardbooks Limited | 1 Strand, Grand Buildings, First Floor, London, United Kingdom, WC2N 5HR | 38,471 |
| Scope Ratings GmbH | Lennéstraße 5, 10785 Berlin, Germany | 38,919 |
| The Law Debenture Trust Corporation p.l.c | 8th Floor, 100 Bishopsgate, London EC2N 4AG | 39,153 |
| McCullough Robertson Lawyers | Level 11, 66 Eagle Streety, Brisbane QLD 4000 | 42,008 |
| Bramid P/L | Crawford House, 50 Cedar Avenue, Hamilton, Bermuda, HM 11 | 42,159 |
| Great Chatwell Academy of Learning Ltd | Level 3 45-47 High Street, Newport, Shropshire, United Kingdom, TF10 7AT | 42,472 |
| Nasdaq | Fabianinkatu 14, Helsinki FL-00131 | 42,911 |
| Blakenhall & Company | 5th Floor , Queens House, 8-9 Queen Street, London EC4N 1SP | 44,402 |
| CACI Limited | Kensington Village, Avonmore Road, London W14 8TS | 46,425 |
| Second City Creative | 8 Corrour Road, Glasgow G43 2DX | 47,390 |
| Stroz Friedberg | Capital House, 85 King William Street, London EC4N 7BL | 48,031 |
| Linklaters LLP (Dubai) | Ninth Floor, Currency House, Dubai International Finance Centre, PO Box 506516 | 48,278 |
| PriceWaterHouseCoopers LLP (London) | 1 Embankment Place, London, WC2N 6RH | 50,210 |
| Reed Smith LLP | The Broadgate Tower, 20 Primrose Street, London, EC2A 2RS | 53,504 |

| | | |
|---|---|---:|
| Engage | 414 Metal Box Factory, 30 Great Guildford Street, London, SE1 0HS | 53,685 |
| Eversheds Sutherland (International) LLP | One Wood Street, London, EC2V 7WS | 62,786 |
| Simmons & Simmons (HK) | 33rd Floor, China World TowerA, 1 Jianguomenwai Avenue, Bejing 100004 | 67,908 |
| Linklaters LLP (London) | One, Silk Street, London, EC2Y 8HQ | 72,603 |
| The Marsden Group SIPP | c/o Organon Trustees, 8th Floor, Regent House, Heaton Lane, Stockport, SK4 1BS | 73,366 |
| Overbury | 77 Newman Street, London, W1T 3EW | 79,468 |
| TheCityUK | Sixth Floor, Fitzwilliam House, St. Mary Axe, London, England, EC3A 8BF | 84,943 |
| The Crocodile Integrated Marketing Ltd | The Lux Building, 2-4 Hoxton Square, London, N1 6NU | 88,403 |
| Oracle Corporation UK Limited | Oracle Parkway, Thames Valley Park, Reading, Berkshire, RG6 1RA | 89,165 |
| Workman LLP (Threadneedle Pensions Limited) | 2nd Floor, 78 St Vincent Street, Glasgow G2 5UB | 95,340 |
| Pegasystems Limited | 3rd Floor 23 Forbury Road, Reading, Berkshire, RG1 3JH | 96,513 |
| Salesforce UK Limited | Floor 26 Salesforce Tower, 110 Bishopsgate, London, EC2N 4AY | 99,744 |
| Amazon Web Services - Verdi Project | 1 Principal Place, London, Worship Street, EC2A 2FA | 107,092 |
| DLA Piper LLP (US) | 160 Aldersgate Street, London, EC1 4HT | 111,982 |
| LinkLaters LLP (Shanghai) | China, Shanghai Shi, Pudong, Lu Jia Zui, Huayuanshiqiao Rd, 33号花旗集团大厦 | 112,636 |
| Beswick Relocations Services | Church House, Parkway, Holmes Chapel, Cheshire CW4 7BA | 114,212 |
| PrimeRevenue | 600 Peachtree St NE, Suite 4400, Atlanta GA 30308 | 116,597 |
| Venturethree Limited | 11 Cavalry Square London SW3 4RB | 118,048 |
| C2FO - Revenue Share - Water for Commerce Fund Management, LLC | 2020 West 89th Street, Suite 200, Leawood KS 66206 | 132,427 |
| Codix | 200 Rue du Vallon - Immeuble le Carat VALBONNE 06560 | 142,229 |
| Infosys | 14th Floor Canary Wharf, 10 Upper Bank Street, E14 5NP | 146,816 |
| Islington London Borough Council | 222 Upper St, London N1 1XR | 148,373 |
| AMAS Ltd - JLL | 30-32 Market Square, Lisburn, County Antrim, Northern Ireland, BT28 1AG | 162,496 |
| GCI Network Solutions | Global House, 2 Crofton Close, Lincoln LN3 4NT | 173,544 |
| WPRL EVIE Capital Limited | Interpark House, 7 Down Street, London, W1J 7AJ | 179,615 |
| Emerson Management Services | North West Portfolio(NO 2) Limited, Emerson House, Heyes Lane, Alderley Edge, Cheshire SK9 | 216,128 |
| Amazon Web Services - USD | 1 Principal Place, London, Worship Street, EC2A 2FA | 244,589 |
| Allens >< Linklaters | Deutsche Bank Place, Corner Hunter and Phillip Streets, Sydney, NSW 2000 | 261,794 |
| Workday Limited | 7th Floor 1 Finsbury Avenue, London, England, EC2M 2PF | 308,625 |
| Encompass | Floor 3, 33 Bothwell Street, Glasgow, G2 6NL | 376,517 |
| Sistemas UK Limited (Globant) | 5 Fl Diamond House 36-38 Hatton Grd EC1N 8EB | 377,050 |
| Clayton UTZ | Level 15, 1 Bligh Street Sydney Nsw 2000 | 435,435 |
| Colliers International | 50 George Street London W1U 7GA | 488,130 |
| Mayer Brown LLP | 230 South LaSalle Street, Chicago IL 60604 | 524,296 |
| Simmons & Simmons LLP | Citypoint, 1 Ropemaker Street, London, EC2Y 9SS | 599,494 |
| CitiBank | 25 Canada Square, Canary Wharf, London, United Kingdom E14 5LB | 610,772 |
| Ciklum UK Ltd | 2 Stone Buildings, Lincoln's Inn, London WC2A 3TH | 823,182 |
| Taulia P/L | 250 Montgomery St, Suite 400, San Francisco CA 94104 | 1,245,679 |
| SAS Software Ltd | Wittington House Henley Road, Medmenham, Marlow, Buckinghamshire, England, SL7 2EB | 1,365,138 |
| Marsh Limited (UK) | 1 Tower Place West, Tower Place,London EC3R 5BU | 2,904,864 |
| Greensill Capital Pty Ltd | c/o Ulton Group, Ground Floor, 62-66 Woodooma Street, Bundaberg, QLD 4670 | 339,084,360 |
| Greensill Capital Management Company Limited | One Southampton Street, Covent Garden, London WC2R 0LR, England | 13,545,374 |
| Greensill Capital (Aus) Pty Ltd | c/o Ulton Group, Ground Floor, 62-66 Woodooma Street, Bundaberg, QLD 4670 | 84,057 |
| GC Trading Ltd | One Southampton Street, Covent Garden, London WC2R 0LR, England | 116,626 |
| GC TA Ltd. UK | One Southampton Street, Covent Garden, London WC2R 0LR, England | 83,755 |
| GC TA Ltd. UK | One Southampton Street, Covent Garden, London WC2R 0LR, England | 41,896 |
| Laufer | 6300 Daresbury Park, Daresbury, Warrington, Cheshire, United Kingdom, WA4 4GE | 329,182 |
| Greensill (Netherlands) BV | Prins Bernhardplein 200, 1097JB Amsterdam | 22,338 |
| Greensill GmbH | Mainzer Landstrasse 50, 60325 Frankfurt, Germany | 1,441,186 |
| Greensill Capital Investments (UK) | One Southampton Street, Covent Garden, London WC2R 0LR, England | 160,897 |

| | | |
|---|---|---:|
| Greensill Limited (UK) | One Southampton Street, Covent Garden, London WC2R 0LR, England | 160,896 |
| Greensill Trading Limited (UK) | One Southampton Street, Covent Garden, London WC2R 0LR, England | 160,945 |
| Greensill Capital Trading 2 Limited | One Southampton Street, Covent Garden, London WC2R 0LR, England | 160,945 |
| Greensill Capital Trading 3 Limited | One Southampton Street, Covent Garden, London WC2R 0LR, England | 160,896 |
| Greensill Switzerland SARL | c/o Interturst (Suisse) SA, rue Philippe-Plantamour 18, 1201 Geneva, Switzerland | 284,308 |
| Special Needs Group Limited | 1 Abby Square, Chester, CH1 2HU | 1,661,289.04 |
| CREDIT SUISSE AG, LONDON BRANCH | One Cabot Square, London, E14 4QJ | 440,000,000 |
| Atlantic 57 Consultancy Limited | Islands. | 1,265,687.00 |
| SIMEC INTERNATIONAL UK LIMITED | Birdport, Corporation Rd, Newport, South Wales, NP194RE, UK | 2,786,680.00 |
| Aar Tee Commodities (UK) Limited | c/o Acenta Steel Limited, Planetary Rd, Willenhall, WV13 3SW, UK. | 2,786,680.00 |
| GFG | 8 Marina View, #40-06 Asia Square Tower 1, Singapore, 018960 | 16,720,080.00 |
| Kerry Ireland Investments Limited | The New Barn, Mill Lane, Eastry, Sandwich, Kent, CT13 0JW | 1,393,340.00 |
| Tradeshift Holdings Inc. | 612 Howard Street Suite 100 San Francisco, CA 94105 United States | 7,127,141.14 |
| BCC Trade Credit Pty Ltd | Level 16, 347 Kent Street, Sydney, NSW 2000 | |
| Chubb European Group SE | 100 Leadenhall Street, London, England, EC3A 3BP | |
| Zurich Insurance Plc, UK Branch | 70 Mark Lane, London EC3R 7NQ | |
| Swiss Re International SE | SWISS RE INTERNATIONAL SE, NIEDERLASSUNG DEUTSCHLAND of Arabellastrasse 30, 81925 Munich, Germany | 500,000,000.00 |
| QBE (UK) Ltd | Plantation Place, 30 Fenchurch St, London, EC3M 3BD | |

***(Potential 1st loss claims, dependant on whether assets default and insurance claims are lodged)***

| | | |
|---|---|---:|
| C2FO | 9th Floor 107 Cheapside, London, EC2V 6DN | 161,954 |
| Leighton Contractors | 202 PIER STREET, PERTH, WESTERN AUSTRALIA, 6000, Australia | 395,198 |
| WPRL EVIE CAPITAL LIMITED | Interpark House, 7 Down Street, London W1J 7AJ | 1,817,262 |
| Taulia | Taulia UK Ltd,1st Floor, 32 Fitzroy Square, London, W1T 6EX | 1,127,580 |
| Textura | Oracle Parkway, Thames Valley Park, Reading, Berkshire, England, RG6 1RA | 863,375 |
| Oracle EPP Sub Direct | Oracle Parkway, Thames Valley Park, Reading, Berkshire, England, RG6 1RA | 550.62 |
| Engagedly Inc | Kemp House 152-160 City Road, London, EC1V 2NX | 2,347.78 |
| Linda Beauchamp | | 4,180.02 |
| As One Solutions (Bradden) LLP | Valhalla House, 30 Ashby Road, Towcester, Northamptonshire, NN12 6PG | 5,805.59 |
| Stephen Greene | | 5,806.05 |
| Quantum IT Service Ltd | 20 Cavendish Avenue, Eastbourne, England, BN22 8EN | 6,966.70 |
| Cresswood Media | 7 Brackenwood, Liverpool, L12 0NG | 8,778.04 |
| Dalton Consulting Limited | C/O Sandison Easson & Co Rex Buildings, Alderley Road, Wilmslow, United Kingdom, SK9 1HY | 11,611.16 |
| Y2P PVT LTD | 19 Delaney Way, Salford, Lancashire, United Kingdom, M7 1BL | 12,540.06 |
| Saatvik Ltd | 38 Howton Place, Bushey Heath, Bushey, England, WD23 1HX | 12,540.06 |
| Salesforce UK Limited | Village 9, Floor 26, Salesforce Tower, 110 Bishopsgate, London, EC2N 4AY | 12,540.06 |
| SIMPLE CODE-X LIMITED | 275 Deansgate, Manchester, England, M3 4EL | 13,167.06 |
| Pmlp Soft IT Ltd | 10 Woodbine Place, Wanstead, London, England, E11 2RH | 13,236.73 |
| Business Data Partners | Business Data Partners Ltd, 20 St Dunstan's Hill, Billingsgate, London EC3R 8HL | 13,449.21 |
| Crumb Umbrella | 1st Floor Packwood House, Guild St, Stratford-upon-Avon CV37 6RP | 15,326.74 |
| Try Catch Limited | 61 Savannah Place, Great Sankey, Warrington, WA5 8GN | 16,162.74 |
| PrimeRevenue | 85 Gresham Street, London UK EC2V 7NQ, | 17,333.24 |
| Codix | 200 Rue du Vallon, 06560 Valbonne, France | 20,045.89 |
| Neil Hobday | | 20,900.10 |
| PriceWaterHouseCoopers LLP (London) | 1 Embankment Place, London, WC2N 6RH | 21,000.00 |
| Zeinal Bava | | 23,221.40 |
| iiPay Ltd | Festival House, Jessop Avenue, 2nd Floor, Cheltenham, GL50 3SH, United Kingdom | 23,645.55 |
| Ciklum UK Ltd | 2 Stone Buildings, Lincoln's Inn, London WC2A 3TH | 26,666.00 |

| | | |
|---|---|---:|
| GCI Network Solutions | Global House, Crofton Close, Lincoln, Lincolnshire, LN3 4NT | 29,260.14 |
| Bramid P/L | Crawford House, 50 Cedar Avenue, Hamilton Bermuda HM 11 | 30,000.00 |
| CDW (Kelway) | 1 New Change, London EC4M 9AF | 30,982.00 |
| Intelligent Business Solutions (Khaled Albasias) | 11 Hilly Field, Harlow, Essex, CM18 7HU | 36,666.00 |
| Railsbank Technology Limited | Elm Yard, 10 - 16 Elm Street, London, England, WC1X 0BJ | 41,800.20 |
| Oracle EPP Sub Direct | Oracle Parkway, Thames Valley Park, Reading, Berkshire, England, RG6 1RA | 47,438.84 |
| Sistemas UK Limited (Globant) | | 53,520.20 |
| Greensill Bank AG P/L | Martinistrasse 48, D-28195 Bremen, Germany | 54,268.84 |
| Cognizant Worldwide Limited | 1 Kingdom St, London W2 6BD | 55,733.60 |
| Infosys | 14th and 15th Floor, 10 Upper Bank Street, Canary Wharf, London, E14 5NP | 80,117.05 |
| TMT Group | Cheshire House, Green Ln, Romiley, Stockport SK6 3JG | 83,600.40 |
| Ciklum UK Ltd | 2 Stone Buildings, Lincoln's Inn, London WC2A 3TH | 100,000.00 |
| Amazon Web Services | 1 Principal Place Worship Street London EC2A 2FA | 116,702.09 |
| Amazon Web Services | 1 Principal Place Worship Street London EC2A 2FA | 141,096.28 |
| PriceWaterHouseCoopers LLP (London) | 1 Embankment Place, London, WC2N 6RH | 146,734.03 |
| Sistemas UK Limited (Globant) | Third Floor, 24 Chiswell Street, London, United Kingdom, EC1Y 4YX | 239,297.00 |
| Helios Strategic Advisors, LLC | 780 THIRD AVENUE NEW YORK NY 10017 | 340,261.77 |
| CitiBank | 25 Canada Square, Canary Wharf, London, United Kingdom E14 5LB | 529,279.09 |
| Ciklum UK Ltd | 2 Stone Buildings, Lincoln's Inn, London WC2A 3TH | 530,000.00 |
| Greensill Bank AG P/L | Martinistrasse 48, D-28195 Bremen, Germany | 538,822.90 |
| Allen & Overy | One Bishops Square, Spitalfields, London E1 6AD | 741,682.52 |
| Simmons & Simmons | Citypoint, 1 Ropemaker Street, London, EC2Y 9SS, United Kingdom | 755,344.73 |
| Greensill Bank AG P/L | Martinistrasse 48, D-28195 Bremen, Germany | 45,172,868.00 |
| Marsh Limited | 1 Tower Place West, Tower Place, London EC3R 5BU | 38,605,000.00 |
| **Total Unsecured non-preferential claims** | | **1,456,984,613** |

Commercial in confidence

**SCHEDULE OF SHAREHOLDERS**

| Name of shareholder | Address (with postcode) | Nominal Amount of shares held $ | Type of shares held | Number of shares held | Amount per share called up $ | Total amount shares called up $ |
|---|---|---|---|---|---|---|
| Greensill Capital Pty Limited | C/O Ulton Chartered Accountants Level 1 62-66 Woondooma Street Bundaberg QLD 4670 | 13,479 | Ordinary shares of $0.01 each | 1,347,865 | $0.01 | 13,479 |
| Greensill Capital Pty Limited | C/O Ulton Chartered Accountants Level 1 62-66 Woondooma Street Bundaberg QLD 4670 | £1 | Ordinary share of £1 | 1 | £1 | £1 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Greensill Capital Management Company UK Ltd | Statement of Affairs | Commercial in confidence |
|---|---|---|

**SUMMARY OF ASSETS**

| | Book Value, USD | Estimated to Realise USD |
|---|---|---|
| Assets subject to fixed charge | | |
| None | - | - |
| | | |
| Assets subject to floating charge | | |
| None | - | - |
| | | |
| Uncharged assets | | |
| Cash at bank | 3,195 | 3,195 |
| Petty cash | 1,393 | - |
| Other debtors | 3,125,220 | 2,975,524 |
| VAT asset | 433,776 | 89,885 |
| Employee loans | 1,121,224 | 1,121,224 |
| Interco loan | 13,500,000 | 500,000 |
| Furniture | 2,132 | - |
| Computer kit | 295 | - |
| Other prepayments | - | - |
| Interco Asset Balance - Greensill Capital Pty Ltd | 13,369 | - |
| Interco Asset Balance - Greensill Capital UK Ltd | 13,620,272 | 2,724,054 |
| Interco Asset Balance - Greensill Capital South Africa pty | 230 | - |
| Interco Asset Balance - Greensill Capital Asia Pte | 54,799 | - |
| Interco Asset Balance - Earnd Uk Ltd | 14,473,002 | - |
| Interco Asset Balance - Greensill Netherlands BV | 7,014 | - |
| Interco Asset Balance - Greensill Limited (UAE) | 118,829 | - |
| Interco Asset Balance - Omni Technologies SAS (Columbia) | 42,439 | - |
| | **46,517,190** | **7,413,882** |

Signature _____    Date    23 April 2021

| Greensill Capital Management Company UK Ltd | Statement of Affairs | | Commercial in confidence |
|---|---|---|---|
| **SUMMARY OF LIABILITIES** | | | |
| | USD/GBP | 1.383 | |
| | | **Estimated to realise** USD | |
| Estimated assets available for preferential creditors *carried forward* | | 7,413,882 | |
| **Liabilities** | | | |
| Ordinary preferential creditors | | | |
| Wages to 8 March 2021 | | (2,122,606) | net unpaid wages upto GBP800 plus accrued holiday |
| **Estimated deficiency/surplus as regards ordinary preferential creditors** | | 5,291,276 | |
| Secondary preferential creditors | | (8,042,550) | HMRC |
| **Estimated deficiency/surplus as regards secondary preferential creditors** | | (2,751,274) | |
| Estimated prescribed part of net property where applicable (to carry forward) | | NIL | |
| **Estimated total assets available for floating charge holders** | | (2,751,274) | |
| Debts secured by floating charges | | NIL | |
| **Estimated deficiency/surplus of assets after floating charges** | | (2,751,274) | |
| Estimated prescribed part of net property where applicable (brought down) | | NIL | |
| **Total assets available to unsecured creditors** | | (2,751,274) | |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | | (14,477,460) | |
| **Estimated deficiency/surplus as regards non-preferential creditors (excluding any shortfall to floating charge holders)** | | (17,228,735) | |
| Shortfall to floating charge holders (brought down) | | NIL | |
| **Estimated deficiency/surplus as regards creditors** | | (17,228,735) | |
| Issued and called up capital | | (1) | |
| **Estimated total deficiency/surplus as regards members** | | (17,228,736) | |

Signature _____                    Date    23 April 2021

Greensill Capital Management Company UK Ltd                                    Statement of Affairs                                                        Commercial in confidence

|  |  |  |  |  |  | 1.383 |
| Name of Creditor | Address | Amount of debt, USD | Detail of security held if any | Date security given | Value of security | GBP |
| --- | --- | --- | --- | --- | --- | --- |
| Suppliers |  |  |  |  |  |  |
| Adele Carr | Suite 5, St James Court, Wilderspool Causeway, Warrington, WA4 6PS | 5,107 | None | None | None | 3,692.14 |
| Amelore | 5 Shadwell, Uley, Dursley, GL11 5BW | 4,266 | None | None | None | 3,084.41 |
| AON | Briarcliff House, Kingsmead, Farnborough Hampshire GU14 7TE | 15,579 | None | None | None | 11,263.70 |
| Fidelis | Unit 1a, Birchwood One, Dewhurst Road, Warrington, WA3 7GB | 1,221 | None | None | None | 882.53 |
| iiPay Ltd | 2nd Floor, Festival House, Jessop Ave, Cheltenham GL50 3SH | 7,006 | None | None | None | 5,065.16 |
| Kroll Associates UK Ltd | The Shard, 32 London Bridge, London, SE1 9SG | 5,919 | None | None | None | 4,279.16 |
| Lighthouse Serviços de Consultoria Ltda. | 22 Andar, Sala 01, Cidade Moncoes - Sao Paulo | 6,922 | None | None | None | 5,004.28 |
| Nexia SAB&T | Level 16, 1 Market st, Sydney, NSW2000 | 30 | None | None | None | 21.55 |
| Nuffield Health | Epsom Gateway, Ashley Ave, Epsom, Surry, KT18 5AL | 13,464 | None | None | None | 9,734.36 |
| Sheffield Haworth Ltd | 60 Gresham Street, London, EC2V 7BB | 50,160 | None | None | None | 36,265.85 |
| Vodafone (AP) | P.O.Box 5583, Newbury, RG14 9FF | 25,895 | None | None | None | 18,722.22 |
|  |  | **135,568** |  |  |  |  |
| Intercompany |  |  |  |  |  |  |
| Interco Liability Balance - Earnd Pty Ltd |  | 2,387 |  |  |  |  |
| Interco Liability Balance - Shenzhen Greensill Commercial Factoring Limited |  | 46,182 |  |  |  |  |
| Other creditors |  |  |  |  |  |  |
| HMRC | Various | 8,042,550 |  |  |  |  |
| Aon (pensions) | Briarcliff House, Kingsmead, Farnborough Hampshire GU14 7TE | 823,863 |  |  |  |  |
| Accruals | Various | 198,824 |  |  |  |  |
| FreeUp investors | Various | 2,669,865 |  |  |  |  |
|  |  | **11,919,238** |  |  |  |  |

Signature _____              Date ____23 April 2021____

Greensill Capital Management Company UK Ltd                 Statement of Affairs                 Commercial in confidence

**SCHEDULE OF SHAREHOLDERS**

| Name of Shareholder | Address | Nominal Amount held | Type of shares held | Number held | Amount called up per share | Total amount called up |
|---|---|---|---|---|---|---|
| Greensill Capital Pty Ltd | 62-66 Woondooma Street, Bundaberg, Queensland 4670, Australia | 1 | Ordinary | 1 | 1 | 1 |

Signature _____     Date   23 April 2021

Appendix D

**Greensill Capital (UK) Limited**
**(In Administration)**
**Joint Administrators' Trading Account**

| Statement of Affairs £ | | From 08/03/2021 To 16/04/2021 £ | From 08/03/2021 To 16/04/2021 £ |
|---|---|---|---|
| | TRADING EXPENDITURE | | |
| | Rates Refunds | 210.33 | 210.33 |
| | Utilities | (1,652.66) | (1,652.66) |
| | Telephony / Internet | (1,060.67) | (1,060.67) |
| | Operational Costs | (115.99) | (115.99) |
| | Trading Bank Charges | (4,677.58) | (4,677.58) |
| | Subsidiary Costs | (3,168.71) | (3,168.71) |
| | Subsidiary Wages & Expenses | (1,592,511.83) | (1,592,511.83) |
| | Other Payroll Deductions | (21,986.50) | (21,986.50) |
| | Retained Employee Expenses | (1,573.88) | (1,573.88) |
| | | (1,626,537.49) | (1,626,537.49) |
| | **TRADING SURPLUS/(DEFICIT)** | **(1,626,537.49)** | **(1,626,537.49)** |

**Greensill Capital (UK) Limited**
**(In Administration)**
**Joint Administrators' Summary  of Receipts & Payments**

| Statement of Affairs £ | | From 08/03/2021 To 16/04/2021 £ | From 08/03/2021 To 16/04/2021 £ |
|---|---|---|---|
| | ASSET REALISATIONS | | |
| | Book Debts | 98,785.42 | 98,785.42 |
| | Cash at Bank | 9,880,510.60 | 9,880,510.60 |
| | Funds subject to 3rd Party Claims | 3,764,357.01 | 3,764,357.01 |
| | Furniture & Equipment | 69,874.00 | 69,874.00 |
| | Investment Realisations | 354,839.44 | 354,839.44 |
| | Misc Refunds / Receipts | 2,362.08 | 2,362.08 |
| | Trade Asset Collections | 23,639.81 | 23,639.81 |
| | Trading Surplus/(Deficit) | (1,626,537.49) | (1,626,537.49) |
| | | 12,567,830.87 | 12,567,830.87 |
| | COST OF REALISATIONS | | |
| | Agents/Valuers Fees | 27,558.04 | 27,558.04 |
| | Funds Held in Pre-appt Accounts | 7,050,280.74 | 7,050,280.74 |
| | Rents Payable | 8,232.05 | 8,232.05 |
| | Stationery & Postage | 609.65 | 609.65 |
| | Statutory Advertising | 85.00 | 85.00 |
| | | (7,086,765.48) | (7,086,765.48) |
| | | **5,481,065.39** | **5,481,065.39** |
| | REPRESENTED BY | | |
| | Floating Current Account IB | | 5,488,553.32 |
| | Grant Thornton Loan Account | | (814.02) |
| | VAT on Purchases | | 7,300.89 |
| | VAT on Sales | | (13,974.80) |
| | | | **5,481,065.39** |

**Greensill Capital (UK) Limited Trading As: AUSTRALIAN DOLLARS Account**
**(In Administration)**
**Joint Administrators' Trading Account**

| Statement of Affairs AUD | | From 08/03/2021 To 16/04/2021 AUD | From 08/03/2021 To 16/04/2021 AUD |
|---|---|---|---|
| | TRADING EXPENDITURE | | |
| | Trading Bank Charges | 11,010.19 | 11,010.19 |
| | Trade Insurance | 50,490.00 | 50,490.00 |
| | | (61,500.19) | (61,500.19) |
| | **TRADING SURPLUS/(DEFICIT)** | **(61,500.19)** | **(61,500.19)** |

IPS SQL Ver. 2012.10            26 April 2021 19:36

**Greensill Capital (UK) Limited Trading As: AUSTRALIAN DOLLARS Account**
**(In Administration)**
**Joint Administrators' Summary  of Receipts & Payments**

| Statement of Affairs AUD | | From 08/03/2021 To 16/04/2021 AUD | From 08/03/2021 To 16/04/2021 AUD |
|---|---|---|---|
| | SECURED ASSETS | | |
| | Bank Interest | 793.96 | 793.96 |
| | | 793.96 | 793.96 |
| | ASSET REALISATIONS | | |
| | Cash at Bank | 15,017,415.60 | 15,017,415.60 |
| | Funds Subject to 3rd Party Claims | 360,836.80 | 360,836.80 |
| | Misc Refunds / Receipts | 5.00 | 5.00 |
| | Trade Asset Collections | 82,657.85 | 82,657.85 |
| | Trading Surplus/(Deficit) | (61,500.19) | (61,500.19) |
| | | 15,399,415.06 | 15,399,415.06 |
| | COST OF REALISATIONS | | |
| | Bank Charges | 28.84 | 28.84 |
| | Funds Held in Pre-appt Accounts | 14,450,694.02 | 14,450,694.02 |
| | | (14,450,722.86) | (14,450,722.86) |
| | | **949,486.16** | **949,486.16** |
| | REPRESENTED BY | | |
| | Floating Current Account IB | | 949,486.16 |
| | | | **949,486.16** |

Note:

**Greensill Capital (UK) Limited Trading As: DOLLAR Account**
**(In Administration)**
**Joint Administrators' Trading Account**

| Statement of Affairs USD | | From 08/03/2021 To 16/04/2021 USD | From 08/03/2021 To 16/04/2021 USD |
|---|---|---:|---:|
| | POST APPOINTMENT SALES | | |
| | Third Party funding | 5,000,000.00 | 5,000,000.00 |
| | | 5,000,000.00 | 5,000,000.00 |
| | OTHER DIRECT COSTS | | |
| | Sub Contractors | 6,695.00 | 6,695.00 |
| | Trading Corrections | 141,243.00 | 141,243.00 |
| | | (147,938.00) | (147,938.00) |
| | TRADING EXPENDITURE | | |
| | Operational costs | 68,284.00 | 68,284.00 |
| | Trading Bank Charges | 147,984.00 | 147,984.00 |
| | Subsidiary Costs | 25,680.00 | 25,680.00 |
| | Creditor ransom payments | 42,224.00 | 42,224.00 |
| | Subsidiary Wages & Expenses | 308,306.00 | 308,306.00 |
| | Trade Insurance | 573,346.27 | 573,346.27 |
| | | (1,165,824.27) | (1,165,824.27) |
| | **TRADING SURPLUS/(DEFICIT)** | **3,686,237.73** | **3,686,237.73** |

**Greensill Capital (UK) Limited Trading As: DOLLAR Account**
**(In Administration)**
**Joint Administrators' Summary  of Receipts & Payments**

| Statement of Affairs USD | | From 08/03/2021 To 16/04/2021 USD | From 08/03/2021 To 16/04/2021 USD |
|---|---|---|---|
| | ASSET REALISATIONS | | |
| | Book Debts | 56,634.00 | 56,634.00 |
| | Cash at Bank | 11,271,161.07 | 11,271,161.07 |
| | Funds Subject to 3rd Party Claims | 12,104,682.85 | 12,104,682.85 |
| | Investment Realisations | 1,058,596.00 | 1,058,596.00 |
| | Trade Asset Collections | 1,531,826.98 | 1,531,826.98 |
| | Trading Surplus/(Deficit) | 3,686,237.73 | 3,686,237.73 |
| | | 29,709,138.63 | 29,709,138.63 |
| | COST OF REALISATIONS | | |
| | Bank Charges | 103.17 | 103.17 |
| | Funds Held in Pre-appt Accounts | 19,711,810.90 | 19,711,810.90 |
| | | (19,711,914.07) | (19,711,914.07) |
| | | **9,997,224.56** | **9,997,224.56** |
| | REPRESENTED BY | | |
| | Floating Current Account IB | | 9,976,102.96 |
| | VAT on Purchases | | 21,121.60 |
| | | | **9,997,224.56** |

Note:

**Greensill Capital (UK) Limited Trading As: EURO Account**
**(In Administration)**
**Joint Administrators' Trading Account**

| Statement of Affairs € | | From 08/03/2021 To 16/04/2021 € | From 08/03/2021 To 16/04/2021 € |
|---|---|---|---|
| | TRADING EXPENDITURE | | |
| | Subsidiary costs | 17,052.00 | 17,052.00 |
| | | (17,052.00) | (17,052.00) |
| | **TRADING SURPLUS/(DEFICIT)** | **(17,052.00)** | **(17,052.00)** |

**Greensill Capital (UK) Limited Trading As: EURO Account
(In Administration)
Joint Administrators' Summary  of Receipts & Payments**

| Statement of Affairs € | | From 08/03/2021 To 16/04/2021 € | From 08/03/2021 To 16/04/2021 € |
|---|---|---|---|
| | ASSET REALISATIONS | | |
| | Cash at Bank | 17,237,502.43 | 17,237,502.43 |
| | Funds Subject to 3rd Party Claims | 8,917,919.41 | 8,917,919.41 |
| | Trade Asset Collections | 2,077,918.54 | 2,077,918.54 |
| | Trading Surplus/(Deficit) | (17,052.00) | (17,052.00) |
| | | 28,216,288.38 | 28,216,288.38 |
| | COST OF REALISATIONS | | |
| | Bank Charges | 23.34 | 23.34 |
| | Funds Held in Pre-appt Accounts | 8,233,340.38 | 8,233,340.38 |
| | | (8,233,363.72) | (8,233,363.72) |
| | | **19,982,924.66** | **19,982,924.66** |
| | REPRESENTED BY | | |
| | Floating Current Account | | 19,982,924.66 |
| | | | **19,982,924.66** |

Note:

**Greensill Capital Management Company (UK) Limited**
**(In Administration)**
**Joint Administrators' Trading Account**

| Statement of Affairs £ | | From 08/03/2021 To 16/04/2021 £ | From 08/03/2021 To 16/04/2021 £ |
|---|---|---|---|
| | TRADING EXPENDITURE | | |
| | Other Payroll Deductions | 2,262.60 | 2,262.60 |
| | | (2,262.60) | (2,262.60) |
| | **TRADING SURPLUS/(DEFICIT)** | **(2,262.60)** | **(2,262.60)** |

**Greensill Capital Management Company (UK) Limited**
**(In Administration)**
**Joint Administrators' Summary  of Receipts & Payments**

| Statement of Affairs £ | | From 08/03/2021 To 16/04/2021 £ | From 08/03/2021 To 16/04/2021 £ |
|---|---|---|---|
| | ASSET REALISATIONS | | |
| | Book Debts | 3,806.00 | 3,806.00 |
| | Misc Refunds / Receipts | 18,402.01 | 18,402.01 |
| | Trading Surplus/(Deficit) | (2,262.60) | (2,262.60) |
| | Transfer from GCUK | 51,160.15 | 51,160.15 |
| | | 71,105.56 | 71,105.56 |
| | COST OF REALISATIONS | | |
| | HR Service Provider | 6,175.16 | 6,175.16 |
| | Statutory Advertising | 85.00 | 85.00 |
| | | (6,260.16) | (6,260.16) |
| | | **64,845.40** | **64,845.40** |
| | REPRESENTED BY | | |
| | Floating Current Account IB | | 63,593.37 |
| | VAT on Purchases | | 1,252.03 |
| | | | **64,845.40** |

IPS SQL Ver. 2012.10                    26 April 2021 19:39

Commercial in confidence

# E   Payments, remuneration and expenses to the Joint Administrators or their associates

GCUK

### SIP9 disclosure

This appendix has been prepared in accordance with the requirements of the Insolvency Act 1986, the Rules and SIP9. In summary, it covers:

- pre-appointment costs
- fee basis
- work done by the Joint Administrators and their team during the Period
- disbursements and expenses
- sub-contracted out work
- payments to associates
- relationships requiring disclosure
- information for creditors (rights, fees, committees)

Commercial in confidence

## Pre-appointment costs

Pre-administration costs are fees charged and expenses incurred by the joint administrators or other qualified insolvency practitioners before the company entered administration but with a view to it doing so. To the extent they remain unpaid when the company enters administration and payment is sought, approval is required from the appropriate body of creditors as to whether they should be paid from the estate.

Prior to appointment, the Joint Administrators, by way of engaging Grant Thornton, were engaged by the directors of the Companies through an engagement letter (the Agreement) dated 31 December 2020, under which our fees were based on the actual time spent on the engagement.

Grant Thornton incurred pre-administration time costs of £214,146 which remain unpaid, although we do not to seek these costs to be paid.

Details of the pre-administration expenses are provided below:

| Cost | Work done | Why the work was necessary pre-appointment and how it furthered the achievement of an objective of administration | Amount incurred and unpaid |
|------|-----------|---|---|
| **Allen & Overy LLP** | • Legal advice and preparation of documentation relating to the appointment and sale | • To assist with the preparation and filing of required documents relating to the appointment<br>• To assist with the sale agreement which was due to be concluded shortly following the administration | £1,036,928 |
| **Hilco Streambank** | • Valuation services | • To provide valuations for the intellectual property | £70,000 |

Commercial in confidence

Post-appointment costs

## Fee basis of the Joint Administrators

As at the date of this report, the fee basis has not been set. As we are aware that some creditors would like to form a creditors' committee, we will discuss our fee proposal with the committee when established.

During the Period, time costs were incurred totalling £2,947,276 represented by 5,240 hours at an average of £562/hr, of which no amounts have been paid to date. A description of the work done in the Period is provided in the respective section below.

As time costs are likely to form the proposed fee basis, we provide below a fees estimate and details of the expenses that will be, or are likely to be incurred.

### Fees estimate and work done in the Period

A fees estimate comprises the work anticipated to be undertaken and the estimated respective time cost – the fees eventually paid may be less depending on the value of asset recoveries or successful claims, for example. The fees estimate below is based on all of the information available to us as at the time of preparing this report. We have considered and accounted for the different levels of expertise that we anticipate will be required to do the work we anticipate necessary for the first year of the administration (ie to 7 March 2022), in calculating the time and cost included in the fees estimate table provided below. The table below also includes narrative details of the work done in the Period (numerical analysis of the work done is in the subsequent table and details of expenses incurred in the Period are provided in the 'Disbursements and expenses' section further below). A more detailed numerical break down of the fees estimate is included in the SIP9 time analysis table further below.

Note that the fees estimate is also based on the following assumptions:

- it covers the first 12 months of the administration, ie to 7 March 2022 only

- there are no matters to be investigated over and above the statutory matters commensurate to size and nature of the business

- it does not account for any substantial litigation or investigation work in this period

| Area of work | Work done | Anticipated work | Why the work is necessary | Financial benefit to creditors | Fees and expense estimate | | |
|---|---|---|---|---|---|---|---|
| **Trading** | | | | | **16,049 hrs** | **£9,953,551** | **£620/hr** |
| **Investor support** | • Stabilise business as usual for trading operations, obligor receipts and payments to investors via the 1,500 transactional bank accounts<br><br>• Liaise with all obligors regarding their obligations to continue paying as normal and consideration of any accelerated payments | • Continue all matters already in hand<br><br>• Deal with any defaulting obligors to take steps to protect the position of GCUK and enforce where necessary to secure payment<br><br>• Liaise with all investors to confirm that we can ensure payments | • To make recoveries in relation to assets both on the balance sheet of the insolvent estate but also on behalf of third-party investors<br><br>• To mitigate costs incurred by the estate for the benefit of third party note holders | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available<br><br>• We are working on an agreement with third-party investors for any work undertaken for the benefit of those investors which does | | | |

Commercial in confidence

| | | | |
|---|---|---|---|
| - Deal with any defaulting obligors to take steps to protect the position of GCUK and enforce where necessary to secure payment<br>- Liaise with all investors to confirm that we can ensure payments continue to be made as their assets mature<br>- Investigate insurance position, advise insures of appointment and appoint legal advisors. Deal with all trade insurance related matters<br>- Liaise with suppliers of the company to ensure business operates as usual by continuing with key suppliers<br>- Draft and negotiate with note holders such that costs incurred in the administration to assist them can be recovered | continue to be made as their assets mature<br>- Deal with all trade insurance related matters including submitting regular reports as required by the policies and preparation and submission of claims if obligors default<br>- Liaise with suppliers of the company to ensure business operates as usual by continuing with key suppliers<br>- Draft and negotiate with note holders such that costs incurred in the administration to assist them can be recovered | | not realise financial value to the estate |

| | | | | hrs | | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **2,620 hrs** | **£1,317,244** | **£503/hr** |
| Insurance | - Liaised with insurance broker regarding the physical assets<br>- Arranged a site visit to review health and safety requirements<br>- Arranged appropriate insurance cover | - Continue to maintain appropriate insurance cover | - To mitigate from loss from an uninsurable event<br>- To comply with regulation and law | | - This work is necessary to help realise financial value for the benefit of the estate and for a distribution to creditors should sufficient funds become available | |
| Property | - Engaged and liaised with agents to confirm whether there was any realisable equity in the property leases<br>- Corresponded with all landlords to negotiate return properties | - Continue liaising with the landlords, utility providers and other service providers until we have exited all sites and all queries have been dealt with<br>- Surrender or otherwise appropriately deal with the remaining lease | - To ensure all physical assets, employee personal belongings and computer equipment are cleared appropriately<br>- To minimise the cost to the estate | | - This work is necessary to help realise financial value for the benefit of the estate and for a distribution to creditors should sufficient funds become available | |

Commercial in confidence

|  | | | |
|---|---|---|---|
|  | • Manage the clearance of properties<br>• Liaised with the utility providers | | |
| **Debtors** | • Detailed reviews of each debtor internally and in conjunction with the retained employees<br>• Liaise with other entities in the Group to agree and sign term sheets and negotiate recoveries<br>• Deal with defaults for demands, interest and covenants<br>• Strategy calls with the lawyers to discuss recovery plan<br>• Liaise directly with debtors by letters, emails and telephone calls to discuss repayments | • Continue working with the debtors, retained employees, credit insurance and lawyers to secure debtor recoveries | • To secure and realise debts | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Shareholdings/ investments** | • Notification of appointment to GCUK subsidiaries<br>• Assist with local winding up of each of the entities<br>• Considering whether can realise value from subsidiaries' businesses | • Continue assistance with the subsidiaries to wind up and realise value | • To ensure any costs are limited and all assets realised | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Vehicles** | • Obtained vehicle information from the company records<br>• Engaged and liaised with agents to confirm whether any realisable equity in the leased vehicles<br>• Liaised with lessors to facilitate collection of leased vehicles | • Liaise with agents regarding the disposal of vehicle | • To realise value for the vehicle owned by the company<br>• To facilitate collection of the leased vehicles | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Plant & machinery, fixtures & fittings, equipment** | • Liaised with Hilco on strategy and timeline for valuation, | • Continued liaison with agents regarding assets to be disposed of | • To realise tangible assets | • This work is necessary to realise financial value for the |

Commercial in confidence

| | | | | |
|---|---|---|---|---|
| | collection and disposal of tangible assets<br>• Liaise with art dealer where some of the company's artwork was held | | | estate and for a distribution to creditors should sufficient funds become available |
| **Cash at bank** | • Liaised with the pre-administration bankers to obtain funds, although the majority of our work to collect the cash is within the trading section due to funds still flowing through the pre-appointment account | • Continued liaison with pre-administration bankers across various jurisdictions | • To ensure all company funds are secured | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Sale of business** | • Instruct legal advisors to assist in the sale negotiation<br>• Facilitated lengthy diligence process including creation of data room and meetings with company officials<br>• Detailed negotiations with the buyer and advisors | • Continue to liaise with parties who are interested in different parts of the business<br>• Agree non-disclosure agreements and provide necessary information for further due diligence<br>• Negotiations and transactions | • To maximise value of assets | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Other assets** | • Detailed reviews of each current asset internally and in conjunction with the retained employees<br>• Strategy calls with the team and lawyers to discuss recovery plan<br>• Allocation and investigation of defaults | • Continue working with the retained employees and lawyers to secure asset recoveries | • To realise assets | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available |
| **Investigations** | | | | 2,929 hrs      £1,115,805      £381/hr |
| **Debtor/directors/ senior employees** | • Issued questionnaires to all parties acting as a director within the last three years | • Conduct a review into the affairs of the company from the books and records and other information obtained during the course of our work | • To ensure all assets are identified, secured and realised where possible<br>• To assist with the preparation of the report on the conduct of the directors | • This work is necessary to discharge the office holders' duties. As explained under 'Why the work is necessary', although it might not add |

Commercial in confidence

| | | | | | | |
|---|---|---|---|---|---|---|
| | | • Note matters requiring further investigation<br>• Potential queries and meetings with directors as required in accordance with any investigations<br>• Provide report to Insolvency Service as required by statute | to the Department of Business, Energy and Industrial Strategy<br>• To consider whether any action needs to be taken against any third-parties | financial value to the estate it will add value to the insolvency process | | |
| **Books & records** | • Conducted a preliminary review of the company's financial information and obtained appropriate backups and copies of software<br>• Retrieved all books and records from all offices used by the company<br>• Working to retrieve all company laptops and other devices from all 435 former employees' home addresses | • Continue retrieval of records and company data on devices<br>• Extensive review of the books and records held by the company to determine which are required to be preserved or could assist with our statutory duties<br>• Further review and analysis of accounting software and other records held electronically | | | | |
| **Bank statements & analysis** | • No work has been started on this matter yet | • Review bank statements to assist investigations where necessary | | | | |
| **Claims** | • No work has been started on this matter yet | • Oversee the pursuit of any legal claims which may arise from our investigations | | | | |
| **Digital Forensics** | • Analysis of data and systems held and utilised by GCUK<br>• Preparation of plan to obtain back up copy of all data held by GCUK to facilitate asset realisations<br>• Commence data capture | • Continue data capture process<br>• Undertake secure data archiving of captured data for future use | | | | |
| **Creditors** | | | | | 1,660 hrs | £845,819 | £510/hr |
| **Secured** | • Obtain legal advice on security claimed by third parties<br>• Secure assets subject to third party claims | • Consider legal advice and adjudicate on third party claims | • To ensure all secured creditor claims are dealt with appropriately | • This work is necessary for administrative purposes and/or complying with statutory requirements and it | | |

Commercial in confidence

| | | | | | | |
|---|---|---|---|---|---|---|
| **Unsecured** | • Gathered information in relation to all known creditors<br>• Liaised with unsecured creditors in respect of their claims in the estate and queries with regards to the process | • Continue to attend to ad hoc enquiries as required<br>• Ensure the unsecured creditors are kept informed | • To ensure all unsecured creditors claims are dealt with appropriately | has no direct financial benefit to the estate | | |
| **Special (ransom) creditors** | Analysis of creditor positions and whether any require ransom payments | • Our work in relation to this matter is complete | • To ensure all claims are captured and dealt with properly | | | |
| **Dividends** | • We have not begun work on this stream yet | • Begin adjudicating claims to enable distributions to creditors | • Required as part of the duties of the Joint Administrators | | | |
| **Administration** | | | | | 3,957 hrs | £1,847,737 | £467/hr |
| **Take-on** | • Anti-Money Laundering and other compliance check procedures<br>• Creation of case specific files on Joint Administrators' case management systems<br>• Review of ethical matters for taking on the case | • Our work in relation to this matter is complete | • To comply with the appropriate legislation and Ethical guidelines | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate | | |
| **Appointment formalities** | • Proposed Insolvency Practitioners' attendance at Court hearing<br>• Creation of the necessary statutory notices for appointment<br>• Filing of the relevant forms on Companies House<br>• Advertisement of the appointment in the London Gazette<br>• Initial notifications to the relevant internal teams | • Our work in relation to this matter is complete | • Required to ensure that the appointment complies with the statutory requirements | | | |

Commercial in confidence

| | | | |
|---|---|---|---|
| **Case set-up** | • Set up the case on the Joint Administrators' case management platform<br>• Calculate, complete and submit the bordereau notification<br>• Set up various files for the case<br>• Collated and assessed information regarding data collection, storage, processing and destruction, implementing and maintaining any data protection strategies | • Our work in relation to this matter is complete | • To ensure we can send documentation to appropriate parties<br>• To ensure the adequate level of bonding is in place |
| **Case management** | • Frequent team calls for all team members to ensure all are aligned on the strategy and working together with the employees of GCUK<br>• Liaised with internal Public Relations team to control the level of press interest and media speculation | • Frequent team calls to ensure all are aligned on the strategy<br>• Review of case and progress by Joint Administrators, their team and internal risk management team | • To ensure all matters are dealt with in a timely fashion |
| **Reports to creditors, notices & decisions** | • Formal notification of appointment to creditors, employees and other parties<br>• Preparation of proposal report for creditors<br>• Preparation of this fees estimate and remuneration report for creditors | • Preparation of future progress reports to creditors<br>• Monitor deemed consent and/or decision procedures, reviewing submissions, establishing any decision outcomes and reporting as appropriate<br>• Requesting approval of extension of the administration if required | • Statutory requirement<br>• To provide creditors with an update on the administration<br>• To comply with insolvency legislation |
| **Shareholders / debtor / director communications** | • Sent initial letters to directors<br>• Liaised with directors about their powers and duties | • Deal with other queries as they arise | • To ensure directors are aware of their responsibilities |

Commercial in confidence

| Committee | • No matters have been dealt with yet | • If a committee is established, we will regularly liaise with and report to the committee | • To provide updates and obtain resolutions as required |
|---|---|---|---|
| Statement of affairs | • Request statement of affairs from the directors<br>• Review draft statement of affairs | • Review final statement of affairs<br>• File statement of affairs at Companies House | • To comply with insolvency legislation |
| Treasury, billing & funding | • Setting up the Administration bank accounts in multiple currencies<br>• Processing and recording transactions arising during the Period<br>• Arranging and accounting for various receipts and payments in a timely manner<br>• Advise pre-administration bank accounts of administration | • Processing and recording transactions arising during the administration<br>• Carry out bank reconciliations and update case accounting accordingly | • To comply with insolvency legislation<br>• To ensure payments are made to necessary parties to continue operations as required |
| Tax | • Case planning and information gathering<br>• Review of historical tax position of the Group<br>• Review of VAT position | • Continuation of review of historical tax and VAT position<br>• Preparation and submission of final pre-administration Corporation Tax and VAT returns<br>• Preparation and submission of post-administration Corporation Tax and VAT returns<br>• Deal with all employment / payroll taxation queries<br>• Consider tax implications of transactions, asset disposals and intercompany debtor realisations<br>• Liaison with HMRC | • Statutory compliance<br>• To meet all post-administration tax liabilities |
| Pensions | • Carry out pension searches | • Our work is complete in this matter | • To ensure no historical outstanding pension matters |

Commercial in confidence

**Joint Administrators' costs summary**

| | | | |
|---|---|---|---|
| Fees incurred to 16 April 2021 | 5,240 hrs | £2,947,276 | £562/hr |
| Total fees estimate to 7 March 2022 | 21,974 hrs | £12,132,880 | £552/hr |
| **Total fees estimate** | **27,214 hrs** | **£15,080,156** | **£554/hr** |
| **Legal fees estimate (ex VAT and disbursements)** | **£12,500,000 - £16,000,000** | | |

Commercial in confidence

**Detailed SIP9 time cost analysis for the period and fee estimate variance analysis as at period end**

Period from 08/03/2021 to 16/04/2021

| Area of work | Partner Hrs | Partner £ | Manager Hrs | Manager £ | Executive Hrs | Executive £ | Administrator Hrs | Administrator £ | Period total Hrs | Period total £ | Period total £/hr | Fees estimate Hrs | Fees estimate £ | Fees estimate £/hr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Trading:** | | | | | | | | | 2,953.32 | 1,807,783.25 | 612.12 | 16,048.85 | 9,953,550.52 | 620.20 |
| Investor support | 1,053.87 | 916,988.25 | 1,003.55 | 570,275.00 | 769.10 | 295,077.50 | 126.80 | 25,442.50 | 2,953.32 | 1,807,783.25 | 612.12 | 16,048.85 | 9,953,550.52 | 620.20 |
| **Realisation of assets:** | | | | | | | | | 1,011.45 | 548,548.75 | 542.34 | 2,619.58 | 1,317,244.31 | 502.85 |
| Insurance | 30.83 | 25,426.25 | 12.05 | 14,901.25 | 34.40 | 14,372.25 | 1.00 | 275.00 | 78.28 | 54,974.75 | 702.28 | 186.50 | 80,506.45 | 431.67 |
| Property | | | 24.30 | 11,907.00 | 26.70 | 8,795.50 | 23.40 | 6,435.00 | 74.40 | 27,137.50 | 364.75 | 188.66 | 75,936.66 | 402.50 |
| Debtors | 111.77 | 12,213.25 | 81.25 | 42,872.50 | 198.65 | 79,652.25 | 8.20 | 2,255.00 | 399.87 | 136,993.00 | 342.59 | 909.74 | 381,180.15 | 419.00 |
| Shareholdings / investments | 41.85 | 32,883.75 | | | | | | | 41.85 | 32,883.75 | 785.75 | 522.49 | 345,564.19 | 661.38 |
| Vehicles | | | 5.50 | 2,695.00 | | | | | 5.50 | 2,695.00 | 490.00 | 47.17 | 18,984.16 | 402.50 |
| Plant & machinery, fixtures & fittings, equipment | | | 12.50 | 6,125.00 | 17.20 | 5,418.00 | | | 29.70 | 11,543.00 | 388.65 | 94.33 | 33,841.34 | 358.75 |
| Cash at bank | 0.50 | 437.50 | | | | | | | 0.50 | 437.50 | 875.00 | 5.50 | 3,437.50 | 625.00 |
| Sale of business | 162.90 | 141,250.50 | 56.00 | 32,815.00 | | | | | 218.90 | 174,065.50 | 795.18 | 342.55 | 219,654.95 | 641.24 |
| Other assets | 62.10 | 48,981.00 | 97.40 | 57,716.00 | 2.95 | 1,121.75 | | | 162.45 | 107,818.75 | 663.70 | 322.64 | 158,138.91 | 490.13 |
| **Investigations:** | | | | | | | | | 239.00 | 95,791.25 | 477.02 | 2,928.80 | 1,115,804.56 | 380.98 |
| Debtor / director / senior employees | 11.00 | 8,662.00 | | | 8.25 | 3,506.25 | 4.35 | 783.00 | 23.60 | 12,951.25 | 548.78 | 94.33 | 60,136.17 | 637.50 |
| Books & records | 8.50 | 7,437.50 | 27.50 | 13,540.00 | 20.30 | 7,054.50 | 1.00 | 180.00 | 57.30 | 28,212.00 | 492.36 | 332.78 | 141,038.32 | 423.82 |
| Claims | | | | | | | | | | | | 438.49 | 195,301.03 | 445.39 |
| Digital forensics | | | 150.00 | 51,587.50 | 1.50 | 187.50 | | | 151.50 | 51,775.00 | 341.75 | 1,950.00 | 653,250.00 | 335.00 |
| Bank statements & analysis | | | 0.60 | 303.00 | 6.00 | 2,550.00 | | | 6.60 | 2,853.00 | 432.27 | 113.20 | 66,079.04 | 583.75 |
| **Creditors:** | | | | | | | | | 265.00 | 92,909.75 | 350.60 | 1,659.97 | 845,819.21 | 509.54 |
| Secured | 3.60 | 2,916.00 | 21.70 | 10,633.00 | 24.25 | 10,306.25 | | | 49.55 | 23,855.25 | 481.44 | 433.82 | 284,844.85 | 656.60 |
| Unsecured | | | 9.20 | 4,803.00 | 115.85 | 41,459.00 | 87.40 | 21,517.50 | 212.45 | 67,779.50 | 319.04 | 1,156.59 | 542,628.02 | 469.16 |
| Special (ransom) creditors | | | | | 3.00 | 1,275.00 | | | 3.00 | 1,275.00 | 425.00 | 3.00 | 1,275.00 | 425.00 |
| Dividends | | | | | | | | | | | | 66.56 | 17,071.34 | 256.48 |
| **Administration:** | | | | | | | | | 771.43 | 402,242.50 | 521.42 | 3,956.93 | 1,847,737.07 | 466.96 |
| Take-on | | | 3.00 | 1,470.00 | 0.25 | 75.00 | | | 3.25 | 1,545.00 | 475.38 | 3.25 | 1,545.00 | 475.38 |
| Appointment formalities | 14.00 | 9,460.00 | 0.50 | 187.50 | 1.00 | 300.00 | 5.10 | 918.00 | 20.60 | 10,865.50 | 527.45 | 20.60 | 10,865.50 | 527.45 |
| Case set-up | | | 1.45 | 493.00 | 7.70 | 2,748.00 | | | 9.15 | 3,241.00 | 354.21 | 9.15 | 3,241.00 | 354.21 |
| Other IPs, OR, AiB | | | 2.10 | 1,029.00 | | | | | 2.10 | 1,029.00 | 490.00 | 2.10 | 1,029.00 | 490.00 |
| Case management | 151.58 | 118,799.00 | 172.60 | 89,013.50 | 152.95 | 56,394.25 | 6.05 | 1,089.00 | 483.18 | 265,295.75 | 549.06 | 1,170.78 | 442,034.11 | 377.56 |
| Reports to creditors, notices & | 11.50 | 9,207.50 | 42.25 | 20,515.00 | 20.15 | 6,338.50 | 0.35 | 63.00 | 74.25 | 36,124.00 | 486.52 | 822.36 | 414,658.85 | 504.23 |
| Shareholders / debtor / director communications | | | | | 1.50 | 450.00 | | | 1.50 | 450.00 | 300.00 | 5.00 | 1,500.00 | 300.00 |
| Committee / commissioners | | | | | | | | | | | | 237.52 | 97,545.60 | 410.68 |
| Statement of affairs | 1.50 | 1,312.50 | 1.50 | 735.00 | | | 0.45 | 81.00 | 3.45 | 2,128.50 | 616.96 | 19.08 | 7,771.85 | 407.33 |
| Treasury, billing & funding | | | 12.00 | 5,817.50 | 72.05 | 18,594.75 | 4.00 | 716.25 | 88.05 | 25,128.50 | 285.39 | 1,162.49 | 532,280.15 | 457.88 |
| Tax | 39.95 | 31,360.75 | 42.35 | 23,867.00 | 1.00 | 315.00 | 1.10 | 293.00 | 84.40 | 55,835.75 | 661.56 | 503.10 | 334,666.31 | 665.21 |
| Pensions | | | 0.60 | 405.00 | 0.50 | 122.50 | 0.40 | 72.00 | 1.50 | 599.50 | 399.67 | 1.50 | 599.50 | 399.67 |
| **Total** | **1,705.45** | **1,367,335.75** | **1,779.90** | **963,705.75** | **1,485.25** | **556,113.75** | **269.60** | **60,120.25** | **5,240.20** | **2,947,275.50** | **562.44** | **27,214.13** | **15,080,155.67** | **554.13** |

**Notes:**

- Trading includes the continued provision of support and infrastructure, including operations and back-office support, credit, risk and legal support for defaulting or likely to default obligors and insurance support, to enable investors to recover the sums due to them from obligors.
- Partner includes partners and directors
- Manager includes associate directors and managers
- Executive includes assistant manager and executives
- Total time costs paid to date: £Nil
- Please note that the actual time incurred in the Period may slightly differ to that reported in the table above. This is due to lags between time being recorded on our internal system by staff and then being posted to the case. We do not expect any differences to be material and any such discrepancies will be noted in our next report.

Commercial in confidence

## Statement of expenses and disbursements incurred in the Period

This table provides details of expenses and disbursements incurred in the Period in connection with the work done by the Joint Administrators, a description of which is provided in the 'Fees estimate and work done in the Period' section above.

Due to the various currencies being used by GCUK, the table below shows the costs incurred in Sterling using the following exchange rates on 16 April 2021:

- Australian Dollar to Sterling: 0.56157
- US Dollar to Sterling: 0.72547
- Euro to Sterling: 0.86858

The actual costs in the local currencies paid at the Period end can be found in the R&Ps.

| Category | Currency paid in R&Ps | Incurred in the Period (£) | Of which paid by the estate as at Period end (£) |
|---|---|---|---|
| **Category 1 disbursements** | | | |
| **Land Registry searches** | | 25 | - |
| **Courier services** | | 193 | - |
| **Category 2 disbursements** | | | |
| **Mileage** | | 148 | - |
| **Expenses** | | | |
| **Subsidiary wages and expenses:** | | | |
| UK salaries | GBP | 1,587,956 | 1,587,956 |
| US salaries | USD | 466,150 | 223,667 |
| Other international staff | EUR | 77,261 | - |
| iiPay | GBP | 6,715 | 6,715 |
| Zurich | GBP | 501 | 501 |
| **Other payroll deductions:** | | | |
| Aegon SIPP | GBP | 10,925 | 10,925 |
| Fideliti | GBP | 961 | 961 |
| AIG Life | GBP | 9,600 | 9,600 |
| Zurich | GBP | 501 | 501 |
| **Retained employee expenses** | GBP | 1,574 | 1,574 |
| **Operational costs:** | | | |
| Ciklum UK Limited | USD | 45,983 | 45,983 |
| J Frog Limited | USD | 3,555 | 3,555 |
| Teamviewer Germany GmbH | GBP | 1,248 | 1,248 |
| Toro Risk Solutions | GBP | 995 | 995 |
| Information Commissioner Registration Account | GBP | 80 | 80 |

Commercial in confidence

| | | | |
|---|---|---:|---:|
| Fuel Card Services Limited | GBP | 36 | 36 |
| **Creditor ransom payments:** Ciklum UK Limited | USD | 30,632 | 30,632 |
| **Trading corrections** (refunds where customers continued to pay into the administration) | USD | 102,468 | 102,468 |
| **Telephony/Internet:** | | | |
| EE Limited | GBP | 88 | 88 |
| BT Direct | GBP | 558 | 558 |
| Talk Talk | GBP | 459 | 459 |
| **Trading bank charges** | USD | 108,403 | 107,358 |
| | GBP | 4,678 | 4,678 |
| | AUD | 6,183 | 6,183 |
| | EUR | 15,432 | - |
| **Subsidiary costs:** | | | |
| Foo Kon Tan LLP | USD | 33,715 | 18,630 |
| Saville and Co | GBP | 3,169 | 3,169 |
| Stibble N.V. | EUR | 13,029 | 13,029 |
| Simmons & Simmons LLP | EUR | 1,782 | 1,782 |
| **Trade insurance:** Marsh Pty Limited | USD | 1,290,471 | 1,290,471 |
| | AUD | 28,354 | 28,354 |
| | EUR | 1,102,337 | 1,102,337 |
| **Rents payable:** | | | |
| The Marsden Group SIPP | GBP | 2,498 | 2,498 |
| North West Portfolio (No. 2) Limited | GBP | 5,734 | 5,734 |
| **Utilities:** NPower | GBP | 1,653 | 1,653 |
| **Security costs:** Mak Integrated Services Limited | GBP | 830 | 830 |
| **Bank charges** | USD | 75 | 75 |
| | AUD | 16 | 16 |
| | EUR | 20 | 20 |
| **Subcontractors** | USD | 9,714 | 9,714 |
| **Agents/Valuers:** Hilco Global | GBP | 27,558 | 27,558 |
| **Stationary & Postage:** | | | |
| Central Mailing Services Limited | GBP | 593 | 593 |
| Royal Mail | GBP | 16 | 16 |
| **Statutory advertising:** Gazette Direct | GBP | 85 | 85 |
| **Storage costs:** Restore Plc | GBP | 1,086 | 1,086 |
| **Total expenses and disbursements** | | **5,006,043** | **4,654,371** |

Commercial in confidence

Disbursements are expenses met by and reimbursed to an office holder in connection with an insolvency appointment and fall into two categories:

**Category 1 disbursements**

These are also known as 'out of pocket expenses' and are payments to independent third parties where there is specific expenditure directly referable to the insolvent estate; they can be drawn without prior approval and consist of the following categories:

- Travel and subsistence – these costs, which exclude mileage, are incurred by staff in attending trading premises or meetings, for example
- Office costs – these are costs such as postage or courier charges which are incurred in managing the case
- Statutory costs – these are costs such as bonding and advertising relating specifically to the case, which are required by statute

They also include expenses which have been paid using a Grant Thornton Loan, the balance of which (if any) can be seen on the joint administrators' receipts and payment account at Appendix D.

**Category 2 disbursements**

These are expenses that are directly referable to the insolvent estate but not a payment to an independent third party. They may include shared or allocated costs that may be incurred by an office holder or their firm, and that can be allocated to the appointment on a proper and reasonable basis. Category 2 disbursements require approval in the same manner as an office holder's remuneration.

Mileage is charged at 45p a mile. VAT is added as appropriate. Details of these costs are also provided in the table above, where incurred.

## Sub-contracted out work

We confirm that, in the Period, we have not sub-contracted out any work that could otherwise have been carried out by us or our team.

## Payments to associates

Where we have enlisted the services of others, we have sought to obtain the best value and service. In the interest of transparency, we disclose below services we have sought from within our firm or from a party with whom (to the best of our knowledge) our firm, or an individual within our firm, has a business or personal relationship:

| Service provider | Services enlisted | Cost of service |
|---|---|---|
| Grant Thornton UK LLP | • Tax work/advice (narrative is included within the above narrative of work done)<br>• Pensions work/advice (narrative is included within the above narrative of work done)<br>• Digital Forensics (narrative is included within the above narrative of work done) | • Costs are included within the above SIP9 time cost analysis |
| Grant Thornton Australia Limited | • Limited business review of security holdings based in Australia. GCUK holds various asset debentures and share pledges over certain Australian entities, as well as the UK based holding companies<br>• Letter of engagement dated 19 April 2021 | • No costs have been incurred during the Period as we formally engaged Grant Thornton Australia Limited following the end of the Period and the estimate of costs is shown in the table below |

Commercial in confidence

| | Partner | | Director | | Senior | | Senior Associate | | Estimate | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hrs | £ | Hrs | £ | Hrs | £ | Hrs | £ | Hrs | £ | £/hr |
| Grant Thornton Australia Limited | 81.00 | 32,076.00 | 76.00 | 26,752.00 | 114.00 | 37,620.00 | 264.00 | 74,052.00 | 535.00 | 170,500.00 | 318.69 |

## Relationships requiring disclosure

We confirm that we are not aware of any business or personal relationships with any parties responsible for approving the Joint Administrators' fee basis, or who provide services to us as joint administrators, which may give rise to a potential conflict.

## Information for creditors and members

Information to help creditors and members to understand their rights in insolvency and regarding officeholders' (ie administrators or liquidators) fees, and the roles and functions of committees is available via Grant Thornton's website:

https://www.grantthornton.co.uk/portal

Alternatively, we will supply this information by post, free of charge, on request.

Commercial in confidence

# E   Payments, remuneration and expenses to the Joint Administrators or their associates

GCMC

## SIP9 disclosure

This appendix has been prepared in accordance with the requirements of the Insolvency Act 1986, the Rules and SIP9. In summary, it covers:

- pre-appointment costs
- fee basis
- work done by the Joint Administrators and their team during the Period
- disbursements and expenses
- sub-contracted out work
- payments to associates
- relationships requiring disclosure
- information for creditors (rights, fees, committees)

Commercial in confidence

## Pre-appointment costs

Pre-administration costs are fees charged and expenses incurred by the joint administrators or other qualified insolvency practitioners, before the company entered administration but with a view to it doing so. To the extent they remain unpaid when the company enters administration and payment is sought, approval is required from the appropriate body of creditors as to whether they should be paid from the estate.

Neither the Joint Administrators, by way of Grant Thornton being engaged, or any other qualified insolvency practitioner incurred any pre-administration costs in relation to the company.

Details of the pre-administration costs are provided below:

| Cost | Work done | Why the work was necessary pre-appointment and how it furthered the achievement of an objective of administration | Amount incurred and unpaid |
|---|---|---|---|
| **Allen & Overy LLP** | • Legal advice and preparation of documentation relating to the appointment and sale | • To assist with the preparation and filing of required documents relating to the appointment <br> • To assist with the sale agreement which was due to be concluded shortly following the administration | £115,214 |

Commercial in confidence

## Post-appointment costs

### Fee basis of the joint administrators

As at the date of this report the fee basis has not been set.

During the Period, time costs were incurred totalling £394,102 represented by 779 hours at an average of £506/hr of which no amounts have been paid to date. A description of the work done in the Period is provided in the respective section below.

**Proposed fee basis**

We propose that the remuneration of the Joint Administrators be fixed on the basis of time charged for the work undertaken.

As time costs form the proposed fee basis, we provide below a fees estimate and details of the expenses that will be, or are likely to be, incurred.

**Likely return to creditors**

The timing and quantum of future dividends is currently unknown.

**Fees estimate and work done in the Period**

A fees estimate comprises the work anticipated to be undertaken and the estimated respective time cost – the fees eventually paid may be less depending on the value of asset recoveries or successful claims, for example. The fees estimate below is based on all of the information available to us as at the date of this report. We have considered and accounted for the different levels of expertise that we anticipate will be required to do the work we anticipate necessary for the first year of the administration (ie to 7 March 2022), in calculating the time and cost included in the fees estimate table provided below. The table below also includes narrative details of the work done in the Period (numerical analysis of the work done is in the subsequent table and details of expenses incurred in the Period are provided in the 'Disbursements and expenses' section further below). A more detailed numerical break down of the fees estimate is included in the SIP9 time costs analysis table further below.

Note that the fees estimate is also based on the following assumptions:

- it covers the first 12 months of the administration, ie to 7 March 2022 only

- there are no matters to be investigated over and above the statutory matters commensurate to size and nature of the business

- it does not account for any substantial litigation or investigation work in this period

| Area of work | Work done | Anticipated work | Why the work is necessary | Financial benefit to creditors | Fees and expense estimate | | |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | 154 hrs | £84,947 | £535/hr |
| **Insurance** | • Initial instruction and discussion with insurance broker | • Consider and maintain insurance where appropriate | • To mitigate from loss from an uninsurable event<br>• To comply with regulation and law | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no | | | |

Commercial in confidence

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | direct financial benefit to the estate | | | | |
| **Debtors** | • Review initial debtor position | • Detailed review of debtors in conjunction with the retained employees <br>• Liaise with other entities in the Group regarding intercompany debtors | • To recover debtors | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available | | | |
| **Shareholdings/ investments, sale of business and other assets** | • Notification of appointment to GCMC subsidiaries <br>• Assist with local winding up of each of the entities <br>• Considering whether can realise value from subsidiaries' businesses | • Continue assistance with the subsidiaries to wind up and realise value | • To ensure any costs are limited and all assets realised | • This work is necessary to realise financial value for the estate and for a distribution to creditors should sufficient funds become available | | | |
| **Investigations** | | | | | **36 hrs** | **£19,536** | **£545/hr** |
| **Debtor/directors/ senior employees** | • Set up internal checklists for investigations and internal correspondence | • Conduct a review into the affairs of the company from the books and records and other information obtained during the course of our work <br>• Note matters requiring further investigation <br>• Potential queries and meetings with directors as required in accordance with any investigations <br>• Provide report to Insolvency Service as required by statute | • To ensure all assets are identified, secured and realised where possible <br>• To assist with the preparation of the report on the conduct of the directors to the Department of Business, Energy and Industrial Strategy | • This work is necessary to discharge the office holders' duties. As explained under 'Why the work is necessary', although it might not add financial value to the estate it will add value to the insolvency process | | | |
| **Books & records** | • Internal correspondence regarding investigations | • Review of the books and records held by the company to determine which are required to be preserved or could assist with our statutory duties | | | | | |
| **Bank statements & analysis** | • No work has been started on this matter yet | • Review bank statements to assist investigations where necessary | | | | | |

Commercial in confidence

| Creditors | | | | | 793 hrs | £353,614 | £445/hr |
|---|---|---|---|---|---|---|---|
| **Employees & pensions** | <ul><li>Prepared and circulated formal notice to all employees including our initial strategy and liaison on what this would mean going forward</li><li>Held virtual meetings for all employees</li><li>Managed redundancies of part of the workforce</li><li>Responded to all employee queries</li><li>Engaged and liaised with ERA Solutions Limited in relation to employee claims and support</li><li>Deal with payments of wages and all other employee related costs</li></ul> | <ul><li>Obtain details from ERA Solutions of employee claims and input into the Insolvency Practitioners' System</li><li>Continue to respond to employee queries and payments of wages and other employee related costs</li></ul> | <ul><li>To ensure retained employees are kept up to date on strategy and paid for their service</li><li>To ensure former employee claims are dealt with appropriately</li></ul> | <ul><li>This work is necessary to discharge the office holders' duties. As explained under 'Why the work is necessary', although it will not add financial value to the estate it will add value to the insolvency process</li></ul> | | | |
| **Unsecured** | <ul><li>Gathered information in relation to all known creditors</li><li>Liaised with unsecured creditors in respect of their claims in the estate and queries with regards to the process</li></ul> | <ul><li>Continue to attend to ad hoc enquiries as required</li><li>Ensure the unsecured creditors are kept informed</li></ul> | <ul><li>To ensure all unsecured creditors' claims are dealt with appropriately</li></ul> | <ul><li>This work is necessary to discharge the office holders' duties. As explained under 'Why the work is necessary', although it will not add financial value to the estate it will add value to the insolvency process</li></ul> | | | |
| **Administration** | | | | | 708 hrs | £395,119 | £558/hr |
| **Take-on** | <ul><li>Anti-Money Laundering and other compliance check procedures</li><li>Review of ethical matters for taking on the case</li></ul> | <ul><li>Our work in relation to this matter is complete</li></ul> | <ul><li>To comply with the appropriate legislation and Ethical guidelines</li></ul> | <ul><li>This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate</li></ul> | | | |
| **Appointment formalities** | <ul><li>Insolvency Practitioners' attendance at Court hearing</li></ul> | <ul><li>Our work in relation to this matter is complete</li></ul> | <ul><li>Required to ensure that the appointment complies with the statutory requirements</li></ul> | <ul><li>This work is necessary for administrative purposes and/or complying with statutory requirements and it has no</li></ul> | | | |

Commercial in confidence

| | | | |
|---|---|---|---|
| | • Creation of the necessary statutory notices for appointment<br>• Filing of the relevant forms on Companies House<br>• Advertisement of the appointment in the London Gazette<br>• Initial notifications to the relevant internal teams | | direct financial benefit to the estate |
| **Case set-up** | • Set up the case on the Joint Administrators' case management platform<br>• Calculate, complete and submit the bordereau notification<br>• Creation of case specific files on Joint Administrators' case management systems<br>• Collated and assessed information regarding data collection, storage, processing and destruction, implementing and maintaining any data protection strategies | • Our work in relation to this matter is complete | • To ensure we can send documentation to appropriate parties<br>• To ensure the adequate level of bonding is in place | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |
| **Case management** | • Frequent team calls to ensure all team members are aligned on the strategy<br>• Liaised with internal Public Relations team to control the level of press interest and media speculation | • Frequent team calls to ensure all team members are aligned on the strategy<br>• Ongoing review of case and progress by Joint Administrators, their team and internal risk management team | • To ensure all matters are dealt with in a timely fashion | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |
| **Reports to creditors, notices & decisions** | • Formal notification of appointment to creditors, employees and other parties<br>• Preparation of proposal report for creditors | • Preparation of future progress reports to creditors<br>• Monitor deemed consent and/or decision procedures, reviewing submissions, establishing any decision outcomes and reporting as appropriate | • Statutory requirement<br>• To provide creditors with an update on the administration<br>• To comply with insolvency legislation | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |

Commercial in confidence

| | | | | |
|---|---|---|---|---|
| | • Preparation of this fees estimate and remuneration report for creditors | • Requesting approval of extension of the administration if required | | |
| **Shareholders / debtor / director communications** | • Send initial letters to directors<br>• Liaised with directors about their powers and duties | • Deal with other queries as they arise | • To ensure directors are aware of their responsibilities | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |
| **Statement of affairs** | • No work has been started on this matter yet | • Review directors' statement of affairs<br>• File statement of affairs at Companies House | • To comply with insolvency legislation | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |
| **Treasury, billing & funding** | • Setting up the Administration bank accounts in multiple currencies<br>• Processing and recording transactions arising during the Period<br>• Arranging and accounting for various receipts and payments in a timely manner<br>• Advise pre-administration bank accounts of administration | • Processing and recording transactions arising during the administration<br>• Carry out bank reconciliations and update case accounting accordingly | • To comply with insolvency legislation<br>• To ensure payments are made to necessary parties to continue operations as required | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |
| **Tax** | • Case planning and information gathering<br>• Review of historical tax position of the Group<br>• Review of VAT position | • Continuation of review of historical tax and VAT position<br>• Preparation and submission of final pre-administration Corporation Tax and VAT returns<br>• Preparation and submission of post-administration Corporation Tax and VAT returns<br>• Deal with all employment / payroll taxation queries | • Statutory compliance<br>• To meet all post-administration tax liabilities | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |

Commercial in confidence

| | | | |
|---|---|---|---|
| | • Consider tax implications of transactions and asset disposals<br>• Liaison with HMRC | | |
| **Pensions** | • Oversight of payroll uploads, payment of amounts due<br>• Dealing with enquiries | • Continued oversight of payroll uploads, payment of amounts due<br>• Renewal of benefits at plan anniversaries and enquiries from insurers, brokers and employees | • Statutory compliance<br>• To meet all post-administration pension liabilities | • This work is necessary for administrative purposes and/or complying with statutory requirements and it has no direct financial benefit to the estate |

**Joint Administrators' costs summary**

| | | | |
|---|---|---|---|
| Fees incurred to 16 April 2021 | 779 hrs | £394,102 | £506/hr |
| Total fees estimate to 7 March 2022 | 912 hrs | £456,614 | £501/hr |
| **Total fees estimate** | **1,691 hrs** | **£850,716** | **£503/hr** |
| **Legal fees estimate (ex VAT and disbursements)** | | **£500,000 - £1,000,000** | |

Commercial in confidence

**Detailed SIP9 time cost analysis for the period and fee estimate variance analaysis as at period end**
Period from 08/03/2021 to 16/04/2021

| Area of work | Partner | | Manager | | Executive | | Administrator | | Period total | | | Fees estimate | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hrs | £ | Hrs | £ | Hrs | £ | Hrs | £ | Hrs | £ | £/hr | Hrs | £ | £/hr |
| Realisation of assets: | | | | | | | | | 72.92 | 42,928.25 | 588.70 | 154.08 | 82,446.90 | 535.09 |
| Insurance | 0.15 | 131.25 | - | - | 0.75 | 225.00 | | | 0.90 | 356.25 | 395.83 | 20.00 | 7,916.67 | 395.83 |
| Debtors | 1.50 | 1,312.50 | - | - | - | - | | | 1.50 | 1,312.50 | 875.00 | 22.81 | 13,631.41 | 597.58 |
| Shareholdings / investments | 30.65 | 24,073.75 | - | - | - | - | 8.07 | 1,412.25 | 38.72 | 25,486.00 | 658.21 | 61.25 | 35,601.56 | 581.25 |
| Sale of business | 0.90 | 787.50 | - | - | - | - | | | 0.90 | 787.50 | 875.00 | 9.12 | 5,052.57 | 554.01 |
| Other assets | - | - | 30.10 | 14,734.00 | 0.80 | 252.00 | | | 30.90 | 14,986.00 | 484.98 | 40.90 | 20,244.68 | 494.98 |
| Investigations: | | | | | | | | | 1.20 | 355.00 | 295.83 | 35.86 | 19,535.79 | 544.78 |
| Debtor / director / senior | 0.20 | 175.00 | - | - | - | - | | | 0.20 | 175.00 | 875.00 | 8.50 | 4,561.20 | 536.61 |
| Books & records | - | - | - | - | - | - | 1.00 | 180.00 | 1.00 | 180.00 | 180.00 | 22.80 | 12,648.31 | 554.75 |
| Bank statements & analysis | - | - | - | - | - | - | | | | | | 4.56 | 2,326.28 | 510.15 |
| Creditors: | | | | | | | | | 496.60 | 247,970.25 | 499.34 | 793.01 | 353,614.20 | 445.91 |
| Employees & pensions | 21.50 | 18,812.50 | 386.40 | 205,318.00 | 3.45 | 1,025.50 | 64.45 | 17,030.25 | 475.80 | 242,186.25 | 509.01 | 691.50 | 319,832.58 | 462.52 |
| Unsecured | - | - | 0.25 | 97.50 | 15.00 | 4,687.50 | 5.55 | 999.00 | 20.80 | 5,784.00 | 278.08 | 101.51 | 33,781.62 | 332.79 |
| Administration: | | | | | | | | | 208.00 | 102,848.75 | 494.47 | 708.14 | 395,119.11 | 557.97 |
| Take-on | - | - | 1.00 | 490.00 | - | - | | | 1.00 | 490.00 | 490.00 | 1.00 | 490.00 | 490.00 |
| Appointment formalities | 4.00 | 3,500.00 | - | - | 8.00 | 3,337.50 | 5.25 | 945.00 | 17.25 | 7,782.50 | 451.16 | 17.25 | 7,782.50 | 451.16 |
| Case set-up | - | - | 0.20 | 68.00 | 3.70 | 1,378.00 | | | 3.90 | 1,446.00 | 370.77 | 3.90 | 1,446.00 | 370.77 |
| Case management | 1.95 | 1,706.25 | 1.00 | 440.00 | 19.70 | 7,063.00 | 4.40 | 792.00 | 27.05 | 10,001.25 | 369.73 | 93.75 | 60,277.20 | 642.96 |
| Reports to creditors, notices & decisions | 0.50 | 437.50 | 2.45 | 1,073.00 | 7.75 | 2,385.00 | 0.35 | 63.00 | 11.05 | 3,958.50 | 358.24 | 82.63 | 38,466.22 | 465.52 |
| Shareholders / debtor / director communications | - | - | - | - | 1.25 | 375.00 | | | 1.25 | 375.00 | 300.00 | 5.00 | 1,500.00 | 300.00 |
| Statement of affairs | | | | | | | | | | | | 5.00 | 1,500.00 | 300.00 |
| Treasury, billing & funding | - | - | - | - | 17.25 | 3,857.50 | 0.90 | 160.75 | 18.15 | 4,018.25 | 221.39 | 60.40 | 14,255.00 | 236.01 |
| Tax | 13.75 | 10,793.75 | 15.50 | 10,428.50 | 29.10 | 7,288.00 | 1.60 | 368.00 | 59.95 | 28,878.25 | 481.71 | 314.44 | 184,994.06 | 588.33 |
| Pensions | - | - | 68.40 | 46,170.00 | 0.60 | 147.00 | 0.40 | 72.00 | 69.40 | 46,389.00 | 668.43 | 125.78 | 84,898.13 | 675.00 |
| Total | 75.50 | 62,080.00 | 506.30 | 279,494.00 | 107.35 | 32,021.00 | 91.97 | 22,022.25 | 778.72 | 394,102.25 | 506.09 | 1,691.09 | 850,716.00 | 503.06 |

**Notes:**
- Partner includes partners and directors
- Manager includes associate directors and managers
- Executive includes assistant manager and executives
- Total time costs paid to date: £Nil
- Please note that the actual time incurred in the Period may slightly differ to that reported in the table above. This is due to lags between time being recorded on our internal system by staff and then being posted to the case. We do not expect any differences to be material and any such discrepancies will be noted in our next report.

Commercial in confidence

## Statement of expenses and disbursements incurred in the Period

This table provides details of expenses and disbursements incurred in the Period in connection with the work done by the joint administrators, description of which is provided in the 'Fees estimate and work done in the Period' section above.

| Category | Incurred in the Period (£) | Of which paid by the estate as at Period end (£) |
|---|---|---|
| **Category 1 disbursements** | | |
| **None during the Period** | - | - |
| **Category 2 disbursements** | | |
| **None during the Period** | - | |
| **Expenses** | | |
| **Professional fees:** ERA Solutions Limited | 13,520 | - |
| **HR Service Provider:** iiPay Limited | 23,140 | 23,140 |
| **Other payroll deductions:** | | |
| Metlife Europe | 31,950 | 31,950 |
| Aegon SIPP | 321,791 | - |
| **Stationary & postage:** Central Mailing Services Limited | 463 | - |
| **Statutory advertising:** Gazette Direct | 85 | 85 |
| **Total expenses and disbursements** | **390,949** | **55,175** |

Disbursements are expenses met by and reimbursed to an office holder in connection with an insolvency appointment and fall into two categories:

**Category 1 disbursements**

These are also known as 'out of pocket expenses' and are payments to independent third parties where there is specific expenditure directly referable to the insolvent estate; they can be drawn without prior approval and consist of the following categories:

- Travel and subsistence – these costs, which exclude mileage, are incurred by staff in attending trading premises or meetings, for example
- Office costs – these are costs such as postage or courier charges which are incurred in managing the case
- Statutory costs – these are costs such as bonding and advertising relating specifically to the case, which are required by statute

They also include expenses which have been paid using a Grant Thornton Loan, the balance of which (if any) can be seen on the Joint Administrators' R&P.

**Category 2 disbursements**

These are expenses that are directly referable to the insolvent estate but not a payment to an independent third party. They may include shared or allocated costs that may be incurred by an office holder or their firm, and that can be allocated to the appointment on a proper and reasonable basis. Category 2 disbursements require approval in the same manner as an office holder's remuneration.

Commercial in confidence

To the extent that recovery of category 2 disbursements is sought, this will be for mileage only.

Mileage is charged at 45p a mile. VAT is added as appropriate. Details of these costs are also provided in the table above, where incurred.

## Sub-contracted out work

During the Period we have sub-contracted out the following work that could otherwise have been carried out by us or our team:

| Sub-contractor | Work sub-contracted out | Reason(s) for sub-contracting out | Cost incurred (£) |
|---|---|---|---|
| ERA Solutions Limited | • Employment rights advice | • Specialist nature of work | £13,520 |

## Payments to associates

Where we have enlisted the services of others, we have sought to obtain the best value and service. In the interest of transparency, we disclose below services we have sought from within our firm or from a party with whom (to the best of our knowledge) our firm, or an individual within our firm, has a business or personal relationship:

| Service provider | Services enlisted | Cost of service |
|---|---|---|
| Grant Thornton UK LLP | • Tax work/advice (narrative is included within the above narrative of work done)<br>• Pensions work/advice (narrative is included within the above narrative of work done) | • Costs are included within the above SIP9 time cost analysis |

## Relationships requiring disclosure

We confirm that we are not aware of any business or personal relationships with any parties responsible for approving the joint administrators' fee basis, or who provide services to us as joint administrators, which may give rise to a potential conflict.

## Information for creditors and members

Information to help creditors and members to understand their rights in insolvency and regarding officeholders' (ie administrators or liquidators) fees, and the roles and functions of committees is available via Grant Thornton's website:

https://www.grantthornton.co.uk/portal

Alternatively, we will supply this information by post, free of charge, on request.

Appendix F

**Greensill Capital (UK) Limited - In Administration**

**Notice of vote by correspondence**

| | |
|---|---|
| Company name | Greensill Capital (UK) Limited |
| Company number | 08126173 |
| Court name and number | High Court of Justice Business & Property Courts of England & Wales Insolvency & Companies List - 000435 of 2021 |
| Decision date | 14 May 2021 |

NOTICE IS HEREBY GIVEN that under paragraph 51 of Schedule B1 of the Insolvency Act 1986 and rule 3.39 of the Insolvency (England & Wales) Rules 2016, decisions of the creditors are sought as follows:

1   That the Joint Administrators' Proposals be approved

And

2   whether a creditors' committee be formed

To vote a creditor can:

- return the voting form provided with this notice to Chris Laverty at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB

- or send it as an email attachment to cmu@uk.gt.com

A creditor who is entitled to vote may do so no later than 23:59 on the decision date.

For a creditor's vote to be valid a proof of debt must be received no later than the decision date, failing which the creditor's vote will be disregarded. A proof of debt can either be lodged on the portal, delivered to Chris Laverty at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB or as an attachment to an email to cmu@uk.gt.com. A new proof of debt is not required if you have previously submitted one in the proceedings.

A creditor whose debt is treated as a small debt in accordance with rule 14.31(1) of the Insolvency (England and Wales) Rules 2016 must deliver a proof of debt if they wish to vote, unless a proof of debt has previously been submitted, failing which the vote will be disregarded.

A creditor who has opted out from receiving notices may nevertheless vote if a proof of debt is delivered, unless a proof of debt has previously been submitted, failing which the vote will be disregarded.

A vote cast in a decision procedure which is not a meeting may not be changed.

A decision of the convenor is subject to appeal to the court by any creditor in accordance with rule 15.35 of the Insolvency (England and Wales) Rules 2016. An appeal under this rule may not be made later than 21 days after the decision date.

A physical meeting will be held to replace this vote by correspondence if requested not later than five business days after the date of delivery of this notice by not less than one of the following:

- 10% in value of the creditors
- 10% in number of the creditors
- 10 creditors.

DATED THIS 28th day of April 2021

Chris Laverty
Joint Administrator

**VOTING FORM**

Company name                                      Greensill Capital (UK) Limited

Please delete as appropriate if you are for or against the resolutions below.

This form must be received at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB or as an attachment to an email to cmu@uk.gt.com by 23.59 on 14 May 2021 in order to be counted. It must be accompanied by a proof of debt, unless you have previously submitted a proof of debt, failing which your vote will be disregarded.

Resolutions

1   That the Joint Administrators' Proposals be approved                    **For / Against**

2   Do you want a creditors' committee to be formed?                        **Yes / No**

If a creditors' committee is formed I/we
nominate the following creditors to serve as members of such committee:
1
2
3
4
5

A creditor is eligible to be a member of such a committee if, the person has proved for a debt; the debt is not fully secured; and neither of the following apply: the proof has been wholly disallowed for voting purposes, or the proof has been wholly rejected for the purpose of distribution or dividend. No person can be a member as both a creditor and a contributory. A body corporate may be a member of a creditors' committee, but it cannot act otherwise than by a representative appointed under rule 17.17 of the Insolvency (England and Wales) Rules 2016.

TO BE COMPLETED BY CREDITOR WHEN RETURNING FORM:

Name of creditor

Signature

Date (DD/MM/YYYY)

(If signing on behalf of the creditor, state capacity e.g. director/solicitor)

If you require any further details or clarification prior to returning your vote, please contact Jenna Carr at the address above. Please note that once cast, a vote cannot be changed or withdrawn

Office use only:

Date Completed form received
(DD/MM/YYYY)

Initial

2

Commercial in confidence

**Rule 14.4 of the Insolvency (England and Wales) Rules 2016**

**Proof of debt**

Our ref: 157289-100/CML/JXC/RJJ/TXA/gen2002

**Greensill Capital (UK) Limited - In Administration**

| | | |
|---|---|---|
| Date of administration 8 March 2021. | | |
| 1 | Name of creditor<br><br>(If a company please also give company registration number) | |
| 2 | Address of creditor for correspondence: | |
| 3 | Email address: | |
| 4 | Telephone number: | |
| 5 | Total amount of claim, including any Value Added Tax and outstanding uncapitalised interest as at the date of insolvency. | £ |
| 6 | If amount in 5 above includes outstanding uncapitalised interest please state amount | £ |
| 7 | Particulars of how and when debt incurred<br><br>(If you need more space append a continuation sheet to this form). | |
| 8 | Particulars of any security held, the value of the security, and the date it was given. | |
| 9 | Particulars of any reservation of title claimed in respect of goods supplied to which the claim relates. | |
| 10 | Details of any documents by reference to which the debt can be substantiated. | |
| 11 | Signature of creditor or person authorised to act on his behalf | |
| 12 | Name in BLOCK LETTERS | |
| 13 | Position with or in relation to creditor | |
| 14 | Date of signature | |
| 15 | Address of person signing (if different from 2 above) | |

**Greensill Capital Management Company (UK) Limited - In Administration**

**Notice of vote by correspondence**

| | |
|---|---|
| Company name | Greensill Capital Management Company (UK) Limited |
| Company number | 08037769 |
| Court name and number | High Court of Justice Business & Property Courts of England & Wales Insolvency & Companies List 000436 of 2021 |
| Decision date | 14 May 2021 |

NOTICE IS HEREBY GIVEN that under paragraph 51 of schedule B1 to the Insolvency Act 1986 and rules 3.39, 3.52 and 18.18 of the Insolvency (England & Wales) Rules 2016, decisions of the creditors are sought as follows:

1   That the Joint Administrators' proposals be approved

2   The Joint Administrators' pre-administration costs of £115,214, charged or incurred with a view to the company entering administration, be approved as an expense of the administration

3   The basis of the Joint Administrators' remuneration be fixed according to the time properly spent by the Joint Administrators and their staff on the administration, with a fees estimate of £850,716

4   The Joint Administrators be permitted to draw category 2 disbursements for mileage at 45p per mile

And

5   whether a creditors' committee be formed

To vote a creditor can:

- return the voting form provided with this notice to Aamirah M Patel at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB

- or send it as an email attachment to Greensill@uk.gt.com

A creditor who is entitled to vote may do so no later than 23:59 on the decision date.

For a creditor's vote to be valid a proof of debt must be received no later than the decision date, failing which the creditor's vote will be disregarded. A proof of debt can either be lodged on the portal, delivered to Aamirah M Patel at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB or as an attachment to an email to Greensill@uk.gt.com. A new proof of debt is not required if you have previously submitted one in the proceedings. A proof of debt form is enclosed for completion if required.

A creditor whose debt is treated as a small debt in accordance with rule 14.31(1) of the Insolvency (England and Wales) Rules 2016 must deliver a proof of debt if they wish to vote, unless a proof of debt has previously been submitted, failing which the vote will be disregarded.

A creditor who has opted out from receiving notices may nevertheless vote if a proof of debt is delivered, unless a proof of debt has previously been submitted, failing which the vote will be disregarded.

A vote cast in a decision procedure which is not a meeting may not be changed.

A decision of the convenor is subject to appeal to the court by any creditor in accordance with rule 15.35 of the Insolvency (England and Wales) Rules 2016. An appeal under this rule may not be made later than 21 days after the decision date.

A physical meeting will be held to replace this vote by correspondence if requested not later than five business days after the date of delivery of this notice by not less than one of the following:

- 10% in value of the creditors
- 10% in number of the creditors
- 10 creditors.

DATED THIS 28th day of April 2021

_____

Chris Laverty
Joint Administrator

**VOTING FORM**

Company name          Greensill Capital Management Company (UK) Limited

Please delete as appropriate if you are for or against the resolutions below.

This form must be received at Grant Thornton UK LLP, 4 Hardman Square, Spinningfields, Manchester, M3 3EB or as an attachment to an email to Greensill@uk.gt.com by 23.59 on 14 May 2021 in order to be counted. It must be accompanied by a proof of debt, unless you have previously submitted a proof of debt, failing which your vote will be disregarded.

Resolution(s)

1   That the Joint Administrators' proposals be approved                    **For/Against**

2   The Joint Administrators' pre-administration costs of £115,214, charged or incurred with a view to the company entering administration, be approved as an expense of the administration

                                                                           **For/Against**

3   The basis of the Joint Administrators' remuneration be fixed according to the time properly spent by the Joint Administrators and their staff on the administration, with a fees estimate of £850,716

                                                                           **For/Against**

4   The Joint Administrators be permitted to draw category 2 disbursements for mileage at 45p per mile                                                                **For/Against**

5   Do you want a creditors' committee to be formed?                        **Yes/No**

If a creditors' committee is formed I/we
nominate the following creditors to serve as members of such committee:
1
2
3
4
5

A creditor is eligible to be a member of such a committee if, the person has proved for a debt; the debt is not fully secured; and neither of the following apply: the proof has been wholly disallowed for voting purposes, or the proof has been wholly rejected for the purpose of distribution or dividend. No person can be a member as both a creditor and a contributory. A body corporate may be a member of a creditors' committee, but it cannot act otherwise than by a representative appointed under rule 17.17 of the Insolvency (England and Wales) Rules 2016.

TO BE COMPLETED BY CREDITOR WHEN RETURNING FORM:

Name of creditor

Signature _____

Date (DD/MM/YYYY) _____

3

(If signing on behalf of the creditor, state capacity e.g. director/solicitor)

_____

If you require any further details or clarification prior to returning your vote, please contact Aamirah M Patel at the address above. Please note that once cast, a vote cannot be changed or withdrawn

Office use only:

Date Completed form received
(DD/MM/YYYY)                          _____

Initial                                         _____

4

Commercial in confidence

**Rule 14.4 of the Insolvency (England and Wales) Rules 2016**

**Proof of debt**

Our ref: 157403-100/CML/JXC/RJJ/TXA/gen2002

**Greensill Capital Management Company (UK) Limited - In Administration**

| | Date of administration 8 March 2021. | |
|---|---|---|
| 1 | Name of creditor<br><br>(If a company please also give company registration number) | |
| 2 | Address of creditor for correspondence: | |
| 3 | Email address: | |
| 4 | Telephone number: | |
| 5 | Total amount of claim, including any Value Added Tax and outstanding uncapitalised interest as at the date of insolvency. | £ |
| 6 | If amount in 5 above includes outstanding uncapitalised interest please state amount | £ |
| 7 | Particulars of how and when debt incurred<br><br>(If you need more space append a continuation sheet to this form). | |
| 8 | Particulars of any security held, the value of the security, and the date it was given. | |
| 9 | Particulars of any reservation of title claimed in respect of goods supplied to which the claim relates. | |
| 10 | Details of any documents by reference to which the debt can be substantiated. | |
| 11 | Signature of creditor or person authorised to act on his behalf | |
| 12 | Name in BLOCK LETTERS | |
| 13 | Position with or in relation to creditor | |
| 14 | Date of signature | |
| 15 | Address of person signing (if different from 2 above) | |

Commercial in confidence

# G Grant Thornton UK LLP prior professional relationships

### Fundamental principles

In determining whether to accept any appoint as insolvency practitioners, we need to consider all relationships with GCUK where we have had a prior professional relationship in the last three years. In order to be as transparent as possible, we set out below all relevant relationships including those which are significantly older than three years old.

### Historical direct relationships with GCUK

We have previously had the following direct relationships with GCUK both of which are more than three years old:
- Grant Thornton was the appointed auditor of GCUK in 2013. The Firm resigned as auditor in July 2015 and did not undertake the 2014 audit.
- In 2014, the Firm provided VAT and other tax advice to GCUK, with fees of c£90,000. No further engagements have been identified subsequent to this date.

### Previous interactions with GCUK as a lender

Chris Laverty, Trevor O'Sullivan and Helen Dale of the Firm were appointed joint administrators to Caversham Finance Limited ("Caversham") in March 2020.  At the time of the insolvency, GCUK was owed £30.8 million by Caversham.

All amounts owing to GCUK from Caversham were repaid in full in July and August 2020 from asset realisations. There were no further connections between Caversham and GCUK.

The Firm has fully considered all of the above previous engagements and has concluded that they do not give rise to any risks that would compromise any of the Fundamental Principles (Integrity, Objectivity, Professional Competence and Due Care, Confidentiality or Professional Behaviour) or one of the five threats (being Self-interest, Self-review, Advocacy, Familiarity or Intimidation) set out in the Insolvency Practitioners Association Ethics Code for Members.  It is on the basis of this analysis that we have accepted the administration appointments.

### GFG Alliance

The Firm has previously undertaken advisory engagements for certain GFG Alliance companies. Certain GFG Alliance companies are also significant debtors to investors who have acquired notes from GCUK, that are secured on obligations from these companies. These notes are principally held by five investors. GCUK holds c$230 million of GFG related receivables on its own balance sheet, that we will look to realise. Given this position, the Firm undertook a full review of its prior relationships with GFG Alliance companies to consider whether they could compromise any of the threats to independence set out above:

- Self-interest – the Firm ceased all work with GFG Alliance companies in early 2020 and did not pursue further assignments
- Self-review – over the five years from 2016 to early 2020, the work undertaken for GFG Alliance companies principally concerned operational, valuation, planning and financial diligence assignments relating to transactions. The Firm did not provide M&A advice, or assistance on raising either debt or equity, for any GFG Alliance company and there is no risk that we would have to review a decision on lending by GCUK where the Firm had provided debt advisory services to a GFG Alliance company. The Firm has not provided debt structuring advice to any GFG Alliance company, either in relation to funding by GCUK or any other financial institution, including any UK Government Covid related schemes
- Familiarity – whilst individuals within the Firm have historical relationships with GFG Alliance personnel from past engagements performed, the team that will undertake the administration appointments is independent of any relationships the Firm had with GFG Alliance personnel. The Firm has put information barriers in place to ensure that the team dealing with the administration do not have any contact on matters in connection with the administration with those who carried out the historical work, nor do they have access to files or information obtained during that historical work
- Intimidation and Advocacy – we do not consider these to be threats as the Firm ceased working with all GFG Alliance companies in early 2020 and has not sought further engagements

Commercial in confidence

In addition, members of the Grant Thornton International Limited network (which comprises member firms which are all independent from the Firm) provided tax and transaction services to GFG Alliance companies outside the UK.

Grant Thornton France is an auditor (jointly with KPMG) of three related GFG Alliance companies.

The Firm has considered all the circumstances of its prior relationships with GFG Alliance companies and concluded that there are no threats to the Fundamental Principles set out in the Insolvency Practitioners Association Ethics Code for Members arising from these previous relationships with GFG Alliance companies.

Commercial in confidence



© 2021 Grant Thornton UK LLP. All rights reserved.

'Grant Thornton' refers to the brand under which the Grant Thornton member firms provide assurance, tax and advisory services to their clients and/or refers to one or more member firms, as the context requires.

Grant Thornton UK LLP is a member firm of Grant Thornton International Ltd (GTIL). GTIL and the member firms are not a worldwide partnership. GTIL and each member firm is a separate legal entity. Services are delivered by the member firms. GTIL does not provide services to clients. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions.

grantthornton.co.uk