1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re Application of CREDIT SUISSE
VIRTUOSO SICAV-SIF IN RESPECT OF
THE SUB-FUND CREDIT SUISSE (LUX)
SUPPLY CHAIN FINANCE FUND,

              Applicant.

Case No.  21-mc-80308-JCS

**ORDER REGARDING APPLICATION
TO SERVE SUBPOENA AND MOTION
TO VACATE OR QUASH**

Re: Dkt. Nos. 1, 17

## I.      INTRODUCTION

Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Finance Fund ("CSV") filed an ex parte application under 28 U.S.C. § 1782 for permission to issue a subpoena to SB Investment Advisors (US) Inc. ("SBIA-US"), an affiliate of the SoftBank Group, for the purpose of litigation CSV intends to pursue in England against other SoftBank entities.  The Court granted that application without prejudice to SBIA-US moving to quash.  SBIA-US has now filed a motion to vacate that previous order, quash the subpoena, or stay enforcement.  The Court held a hearing on May 20, 2022.

In light of a recent decision by the Ninth Circuit, the Court lacked jurisdiction under 28 U.S.C. § 636(b)(1)(A) to issue the previous order granting CSV's application.  *See CPC Pat. Techs. PTY Ltd. v. Apple, Inc.*, __ F.4th __, No. 21-16212, 2022 WL 1562158 (9th Cir. May 18, 2022).  The parties agreed at the hearing that the Court should vacate that order and address the application anew based on the arguments raised in briefing SBIA-US's motion to vacate and quash.  The previous order is therefore VACATED, and the subpoena served pursuant to that order is no longer valid.  The parties have now consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c), thus authorizing the undersigned magistrate judge to decide the application.

For the reasons discussed below, CSV's application is GRANTED, on the condition that CSV may not serve its proposed subpoena unless and until it obtains leave from the English court to file and serve its claim.

## II.    BACKGROUND

### A.    Factual Overview

#### 1.    Relevant Entities

SBIA-US is a U.S. registered investment advisor that, as is relevant here, provides investment advice to two SoftBank investment funds: SoftBank Vision Fund L.P. ("SVF I") and SoftBank Vision Fund II-2 L.P. ("SVF II," collectively the "SVFs").[1]

Greensill Capital Pty Ltd ("Greensill") is an Australian company that provides supply chain financing.  According to SBIA-US, SFV I invested over $700 million in Greensill in two transactions in 2019, and—as discussed further below—SFV II invested $440 million in Greensill in 2020.  As discussed further below, Greensill is now insolvent.

CSV is a Luxembourg investment fund.  Its particular sub-fund at issue here focused on investing in supply chain finance programs, including through Greensill.

Katerra Inc. was a U.S. business in the construction industry.  Among other things, Katerra developed a platform for producing modular components for the construction of apartment buildings.  SVF I invested around $1.75 billion in Katerra in 2018 and 2019.  As discussed further below, Katerra is now insolvent.

#### 2.    The Underlying Transactions

Greensill and Katerra entered a Receivables Purchase Agreement ("RPA") in 2019 through which Greensill purchased Katerra's accounts receivable—effectively fronting, at a discount,

---

[1] This order somewhat simplifies the events and corporate structures at issue, and should not be construed as a comprehensive description of those events or as resolving any disputed issue of fact.  Here, for example, the full story (at least in SBIA-US's telling) is that SBIA-US provides investment advice to SB Investment Advisors (UK) Limited, which in turn manages SVF I and provides investment advice to SB Global Advisors Limited, which manages SVF II.  While such intricacies might (or might not) be highly relevant to the merits of any substantive litigation in England or elsewhere, they are not particularly relevant to the outcome of the discovery dispute here.  There is no dispute that SBIA-US provided advice related to at least some investments by both SVFs, *see* Mot. at 3; O'Connor Decl. ¶ 8, and there is at least some evidence that it was involve with the SVFs' dealings with Katerra and Greensill.

United States District Court
Northern District of California

money that Katerra expected to receive from its buyers, with the expectation that Greensill would make a profit when the buyers paid their bills. Greensill in turn, through a special purpose vehicle called Hoffman s.à.r.l., securitized the rights to funds from those accounts receivable into notes purchased by CSV. The SVFs were aware that CSV held notes for Katerra's accounts receivable. By early 2020, CSV had invested around $440 million in such notes. By later that year, Katerra was in severe financial distress. CSV periodically agreed to roll over notes that were about to come due for notes that were due at a later date, ultimately holding notes due in March and May of 2021.

To alleviate Katerra's inability to pay its debts, Greensill agreed in 2020 to cancel its rights to Katerra's accounts receivable (and related liens on Katerra assets) in exchange for equity in Katerra. Greensill in turn transferred that equity to SVF II. CSV asserts that is not aware of any consideration having been provided by SVF II in return for that equity, while SBIA-US offers a declaration that SVF II paid Greensill $440 million for it, with the intention that those funds would be used to buy back the notes from CSV. (The various transactions during this period involved a number of Softbank and Greensill corporate entities and shifting goals as to what Greensill might be able to collect from Katerra, leading to the parties' present dispute as to whether the $440 million was actually provided as consideration for the Katerra equity.) According to SBIA-US, Greensill improperly transferred some of the $440 million to a German affiliate that was under investigation by German authorities and otherwise used all of those funds for its own purposes. In any event, Greensill never bought back the notes from CSV, and CSV was left holding notes that had become worthless when Greensill canceled its rights under the RPA to Katerra's accounts receivable.

As a result of restructuring, the SVFs owned substantially all of Katerra by the end of 2020. Some Greensill subsidiaries became insolvent in March of 2021 and Greensill itself declared insolvency in June of that year. Of particular note, a Greensill entity in the United Kingdom, Greensill Limited ("GL"), entered UK liquidation proceedings on July 30, 2021. The notes that CSV held defaulted when they were due in March and May of 2021. Katerra and its affiliates filed Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the Southern

District of Texas in June of 2021.[2]

In the spring of 2021, Katerra sought assurance from SoftBank that Katerra's $440 million obligations under the RPA had been paid off, with Katerra representatives ultimately meeting with SoftBank's CEO Masayoshi Son. Katerra's independent directors conducted an investigation as to whether Katerra had any claims against SoftBank, which involved a production of over 2,000 documents by SoftBank to Katerra.

### 3.    GL's Claims in the Texas Bankruptcy Proceedings

GL, through its joint liquidators appointed for its UK liquidation, filed proofs of claim as to six potential claims in Katerra's Texas bankruptcy proceedings, including a claim under section 423 of England's Insolvency Act. East Decl. (dkt. 17-2) Ex. 21. GL sought to lift the automatic stay in order to pursue a transaction-at-undervalue claim under section 238 of the English Insolvency Act against Katerra in England, arguing that the equity GL received in return for extinguishing its claims under the RPA was grossly undervalued and that GL (as opposed to other Greensill entities) never obtained any consideration for then transferring that equity to SoftBank. *See* East Decl. Ex. 27 at 8:1–11:20. One of GL's liquidators testified in the Texas proceedings that "in essence . . . Credit Suisse" (he was not sure of "the correct legal title of the entity") was funding the liquidation efforts, although it was not providing any direction as to how those efforts should occur. *Id.* at 30:3–21. On October 4, 2021, the bankruptcy court declined to lift the automatic stay. *Id.* at 96:17–97:12. GL ultimately withdrew all of its claims in the bankruptcy case, stipulating in an order adopted by the bankruptcy court on January 28, 2022 not to pursue those claims in any jurisdiction. East Decl. Ex. 34.

### 4.    Anticipated English Litigation

CSV's counsel sent SoftBank a letter on October 7, 2021 indicating it was considering litigation against various SoftBank entities including SBIA-US, with potential claims including "[r]emedies available to [CSV] as the victim of the transactions pursuant to section 423 of the Insolvency Act 1986 (or equivalents)." 1st Golding Decl. (dkt. 1-1) Ex. 2. CSV and SoftBank

---

[2] *In re Katerra Inc.*, No. 21-31861 (DRJ) (Bankr. S.D. Tex.).

United States District Court
Northern District of California

1    exchanged correspondence over the following months, and there was some dispute as to whether

2    CSV's letters satisfied England's procedural requirements for communication before commencing

3    litigation.[3]  On February 10, 2022, CSV sent SoftBank a "letter before action" ("LBF") setting

4    forth the basis for its claim under section 423 against six SoftBank entities, with SBIA-US not

5    included among them.  East Decl. Ex. 44.  English procedure calls for the recipient of such a letter

6    to provide a response within a reasonable time, the duration of which is dependent on the

7    circumstances of the case, and SoftBank confirmed that it would do so.  2d Golding Decl. (dkt.

8    20-1) ¶ 10; East Decl. Ex. 45.  CSV requested a response by April 8, 2022 and had not received a

9    response as of its March 21, 2022 opposition brief in this case.  2d Golding Decl. ¶ 11.  According

10   to CSV, it would be "inappropriate" to initiate a lawsuit in England before either receiving such a

11   response or the expiration of a reasonable time for such a response.  *Id.* ¶ 10.  At the hearing,

12   counsel for CSV represented that SoftBank responded to the letter still disputing the sufficiency of

13   CSV's pre-suit communications, and that CSV hopes to be able to resolve such issues and begin

14   litigation within a matter of months.

15        CSV does not intend to name SBIA-US as a defendant to its section 423 claim.  1st

16   Golding Decl. ¶ 84; 2d Golding Decl. ¶ 9.  CSV intends to join GL as a "necessary formality," but

17   not to seek any "substantive relief" from GL.  1st Golding Decl. ¶ 70.

18        Section 423 is, generally speaking, a fraudulent conveyance statute.  If a debtor entered a

19   transaction at an "undervalue" (i.e., the consideration it provided significantly exceeded the value

20   of the consideration it received), for the purpose of placing assets beyond the reach of a potential

21   creditor (or otherwise prejudicing a potential creditor), a court may enter an order as appropriate to

22   restore the status quo as if the transaction had not occurred and to protect the interests of victims.

23   *See* Hacker Decl. (dkt. 17-50) ¶ 65; Gloster Decl. (dkt. 20-10) ¶ 58.  In some but not all

24   circumstances, a series of related transactions may be treated as a "transaction" for the purpose of

25   the statute.  Gloster Decl. ¶ 64; Hacker Decl. ¶¶ 67–72.

26

27   _____

     [3] After that initial exchange of letters, CSV filed its present application on December 23, 2021,
28   and the Court granted it on January 4, 2022, without prejudice to SBIA-US bringing a motion to
     quash.

United States District Court
Northern District of California

For CSV to bring a claim under section 423, it must first seek leave of court in England to file such a claim (which is required where the debtor is in formal insolvency proceedings and the plaintiff is a victim of the transaction rather than the liquidator or similar administrator of the insolvent debtor), and must also seek leave of court to serve it on the defendants outside of the jurisdiction.  *See* 1st Golding Decl. ¶¶ 71–72; Blair Decl. (dkt. 17-52) ¶ 24–25; Hacker Decl. ¶¶ 64, 72.  CSV and its expert in English law believe such leave will likely be granted.  *See* Gloster Decl. ¶ 18(1)–(2).  SBIA-US and its expert in English insolvency law believe it likely will not.  *See* Hacker Decl. ¶ 9(a)–(b).

SBIA-US's expert suggests that the documents CSV seeks here would speak only to the SoftBank entities' state of mind, and offers an opinion that such of evidence would be relevant only to the English court's determination of an appropriate remedy, not to the elements of the section 423 claim or to CSV's ability to obtain leave to pursue such a claim.  Hacker Decl. ¶¶ 155–63.  CSV's expert offers an opinion that the documents requested in CSV's subpoena "might likely to be of varying utility" in pleading the proposed claim and obtaining leave to file and serve it, and that they are "clearly likely to be of substantial utility" in proving CSV's case at trial.  Gloster Decl. ¶ 18(3).

All of the experts in this case are highly accomplished English litigators, and neither party questions any expert's qualifications.

### B. Subpoena and Arguments

CSV seeks to serve a subpoena requiring SBIA-US to produce the following documents:

> 1. For each Katerra Board Meeting that took place during the Requested Time Period, all Katerra Board Materials that concern or relate in any way to the Katerra Restructuring.[4]

---

[4] SBIA-US's then–managing partner Jeffrey Housenbold served on Katerra's board of directors, lending credence to CSV's view that SBIA-US might have relevant documents from Katerra's board.  CSV is separately seeking documents from Katerra in the District of Arizona, where the court granted its application under § 1782 in late April of this year.  *See In re Credit Suisse Virtuoso SICAV-SIF in Respect of Sub-Fund Credit Suisse (Lux) Supply Chain Fin. Fund*, No. MC-21-00051-PHX-DWL, 2022 WL 1265919 (D. Ariz. Apr. 28, 2022).

2. All Documents consisting of or reflecting communications You engaged in concerning the Security Release Agreement, the CEA, or the Share Disposal Agreement.[5]

3. All Documents consisting of or reflecting communications You engaged in concerning whether or how the Katerra Restructuring—or any specific transaction that was a part of the Katerra Restructuring, including but not limited to the Security Release Agreement, the CEA, or the Share Disposal Agreement—would, could, or did affect Petitioner, Credit Suisse, and/or any investors in Petitioner or any sub-fund thereof.

[CSV is no longer pursuing request number 4.]

5. Documents concerning the consideration, if any, provided to Katerra by Greensill, Softbank, or any other entity in connection with the CEA.

6. Documents concerning the consideration, if any, provided to Greensill by Softbank or any other entity in connection with the Share Disposal Agreement.

7. All Documents consisting of or reflecting communications You engaged in between March 1, 2021 and May 31, 2021 concerning Katerra's requests to confirm that the Katerra RPA had been terminated and that Katerra did not owe any amounts thereunder to Greensill, including but not limited to all Documents consisting of or reflecting communications You engaged in internally or with other Softbank entities or personnel concerning whether and, if so, how, to respond to Katerra's requests for confirmation.

8. Without limitation as to time period, all Documents that You produced to Katerra in connection with the Katerra Softbank Investigation.

Application (dkt. 1) Ex. 1 at 6–7.  Except for the final request, the subpoena generally covers a time period from September 1, 2020 to May 31, 2021.  *Id.* at 6.  The Court granted CSV's application to serve the subpoena on January 4, 2022.  Dkt. 6.

Moving to vacate the Court's previous order, SBIA-US argues that CSV has not satisfied § 1782's mandatory requirements because it has neither filed its anticipated English lawsuit nor shown a reasonable probability that it will be permitted to either file the claim or serve it on the anticipated defendants, Mot. (dkt. 17) at 11–16, and because the subpoena is an improper "fishing expedition" for potential claims CSV has not yet discovered, as evidenced in part by the fact that

---

[5] The Security Release Agreement refers to a December 1, 2020 agreement between Greensill and Katerra.  The CEA refers to a December 30, 2020 agreement between Greensill and Katerra.  The Share Disposal Agreement refers to a December 30, 2020 agreement between Greensill and SVF II.

United States District Court
Northern District of California

the documents it seeks would not be relevant to the English case except as to remedies, *id.* at 16–18. CSV contends that it has taken concrete steps towards filing its lawsuit in accordance with English pre-litigation procedures, and the case is therefore within "reasonable contemplation" as required for an application under § 1782. Opp'n (dkt. 20) at 6–8. CSV argues that while it is likely to succeed in obtaining leave to proceed from the English court, this Court should not delve into the merits of its potential claim. *Id.* at 8–11. Addressing SBIA-US's "fishing expedition arguments," CSV asserts that the stage at which it the documents would be relevant is not a reason to deny its application, nor is the possibility that the evidence it obtains might support other potential claims. *Id.* at 11–13.

Turning to relevant discretionary factors, SBIA-US contends that it might still be named as a defendant to CSV's English claim (which would weigh against allowing discovery under § 1782), and regardless, CSV can obtain the documents at issue from the parties it has stated it intends to sue. Mot. at 18–20. CSV asserts that it will not name SBIA-US as a defendant, it is not clear whether all of the documents at issue will be available from the defendants it intends to name through English discovery, and that § 1782 does require an applicant to exhaust avenues for foreign discovery before seeking relief under the statute. Opp'n at 13–17.

SBIA-US contends that the lack of any currently-filed claim also weighs against granting the application based on the discretionary factors of the nature of foreign proceedings and circumvention of foreign policy. Mot. at 20–22. CSV argues that those factors favor granting its application because English courts are receptive to evidence obtained under § 1782, no English law or policy prevents CSV from seeking these documents under U.S. procedures, and § 1782 does not require documents to be discoverable under foreign law or the discovery phase of a foreign case to have begun. Opp'n at 17–20.

SBIA-US argues that CSV's subpoena is overly burdensome because CSV "acknowledges that it does not need the requested documents to *commence* its" English lawsuit, documents could be obtained from the anticipated defendants to the case, and CSV's specific requests overbroad in certain respects. Mot. at 22–23. For the same reasons, SBIA-US argues that even if the order granting the application is not vacated, the subpoena should be quashed under Rule 45 of the

1    Federal Rules of Civil Procedure.  *Id.* at 24.  In the alternative, SBIA-US seeks a stay of any

2    obligation to respond until CSV "obtains the necessary leave to commence proceedings in

3    England and attempts to procure the requested documents through the English discovery process."

4    *Id.* at 24–25.  CSV contends that its requests are reasonable, SBIA-US did not raise any issues of

5    scope to attempt to resolve such disputes before bringing its motion, and a stay would be

6    unwarranted and inefficient.  Opp'n at 21–25.

7    **III.    DISCUSSION**

8        **A.    Legal Standard**

9        Section 1782 provides, in relevant part:

10   > The district court of the district in which a person resides or is found
11   > may order him to give his testimony or statement or to produce a
     > document or other thing for use in a proceeding in a foreign or
     > international tribunal . . . .  The order may be made . . . upon the
12   > application of any interested person . . . .

13   28 U.S.C. § 1782(a).  Section 1782 permits district courts to authorize discovery where the

14   following requirements are met: "(1) the person from whom the discovery is sought 'resides or is

15   found' in the district of the district court where the application is made; (2) the discovery is 'for

16   use in a proceeding in a foreign or international tribunal'; and (3) the application is made by a

17   foreign or international tribunal or 'any interested person.'"  *Khrapunov v. Prosyankin*, 931 F.3d

18   922, 925 (9th Cir. 2019) (citations omitted).

19       A litigant in a foreign action qualifies as an "interested person" under § 1782.  *See Intel*

20   *Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).  Further, § 1782 does not

21   require that a formal proceeding in the foreign jurisdiction is currently pending, or even imminent;

22   rather, a court may permit discovery under Section 1782 so long as a "dispositive ruling" by the

23   foreign adjudicative body is "within reasonable contemplation."  *In re Hoteles City Express,* No.

24   18-mc-80112-JSC, 2018 WL 3417551, at *2 (N.D. Cal. July 13, 2018) (quoting *Intel*, 542 U.S. at

25   256).

26       Even if the basic requirements of § 1782 are satisfied, however, a district court has wide

27   discretion in deciding whether to permit discovery under § 1782.  *Intel*, 542 U.S. at 260–61.  In

28   exercising its discretion, a district court should consider the following factors: (1) whether the

*United States District Court*
*Northern District of California*

9

"person from whom discovery is sought is a participant in the foreign proceeding," (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance," (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 264–65.

"A district court's discretion is to be exercised in view of the twin aims of § 1782: providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *In re Nat'l Ct. Admin. of the Republic of Korea*, No. C15-80069 MISC LB, 2015 WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015) (citing *Schmitz v. Bernstein Libehard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004)).  The party seeking discovery need not establish that the information sought would be discoverable under the foreign court's law or that the United States would permit the discovery in an analogous domestic proceeding.  *See Intel*, 542 U.S. at 247, 261–63.

### B.   Mandatory Requirements

There is no dispute in this case that SBIA-US (which has an office in San Carlos) is found in this district, that CSV's intended English lawsuit would be a foreign proceeding within the scope of § 1782 if it occurs, or that CSV would be an "interested person" in that case.  With respect to the statute's mandatory requirements, the parties dispute whether CSV is reasonably likely to be granted leave to file and serve its claim (implicating both the "foreign proceeding" and "for use in" requirements), and whether CSV's subpoena is an improper fishing expedition for other potential claims (implicating whether the documents are truly "for use in" the foreign proceedings currently contemplated).

After briefing on SBIA-US's motion had concluded, the Second Circuit addressed a somewhat similar fact pattern in *IJK Palm LLC v. Anholt Services USA, Inc.*, __ F.4th __, No. 20-3963, 2022 WL 1435270 (2d Cir. May 6, 2022).  The applicant in that case (IJK) had invested in a fund (PIP) that in turn invested in a palm oil company (UOL).  2022 WL 1435270, at *2. When UOL experienced financial trouble and defaulted on its debt, it issued new shares to its

debtholders at a low price, diluting the stake that IJK, through PIP, held in the company.  *Id.*  In IJK's view, the decision to do so was improperly influenced by UOL board members who owned significant amounts of the company's debt.  *Id.*  A magistrate judge granted IJK's application under § 1782 to serve subpoenas for documents relevant to a derivative suit that IJK intended to file.  *Id.* at *3.  Several targets of the subpoenas moved to intervene and vacate the order, arguing that because UOL had entered Cayman Islands liquidation proceedings, "only the court-appointed liquidator could pursue derivative claims on behalf of UOL" and "IJK could no longer assert that the requested discovery was 'for use' in a derivative suit on UOL's behalf."  *Id.*  The magistrate judge recommended against vacating the order, holding that IJK could obtain permission from a Cayman Islands court to bring its claim if the liquidator was unwilling to do so, and the district court overruled objections to that recommendation, adding that even if IJK could not bring a derivative suit itself, the potential to persuade the liquidator to pursue claims rendered IJK an "interested person," and IJK could also bring a derivative suit itself against PIP.  *Id.* at *3–4.

The Second Circuit reversed, holding that the potential for IJK to provide documents to the liquidator did not establish that the documents were "for use" in any "foreign proceeding," nor would IJK be an "interested person" in whatever proceeding the liquidator might initiate, and IJK had not taken sufficient steps to show that it was contemplating bringing an action against PIP.  *Id.* at *5–6, *8.  Addressing the theory closest to the CSV's position here, the Second Circuit held that while IJK would be an "interested person" to a double-derivative suit it might assert itself on behalf of PIP against UOL, IJK failed to show that such a case was "within reasonable contemplation" because it did not provide sufficient evidence to evaluate either whether the liquidator would refuse to bring a case or, if so, whether the Cayman Islands court would approve IJK's apparently novel double-derivative lawsuit in the absence of a suit by the liquidator.  *Id.* at *7.  The court concluded that "if a movant's ability to initiate a proceeding depends on some intervening event or decision, it must provide an objective basis on which to conclude that the event will occur or the requisite decision will be favorable," and that an appropriately "limited foray into foreign law to assess the procedural mechanism by which a movant may inject the discovery it seeks into foreign proceedings" revealed "a series of procedural hurdles under

1    Cayman law" that IJK had not shown it could overcome.  *Id.* at *7–8.

2         Here, CSV has not asserted any desire to provide documents to a third party (rather than

3    the English court) or argued that such use could be sufficient, nor has it suggested that it might

4    bring some other claim (like IJK's theoretical claim against PIP).  SBIA-US has not argued that

5    there is any possibility of GL's liquidators themselves bringing claims against the SoftBank

6    entities.  Accordingly, the question under the framework of *IJK Palm* is whether CSV has

7    "provide[d] an objective basis on which to conclude," *see id.* at *7, that the English court will

8    grant it leave to file its claim and serve it on the SoftBank defendants outside of England.

9         Unlike in the case before the Second Circuit, CSV has provided such a basis here.  Its

10    expert on English law—a retired English appellate judge and current international arbitrator—

11    offers a reasoned opinion as to why the English court will likely grant such leave.  Gloster Decl.

12    ¶¶ 54–169.  It is difficult to imagine any other method by which an applicant could meet its burden

13    to show that it would clear this sort of procedural hurdle.  Of course, the record also contains

14    competing evidence in the form of SBIA-US's expert's opinion that leave would likely be denied.

15    Hacker Decl. ¶¶ 82–154.  It would seem that reasonable minds could differ on this issue of English

16    law.  Resolving that conflict goes well beyond the sort of "limited foray" contemplated by *IJK*

17    *Palm*, and is not necessary to determine that CSV has met its burden.  *See Euromepa S.A. v. R.*

18    *Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) (finding "a battle-by-affidavit of international

19    legal experts" to conclusively resolve issues of foreign law inappropriate under § 1782).  The case

20    on which *IJK Palm* relied for the rule that an applicant ""provide sufficiently reliable indications

21    of the likelihood that proceedings will be instituted within a reasonable time" framed that test as

22    part of an inquiry towards whether foreign proceedings were "more than merely speculative."

23    *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 101 (2d Cir. 2020); *see IJK Palm*, 2022 WL

24    1435270, at *8 (quoting *Mangouras*).  Under § 1782, CSV need only show that the foreign case

25    for which it intends to use these documents is "within reasonable contemplation."  *Intel*, 542 U.S.

26    at 259.  Its evidence is sufficient to meet that standard, even if successfully obtaining leave to

27    pursue its claim is not fully assured.

28         SBIA-US also argues that CSV's potential use of documents for other claims, as well as its

United States District Court
Northern District of California

United States District Court
Northern District of California

1    failure to actually commence litigation in England before bringing this application and its

2    apparently lack of need for these documents to do so, renders its request a prohibited "fishing

3    expedition." Mot. at 17.  Some courts have addressed this concern in the context of whether a

4    dispositive ruling in the foreign proceeding is reasonably contemplated.  *E.g.*, *In re Certain Funds,*

5    *Accts., &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, No. 14 CIV. 1801

6    NRB, 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014), *aff'd sub nom. Certain Funds, Accts.*

7    *&/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015).  It might also bear on whether

8    the documents are actually intended for use in such a proceeding.  The Ninth Circuit has indicated

9    that at least in the usual case, however, the potential for an improper fishing expedition is best

10   considered as a matter of the district court's discretion, after the court has determined that an

11   application meets the statutory requirements.  *See In re Premises Located at 840 140th Ave. NE*,

12   634 F.3d 557, 563 (9th Cir. 2011) (identifying a case considering whether a request was a fishing

13   expedition as an example of the "wide range of potentially applicable factors to consider in

14   making that discretionary determination").  And although the Second Circuit affirmed the denial

15   of the application in *Certain Funds* because it found that foreign proceedings were not within

16   reasonable contemplation, it disapproved of the district court's treatment of doubt as to the

17   purpose for which the documents were sought as a matter of the statutory requirements rather than

18   a factor to consider in exercising its discretion.  *Certain Funds*, 798 F.3d at 124 n.14.[6]

19         If CSV made no showing that it intends to use the documents it seeks for the purpose of its

20   anticipated section 423 claim, it would not meet the statutory prerequisite that evidence be "for use

21   in" a reasonably contemplated foreign proceeding.  *See*  28 U.S.C. § 1782(a).  Under such

22   circumstances, CSV's true purpose might instead be the sort of improper fishing for potential

23   undiscovered claims that courts have disapproved, but any such concern would be ancillary to the

24   more glaring issue that CSV did not meet the basic requirements of the statute.  Here, however,

25   CSV has offered expert opinion evidence that at least most of the documents it seeks are relevant

---

27   [6] The Second Circuit also noted that the district court should not have focused on whether a
     "dispositive ruling"—as distinct from commencement of litigation—was reasonably
28   contemplated, holding that to be "a distinction without a difference" for the purpose of § 1782.
     *Certain Funds*, 798 F.3d at 124 n.14.

1    to the merits of its claim, Gloster Decl. ¶¶ 170–84,[7] and SBIA-US's expert does not take the

2    position that they are irrelevant to the claim, but instead that they pertain only to questions of a

3    remedy that would arise later in the case, Hacker Decl. ¶¶ 155–63.  CSV has met its burden as to

4    this element.

5            Because CSV's application satisfies the requirements of the statute, the Court turns to

6    whether granting relief is an appropriate exercise of discretion.

7        **C.    Discretionary Factors**

8            **1.    Parties to Foreign Proceedings**

9            The first discretionary factor identified by the Supreme Court in *Intel* considers whether

10   applications for discovery seek discovery from participants in the foreign proceeding.  *Intel*, 542

11   U.S. at 247.  "[W]hen the person from whom discovery is sought is a participant in the foreign

12   proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when

13   evidence is sought from a nonparticipant in the matter arising abroad," because "[n]onparticipants

14   in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their

15   evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel*, 542

16   U.S. at 264; *see also In re Varian Med. Sys. Int'l AG*, No. 16-mc-80048-MEJ, 2016 WL 1161568,

17   at *3 (N.D. Cal. Mar. 24, 2016) ("[T]he key issue is whether the material is obtainable through the

18   foreign proceeding." (citation omitted)).  As such, the first discretionary factor favors discovery

19   against nonparticipants in foreign proceedings.  *Cf. In re Varian Med. Sys.*, 2016 WL 1161568, at

20   *4 (finding that the first *Intel* factor weighs heavily against seeking discovery from participants in

21   foreign tribunals).

22           SBIA-US contends that this factor weighs against CSV's application because CSV might

23   still name SBIA-US as a defendant in its English lawsuit, and even if it does not, the relevant

24   documents at issue would be available from the other SoftBank entities it intends to sue both

25

26   _____

     [7] CSV's expert does not specifically assert the relevance of CSV's seventh and eighth requests,
     instead averring that they "may or may not materially assist [CSV] to plead its case, or meet any
27   threshold test," with that "point best left to legal submission on the scope and nature of [the
     documents sought] against each element of a claim under section 423."  Gloster Decl. ¶¶ 185–86.
28   She also does not address the relevance of the fourth request, which CSV has declined to pursue.
     *Id.* ¶ 183.

United States District Court
Northern District of California

because those entities would be expected to have these documents in their own right and because they could obtain them on request from SBIA-US.  Mot. at 18–20.  SBIA-US submits a declaration by Aidan O'Connor, its chief compliance officer (among other roles), stating that "[t]o the extent any of the documents requested in the Subpoena are in the possession, custody or control of SBIA US, they are all documents that SBIA US would provide to SBIA UK (and through SBIA UK, to the [SVFs]) upon request (either as a matter of custom and practice, or under the relevant contractual arrangements in place)."  O'Connor Decl. (dkt. 17-49) ¶ 11.  SBIA-US's own expert on this issue of English law, however, states that whether and English court would consider such documents to be within the control of the SoftBank entities CSV intends to name as defendants would depend on whether the contracts at issue are enforceable and a fact-dependent inquiry into the nature of the parties' customs and practices.  Blair Decl. ¶¶ 54–69.

SBIA-US is not currently anticipated to be a defendant in CSV's English lawsuit, and while many of the documents at issue might well be available from the other SoftBank defendants (either in their own possession, or by virtue of control they exercise over SBIA-US's documents), that does not appear to be assured, and could require litigation in England over questions of control.

At the hearing, counsel for SBIA-US made for the first time the following representation, as authorized by SBIA-US:

> If a U.K. case is permitted to go forward, and if SBIA (US) is not a party, SBIA (US) will transfer all of its documents relating to this matter to the SoftBank entities that are named as parties. To be clear, this is a commitment to Your Honor, to this court, and is not a submission to the jurisdiction of the English courts by any SoftBank entity.
>
> . . .
>
> . . . And without any review -- it will be a simple thing for SBIA (US) to do. They will just send everything.

Hr'g Tr. (dkt. 33) at 21:1–21.

The Court holds SBIA-US to that representation, which may be relevant to whether particular document requests are unduly burdensome in light of the availability of documents in England.  But SBIA-US's agreement to transfer documents does not fully resolve the issue.

1   Reasonable minds might disagree as to the scope of "all of its documents relating to this matter,"

2   and if later discovery in England uncovered gaps in what CSV expected to receive, the parties and

3   courts both here and in England could face complex questions of whether such gaps arose from

4   foreign SoftBank entities' decisions as to what to produce, SBIA-US's decisions as to what to

5   transfer to its affiliates, or the fact that the documents simply did not exist.  While the Court

6   appreciates SBIA-US's efforts to find a creative resolution of this dispute, its willingness to

7   transfer documents does not fully equate to SBIA-US being a "party" to the foreign litigation.

8       Taking into account § 1782's purpose of efficiency, this factor tends to favor granting

9   CSV's application, albeit not as strongly as it might if CSV had *no* avenue to obtain the materials

10  at issue through its foreign lawsuit.

### 2.     Receptivity of the Foreign Tribunal

12      *Intel*'s second discretionary factor "focuses on whether the foreign tribunal is willing to

13  consider the information sought." *In re Varian Med. Sys.*, 2016 WL 1161568, at *4. Where there

14  is no evidence suggesting that foreign courts would be unreceptive to the requested discovery, the

15  second discretionary factor weighs in favor of the application. *See In re Med. Corp. H&S*, No. 19-

16  mc-80107-SVK, 2019 WL 2299953, at *3 (N.D. Cal. May 30, 2019) (holding that the second

17  factor weighs in favor of an application when there is an absence of evidence that a foreign

18  tribunal is unreceptive to this type of discovery or the information sought).

19      SBIA-US argues that this factor weighs against CSV's application because there is

20  currently no foreign proceeding underway in which evidence could be received.  Mot. at 20–21

21  (citing *HT S.R.L. v. Velasco*, 125 F. Supp. 3d 211, 223 (D.D.C. 2015); *Norex Petroleum Ltd. v.

22  Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 54 (D.D.C. 2005); *In re King.com Ltd.*, No. 16-

23  mc-80070-JCS, 2016 WL 4364286, at *8 (N.D. Cal. Aug. 16, 2016)).  That approach, focusing on

24  the stage of the proceedings, is not consistent with the usual practice of this district, where this

25  factor generally turns on the manner in which foreign courts view this sort of assistance from the

26  United States.  *See, e.g.*, *Med. Corp. H&S*, 2019 WL 2299953, at *3.  This Court's decision in

27  *King.com* addressed the unusual circumstance of a foreign court having stayed proceedings,

28  affirmatively indicating that discovery should not proceed during that time.  *See* 2016 WL

16

United States District Court
Northern District of California

4364286, at *2, *8.  Extending that principle to weigh against discovery in any case not yet commenced would undermine *Intel*'s rejection of a lower court's view "that § 1782 comes into play only when adjudicative proceedings are 'pending' or 'imminent,'" and its holding instead that the foreign proceeding need only "be within reasonable contemplation."  *Intel*, 542 U.S. at 259.

The District of Columbia decisions SBIA-US cites do not change this Court's view.  The magistrate judge in *Velasco* held that bringing an application early rather than late in the foreign proceedings favored granting it, 125 F. Supp. 3d at 223–24, and in adopting the relevant portion of the magistrate judge's ruling (while setting aside unrelated portions), the district court rejected the respondent's argument that applicant should not be allowed to seek discovery in the United States before it was permitted to do so in Italy, *HT S.R.L. v. Velasco*, No. MC 15-664 (RBW), 2015 WL 13759884, at *3 (D.D.C. Nov. 13, 2015).  *Norex Petroleum* somewhat more clearly supports SBIA-US's position, but provides little reasoning to support its view that discovery should not be permitted under § 1782 before it is available in a foreign proceeding, and does not address the tension between that view and *Intel*'s holding that the statute applies even before a foreign proceeding is commenced.

CSV offers at least some evidence and caselaw to support its view that English courts are generally receptive to evidence obtained in the United States under § 1782.  *See, e.g.*, 2d Golding Decl. ¶ 21 & Exs. 7–8.  SBIA-US does not dispute that point.  The Court finds that no other aspect of the nature of the English court or the character of the anticipated English proceedings weighs against CSV's application.  *See Intel*, 542 U.S. at 264.

### 3.   Circumvention of Policy

The third factor in *Intel* considers whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  Where there is a "perception that an applicant has side-stepped less-than-favorable discovery rules by resorting immediately to § 1782" this factor may weigh against the application.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C07-5944-SC, 2013 WL 183944, at *3 (N.D. Cal. Jan. 17, 2013).  But absence of evidence of attempted circumvention weighs in favor of an application.  *See, e.g.*, *In re Google, Inc.*, No. 14-mc-80333-DMR, 2014 WL

1  7146994, at *2 (N.D. Cal. Dec. 15, 2014); *In re Eurasian Nat. Res. Corp. Ltd.*, No. 18-mc-80041-

2  LB, 2018 WL 1557167, at *3 (N.D. Cal. Mar. 30, 2018); *In re Honda*, No. 21-mc-80167-VKD,

3  2021 WL 3173210, at *4 (N.D. Cal. July 27, 2021).

4         SBIA-US argues that the timing of CSV's application—before it has filed its English

5  lawsuit and would be entitled to discovery in that forum—weighs against granting the application

6  under this factor as well.

7         "The fact that more evidence may be obtained via a § 1782 application than via the foreign

8  discovery procedures does not amount to circumvention and does not militate against approval of

9  the application." *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-WHO

10  (TSH), 2020 WL 820327, at *5 (N.D. Cal. Feb. 19, 2020).

> That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means. '[P]roof-gathering restrictions' are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information.

15  *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015).  Here, SBIA-US asserts only the lack of

16  any English procedure to obtain documents at this time, not any privilege-like rule, privacy

17  protection, or similar *prohibition* on their discovery.

18         To the extent other district courts have reached contrary conclusions at this factor, this

19  Court respectfully disagrees that the mere unavailability of the discovery at issue under foreign

20  law weighs against granting an application under § 1782.  Many of the cases SBIA-US cites rested

21  on a conclusion that the documents at issue were in the possession of entities subject to the

22  jurisdiction of the foreign court—a consideration this Court views as better addressed in the

23  context of the first factor, on which those decisions also relied more heavily.  *See, e.g.*, *Banoka v.*

24  *Westmont Int'l Dev. Inc.*, No. 21-20434, 2022 WL 480118, at *3 (S.D. Tex. Feb. 10, 2022), *aff'd*

25  *sub nom. Bissonnet v. Westmont Int'l Dev., Inc.*, No. 21-20434, 2022 WL 636680 (5th Cir. Mar. 4,

26  2022); *Saint-Gobain Adfors S.A.S. v. 3M Co.*, No. 0:20-mc-00052-MJD-KMM, 2020 WL 6111632

27  (D. Minn. Oct. 16, 2020).

28         As noted above, the "perception that an applicant has 'side-stepped' less-than-favorable

United States District Court
Northern District of California

discovery rules by resorting immediately to § 1782 can be a factor in a court's analysis." *Cathode Ray Tube*, 2013 WL 183944, at *3 (quoting *In re Application of Caratube Int'l Oil Co., LLP*, 730 F.Supp.2d 101, 107–08 (D.D.C. 2010)). But merely bringing an application before discovery has opened abroad, for documents that might well be outside the jurisdiction of the foreign court or require contested litigation to resolve that question, does not give rise to such a perception.

This factor weighs in favor of granting the application. Regardless, because the Court holds below in the context of undue burden that the application should not be granted unless and until CSV obtains the necessary leave from the English court to file and serve its claims, SBIA-US's concerns about pre-suit discovery will likely be moot in the event that CSV files a renewed application after such leave is granted.

### 4. Undue Burden

*Intel*'s fourth and final factor considers whether the requested discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. Requests are unduly burdensome when they are "not narrowly tailored, request confidential information and appear to be a broad 'fishing expedition' for irrelevant information." *In re Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016). The "proper scope" of requests under section 1782 is "generally determined by the Federal Rules of Civil Procedure." *In re Varian Med. Sys.*, 2016 WL 1161568, at *5. Parties "may obtain discovery that is relevant to any parties claim or defense," Fed. R. Civ. P. 26(b)(1), but "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 246.

Here, SBIA-US's concerns about the stage of the proceedings and the hurdles that CSV must clear to file and serve its claim carry weight. As discussed above, the parties have offered opinions from qualified experts in English law disagreeing as to whether an English court is likely to grant SBIA-US leave to file a section 423 claim that GL's liquidators have not pursued, and whether the court is likely to grant SBIA-US leave to serve the claim on the SoftBank entities it intends to sue, all of which are located outside of England. While CSV has shown a reasonable probability that the claim will proceed, as is needed to meet § 1782's mandatory requirement of a foreign proceeding reasonably contemplated, SBIA-US has also shown a reasonable probability that the claim will *not* proceed. Under the circumstances of this case, it would be an undue burden

1    to require SBIA-US to engage in the costly effort of gathering, reviewing, and producing

2    documents for litigation that might well be nipped in the bud by the foreign court before any

3    defendant is served.  To do so when CSV has shown no prejudice that would result from waiting

4    for the English court's threshold decisions on leave to file and serve, which that court will

5    presumably address in the near future, would not serve § 1782's purpose of efficiency.

6              There might well be circumstances where it would be appropriate to allow a plaintiff to

7    pursue discovery under § 1782 before obtaining necessary pre-filing review from a foreign court.

8    If CSV had shown risk that documents would be lost in the interim, a need for the discovery in

9    order to make the necessary showing for leave to file and serve, or that some substantive stage of

10   the case was likely to arise before documents could be obtained from a later subpoena, the

11   outcome might differ.  Delay might also be unwarranted if SBIA-US had offered no evidence to

12   rebut CSV's expert opinion that the English court would likely grant leave to proceed.  Nor should

13   this decision be taken as suggesting that the possibility of any early motion or ruling disposing of a

14   yet-to-be-filed case should be a barrier to discovery under § 1782.  As it stands, however, the

15   parties agree that the English court must and will make a threshold decision of whether to grant

16   CSV leave to file and serve before CSV may proceed with its case, that decision appears likely to

17   occur in the near future, there is reason to question whether the English court will grant such

18   leave, and CSV has shown no harm that would result from awaiting that decision and—if the case

19   proceeds—allowing a subpoena under §1782 here to go forward in parallel with the English

20   discovery process.[8]

21             Without reaching the question of whether SBIA-US's concern regarding CSV improperly

22   fishing for undiscovered claims would itself be sufficient to deny the application, the approach of

23   waiting until the English court determines whether CSV can proceed on its section 423 claim

24

25   _____

26   [8] If the English case proceeds, the Court will not require CSV to exhaust efforts to obtain the
     documents it seeks through English discovery before renewing its application here.  Such an
     approach could cause inefficient litigation of the scope of the various SoftBank entities' discovery
27   obligations under English law and the power of the English court to order production of SBIA-
     US's documents, as well as unnecessary delay in CSV only being able to seek relevant documents
28   here after regular discovery in England has concluded—potentially requiring a stay of the English
     proceedings or preventing CSV from using documents it received too late to prove its case.

United States District Court
Northern District of California

1    tends to mitigate that issue as well.  If the English court grants CSV leave to proceed, CSV has

2    made a sufficient showing that at least much of the evidence it seeks is relevant to that claim.

3    While CSV could perhaps uncover grounds for additional claims against SBIA-US or other

4    SoftBank entities from the same evidence, such is the nature of any discovery.  On the other hand,

5    if the English court does not grant CSV leave to file and serve its section 423 claim, CSV will not

6    be able to use § 1782 for the sort of fishing expedition that courts have cautioned against.  *See,*

7    *e.g.*, *In re Pioneer Corp.*, No. CV 18-4524 JAK (SSX), 2018 WL 4963126, at *5 (C.D. Cal. Aug.

8    27, 2018) (citing *Premises*, 634 F.3d at 563).

9         SBIA-US's remaining concerns regarding the scope of particular requests and the relevant

10   time period are the sort of discovery disputes this Court expects parties to resolve through good

11   faith negotiation.  They are not grounds to deny the application in its entirety, much less before the

12   parties have attempted to negotiate its scope.

13        As a matter of discretion, the Court finds that the requiring SBIA-US to produce

14   documents before CSV has obtained leave from the English court to file and serve its section 423

15   claim would be an undue burden.  But in the interest of efficiency, rather than either denying the

16   application without prejudice to refiling or allowing CSV to serve its subpoena now but staying

17   compliance pending an uncertain outcome in England, the Court GRANTS the application *on the*

18   *condition* that CSV may serve a subpoena on SDIA-US *only* if and after the English court grants

19   CSV leave to file and serve its claim.  In that event, CSV may serve a subpoena no broader than

20   Exhibit 1 to its application—the subpoena actually served should, for example, omit the fourth

21   request that CSV is no longer pursuing, and may be further narrowed if CSV determines that the

22   arguments presented here, circumstances of the case, or any subsequent compromise by the parties

23   so warrants.

24   **IV.    CONCLUSION**

25        The Court's previous order granting CSV's application is VACATED for lack of

26   jurisdiction, and SBIA-US need not respond to the previously served subpoena.  With the Court's

27   jurisdiction now established under 28 U.S.C. § 636(c), CSV's application is CONDITIONALLY

28   GRANTED on the terms discussed above.  The parties are further ordered to meet and confer by

United States District Court
Northern District of California

videoconference forthwith regarding the scope of the subpoena, so that any production may proceed expeditiously if and when CSV is permitted to file suit in the UK.  Moreover, based on counsel's representations to the Court, SBIA-US is ORDERED to "transfer all of its documents relating to this matter to the SoftBank entities that are named as parties" if the English court permits CSV to proceed against other SoftBank entities and SBIA-US is not named as a party to that case.  *See* Hr'g Tr. at 21:1–4.

A status conference regarding the status of the foreign proceeding and the result of the parties' efforts to agree on a scope for the subpoena if it can be served under this order will occur on August 19, 2022 at 2:00 PM.  The parties shall file a joint status conference statement one week in advance.

**IT IS SO ORDERED.**

Dated: June 1, 2022

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

22